**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Mawson Infrastructure Group, Inc., | Case No. 24-12726 (MFW) |
| Alleged Debtor. | |
| Mawson Infrastructure Group, Inc., | |
| Plaintiff, | Adv. Pro. No. 25-50008 (MFW) |
| v. | |
| Celsius Network Ltd., Celsius Mining LLC, and Ionic Digital Mining LLC, | |
| Defendants. | |

**OPPOSITION OF CELSIUS NETWORK LTD. AND CELSIUS MINING LLC
TO THE ALLEGED DEBTOR'S EMERGENCY MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
<u>EXTENDING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 105</u>**

Celsius Network Limited ("**Celsius**") and Celsius Mining LLC ("**Celsius Mining**" and, together with Celsius, the "**Celsius Parties**"), acting by and through the Blockchain Recovery Investment Consortium LLC, in its capacity as Complex Asset Recovery Manager and Litigation Administrator for Celsius Network LLC and its affiliated Post-Effective Date Debtors (the "**ARM Administrator**"), hereby oppose (the "**Opposition**") the *Emergency Motion for Temporary Restraining Order and Preliminary Injunction Extending the Automatic Stay Pursuant to 11 U.S.C. § 105* (the "**TRO Motion**") filed by alleged debtor Mawson Infrastructure Group, Inc. ("**Mawson**"), which seeks an order

extending the automatic stay in Mawson's involuntary chapter 11 case (the "**Involuntary Case**") to the continued prosecution of an arbitration against its non-debtor subsidiaries Luna Squares LLC ("**Luna**") and Cosmos Infrastructure LLC ("**Cosmos**" and, together with Mawson and Luna, the "**Mawson Parties**").[1]  In support of the Opposition, the Celsius Parties respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The TRO Motion seeks to extend a stay that Mawson contends is unjustified and never should have existed.    In the *Alleged Debtor's Answer to Involuntary Petition* [Docket # 16] (the "**Answer**"), Mawson "insists that the petition was filed in bad faith with the improper purpose to harass and intimidate Mawson."  Answer, ¶ 1.  Mawson describes the involuntary petition as "an extension of ongoing disputes with Mawson's former Board Director and Chief Executive Officer, James Manning."  *Id.*  Mawson further declares that the Involuntary Case "must be dismissed both procedurally and substantively as a bad faith filing."  *Id.*, ¶ 8.  Mawson asserts multiple affirmative defenses, including that "the relief sought in this proposed chapter 11 case is barred by the doctrine of laches, waiver, and estoppel."  *Id.*, ¶ 50.  Not least of all, Mawson reserves the right to seek costs, attorneys' fees, damages and sanctions against the petitioning creditors.  *Id.*, ¶¶ 51-53.

2.      Mawson's demand for a dismissal of the involuntary petition and its objection to the proposed chapter 11 case are fatal to the TRO Motion.[2]  In light of these

---

[1]      The Celsius Parties note that Mawson filed the adversary complaint, the TRO Motion and a supporting declaration under seal.  The Celsius Parties' are not aware of any basis for sealing those pleadings or any response thereto.  Accordingly, the Celsius Parties are not seeking to seal the Opposition or the Declaration of Keith H. Wofford in support of the Opposition (the "**Wofford Declaration**").

[2]      Mawson's opposition to the Involuntary Case is incompatible with any effort to enforce the automatic stay, much less to extend it.  The TRO Motion is also inconsistent with Mawson's prior contention that arbitration of all disputes between the Celsius Parties and the Mawson Parties was mandatory.  Further,

positions, Mawson simply cannot satisfy the legal standards for a temporary restraining order or preliminary injunction. The governing case law on the extension of the automatic stay requires that the Court apply the preliminary injunction test in light of the reorganizational purposes of chapter 11. For example, courts assess the likelihood of success on the merits based on the likelihood that the debtor will successfully reorganize and assess irreparable harm based on harm to the debtor's reorganization. The Answer clearly demonstrates that Mawson has no reorganizational purpose or plans. Mawson's Answer seeks to depart the jurisdiction of this Court and to face its creditors in the field, without the protection of the automatic stay. Mawson has not – and cannot – satisfy any of the required elements for a temporary restraining order or a preliminary injunction.

3.     Further, the motives behind the TRO Motion are dubious. The TRO Motion is a last-ditch effort by Mawson to evade the consequences of an arbitration that it compelled the Celsius Parties to undertake. Most immediately, Mawson wishes to forestall an impending ruling on the Celsius's (now fully briefed) dispositive motion to enforce a promissory note issued by non-debtor Luna in consideration for a secured loan in the original principal amount of $20 million (the "**Promissory Note**"). When the petitioning creditors commenced the Involuntary Case, Celsius was preparing to submit a dispositive motion in the arbitration for final awards on both the Promissory Note and a related guaranty issued by Mawson (the "**Guaranty**"). Prior to the filing of the Involuntary Case, the arbitrator jointly nominated by the parties (the "**Arbitrator**") had authorized the filing of that dispositive motion based on his determination in accordance with the applicable

---

the TRO Motion wastes judicial resources and undermines arbitration's promise of efficiency. Accordingly, the Celsius Parties reserve the right to file and prosecute a motion to lift or modify the stay, whether or not the Court enters a temporary restraining order or preliminary injunction.

arbitration rules (and over Mawson's objection) that Celsius had a likelihood of success on the merits of those claims.  At a scheduling conference convened after the commencement of the Involuntary Case, the Arbitrator deferred all dispositive motions involving Mawson, but ruled that Celsius's dispositive motion against Luna on the Promissory Note should go forward as scheduled, given Luna's non-debtor status.  More than three weeks after that ruling, on January 10, 2025, the Mawson Parties requested a stay of all activity in the arbitration, including briefing on the Promissory Note claim against non-debtor Luna.  The Arbitrator declined.  The Mawson Parties promptly renewed their request for a stay, and the Arbitrator again declined.  In the face of an impending adverse decision in its chosen forum, Mawson has rushed to this Court with a hypocritical and futile request to extend the automatic stay.[3]

4.      For these reasons, and for the other reasons set forth below, Mawson's request for a temporary restraining order and preliminary injunction prohibiting further prosecution of the arbitration against non-debtors Luna and Cosmos is without merit, and this Court should promptly enter an order denying the TRO Motion.

## BACKGROUND

### A.      The Promissory Note and the Guaranty

5.      On February 23, 2022, Luna executed the Promissory Note in favor of Celsius Mining, evidencing a loan to Luna of $20 million.  On the same day, Celsius Mining assigned the Promissory Note to Celsius, which acceded to the rights of the Holder

---

[3]      Briefing in the Arbitration has continued in accordance with the Arbitrator's ruling.  Luna filed its opposition to Celsius's Rule 34 Dispositive Motion on January 20, 2025, and Celsius submitted its reply earlier today.

of the Promissory Note.  Interest on the Promissory Note accrued at a rate of 12%, and the Promissory Note specified terms for the quarterly payment of interest and amortization. The entire outstanding principal balance, together with accrued and unpaid interest, was due on August 23, 2023 (the "**Maturity Date**").

6.      Contemporaneously with Luna's issuance of the Promissory Note, Mawson, Luna and Cosmos entered into a Guaranty and Security Agreement, governed on its terms by New York law, pursuant to which Mawson undertook the Guaranty of Luna's obligations under the Promissory Note and Luna and Cosmos (but not Mawson) each pledged certain assets as security for the Promissory Note.

7.      Also on February 23, 2022, Luna (but not Mawson or Cosmos) entered into a Co-Location Agreement with Celsius Mining (the "**Co-Location Agreement**"), governed on its terms by Delaware law, pursuant to which Luna agreed to provide hosting capacity and services for Celsius Mining's cryptocurrency mining rigs.  Pursuant to the chapter 11 plan of reorganization of Celsius, Celsius Mining and their affiliated debtors (the "**Celsius Plan**"), most of Celsius Mining's remaining mining-related assets (including claims under the Co-Location Agreement) became property of Ionic Digital Mining LLC ("**Ionic**"), which is also a defendant in this adversary proceeding.[4]

8.      Luna never disputed the obligations under the Promissory Note, and Mawson never disputed its obligations under the Guaranty, until after the Maturity Date. To the contrary, Luna timely paid interest and amortization through the end of the first fiscal quarter of 2023, notwithstanding that Celsius, Celsius Mining and certain of their

---

[4]      Ionic is an entity formed in accordance with the Celsius Plan to effectuate the reorganization of certain assets of Celsius Mining.

affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on July 13, 2022.    Interest and amortization payments for the second fiscal quarter of 2023 were tendered late, on July 18, 2023.  *See* Mawson Infrastructure Group, Inc. Form 10-Q dated May 15, 2023, a copy of which is attached as <u>Exhibit A</u> to the Wofford Declaration, and Mawson Infrastructure Group, Inc. Form 10-Q dated August 21, 2023, a copy of which is attached as <u>Exhibit B</u> to the Wofford Declaration.  Luna defaulted on the Luna Note by failing to pay principal and accrued interest in the amount of $8,144,000 on the Maturity Date.  In a recent form 10-Q filed with the Securities Exchange Commission, Mawson and Luna admit that Luna has "not fulfilled specific payment obligations related to the Celsius Promissory Note."  It also admits that the Luna Note "had a maturity date of August 23, 2023" and that "the outstanding balance including interest is $9.38 million as of September 30, 2024, all of which is classified as a current liability."  *See* Mawson Infrastructure Group, Inc. 10-Q dated November 14, 2024, a copy of which is attached as <u>Exhibit C</u> to the Wofford Declaration.

**B.      The Arbitration**

9.      Mawson's description of the background of Celsius's claims and the path to the pending proceedings before the Arbitrator is, at best, incomplete.  Celsius and Celsius Mining initially sought redress for their claims under the Promissory Note, the Guaranty and Security Agreement, and the Co-Location Agreement through an adversary proceeding filed in the United States Bankruptcy Court for the Southern District of New York (the

"Celsius Bankruptcy Court") in November 2023 (the "**Mawson Adversary Proceeding**").[5]

10.     The Mawson Parties, undoubtedly aware of the prompt disposition of the Promissory Note and Guaranty that could occur in court,[6] moved to compel arbitration of the Celsius Parties' claims (the "**Motion to Compel**").   In the memorandum of law supporting the Motion to Compel, a copy of which is attached as <u>Exhibit D</u> to the Wofford Declaration, the Mawson Parties argued that arbitration of the disputes under all three agreements was mandatory, emphasizing both the "'liberal federal policy favoring arbitration'" and the requirement for courts to "'rigorously enforce'" arbitration clauses. *See* Motion to Compel at 9-10. The Celsius Bankruptcy Court granted Mawson's motion to compel arbitration only in part, holding that claims under the Co-Location Agreement (which had an express arbitration clause) were subject to arbitration, while claims related to the Promissory Note and Guaranty (which had no arbitration clause) were not.  On appeal by Mawson, the United States District Court for the Southern District of New York vacated the Celsius Bankruptcy Court's order on April 24, 2024, holding that all of Celsius's claims must be sent to arbitration, including claims relating to the Promissory Note and Guaranty, if only to address the threshold question of the arbitrability.  Ultimately, Celsius consented to the arbitration of the Promissory Note and Guaranty claims to avoid further delay in collecting the outstanding balance it was owed.

---

[5]     Ionic was not a party to that adversary proceeding because it did not obtain its interest in the Co-Location Agreement until January 31, 2024.

[6]     Under New York law, pursuant to CPLR 3213, the holder of an instrument for the payment of money may seek an accelerated determination by filing a motion for summary judgment in lieu of a complaint.  New York law also holds that parol evidence is not admissible in the face of a clearly drafted instrument, such as the Promissory Note and the Guaranty.

11.     Celsius, Celsius Mining and Ionic jointly commenced the arbitration against the Mawson Parties on July 12, 2024.[7]   The arbitration is being administered by the International Centre for Dispute Resolution of the American Arbitration Association ("**AAA**") under Case No. 1-24-0006-4462 (the "**Arbitration**") under the AAA's Commercial Arbitration Rules, including the Procedures for Large, Complex Commercial Disputes (the "**Commercial Rules**").   In their arbitration demand, the Celsius Parties and Ionic sought awards for breach of the Promissory Note, the Guaranty and Security Agreement and the Co-Location Agreement, as well as for certain related claims.

12.     On November 15, 2024, in accordance with a procedural and scheduling order approved by the Arbitrator, Celsius submitted a request to file a Commercial Rule 34 dispositive motion on its claims under the Promissory Note and the Guaranty (the "**Rule 34 Request**").   On November 20, 2024, the Mawson Parties filed an opposition to the Rule 34 Request, and Celsius duly submitted a reply to the opposition on November 22, 2024. Pursuant to Commercial Rule 34, a copy of which is attached as <u>Exhibit E</u> to the Wofford Declaration, the Arbitrator is only permitted to authorize the filing of dispositive motions and to rule on such motions if "the moving party has shown that the motion is likely to succeed."   The Arbitrator granted Celsius's Rule 34 Request on November 23, 2024 and set a deadline of December 4, 2024 for Celsius to file its dispositive motion (the "**Rule 34 Dispositive Motion**") on the Promissory Note claim and the Guaranty claim.

---

[7]     In the two and a half months between the District Court's decision on Mawson's appeal and the commencement of the arbitration, the ARM Administrator and other representatives of the Post-Effective Date Celsius debtors were engaged in the preparation and filing of thousands of lawsuits in advance of the July 15, 2024 statutory deadline under sections 108(a)(2) and 546(a)(1)(A) of the Bankruptcy Code, including the demand for the arbitration and an amended adversary complaint against the Mawson Parties.

13.    On the morning of December 4, 2024, Celsius learned that an involuntary petition had been filed in this Court against Mawson.  Celsius promptly notified the Arbitrator of the involuntary petition and requested a nine-day extension of time to file its Rule 34 Dispositive Motion, so that it could assess the impact of the involuntary case on the arbitration proceedings.[8]  The Arbitrator responded by setting a scheduling conference for December 17, 2024 to hear the parties' positions on that issue (the "**Scheduling Conference**").

14.    At the Scheduling Conference, the parties presented their positions to the Arbitrator, and the Arbitrator ruled that: (i) in light of the stay in the Involuntary Case, the Rule 34 dispositive motions would be deferred with respect to Celsius's claim against Mawson on the Guaranty and Ionic's request for dismissal of counterclaims jointly asserted by Mawson, Luna and Cosmos against Ionic; (ii) Celsius's Rule 34 Dispositive Motion could go forward imminently against non-debtor Luna; and (iii) the parties should meet and confer regarding the modification of the arbitration schedule to accommodate the limited, reasonable delays arising from Mawson's involuntary bankruptcy filing with the aim of preserving a hearing date at the end of September 2025.[9]

15.    Mawson's bankruptcy counsel did not appear at the meet and confer held on December 16, 2024 in advance of the Scheduling Conference (despite being expressly invited by counsel for Celsius) or at the Scheduling Conference itself.  At no time in the three and a half weeks after the Scheduling Conference did Mawson assert that the

---

[8]    Mawson had just appointed new arbitration counsel that same day, and Mawson's newly selected counsel was evidently unaware of the involuntary filing made hours before it sent introductory emails to the Arbitrator and counsel for Celsius and Ionic.

[9]    A copy of the Arbitrator's ruling on matters considered at the Scheduling Conference is attached as Exhibit F to the Wofford Declaration.

automatic stay prevented, or should be extended to prevent, the Rule 34 Dispositive Motion against Luna from going forward.

16.     On January 10, 2025, Mawson filed its Answer, in which it objected to the involuntary petition, alleged bad faith of the petitioning creditors and argued for immediate dismissal of the Involuntary Case.

17.     At 10:45 p.m. that Friday evening, Mawson's bankruptcy counsel sent a letter to the Arbitrator and Celsius, which for the first time asserted that the Rule 34 Dispositive Motion against Luna was incompatible with the automatic stay in Mawson's involuntary case and requested that the Arbitrator reverse its prior ruling and impose a complete stay of the arbitration proceedings.[10]  Celsius opposed the request by letter dated January 13, 2025, and the Arbitrator rejected Mawson's request for a stay of Celsius's Rule 34 Dispositive Motion against Luna.[11]  Mawson repeated its request for a stay by letter dated January 13, 2025, and the Arbitrator also rejected this renewed request.[12]

18.     In response to the Arbitrator's ruling, Mawson filed the instant adversary proceeding and the TRO Motion on January 17, 2025.

19.     On January 20, 2025, Luna filed its opposition to Celsius's Rule 34 Dispositive Motion.  On January 21, 2025, Celsius filed its reply, and briefing on the Rule 34 Dispositive Motion against Luna is now complete.

---

[10]     A copy of the letter from Mawson's counsel to the Arbitrator is attached as Exhibit G to the Wofford Declaration.

[11]     A copy of Celsius's opposition is attached as Exhibit H to the Wofford Declaration, and a copy of the Arbitrator's ruling is attached as Exhibit I to the Wofford Declaration.

[12]     A copy of Mawson's second request for a stay is attached as Exhibit J to the Wofford Declaration, and a copy of the Arbitrator's ruling is attached as Exhibit K to the Wofford Declaration.

## ARGUMENT

20.    It is black-letter law that the automatic stay does not apply to non-debtors such as Luna and Cosmos. *See, e.g.*, *In re Forever 21, Inc.*, 623 B.R. 53, 63 (Bankr. D. Del. 2020) ("The automatic stay only protects debtors, not non-debtor parties") (citing *Brown v. Jevic*, 575 F.3d 322, 328 (3d Cir. 2009); *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997)). Binding authority holds that this fundamental principle applies to a debtor's non-debtor subsidiaries. As the Third Circuit Court of Appeals explained in *Maritime Elec. Co. v. United Jersey Bank,* 959 F.2d 1194 (3d Cir. 1991), "formal distinctions between debtor-affiliated entities are maintained when applying the stay. A proceeding against a non-bankrupt corporation is not automatically stayed by the bankruptcy of its principal, and section 362 does not bar an action against the principal of a debtor-corporation." *Id.* at 1205 (citations omitted). To extend the extend the injunctive force of the automatic stay to non-debtors, a party must (i) satisfy the legal requirements for preliminary injunctive relief and (ii) demonstrate that "unusual circumstances" justify a departure from the foundational rule that the automatic stay is only available to debtors.

A.    **Mawson Has Not Satisfied – and Cannot Satisfy – the Legal Standards for a Temporary Restraining Order or Preliminary Injunctive Relief.**

21.    "[C]ourts generally apply the traditional preliminary injunction test when deciding whether to issue an injunction pursuant to section 105(a)." *In re Forever 21, Inc.* 563 B.R. 53, 64 (Bankr. D. Del. 2020). In other words, a debtor seeking to obtain an injunction "extending" the automatic stay must show a "'substantial likelihood of success on the merits, irreparable harm to the movant, harm to the movant outweighs harm to the nonmovant, and injunctive relief would not violate the public interest.'" *Id.* Courts

generally look to the same factors when determining whether to issue a temporary restraining order, but this Court has, in at least one case, elevated the standard for likelihood of success to a "'strong probability of success on the merits.'" *See, In re Advanced Marketing Svcs., Inc.*, 360 B.R. 421, 426 (Bankr. D. Del. 2007) (quoting *Philips Petroleum Co. v. U.S. Steel Corp.*, 616 F.Supp. 335, 337 (D. Del. 1985). As this Court has observed, any order extending the automatic stay "must be consistent with the purpose of the stay itself, that is, to 'suspend actions that pose a serious threat to a corporate debtor's reorganization efforts.'" *In re Uni-Marts, LLC*, 405 B.R. 113, 127 (Bankr. D. Del. 2009) (citing *Ochs v. Lipson (In re First Cent. Fin. Corp.)*, 238 B.R. 9, 18 (Bankr. E.D.N.Y. 1999)).

22.    First, Mawson has not shown – and cannot show –that it has a strong probability of success on the merits.   The "likelihood of success under the first prong is interpreted by bankruptcy courts as the equivalent of ***the debtor's ability to successfully reorganize***." *In re Philadelphia Newspapers, LLC*, 423 B.R. 98, 106 (E.D. Pa. 2010) (emphasis added).   Mawson is in this Court involuntarily, and by the admissions and arguments in its Answer, Mawson has demonstrated that it has no reorganizational purpose and has not made any reorganizational efforts.   Thus, the relief Mawson seeks would require that the Court assume both the validity of the chapter 11 case and Mawson's intent to reorganize in chapter 11.   Mawson cannot be found to have a "strong probability of success" with a non-existent reorganization in a case that Mawson itself says is a product of bad faith.

23.    Even if this Court were to ignore the reorganizational framework for extending the automatic stay – and it should not – Mawson also cannot demonstrate that

Luna has a strong probability of success on the merits in the Rule 34 Dispositive Motion. Commercial Rule 34(a) provides that the Arbitrator "may allow the filing of and make rulings upon a dispositive motion *only if* the arbitrator determines the moving party has shown that the motion is likely to succeed and to dispose of narrow issues in the case" (emphasis added). Thus, when the Arbitrator considered Celsius's request for to file a dispositive motion on the Promissory Note claim, it necessarily determined that Celsius was likely to succeed. This determination by the Arbitrator in Mawson's chosen forum precludes any argument that Luna has a strong probability of success on the merits.

24.     Second, Mawson has failed to demonstrate any harm – much less any irreparable harm – that will come from the resolution of the Rule 34 Dispositive Motion and the continuation of the Arbitration against its non-debtor subsidiaries. Again, Courts view the irreparable harm prong through the lens of a debtor's reorganizational efforts. They assess whether the continuation of a legal action will harm the debtor's reorganization, for example, by diverting management resources or delaying the reorganization. *See, e.g., In re Continental Airlines, Inc.*, 177 B.R. 475, 481n.6 (D. Del. 1993); *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 617 (Bankr. E.D. Pa. 2009). Mawson's absolute lack of any reorganizational purpose in the Involuntary Case precludes it from demonstrating any irreparable harm that would support an extension of the automatic stay. Outside of the reorganizational context, Mawson's argument that the continuation of the Arbitration constitutes irreparable harm lacks all credibility. Mawson forced the dispute into arbitration precisely to avoid a determination of liability under the Promissory Note and Guaranty in the courts.

25.     Third, the balance of harms clearly weighs in favor of the Celsius Parties. As post-effective date debtors established by the Celsius Plan, the Celsius Parties represent the interests of thousands of creditors – many of them retail investors who lost substantial sums and who have been waiting eagerly to receive distributions on their claims.   The Celsius Parties are pursuing the claims in the Arbitration for the benefit of these creditors. The Mawson Parties have repeatedly hindered and delayed the Celsius Parties' efforts to collect on the Promissory Note and the Guaranty, and now nearly eighteen months have passed since the Maturity Date.   The costs of further delay in the arbitration will be borne by the Celsius Parties' creditors and that delay will only aggravate the substantial losses they have suffered.   In contrast, Mawson will suffer no legally cognizable harm from a continuation of the Arbitration, given that the relief it seeks – the dismissal of the Involuntary Case – would achieve that very result.

26.     Fourth, granting the TRO Motion to suspend the Arbitration would violate the public interest.   Here, again, the reorganizational framework for extending the automatic stay is paramount.   "In the context of bankruptcy proceedings, the 'public interest' element means 'the promoting of a successful reorganization.'" *In re American Film Techs., Inc.* 175 B.R. 847, 849 (Bankr. D. Del. 1994) (quoting *Gathering Restr., Inc. v. First National Bank of Valparaiso (In re Gathering Restr., Inc.)*, 79 B.R. 992, 999 (Bankr. N.D. Ind. 1986)).   Extending the stay here would not promote any reorganization and therefore would not be in the public interest.   Further, allowing Mawson to exploit the jurisdiction of this Court to escape the consequences of an arbitration it compelled the Celsius Parties to pursue would undermine the liberal federal policy favoring arbitration and the judicial policy of rigorously enforcing arbitration clauses.   This would also be

contrary to the public interest.  Finally, entangling this Court in a pending arbitration that Mawson demanded (and continues to seek the benefit of), would be a waste of judicial resources.

**B.    Mawson Has Failed to Demonstrate the Existence of "Unusual Circumstances" that Would Justify Extension of the Automatic Stay.**

27.    Mawson's failure to satisfy any prong of the test for a temporary restraining order or preliminary injunction is fatal to the TRO Motion, and the Court should deny the TRO Motion solely on those grounds.  Nevertheless, the TRO Motion also fails, separately and independently, because Mawson has not demonstrated that "unusual circumstances" justify extending the automatic stay.

28.    The Third Circuit has acknowledged the power of courts to extend the automatic stay to non-debtor co-defendants in "unusual circumstances."  *McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 510 (3d Cir. 1997).  One such unusual circumstance arises when "stay protection is essential to the debtor's efforts of reorganization." *Id.* (citations omitted).  No such circumstance exists here, because Mawson is not currently pursuing – and has no intention of pursuing – a reorganization in chapter 11.  Mawson contends that that policy behind the automatic stay justifies an extension of the stay to its non-debtor subsidiaries notwithstanding its lack of a reorganizational purpose.  This position does not square with either the facts or the law. Celsius is not "gaining a preference" for its claims in the Arbitration beyond any preference that it already has: Celsius is a structurally senior secured creditor at non-debtors Luna and Cosmos, and, thus, already has priority over all claims at Mawson with respect to those subsidiaries.  Further, Courts have made clear that the automatic stay does not prohibit

claims against a non-debtor subsidiary, even if that claim could have an adverse impact on the stock of the subsidiary. *See, e.g.*, *Kreisler v. Goldberg*, 478 F.3d 209, 215 (4th Cir. 2007) (holding that the automatic stay did not prevent a landlord from pursuing an ejectment action against the debtor's wholly-owned non-debtor subsidiary); *In re Winer*, 158 B.R. 736, 743 (Bankr. N.D. Ill. 1993) (noting that "the debtor cannot invoke the automatic stay just because the action against the non-debtor subsidiary will impact on the value of the debtor's stock").

29.     Relying the Fourth Circuit's decision in *A.H. Robins v. Piccinin*, the Third Circuit and courts elsewhere have also found "unusual circumstances" where "'there is such an identity between the debtor and the third-party defendant that a judgment against the defendant will in effect be a judgment or finding against the debtor.'" *Id.* (quoting *A.H. Robins v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986).

30.     Taken on its face, the oft-quoted phrase from the *A.H. Robins* case about identity of interests would suggest that the "unusual circumstances" exception could swallow the "universally acknowledged" rule that "an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors or others with a similar legal or factual nexus" to the debtor. *McCartney*, 106 F.3d at 509-10 (quoting *Maritime*, 959 F.2d at 1205) (citations omitted). However, shortly after the *A.H. Robins* decision, the Fourth Circuit clarified that the mere existence of a contractual guaranty relationship was not sufficient to establish "unusual circumstances" warranting extension of the automatic stay. In *Credit Alliance Corp. v. Williams*, 851 F.2d 119 (4th Cir. 1988), the Fourth Circuit addressed an appeal lodged by the guarantor of a promissory note, who argued that the default judgment against him was rendered void by the

16

borrower's bankruptcy petition.  The Fourth Circuit held that "[t]here is nothing 'unusual' about this guaranty agreement that would permit the guarantor . . . to invoke the statutory protection of § 362 or that would permit us to stay enforcement of the New York judgment against him on equitable grounds. . . .  [N]either Penn Hook [the debtor] nor its estate is jeopardized by the judgment against Williams.   The purpose of the guaranty would be frustrated by interpreting § 362 so as to stay [the Lender's] action against the non-bankrupt guarantor when the defaulting debtor petitioned for bankruptcy."  *Id.* at 121-22.

31.    Other courts have affirmed the basic principle that the existence of a guaranty or indemnity agreement between a debtor and a non-debtor is not sufficient to create "unusual circumstances."  *See, e.g., In re Brier Creek Corp. Ctr. Assocs. Ltd.*, 486 B.R. 681, 690 (Bankr. E.D.N.C. 2013) (holding that "a suit against a debtor's guarantor does not in and of itself constitute "unusual circumstances" and that  "other circumstances" must be present to bring the guarantor within the scope of the exception); *Chicago Title Ins. Co. v. Lerner*, 435 B.R. 732, 736-37 (S.D. Fla. 2010) (holding that there was no adverse effect on a debtor by the enforcement of a non-debtor guaranty, when "enforcing the guaranty would only replace one creditor with another"); *In re Veeco Inv. Co., L.P.*, 157 B.R. 452, 454 (Bankr. W.D. Mo. 1993) (holding that the "unusual circumstances" exception does not apply to a non-debtor surety whose obligations are independent and primary and not derivative of those of the debtor); *Algemene Bank Nederland, N.V. v. Hallwood Indus. Inc.*, 133 B.R. 176, 180 (Bankr. W.D. Pa. 1991) (holding that the existence of an indemnity agreement alone did not create the identity of interest necessary to extend the stay).  Further, at least one bankruptcy court has held that the "unusual circumstances" exception simply does not apply where, as here, the guarantor is the debtor,

and the creditor is seeking to recover from a non-debtor primary obligor.  In *In re Strak*, Case No. 18-22185, 2018 WL 6566622 (Bankr. D.N.J. Dec. 11, 2018), the United States Bankruptcy Court for the District of New Jersey addressed a request by a debtor guarantor to extend the stay to his non-debtor majority-owned limited liability company, the primary obligor on a mortgage note.  The court rejected the debtor's request, stating: "Unlike in *A.H. Robins* and its progeny, no unusual circumstances are alleged here. In this situation, if the court were to extend the automatic stay to a primary obligor when the case was filed by a mere guarantor it would flip the reasoning of those cases on their heads."  *Id.* at *2.

32.    The TRO Motion does not allege any "other circumstances" beyond an alleged identity of interest between Mawson and its subsidiaries that would justify an extension of the automatic stay.  The sole argument Mawson makes for an identity of interest are the Celsius Parties' assertion of alter ego claims.  But the case law has established – including the seminal *A.H. Robins* decision – that alter ego claims are precisely the types of claims that *do not* establish a unity of interest under the "unusual circumstances" standard.  Courts have expressly declined to extend the automatic stay where the liability of the non-debtor co-defendant is separate and independent of the liability of the debtor, for example, in the case of joint and several liability.  *See, e.g.*, *A.H. Robins*, 788 F.2d at 999 (noting that the automatic stay would not extend to a non-debtor that is "independently liable as, for example, where the debtor and another are joint tort feasors or where the non-debtor's liability rests upon his own breach of duty") (quoting *In re Metal Center*, 31 B.R. 458, 462 (D. Conn. 1983)); *Mardice v. Ebony Media Ops., LLC*, 19-CV-8910 (VSB), 2021 WL 146358 (S.D.N.Y. Jan. 15, 2021).  Following this line of cases, the United States District Court for the Southern District of New York declined to

extend the automatic stay to a debtor's co-defendants on the grounds that they would be jointly and severally liable under an alter ego theory. *See*, *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F.Supp. 603, 609 (S.D.N.Y. 1996).

**C.      Mawson Should Be Judicially Estopped from Seeking a Stay of the Arbitration.**

33.     The Court should also deny the TRO Motion and dismiss the adversary proceeding on the grounds of judicial estoppel.  In the Mawson Adversary Proceeding in the Celsius Bankruptcy Court, Mawson argued that arbitration of the claims under the Promissory Note, the Guaranty and the Co-Location Agreement was mandatory.  Motion to Compel at 9-10.  On appeal, the District Court adopted Mawson's position, and, in compliance with that decision, the Celsius Parties commenced the Arbitration.  In the TRO Motion, Mawson is taking the opposite position.  Unhappy with the progress of the Arbitration and the impending ruling on the Promissory Note, Mawson is asking this Court to stay an arbitration that it successfully argued was mandatory.   These positions are irreconcilably inconsistent, satisfying the first prong of the judicial estoppel analysis. *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d. Cir. 2001).

34.     The second element of judicial estoppel is that the party must have changed its position "in bad faith—i.e., with intent to play fast and loose with the court." *Id.* (citing *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir.1996). The TRO Motion clearly demonstrates bad faith, not only for Mawson's attempt to evade – or, at the very least, hinder and delay – a ruling in an arbitration that it demanded, but also for its request to extend a stay that it contends was improperly imposed on it.

35.     As a remedy, the Celsius Parties request that the Court enter an order denying the TRO Motion and dismissing the adversary proceeding.  Such an order is certainly a remedy tailored to address the harm identified. *Id.*  No lesser remedy would adequately address Mawson's conduct in this adversary proceeding.

## CONCLUSION

36.     For the foregoing reasons, this Court should promptly enter an order denying the TRO Motion, dismissing this adversary proceeding, and granting such other and further relief to the Celsius Parties as the Court deems just and proper.

Dated: January 21, 2025
      Wilmington, Delaware

**VENABLE LLP**

*/s/ Daniel A. O'Brien*
Daniel A. O'Brien (No. 4897)
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Tel: 302.298.3535
Fax: 302.298.3550
daobrien@venable.com

and

Jeffrey S. Sabin
**VENABLE LLP**
151 West 42nd St.
New York, New York 10036
Tel: (212) 307-5500
jssabin@venable.com

and

Andrew J. Currie
**VENABLE LLP**
600 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 344-4000
ajcurrie@venable.com

and

Stephen Moeller-Sally
**WHITE & CASE LLP**
75 State Street
Boston, MA 02109
Tel: (617) 979-9300
ssally@whitecase.com

and

Keith H. Wofford
**WHITE & CASE LLP**
Southeast Financial Center
200 S. Biscayne Blvd., Suite 4900
Miami, Florida 33131-2352
Tel: (305) 371-2700
kwofford@whitecase.com

*Counsel for Celsius Network Limited and*
*Celsius Mining LLC*