**EXHIBIT A**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended <u>March 31, 2023</u>**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission file number <u>001-40849</u>**

# <u>Mawson Infrastructure Group Inc.</u>

(Exact name of registrant as specified in its charter)

| <u>Delaware</u> | <u>88-0445167</u> |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

<u>201 Clark Street, Sharon, Pennsylvania 16146</u>
(Address of principal executive offices, including zip code)

+<u>61 2 8624 6130</u>
(Registrant's telephone number, including area code)

_____
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | MIGI | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | | |
|---|---|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ | | |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of May 8, 2023, the issuer had a total of 16,208,041 shares of common stock, par value $0.001 per share, outstanding.

**MAWSON INFRASTRUCTURE GROUP INC.**
**FORM 10-Q**
**FOR THE QUARTER ENDED MARCH 31, 2023**

**TABLE OF CONTENTS**

| Item | | Page Number |
|---|---|---|
| | **Part I – Financial Information** | |
| 1. | Financial Statements | 1 |
| 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| 3. | Quantitative and Qualitative Disclosures about Market Risks | 31 |
| 4. | Controls and Procedures | 31 |
| | **Part II – Other Information** | |
| 1. | Legal Proceedings | 33 |
| 1A. | Risk Factors | 33 |
| 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 33 |
| 3. | Defaults Upon Senior Securities | 33 |
| 4. | Mine Safety Disclosure | 33 |
| 5. | Other Information | 33 |
| 6. | Exhibits | 34 |
| | Signatures | 35 |

PART I. FINANCIAL INFORMATION

**Item 1. Financial Statements**

MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES
CONSOLIDATED CONDENSED BALANCE SHEETS

| | March 31, 2023 (unaudited) | December 31, 2022 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,387,326 | $ 946,265 |
| Prepaid expenses | 1,931,016 | 3,488,868 |
| Trade and other receivables | 7,950,146 | 10,458,076 |
| Assets held for sale | 5,446,059 | 5,446,059 |
| Digital currencies | 28,681 | - |
| **Total current assets** | **16,743,228** | **20,339,268** |
| Property and equipment, net | 84,564,180 | 91,016,498 |
| Derivative asset | 10,618,746 | 11,299,971 |
| Investments, equity method | 2,015,618 | 2,085,373 |
| Marketable securities | - | 3,243,957 |
| Security deposits | 224,064 | 2,524,065 |
| Operating lease right-of-use asset | 2,564,031 | 2,819,933 |
| | | |
| **Total assets** | **$ 116,729,867** | **$ 133,329,065** |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Trade and other payables | $ 24,177,679 | $ 10,572,061 |
| Current portion of operating lease liability | 1,397,729 | 1,300,062 |
| Current portion of finance lease liability | 31,275 | 30,702 |
| Current portion of long-term borrowings | 22,943,525 | 23,610,583 |
| **Total current liabilities** | **48,550,208** | **35,513,408** |
| Customer deposits | - | 15,328,445 |
| Operating lease liability, net of current portion | 1,370,951 | 1,727,975 |
| Finance lease liability, net of current portion | 75,187 | 83,223 |
| Long-term borrowings, net of current portion | - | 4,509,894 |
| **Total liabilities** | **49,996,346** | **57,162,945** |
| | | |
| Commitments and Contingencies (note 10) | | |
| | | |
| Stockholders' equity: | | |
| Series A preferred stock (1,000,000 authorized shares; nil issued and outstanding as of March 31, 2023 and December 2022) | - | - |
| Common stock (90,000,000 authorized, 14,131,110 and 13,625,882 issued and outstanding as of March 31, 2023, and December 31, 2022, respectively, $0.001 par value shares) | 14,131 | 13,626 |
| Additional paid-in capital | 196,110,680 | 194,294,559 |
| Accumulated other comprehensive income | 5,112,159 | 5,021,467 |
| Accumulated deficit | (133,359,653) | (122,257,628) |
| **Total Mawson Infrastructure Group, Inc. stockholders' equity** | **67,877,317** | **77,072,024** |
| Non-controlling interest | (1,143,796) | (905,904) |
| **Total stockholder's equity** | **66,733,521** | **76,166,120** |
| **Total liabilities and stockholder's equity** | **$ 116,729,867** | **$ 133,329,065** |

See Accompanying Notes to Unaudited Consolidated Condensed Financial Statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF OPERATIONS**
(Unaudited)

| | For the three months ended March 31, | |
|---|---|---|
| | **2023** | **2022** |
| **Revenues:** | | |
| Digital currency mining revenue | $ 2,756,000 | $ 18,783,842 |
| Hosting co-location revenue | 4,322,553 | 548,948 |
| Net energy benefits | 441,055 | - |
| Sale of equipment | 150,997 | 91,545 |
| Total revenues | 7,670,605 | 19,424,335 |
| Less: Cost of revenues (excluding depreciation) | 4,678,002 | 8,412,360 |
| **Gross profit** | 2,992,603 | 11,011,975 |
| Selling, general and administrative | 4,977,417 | 6,476,945 |
| Share based payments | 1,068,288 | 390,609 |
| Depreciation and amortization | 7,962,523 | 13,803,032 |
| Change in fair value of derivative asset | 681,225 | - |
| Total operating expenses | 14,689,453 | 20,670,586 |
| **Loss from operations** | (11,696,850) | (9,658,611) |
| **Non-operating income/(expense):** | | |
| Losses on foreign currency transactions | (418,216) | (699,237) |
| Interest expense | (835,107) | (1,236,673) |
| Loss on write off property and equipment | (118,933) | - |
| Profit on sale of site | 790,847 | - |
| Gain on sale of marketable securities | 1,437,230 | - |
| Other income | 44,510 | 24,447 |
| Share of net loss of equity method investments | (36,356) | - |
| Total non-operating expense | 863,975 | (1,911,463) |
| **Loss before income taxes** | (10,832,875) | (11,570,074) |
| Income tax expenses | (548,083) | - |
| **Net Loss** | (11,380,958) | (11,570,074) |
| Less: Net loss attributable to non-controlling interests | (278,933) | (234,419) |
| | | |
| **Net Loss attributed to Mawson Infrastructure Group, Inc. stockholders** | $ (11,102,025) | $ (11,335,655) |
| | | |
| **Net Loss per share, basic & diluted** | $ (0.80) | $ (0.96) |
| **Weighted average number of shares outstanding** | 13,953,308 | 11,854,946 |

See Accompanying Notes to Unaudited Consolidated Condensed Financial Statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF COMPREHENSIVE LOSS**
(Unaudited)

| | For the three months Ended March 31, | |
| --- | --- | --- |
| | **2023** | **2022** |
| Net Loss | $ (11,380,958) | $ (11,570,074) |
| Other comprehensive income/(loss) | | |
| Foreign currency translation adjustment | 131,733 | 583,309 |
| Comprehensive loss | (11,249,225) | (10,986,765) |
| Less: Comprehensive loss attributable to non-controlling interests | (278,933) | (234,419) |
| **Comprehensive loss attributable to common stockholders** | $ (10,970,292) | $ (10,752,346) |

The accompanying Notes to Unaudited Consolidated Condensed Financial Statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY**
(Unaudited)

**For the Three Months Ended March 31, 2023**

| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity |
|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2022** | 13,625,882 | $ 13,626 | $194,294,559 | $ 5,021,467 | $(122,257,628) | $ 77,072,024 | $ (905,904) | $ 76,166,120 |
| Issuance of common stock, share based compensation | 216,460 | 216 | 647,757 | - | - | 647,973 | - | 647,973 |
| Issuance of warrants | - | - | 500,500 | - | - | 500,500 | - | 500,500 |
| Exercising of RSU's and stock options | 113,104 | 113 | 196,661 | - | - | 196,774 | - | 196,774 |
| Issuance of common stock, net of offer costs | 175,664 | 176 | 471,203 | - | - | 471,379 | - | 471,379 |
| Net loss | - | - | - | - | (11,102,025) | (11,102,025) | (278,933) | (11,380,958) |
| Other comprehensive income | - | - | - | 90,692 | - | 90,692 | 41,041 | 131,733 |
| **Balance as of March 31, 2023** | 14,131,110 | $ 14,131 | $196,110,680 | $ 5,112,159 | $(133,359,653) | $ 67,877,317 | $(1,143,796) | $ 66,733,521 |

See Accompanying Notes to Unaudited Consolidated Condensed Financial Statements.

4

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY**
(Unaudited)

**For the Three Months Ended March 31, 2022**

| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity |
|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2021** | 11,791,085 | $ 11,091 | $ 186,378,477 | $ (521,094) | $ (71,123,259) | $ 114,745,215 | $ (164,626) | $ 114,580,589 |
| Issuance of common stock, share based compensation | 2,298 | 15 | 107,734 | - | - | 107,749 | - | 107,749 |
| Issuance of warrants | - | - | 166,833 | - | - | 166,833 | - | 166,833 |
| Issuance of RSU's and stock options | 137,500 | 825 | 59,892 | - | - | 60,717 | - | 60,717 |
| Net loss | - | - | - | - | (11,335,655) | (11,335,655) | (234,419) | (11,570,074) |
| Other comprehensive income | - | - | - | 583,308 | - | 583,308 | - | 583,308 |
| **Balance as of March 31, 2022** | 11,930,883 | $ 11,931 | $ 186,712,936 | $ 62,214 | $ (82,458,914) | $ 104,328,167 | $ (399,045) | $ 103,929,122 |

See Accompanying Notes to Unaudited Consolidated Condensed Financial Statements.

5

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF CASH FLOWS**
(Unaudited)

| | For the three months ended March 31, | |
|---|---|---|
| | **2023** | **2022** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (11,380,958) | $ (11,570,074) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 7,962,523 | 13,804,492 |
| Amortization of operating lease right-of-use asset | 338,781 | 367,135 |
| Foreign exchange gain | 386,952 | - |
| Non-cash interest expense | 439,635 | - |
| Share based payments | 1,068,288 | 390,609 |
| Unrealized (gain) loss on derivative asset | 681,225 | 249,861 |
| Gain on sale of marketable securities | (1,437,230) | - |
| Loss from equity method investments | 36,122 | - |
| Loss on sale of property and equipment | 77,603 | - |
| Loss on write off of property and equipment | 118,933 | - |
| Changes in assets and liabilities: | | |
| Trade and other receivables | 981,569 | 562,626 |
| Operating lease liabilities | (340,156) | - |
| Other current assets | 3,829,172 | (4,187,204) |
| Trade and other payables | (1,445,868) | 6,248,314 |
| **Net cash provided by (used in) operating activities** | 1,316,591 | 5,865,759 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Payment for the purchase of property and equipment | (3,148,946) | (6,030,740) |
| Proceeds from sales of property and equipment | 1,010,692 | - |
| Proceeds from sale of marketable securities | 6,207,548 | - |
| Payment of property and equipment deposits | - | (23,630,470) |
| **Net cash provided by (used in) investing activities** | 4,069,294 | (29,661,210) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from common share issuances | 471,379 | 50,628 |
| Proceeds from borrowings | - | 27,055,524 |
| Repayment of finance lease liabilities | (9,543) | (379,026) |
| Repayment of borrowings | (5,397,550) | (3,242,194) |
| **Net cash provided by financing activities** | (4,935,714) | 23,484,932 |
| Effect of exchange rate changes on cash and cash equivalents | (9,110) | 648,104 |
| Net increase in cash and cash equivalents | 441,061 | 337,585 |
| Cash and cash equivalents at beginning of period | 946,265 | 5,467,273 |
| Cash and cash equivalents at end of period | $ 1,387,326 | $ 5,804,858 |
| **Supplemental disclosure of cash flow information** | | |
| **Non-cash transactions** | | |
| Recognition of right of use operating asset and lease liability | 82,879 | - |
| Accrued interest on convertible notes settled in common stock | 276,959 | - |

See Accompanying Notes to Unaudited Consolidated Condensed Financial Statements.

**MAWSON INFRASTRUCTURE GROUP, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**
(Unaudited)

## NOTE 1 – GENERAL

**General**

Mawson Infrastructure Group, Inc. (the "Company" or "Mawson" or "we"), was incorporated in the State of Delaware on February 10, 2012.

The accompanying consolidated financial statements, including the results of the Company's subsidiaries: Mawson Infrastructure Group Pty Ltd ("Mawson AU"), Cosmos Trading Pty Ltd, Cosmos Infrastructure LLC, Cosmos Manager LLC, MIG No.1 Pty Ltd, MIG No.1 LLC (formed February 3, 2023), Mawson AU Limited, Luna Squares LLC, Luna Squares Texas LLC, Luna Squares Repairs LLC, Luna Squares Property LLC, Mawson Midland LLC, Mawson Hosting LLC (formed February 16, 2023), Mawson Ohio LLC and Mawson Mining LLC (collectively referred to as the "Group"), have been prepared by the Company, pursuant to the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and in accordance with accounting principles generally accepted in the United States ("U.S. GAAP").

These consolidated, condensed unaudited interim financial statements should be read in conjunction with the audited consolidated financial statements of the Group as of December 31, 2022, and the notes thereto, included in the Company's Annual Report on Form 10-K filed with SEC on March 23, 2023. Accordingly, they do not include all the information and footnotes required by U.S GAAP for complete financial statements. The results of the interim period are not necessarily indicative of the results to be expected for the full year ending December 31, 2023. These consolidated, condensed interim financial statements reflect all adjustments which, in the opinion of management, are necessary to present fairly the financial position, the results of operations and cash flows of the Company for the periods presented.

Mawson, through its subsidiaries, is a 'Digital Asset Infrastructure' business, which owns and operates modular data centers ("MDCs") based in the United States. As at March 31, 2023, Mawson owned 23,332 Application-Specific Integrated Circuit ("ASIC") computers known as "Miners," specifically focused on the SHA-256 algorithm.

**Going Concern**

For the period ended March 31, 2023, the Company incurred a loss after tax of $11.38 million, and as at March 31, 2023, had net current liabilities of $31.81 million, had total net assets of $66.73 million and had an accumulated deficit of $133.36 million. The Company's cash position as at March 31, 2023, was $1.39 million.

Management of the Company believes that there are reasonable grounds to conclude that the Company will continue as a going concern after consideration of the following factors:

The Company's plans include improving profitability and generating sufficient cash flow from operations.

Management of the Company is of the opinion that the Company can continue to access adequate debt and equity funding to meet its working capital requirements. The Company has the ability through its At the Market Offering Agreement (the "ATM Agreement"), to sell shares of its common stock. Effective May 4, 2023, the Company filed a prospectus supplement to amend, supplement and supersede certain information contained in the earlier prospectus and prospectus supplement(collectively, the "May 2022 Prospectus"), which reduced the amount of shares of common stock the Company may offer and sell under the ATM Agreement to an aggregate offering price of up to $9,000,000 from time to time. Under the May 2022 Prospectus, the Company initially registered up to $100,000,000 of common stock for offer and sale. On March 23, 2023, the date the Company filed its Annual Report on Form 10-K for the year ended December 31, 2022, the offering limits set forth in General Instruction I.B.6 of Form S-3, which is referred to as the "baby shelf" rules, began to apply and therefor the amount to be offered under the ATM Agreement was reduced, in part to provide room under the baby shelf rules for a registered direct offering of securities for approximately $5,000,000, which closed on May 8, 2023.

For so long as the Company's public float is less than $75,000,000, it may not sell more than the equivalent of one-third of its public float during any twelve consecutive months pursuant to the baby shelf rules. As of May 8, 2023, the Company had the capacity to issue up to approximately$3.4 million worth of shares under the baby shelf rules. If the Company's public float decreases, the amount of securities the Company may sell under its Shelf Registration Statement will also decline.

Although alternative public and private transaction structures are expected to be available, these may require additional time and cost, may impose operational restrictions on the Company, and may not be available on attractive terms. To the extent the Company raises additional capital or debt, this could cause additional dilution to the Company's current stockholders. The terms of any future capital raise or debt issuance and the costs of any financing are uncertain. There are no assurances that the Company would be able to raise additional financing when needed or that it would be able to do so on favorable terms. As part of the recent registered direct offering which closed on May 8, 2023, the Company agreed not to issue shares for 90 days, or issue shares under its ATM for 180 days.

Based on internally prepared forecast cash flows which take into consideration what management considers to be reasonable scenarios given the inherent risks and uncertainties, combined with existing cash balances, management believes that the Company will be able to meet its obligations as they become due for at least one year from the date of the issuance of these condensed consolidated financial statements.

Accordingly, management of the Company believes that it is appropriate to prepare the Group's consolidated financial statements on a going concern basis. However, should the Company be unable to realize assets at their recognized values and extinguish its liabilities in the normal course of business at the amounts stated in these consolidated financial statements.

These condensed consolidated financial statements do not include any adjustments relating to the recoverability and carrying amounts of assets and the amounts of liabilities should the Company be unable to continue as a going concern and meet its obligations and debts as and when they fall due.

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Principles of Consolidation and Basis of Preparation**

The accompanying consolidated financial statements of the Company include the accounts of the Company and its wholly or majority owned and controlled subsidiaries. Intercompany investments, balances and transactions have been eliminated in consolidation. Non–controlling interests represents the minority equity investment in the Company's subsidiaries, plus the minority investors' share of the net operating results and other components of equity relating to the non–controlling interest.

Pursuant to a Certificate of Amendment to the Certificate of Incorporation of the Company dated February 6, 2023, Mawson executed at a ratio of 1-6 reverse stock split of its outstanding common stock and reduced its authorized common stock to 90,000,000 shares, as set forth in the Company's Current Report on Form 8-K filed February 9, 2023. Unless otherwise indicated, all share and per share amounts included in this Annual Report reflect the effects of the Reverse Stock Split.

Any changes in the Company's ownership interest in a consolidated subsidiary, through additional equity issuances by the consolidated subsidiary or from the Company acquiring the shares from existing stockholders, in which the Company maintains control is recognized as an equity transaction, with appropriate adjustments to both the Company's additional paid-in capital and the corresponding non-controlling interest.

**Use of Estimates and Assumptions**

The preparation of the financial statements in conformity with U.S. GAAP requires management to make estimates, judgments and assumptions that affect the amounts reported in the financial statements and accompanying notes. The Company evaluates on an ongoing basis its assumptions. The Company's management believes that the estimates, judgments and assumptions used are reasonable based upon information available at the time they are made.

These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements, and the reported amounts of income and expenses during the reporting periods. Actual results could differ from those estimates. The Company has considered the following to be significant estimates made by management, including but not limited to, going concern assumptions, estimating the useful lives of fixed assets, realization of long-lived assets, unrealized tax positions and the realization of digital currencies, valuing the derivative asset classified under Level 3 fair value hierarchy, business combinations and the contingent obligation with respect to future revenues.

**Reclassifications**

Certain reclassifications of prior period amounts have been made to conform to current period presentation.

9

**Significant Accounting Policies**

*Revenue Recognition – Digital currency mining revenue*

The Company recognizes revenue under Accounting Standards Codification ("ASC") 606, *Revenue from Contracts with Customers*. The core principle of ASC 606 is that a company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. Five steps are required to be followed in evaluating revenue recognition: (i) identify the contract with the customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price; and (v) recognize revenue when or as the entity satisfies a performance obligation.

In order to identify the performance obligations in a contract with a customer, a company must assess the promised goods or services in the contract and identify each promised good or service that is distinct. A performance obligation meets ASC 606's definition of a "distinct" good or service (or bundle of goods or services) if both of the following criteria are met: The customer can benefit from the good or service either on its own or together with other resources that are readily available to the customer (i.e., the good or service is capable of being distinct), and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract (i.e., the promise to transfer the good or service is distinct within the context of the contract).

There is currently no specific definitive guidance in U.S. GAAP or alternative accounting frameworks for the accounting of digital currencies and management has exercised judgement in determining appropriate accounting treatment for the recognition of revenue for such operations.

The Company has entered into a contract with mining pools and has undertaken the performance obligation of providing computing power in exchange for non-cash consideration in the form of digital currency. The provision of computing power is the only performance obligation in the Company's contract with its pool operators. Where the consideration received is variable (for example, due to payment only being made upon successful mining), it is recognized when it is highly probable that the variability is resolved, which is generally when the digital currency is received.

The Company measures the non-cash consideration received at the fair market value of the digital currency received. Management estimates fair value on a daily basis, as the quantity of digital currency received multiplied by the price quoted on the crypto exchange that the Company uses to dispose of digital currency.

*Property and equipment*

Property and equipment are stated at cost, net of accumulated depreciation. All other repair and maintenance costs are charged to operating expenses as incurred. The present value of the expected cost for the decommissioning of an asset after its use is included in the cost of the respective asset if the recognition criteria for a provision are met. Property and equipment transferred from customers is initially measured at the fair value at the date on which control is obtained.

Property and equipment are depreciated on a straight-line or declining balance basis based on the asset classification, over their useful lives to the economic entity commencing from the time the assets arrive at their destination where they are ready for use. Low-cost assets are capitalized and immediately depreciated. Depreciation is calculated over the following estimated useful lives:

| Asset class | Useful life | Depreciation method |
|---|---|---|
| Fixtures | 5 years | Straight-Line |
| Plant and equipment | 10 years | Straight-Line |
| Modular data center | 5 years | Declining |
| Motor vehicles | 5 years | Straight-Line |
| Computer equipment | 3 years | Straight-Line |
| Processing machinery (Miners) | 2 years | Straight-Line |
| Transformers | 15 years | Straight-Line |
| Leasehold improvements | Shorter of useful life or lease term | Straight-Line |

10

Property and equipment are derecognized upon disposal or when no future economic benefits are expected from its use or disposal. Any gain or loss arising on derecognition of the asset included in the income statement when the asset is derecognized.

The residual values, useful lives and methods of depreciation of property and equipment are reviewed at each financial year end and adjusted prospectively, if appropriate.

The Company's long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such an asset is considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds its fair value. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell.

*Fair value of and recognition of revenue from financial instruments:*

The Company accounts for financial instruments under ASC 820, *Fair Value Measurements*. This statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. To increase consistency and comparability in fair value measurements, ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities;

Level 2 — observable inputs other than Level 1, quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, and model-derived prices whose inputs are observable or whose significant value drivers are observable; and

Level 3 — assets and liabilities whose significant value drivers are unobservable. Observable inputs are based on market data obtained from independent sources, while unobservable inputs are based on the Company's market assumptions. Unobservable inputs require significant management judgment or estimation. In some cases, the inputs used to measure an asset or liability may fall into different levels of the fair value hierarchy. In those instances, the fair value measurement is required to be classified using the lowest level of input that is significant to the fair value measurement. Such determination requires significant management judgment.

|  | Fair value measured at March 31, 2023 | | | |
|  | Total fair value as at March 31, 2023 | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|
| Derivative asset | $        10,618,746 | - | - | 10,618,746 |

|  | Fair value measured at December 31, 2022 | | | |
|  | Total fair value as at December 31, 2022 | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|
| Derivative asset | $        11,299,971 | - | - | 11,299,971 |
| Marketable securities | $        3,243,957 | $        3,243,957 | $        - | $        - |

*Level 1 Assets:*

The Company held 1.59 million shares of common stock in CleanSpark Inc ("CleanSpark"), a Nasdaq listed company as at December 31, 2022. This was recorded at fair value with changes in fair value recognized in the accompanying unaudited condensed consolidated statements of operations. The fair value of the CleanSpark investment is classified in Level 1 of the fair value hierarchy as it is quoted on an active market, that being Nasdaq. During the three month period ended March 31, 2023, the Company sold all of its shares in CleanSpark.

*Level 3 Assets:*

Power Supply Agreement

In June 2022, the Company entered into a Power Supply Agreement with Energy Harbor LLC, the energy supplier to the Company's Pennsylvania facility, to provide the delivery of a fixed portion of the total amount of electricity for a fixed price through to December 2026. If the Pennsylvania facility uses more electricity than contracted, the cost of the excess is incurred at a new price quoted by Energy Harbor LLC.

While the Company manages operating costs at the Pennsylvania facility in part by periodically selling unused or uneconomical power back to the market, the Company does not consider such actions as trading activities. That is, the Company does not engage in speculation in the power market as part of its ordinary activities. Because the sale of any electricity under a curtailment program allows for net settlement, the Company has determined the Power Supply Agreement meets the definition of a derivative under ASC 815, *Derivatives and Hedging*. However, because the Company has the ability to sell the power back to the grid rather than take physical delivery, physical delivery is not probable through the entirety of the contract and therefore, the Company does not believe the normal purchases and normal sales scope exception applies to the Power Supply Agreement. Accordingly, the Power Supply Agreement (the non-hedging derivative contract) is recorded at estimated fair value each reporting period with the change in the fair value recorded in change in fair value of derivative asset in the consolidated statements of operations.

The Power Supply Agreement was classified as a derivative asset beginning in the quarter ended June 30, 2022 and measured at fair value on the date of Power Supply Agreement, with changes in fair value recognized in the accompanying unaudited condensed consolidated statements of operations. The estimated fair value of the Company's derivate asset is classified in Level 3 of the fair value hierarchy due to the significant unobservable inputs utilized in the valuation. Specifically, the Company's discounted cash flow estimation models contain quoted commodity exchange spot and forward prices and are adjusted for basis spreads for load zone-to-hub differentials through the term of the Power Supply Agreement, which ends in December 2026. In addition, the Company adopted a discount rate of approximately 20% above the terminal value of the observable market inputs, but also includes unobservable inputs based on qualitative judgment related to company-specific risk factors. The terms of the Power Supply Agreement require pre-payment of collateral, calculated as forward cost based on the market cost rate of electricity versus the fixed price stated in the contract.

*Share based payments*

The Company follows ASC 718-10 *Compensation-Stock Compensation*. The Company expenses stock-based compensation to employees and non-employees over the requisite service period based on the estimated grant-date fair value of the awards. The Company determines the grant date fair value of the restricted stock units ("RSUs") and options using the Black-Scholes option-pricing model. The assumptions used in calculating the fair value of stock-based awards represent management's best estimates and involve inherent uncertainties and the application of management's judgment. These assumptions are the expected stock volatility, the risk–free interest rate, the expected life of the option, the dividend yield on the underlying stock and the expected forfeiture rate. Expected volatility computes stock price volatility over expected terms based on its historical common stock trading prices. Risk–free interest rates are calculated based on the implied yield available on U. S. 10-year Treasury bond.

*Digital currencies*

Digital currencies are included in current assets in the consolidated condensed balance sheets. Digital currencies are classified as indefinite-lived intangible assets in accordance with ASC 350, Intangibles – *Goodwill and Other*, and are accounted for in connection with the Company's revenue recognition policy detailed above.

12

The following table presents the Company's digital currency (Bitcoin) activities for the quarter ended March 31, 2023, and 2022:

| | Three months to March 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Opening number of Bitcoin held as at December 31, 2022 and 2021** | **0.00** | **0.92** |
| Number of Bitcoin received | 121.11 | 458.68 |
| Number of Bitcoin sold | (120.09) | (459.60) |
| **Closing number of Bitcoin held as at March 31, 2023 and 2022** | 1.02 | 0.00 |

Digital currencies are not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not likely that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

The Company's policy is to dispose of Bitcoin received from mining operations at the earliest opportunity, therefore the holding period is minimal, usually no more than a few days. Due to the short period which Bitcoin are held prior to sale and the consequent small numbers held, the risk of impairment is not material. No impairment charges have been recorded during the quarters ended March 31, 2023 and 2022.

*Recent Accounting Pronouncements*

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB") or other standard setting bodies and adopted by the Company as of the specified effective date. For information with respect to recent accounting pronouncements, see Note 2 to the consolidated financial statements for the Company as of December 31, 2022, included in the Company's Annual Report on Form 10-K filed with SEC on March 23, 2022. Recent accounting pronouncements since that date include:

In March 2023, the FASB issued ASU update 2023-01—Leases (Topic 842): Common Control Arrangements. The Company early adopted ASU 2023-01, as allowed under the ASU. Adoption of this ASU did not have a material impact on the Company's consolidated financial statements or disclosures.

In March 2023, the FASB issued ASU update 2023-02—Investments-Equity Method and Joint Ventures (Topic 323): Accounting for Investments in Tax Credit Structures Using the Proportional Amortization Method (a consensus of the Emerging Issues Task Force). The Company does not expect ASU 2023-02 to have a material impact on the Company's consolidated financial statements or disclosures.

13

**NOTE 3 – BASIC AND DILUTED NET LOSS PER SHARE**

Net loss per common share is calculated in accordance with ASC 260, *Earnings Per Share*. Basic loss per share is computed by dividing net loss by the weighted average number of shares of common stock outstanding during the period. The computation of diluted net loss per share does not include dilutive common stock equivalents in the weighted average shares outstanding, as they would be anti-dilutive.

Securities that could potentially dilute loss per share in the future that were not included in the computation of diluted loss per share as at March 31, 2023 and 2022 are as follows:

| | As at March 31, | |
| --- | --- | --- |
| | **2023** | **2022** |
| Warrants to purchase common stock | 2,825,278 | 1,165,698 |
| Options to purchase common stock | 417 | 125,577 |
| Restricted Stock-Units ("RSUs") issued under a management equity plan | 303,450 | 303,215 |
| | **3,129,145** | **1,594,490** |

The following table sets forth the computation of basic and diluted loss per share:

| | For the three months ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | | **2023** | | **2022** |
| Net Loss attributable to Mawson Infrastructure Group, Inc. common stockholders | $ | (11,102,025) | $ | (11,335,655) |
| | | | | |
| Denominator: | | | | |
| Weighted average common shares - basic and diluted | | 13,953,308 | | 11,854,946 |
| | | | | |
| Loss per common share - basic and diluted | $ | (0.80) | $ | (0.96) |

**NOTE 4 – LEASES**

The Company leases corporate office space at Level 5, 97 Pacific Highway, North Sydney NSW 2060 Australia, being 1,076 square feet under a license agreement.

The Company leases 6-acres of land in Pennsylvania which began in October 2021 for thirty-six months with the option to exercise four additional three-year extensions. An amendment was signed during March 2023 to lease an additional 3.12 acres of land.

On March 16, 2022, Luna Squares Property LLC entered into a lease with respect to a property in the City of Sharon, Mercer County, Pennsylvania with Vertua Property, Inc., a related party (see Note 12). The term of the lease is for 5 years, with 2 options to extend for 5 years each.

During May 2022, Luna Square Texas LLC entered into four lease agreements to lease 11 acres of land in Texas for a period of five years. This is reflected as an asset held for sale as of March 31, 2023 and was sold on April 18, 2023 (see Note 6).

Other than the foregoing leases, the Company does not lease any material assets during the quarter ended March 31, 2023. The Company believes that these offices and facilities are suitable and adequate for its operations as currently conducted and as currently foreseen. In the event additional or substitute offices and facilities are required, the Company believes that it could obtain such offices and facilities at commercially reasonable rate.

14

The Company's lease costs recognized in the Consolidated Condensed Statements of Operations consist of the following:

| | For the three months ended March 31, | |
|---|---|---|
| | 2023 | 2022 |
| Operating lease charges [1] | $ 407,212 | $ 367,135 |
| Finance lease charges: | | |
| Amortization of right-of-use assets | 8,143 | 4,302 |
| Interest on lease obligations | 2,080 | 1,478 |
| | $ 10,223 | $ 5,780 |

(1)  Included in selling, general and administrative expenses.

The following is a schedule of the Company's lease liabilities by contractual maturity as of March 31, 2023:

| | Operating leases | Finance leases |
|---|---|---|
| 2023 | $ 1,171,950 | $ 28,632 |
| 2024 | 1,261,338 | 38,176 |
| 2025 | 267,372 | 38,176 |
| 2026 | 278,064 | 15,016 |
| 2027 | 70,190 | - |
| Total undiscounted lease obligations | 3,048,914 | 120,000 |
| Less imputed interest | (280,234) | (13,538) |
| Total present value of lease liabilities | 2,768,680 | 106,462 |
| Less current portion of lease liabilities | 1,397,729 | 31,275 |
| Non-current lease liabilities | $ 1,370,951 | $ 75,187 |

Other lease information as of and for the period ended March 31, 2023:

| | Operating leases | Finance leases |
|---|---|---|
| Operating cash out flows from leases | $ 100,000 | $ 9,543 |
| Weighted-average remaining lease term (years) | 2.29 | 3.14 |
| Weighted-average discount rate (%) | 8.0% | 7.5% |

15

**NOTE 5 – PROPERTY AND EQUIPMENT**

Property and equipment, net, consisted of the following:

| | March 31, 2023 | December 31, 2022 |
|---|---|---|
| Plant and equipment | 4,118,491 | 4,263,662 |
| Computer equipment | 162,457 | 163,060 |
| Furniture and fixtures | 29,016 | 29,492 |
| Processing machines (Miners) | 102,381,318 | 103,337,719 |
| Modular data center | 21,323,426 | 19,713,534 |
| Motor vehicles | 326,704 | 326,704 |
| Transformers | 4,737,512 | 4,596,892 |
| Low-cost assets | 1,059,319 | 995,292 |
| Assets under construction | 11,737,313 | 11,592,582 |
| Leasehold improvements | 487,530 | 487,527 |
| **Total** | 146,363,086 | 145,506,464 |
| Less: Accumulated depreciation | (61,798,906) | (54,489,966) |
| **Property and equipment, net** | **84,564,180** | **91,016,498** |

The Company incurred depreciation and amortization expense in the amounts of $7.96 million and $13.80 million for the quarters ended March 31, 2023 and March 31, 2022, respectively. There were no impairment charges recognized for property and equipment for either the quarter ended March 31, 2023, or March 31, 2022.

The reclassification of property and equipment to assets held for sale is in relation to the sale of Luna Squares Texas LLC to M Turing VCC Oracle Phase 1 Fund (see Note 6).

**NOTE 6 – ASSETS HELD FOR SALE**

On April 18, 2023, the Company sold 100% of its membership interest in Luna Squares Texas LLC, a Delaware limited liability company, which held rights to 4 greenfield leases in Midland, TX, as well as related contracts. The sale price was $3.0m in cash and $5.5m in stablecoins. In addition, the Company sold 59 transformers which were earmarked for these Texas sites.

From November 9, 2022 these assets were classified as held for sale, from this date depreciation and amortization on the property and equipment and the leases ceased. As at March 31, 2023 the assets included in the sale are stated at carrying value and comprised of the following assets.

| | March 31, 2023 |
|---|---|
| Property and equipment | $ 4,289,684 |
| Security deposit | 1,010,716 |
| Operating lease right-of-use asset | 145,659 |
| **Assets held for sale** | **$ 5,446,059** |

**NOTE 7 – EQUITY METHOD INVESTMENTS**

Mawson AU Limited is a 34.9% shareholder of Tasmania Data Infrastructure Pty Ltd ("TDI") from November 23, 2022 and therefore was accounted for as an equity method investment from this date under ASC 323 *Investments – Equity Method and Joint Ventures* . Our share of income and losses from our equity method investments is included in share of net loss of equity method investment in our consolidated statements of operations.

**NOTE 8 – INCOME TAXES**

The Company's effective tax rate is calculated by dividing total income tax expense by the sum of income before income tax expense and the net income attributable to noncontrolling interests. The Company has maintained a full valuation allowance for federal and the majority of its state jurisdictions.

|  | For the three months ended March 31, | |
| --- | --- | --- |
|  | **2023** | **2022** |
| Effective income tax rate | 0.00% | 0.00% |

The Company's effective tax rate is calculated by dividing total income tax expense by the sum of income before income tax expense and the net income attributable to noncontrolling interests. The Company has maintained a full valuation allowance for federal and the majority of its state jurisdictions. Income tax expense of $548,083 during the three months ended March, 31 2023 relates to the recognition of previously unrecognized tax liability due for the December, 31 2022 year. The company determined the impact of recording this adjustment during 2023 was not material to the financial statements or the opening balance of the accumulated deficit.

**NOTE 9 – BORROWINGS**

*Marshall loan*

In December 2021 MIG No. 1 Pty Ltd entered into a Secured Loan Facility Agreement with Marshall Investments MIG Pty Ltd. The loan matures in February 2024 and bears interest at a rate of 12.00% per annum, payable monthly with interest payments commencing in December 2021. This loan facility is secured by direct assets of MIG No.1 Pty Ltd and a general security agreement given by the Company. Principal repayments began during November 2022.

The outstanding balance is $9.08 million as at March 31, 2023 all of which is classified as a current liability.

*Celsius loan*

On February 23, 2022, Luna Squares LLC entered into a Co-Location Agreement with Celsius Mining LLC. In connection with this agreement, Celsius Mining LLC loaned Luna Squares LLC a principal amount of $20,000,000, for the purpose of funding the infrastructure required to meet the obligations of the Co-Location Agreement, for which Luna Squares LLC issued a Secured Promissory Note for repayment of such amount. The Secured Promissory Note accrues interest daily at a rate of 12% per annum. Luna Squares LLC is required to amortize the loan at a rate of 15% per quarter, principal repayments began at the end of September 2022. The Secured Promissory Note has a maturity date of August 23, 2023, the outstanding balance is $11.0 million as at March 31, 2023, all of which is classified as a current liability. Celsius Mining LLC filed for Chapter 11 bankruptcy protection on July 13, 2022. Celsius Mining LLC has proposed certain changes to the Secured Promissory Note and the related security agreement, however the parties have been unable to agree mutually satisfactory agree terms.

*W Capital loan*

On September 2, 2022, Mawson Infrastructure Group Pty Ltd entered into a Secured Loan Facility Agreement with W Capital Advisors Pty Ltd with a total loan facility of AUD$3 million (USD$1.9 million). This was amended on September 29, 2022 and the loan facility was increased to AUD$8 million (USD$5.2 million). As at March 31, 2023, AUD$3.53 million (USD$2.36 million) has been drawn down from this facility, all of which is classified as a current liability. The Secured Loan Facility accrues interest daily at a rate of 12% per annum and is paid monthly. Principal repayments began in March 2023.

*Convertible notes*

On July 8, 2022, the Company issued secured convertible promissory notes to investors in the aggregate principal amount of $3,600,000 (the "Secured Convertible Promissory Notes") in exchange for an aggregate of $3,600,000 in cash. The Secured Convertible Promissory Notes are convertible at the option of the holder at a price of $5.10 per share of our common stock. The Secured Convertible Promissory Notes bear interest of twenty percent per annum. One-half of the interest that accrues each month on the Secured Convertible Promissory Notes must be paid monthly. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable under the Secured Convertible Promissory Notes, is due and payable if not converted pursuant to the terms and conditions of the Secured Convertible Promissory Note on the earlier of (i) one year after its issuance, or (ii) following an event of default. On September 29, 2022, the Company entered into a letter variation relating to some of the Secured Convertible Promissory Notes, with an aggregate principal amount of $3.1 million, which gave those holders the option to elect for pre-payment (including accrued interest to maturity) subject to certain conditions. Payments of the interest could be made partially in common stock of the Company, at the Company's election. All of the investors included in this letter variation elected for the pre-payment option and therefore there were $3.1 million principal repayments made during November 2022. The final convertible noteholder who was not a party to this variation opted to enter into an arrangement whereby it received pre-payment of interest but agreed that repayment of the principal was not required until the originally agreed Repayment Date (June 2023) and therefore the remaining $0.50 million has been classified as a current liability.

**NOTE 10 – STOCKHOLDERS' EQUITY**

**Stock-Based Compensation:**

*Equity plans*

Under the 2018 Equity Plan, which was approved by stockholders on February 22, 2018, the aggregate number of Shares reserved under this Plan was originally 10,441,251. On August 15, 2018, the stockholders approved the First Amendment to the 2018 Equity Plan, which changed the total number of shares of the Company's common stock to 2,500,000 shares. In addition, the number of shares issuable under the Plan on the first day of each fiscal year beginning with the 2019 fiscal year, would increase by an amount equal to the lower of (i) 100,000 shares (after a later 10 for 1 stock split) or (ii) 5% of the outstanding shares on the last day of the immediately preceding fiscal year. As of January 1, 2023, that meant there were a maximum of 574, 153 shares available. After the 6 for 1 reverse stock split in February 2023, there were 95,693 shares available under the 2018 Plan. After an issue of 93,334 restricted stock units to a consultant (W Capital Advisors Pty Ltd) under the 2018 Plan, and taking into account all options that were issued under the 2018 Plan (after adjusting reverse stock splits), the 2018 Plan is essentially exhausted until it automatically replenishes on January 1, 2024.

Under the 2021 Equity Plan, which was adopted by the Company on August 3, 2021, originally for an aggregate of up to 70,000,000 Shares. Following a 10 for 1 reverse stock split on August 12, 2021, that number was reduced to 7,000,000. Following a 6 for 1 reverse stock split which took effect on February 9, 2023, the aggregate number of Shares under the 2021 Equity Plan was further reduced to 1,166,667. Stockholder consent is being sought at the May 17, 2023 annual meeting to increase this number to 10,000,000. As of March 31, 2023, the number of Shares reserved under this Plan was 383,315.

The Company's stock-based compensation expenses recognized during the three months ended March 31, 2023 and 2022 were included in share based payments expenses in the accompanying unaudited condensed consolidated statements of operations.

The Company recognized stock-based compensation expense during the three months ended March 31, 2023 and 2022 as follows:

| | For the three months ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2023 | | 2022 |
| Performance-based restricted stock awards | $ | 166,779 | $ | 166,276 |
| Service-based restricted stock awards | | 307,069 | | - |
| Total stock-based compensation | $ | 473,848 | $ | 166,276 |

| | Number of shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value |
| --- | --- | --- | --- | --- |
| Outstanding as of December 31, 2022 | 416,791 | 0.22 | 9.09 | |
| Issued | 93,334 | - | | |
| Exercised | (206,438) | - | | 609,806 |
| Expired | - | - | | |
| Outstanding as of March 31, 2023 | 303,867 | 0 | 9.26 | |
| Exercisable as of March 31, 2023 | 191,702 | 0.30 | 5.50 | |

18

*Restricted Common Stock*

The Company recognized an expense in relation to the restricted stock units during the three months ended March 31, 2023 and 2022 as follows:

| | For the three months ended March 31, | |
| --- | --- | --- |
| | **2023** | **2022** |
| Restricted stock unit expense | $ 29,995 | $ - |
| Total restricted stock unit expense | $ 29,995 | $ - |

Future expense related to share-based payments is expected to total approximately $0.15 million which will be expensed over the next 1.29 years.

**Common Stock**

On September 29, 2022, the Company entered into a letter variation relating to three out of four of the Secured Convertible Promissory Notes, where it gave those holders the option to elect for pre-payment (including accrued interest to maturity). Payments of the interest may be made partially in common stock of the Company, at the Company's election. All of the investors included in this letter variation elected for the pre-payment option and therefore there were 104,178 shares of common stock of the Company issued as part of this letter variation. The final convertible noteholder who was not a party to this variation opted to enter into an arrangement on January 16, 2023 whereby it received pre-payment of interest which was also partially paid in shares. In total 18,807 shares of common stock of the Company were issued as part of this arrangement. The Company recognized an $0.06 million expense in relation to 18,807 shares issued in the three months ended March 31, 2023 within the share based payment expense.

Pursuant to that certain Certificate of Amendment to the Certificate of Incorporation of the Company dated February 6, 2023 Mawson executed at a ratio of 1-6 reverse stock split of its outstanding common stock and reduced its authorized common stock to 90,000,000 shares, as set forth in the Company's Current Report on Form 8-K filed February 9, 2023. This reverse stock split meant there were an additional 141 shares issued due to rounding, which are included in the issuance of common stock, share based compensation within the consolidated condensed statements of stockholders' equity.

Under the terms of the Cosmos Transaction Bid Implementation Agreement the Company made share-based awards under an Incentive Compensation Program during September 2021 (refer to reverse acquisition accounting policy). During the three-month period ended March 31, 2023, certain participants partially converted certain of these awards into 100,000 shares of common stock of the Company.

The Company made share-based payments under an Incentive Compensation Program during December 2022. During the quarter ended March 31, 2023, certain participants partially exercised certain of these awards into 13,104 shares of common stock of the Company.

W Capital Advisors Pty Ltd was issued 93,334 shares of common stock during February 2023 for consultancy and advisory services provided to the Company, the fair value of these shares was $0.25 million.

On May 27, 2022, the Company entered into an ATM Agreement with Wainwright, to sell shares of our common stock, par value $0.001 per share, having an aggregate sales price of up to $100 million, from time to time, through an "at the market offering" program under which Wainwright acts as the sales agent. During the quarter ended March 31, 2023, 175,664 shares were issued as part of the ATM Agreement for net cash proceeds of $471,379.

**Restricted Stock**

As of March 31, 2023, the Company had no restricted stock outstanding.

**Common Stock Warrants**

A summary of the status of the Company's outstanding stock warrants and changes during the three months ended March 31, 2023, is as follows:

| | Number of Warrants | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|---|
| Outstanding as of December 31, 2022 | 2,825,278 | | 4.17 | 3.30 |
| Issued | - | | - | - |
| Exercised | - | | - | - |
| Expired | - | | - | - |
| Outstanding as of March 31, 2023 | 2,825,278 | $ | 4.17 | 3.30 |
| Warrants exercisable as of March 31, 2023 | 2,825,278 | $ | 4.17 | 3.30 |

The Company recognized an expense in relation to warrants issued in 2022 during the three months ended March 31, 2023 within in the share based payment expense of $0.50 million.

**NOTE 11 – COMMITMENTS AND CONTINGENCIES**

The Company is currently in the process of applying for sales tax registrations and exemptions in different states in the U.S. At this stage, the Company is unable to determine the financial impact of sales tax.

**NOTE 12 – RELATED PARTY TRANSACTIONS**

On March 16, 2022, Luna Squares LLC entered into a lease with respect to a property in the City of Sharon, Mercer County, Pennsylvania with Vertua Property, Inc, a subsidiary entity in which Vertua Ltd has a 100% ownership interest. James Manning, CEO, a director and a significant shareholder of the Company, is also a director of Vertua Ltd and has a material interest in the Sharon lease as a large shareholder of Vertua Ltd. The lease is for a term of 5 years, and Luna Squares LLC has 2 options to extend for 5 years each. Rent is subject to annual increases equal to the amount of the Consumer Price Index for the Northeast Region, or 4%, whichever is higher. The base rental amount in the first year is $0.24 million. Depending on power energization and usage, variable additional rent may be payable, with charges ranging from $500 to $10,000 per month, depending on power energized and whether it is available.

During the quarter ended March 31, 2023 and the quarter ended March 31, 2022 Mawson Infrastructure Group Pty Ltd paid Vertua Limited $154,559 and $43,873 respectively, for reimbursement for office costs. James Manning, CEO, a director and a significant shareholder of the Company, is also a director of Vertua Ltd.

**NOTE 13 – SUBSEQUENT EVENTS**

On April 18, 2023, the Company sold 100% of its membership interest in Luna Squares Texas LLC, which held rights to 4 greenfield leases in Midland, TX, as well as related revenue sharing contracts with the landlords. The sale price was $8.5m in cash and stablecoins. In addition, Mawson sold 59 transformers which were earmarked for these Texas sites.

Effective May 1, 2023 Mawson Ohio LLC took an assignment of a lease for a site in Corning, Ohio. The term of the lease is for 4 years, with 1 option to extend for 5 years. The site area has a capacity of up to 24MW, with a potential for a further 26MW (subject to the construction of a new substation). The site has not been accurately measured and is part of a much larger site of 118 acres, however the lease area is that are which Mawson Ohio LLC requires for the operation its data center facility comprising of 12 MDCs. 12 MDCs could house up to approximately 7,056 miners.

On May 3, 2023, the Company has entered into a definitive agreement with institutional investors for the issuance and sale of 2,083,336 shares of its common stock (or pre-funded warrants in lieu thereof) at a purchase price of $2.40 per share of common stock in a registered direct offering. In addition, in a concurrent private placement, the Company will issue to the institutional investors unregistered warrants to purchase up to 2,604,170 shares of its common stock with an exercise price of $3.23 per share and are exercisable six months following issuance for a period of five and one-half years following issuance. The shares of common stock and pre-funded warrants described above are being offered and sold by the Company pursuant to a "shelf" registration statement on Form S-3 (File No. 333-264062). The warrants to purchase common stock described above were offered and sold by the Company pursuant to Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder. This offering closed on May 8, 2022. The net amount raised was approximately $5.0 million.

As a condition to the sale of 2,083,336 shares of common stock described above, the Company amended the warrants previously issued to one of the investors in that offering to purchase an aggregate of 1,666,667 shares of common stock for an exercise price of $6.06 per share, which were issued in July of 2022 (the "Existing Warrants"), effective upon the closing of the offering, such that the amended Existing Warrants have a reduced exercise price of $3.23 per share, are exercisable six months following the closing of the offering, and will expire five and one-half years following the closing of this offering.

Effective May 4, 2023, the Company filed a prospectus supplement to amend, supplement and supersede certain information contained in the prospectus supplement dated May 27, 2022, and its accompanying prospectus dated April 11, 2022 (collectively, the "May 2022 Prospectus"), relating to the offer and sale of common stock through H.C. Wainwright & Co., LLC ("Wainwright"), as sales agent, in "at the market offerings" as defined in Rule 415 promulgated under the Securities Act of 1933, as amended, pursuant to the At the Market Offering Agreement with Wainwright dated as of May 27, 2022 (the "ATM Agreement"). The prospectus supplement reduced the amount of shares of Common Stock The Company may offer and sell under the ATM Agreement to an aggregate offering price of up to $9,000,000 from time to time through Wainwright.

Under the May 2022 Prospectus, the Company initially registered up to $100,000,000 of our common stock for offer and sale pursuant to the ATM Agreement. However, on March 23, 2023, the date the Company filed its Annual Report on Form 10-K for the year ended December 31, 2022, the registration registering the shares being sold pursuant to the ATM Agreement became subject to the offering limits set forth in General Instruction I.B.6 of Form S-3. As of May 3, 2023, the aggregate market value of our outstanding common stock held by non-affiliates was approximately $45,720,757.33, which we calculated based on 14,371,373 shares of outstanding common stock as of May 3, 2023, of which 12,735,587 shares were held by non-affiliates, and a price per share of $3.59 which was the closing price of our common stock on March 23, 2023.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*Management's Discussion and Analysis of Financial Condition and Results of Operations analyzes the major elements of our balance sheets, statements of operations and cash flows. The following discussion and analysis of our financial condition and results of operations should be read together with the interim condensed consolidated financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q, as well as our audited consolidated financial statements and related notes as disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022. All amounts are in U.S. dollars.*

*Throughout this report, unless otherwise designated, the terms "we," "us," "our," the "Company," "Mawson," "our company" and the "combined company" refer to Mawson Infrastructure Group Inc., a Delaware corporation, and its direct and indirect subsidiaries, including Mawson Infrastructure Group Pty Ltd, an Australian company ("Mawson AU"), Cosmos Trading Pty Ltd, Cosmos Infrastructure LLC, Cosmos Manager LLC, Cosmos MIG No.1 Pty Ltd, MIG No.1 LLC, Mawson AU Limited, Luna Squares LLC, Luna Squares Texas, Luna Squares Repairs LLC, Luna Squares Property LLC, Mawson Midland LLC, Mawson Ohio LLC, Mawson Hosting LLC and Mawson Mining LLC .*

*Pursuant to that certain Certificate of Amendment to the Certificate of Incorporation of the Company dated February 6, 2023 Mawson executed at a ratio of 1-6 reverse stock split of its outstanding common stock and reduced its authorized common stock to 90,000,000 shares, as set forth in the Company's Current Report on Form 8-K filed February 9, 2023.*

***Forward-Looking Statement Notice***

This Quarterly Report on Form 10-Q contains forward-looking statements about our expectations, beliefs or intentions regarding, among other things, our product development efforts, business, financial condition, results of operations, strategies or prospects. In addition, from time to time, our representatives have made or may make forward-looking statements, orally or in writing. Forward-looking statements can be identified by the use of forward-looking words such as "believe," "expect," "intend," "plan," "may," "should" or "anticipate" or their negatives or other variations of these words or other comparable words or by the fact that these statements do not relate strictly to historical or current matters. These forward-looking statements may be included in, but are not limited to, various filings made by us with the SEC, press releases or oral statements made by or with the approval of one of our authorized executive officers. Forward-looking statements relate to anticipated or expected events, activities, trends or results as of the date they are made. Because forward-looking statements relate to matters that have not yet occurred, these statements are inherently subject to risks and uncertainties that could cause our actual results to differ materially from any future results expressed or implied by the forward-looking statements. Many factors could cause our actual activities or results to differ materially from the activities and results anticipated in forward-looking statements, including, but not limited to, the risk factors set forth in our Annual Report on Form 10-K for the year ended December 31, 2022, and in Part II – Item 1A of this report.

This report identifies important factors which could cause our actual results to differ materially from those indicated by the forward-looking statements, particularly those set forth under Item 1A. "Risk Factors" as disclosed in our Annual Report on Form 10-K for the year ended December 31, 2022.

Such risk factors are not necessarily all of the important factors that could cause actual results to differ materially from those expressed in any of our forward-looking statements. Given these uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements.

Factors that could cause our actual results to differ materially from those expressed or implied in such forward-looking statements include, but are not limited to:

-   our need to, and difficulty in, raising additional capital;

-   downturns in the digital currency industry;

-   inflation;

-   increased interest rates;

-   the inability to procure needed hardware;

-   the failure or breakdown of mining equipment, or internet connection failure;

-   access to reliable and reasonably priced electricity sources;

-   Cyber-security threats;

-   our ability to obtain proper insurance;

-   construction risks;

-   banks and other financial institutions ceasing to provide services to our industry.

-   changes to the Bitcoin network's protocols and software;

-   the decrease in the incentive to mine Bitcoin;

-   the increase of transaction fees related to digital assets;

-   the fraud or security failures of large digital asset exchanges;

-   future digital asset, technological and digital currency development; and

-   the regulation and taxation of digital assets like Bitcoin;

-   our ability to timely and effectively implement controls and procedures required by Section 404 of the Sarbanes-Oxley Act of 2002;

-   material litigation, investigations or enforcement actions by regulators and governmental authorities.

All forward-looking statements attributable to us or persons acting on our behalf speak only as of the date of this report and are expressly qualified in their entirety by the cautionary statements included in this report. Except as required by applicable law, we undertake no obligations to update or revise forward-looking statements to reflect events or circumstances that arise after the date made or to reflect the occurrence of unanticipated events. In evaluating forward-looking statements, you should consider these risks and uncertainties.

*Overview*

Mawson is a 'Digital Asset Infrastructure' business, which owns and operates (through its subsidiaries) modular data centers ("MDCs") in the United States. We are also developing technology to enable us to own and better operate MDCs.

Our primary business is the ownership and operation of the digital infrastructure associated with the operation of blockchain applications. Application-Specific Integrated Circuit ("ASIC") computers known as Miners enable the 'mining' of digital assets such as Bitcoin. We currently operate in one site located in Pennsylvania USA. The Miners we operate are predominantly focused on the process of digital mining, specifically for Bitcoin.

In exchange for powering down our systems and curtailing the power we get from the grid in response to instances of high electricity demand, we receive net energy benefits. We also have a contract with our energy provider where we can trade our energy to achieve net energy benefits. We have recognized a derivative asset on our balance sheet for the contract we have with our energy provider, which has been measured at fair value with any changes in fair value recognized in our statement of operations.

We offer 'hosting' or 'co-location' facilities to other businesses in the digital asset infrastructure industry to have their Miners located within our MDCs. These businesses pay us a fee for the use of our facilities and related services (often based on power consumption).

We also sell new and used digital currency mining, and MDC equipment on a periodic basis, subject to prevailing market conditions and our surplus production capacity.

**As of March 31, 2023**

| | Existing Operations Online | Order and Purchase Agreements | Cumulative Fleet Fully Deployed |
|---|---|---|---|
| Total miners online | 6,104 | - | 6,104 |
| Total miners in transit | - | - | - |
| Total miners on order | - | - | - |
| Total miners in storage | 17,228 | - | 17,228 |
| **Total miners** | **23,332** | **-** | **23,332** |

We continue to conduct research and development in relation to our MDCs which are actively testing in several configurations and locations to determine the best configuration for both ASIC and alternate computing uses.

*Recent Developments.*

On April 18, 2023, the Company sold 100% of its membership interest in Luna Squares Texas LLC, which held rights to 4 greenfield leases in Midland, TX, as well as related contracts. The sale price was $8.5 million in cash and stablecoins. In addition, the Company sold 59 transformers which were earmarked for these Texas sites. The buyer was a fund managed by Mainnet Capital, a Singapore-based fund manager, called M Turing VCC Oracle Phase 1 Fund.

Our legacy business was as a clinical-stage biopharmaceutical company focused on the treatment of ophthalmic disorders, including dry eye syndrome (the "LO2A" business). All of the economic benefits of any successful monetization of our LO2A business, if any, would benefit only the holders of contingent value rights ("CVR") and any contingent right holders. Accordingly we assessed that the fair value of this asset at the acquisition date was $nil. The asset was therefore assessed as impaired and the prior carrying amount of $23.96 million has been fully expensed in the consolidated statements of operations for the year ended December 31, 2021.On March 8, 2021, the Company entered into the Contingent Value Rights Agreement (**"CVR Agreement"**), pursuant to which certain holders of the CVRs had certain rights to any value created in respect of the LO2A business previously carried on by the Company. Despite the holders' representative's good faith endeavors, the holders' representative was unable to procure a suitable transaction. On March 9, 2023, the CVR Agreement was terminated, and the rights of the CVR holders under that agreement expired at the same time. On February 7, 2023, the Company entered into a share purchase agreement with N.Danenberg Holding (2000) Ltd to sell the Company's shares or interests in Wize NC Inc, Occuwize Ltd and Wize Pharma Ltd (**"Wize Entities"**) effective December 31, 2022 in consideration for $10,000. This transaction closed on March 9, 2023. As a result of the sale transaction the Wize Entities were deconsolidated from the group effective December 31, 2022.

On April 18, 2023, the Company sold 100% of its membership interest in Luna Squares Texas LLC, which held rights to 4 greenfield leases in Midland, TX, as well as related revenue sharing contracts with the landlords. The sale price was $8.5m in cash and stablecoins. In addition, Mawson sold 59 transformers which were earmarked for these Texas sites.

Effective May 1, 2023 Mawson Ohio LLC took an assignment of a lease for a site in Corning, Ohio. The term of the lease is for 4 years, with 1 option to extend for 5 years. The site area has a capacity of up to 24MW, with a potential for a further 26MW (subject to the construction of a new substation). The site has not been accurately measured and is part of a much larger site of 118 acres, however the lease area is that are which Mawson Ohio LLC requires for the operation its data center facility comprising of 12 MDCs. 12 MDCs could house up to approximately 7,056 miners.

On May 3, 2023, the Company has entered into a definitive agreement with institutional investors for the issuance and sale of 2,083,336 shares of its common stock (or pre-funded warrants in lieu thereof) at a purchase price of $2.40 per share of common stock in a registered direct offering. In addition, in a concurrent private placement, the Company will issue to the institutional investors unregistered warrants to purchase up to 2,604,170 shares of its common stock with an exercise price of $3.23 per share and are exercisable six months following issuance for a period of five and one-half years following issuance. The shares of common stock and pre-funded warrants described above are being offered and sold by the Company pursuant to a "shelf" registration statement on Form S-3 (File No. 333-264062). The warrants to purchase common stock described above were offered and sold by the Company pursuant to Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder. This offering closed on May 8, 2022. The net amount raised was approximately $5.0 million.

As a condition to the sale of 2,083,336 shares of common stock described above, the Company amended the warrants previously issued to one of the investors in that offering to purchase an aggregate of 1,666,667 shares of common stock for an exercise price of $6.06 per share, which were issued in July of 2022 (the "Existing Warrants"), effective upon the closing of the offering, such that the amended Existing Warrants have a reduced exercise price of $3.23 per share, are exercisable six months following the closing of the offering, and will expire five and one-half years following the closing of this offering.

Effective May 4, 2023, the Company filed a prospectus supplement to amend, supplement and supersede certain information contained in the prospectus supplement dated May 27, 2022, and its accompanying prospectus dated April 11, 2022 (collectively, the "May 2022 Prospectus"), relating to the offer and sale of common stock through H.C. Wainwright & Co., LLC ("Wainwright"), as sales agent, in "at the market offerings" as defined in Rule 415 promulgated under the Securities Act of 1933, as amended, pursuant to the At the Market Offering Agreement with Wainwright dated as of May 27, 2022 (the "ATM Agreement"). The prospectus supplement reduced the amount of shares of Common Stock The Company may offer and sell under the ATM Agreement to an aggregate offering price of up to $9,000,000 from time to time through Wainwright.

Under the May 2022 Prospectus, the Company initially registered up to $100,000,000 of our common stock for offer and sale pursuant to the ATM Agreement. However, on March 23, 2023, the date the Company filed its Annual Report on Form 10-K for the year ended December 31, 2022, the registration registering the shares being sold pursuant to the ATM Agreement became subject to the offering limits set forth in General Instruction I.B.6 of Form S-3. As of May 3, 2023, the aggregate market value of our outstanding common stock held by non-affiliates was approximately $45,720,757.33, which we calculated based on 14,371,373 shares of outstanding common stock as of May 3, 2023, of which 12,735,587 shares were held by non-affiliates, and a price per share of $3.59 which was the closing price of our common stock on March 23, 2023.

*Environment, Sustainability, Governance*

The Company has a strategy to source renewable or sustainable sources of energy, including carbon-neutral or low carbon emissions sources for the majority of its operations. This is a key criteria when analyzing a new site for acquisition, or selling an existing site. The Company believes it can make a positive contribution towards lowering carbon emissions by supporting low-emissions power sources.

The Company can provide, and has provided, electricity grid stability by curtailing its power usage during times of high power prices through its Energy Markets Program, for example through its membership in the PJM Market, and various demand response programs where they are available.

The Company recognizes the challenges posed by climate change, including regulatory, increased costs, and adverse weather events, and seeks to mitigate these risks by for example ensuring that it is informed of regulatory changes, keeping involved with industry groups and thought leaders, and ensuring that physical mitigation steps are undertaken, such as during the process if selecting sites in lower risk climates and regions (i.e. cooler climates, less prone to flooding, cyclones or wildfires), and then ensuring that the construction of the sites takes into account potential climate or weather-related events.

*Results of Operations – Three months Ended March 31, 2023 compared to the three months ended March 31, 2022*

| | For the three months ended March 31, | |
|---|---|---|
| | **2023** | **2022** |
| **Revenues:** | | |
| Digital currency mining revenue | 2,756,000 | 18,783,842 |
| Hosting co-location revenue | 4,322,553 | 548,948 |
| Net energy benefits | 441,055 | - |
| Sale of equipment | 150,997 | 91,545 |
| Total revenues | 7,670,605 | 19,424,335 |
| Less: Cost of revenues (excluding depreciation) | 4,678,002 | 8,412,360 |
| **Gross profit** | **2,992,603** | **11,011,975** |
| Selling, general and administrative | 4,977,417 | 6,476,945 |
| Share based payments | 1,068,288 | 390,609 |
| Depreciation and amortization | 7,962,523 | 13,803,032 |
| Change in fair value of derivative asset | 681,225 | - |
| Total operating expenses | 14,689,453 | 20,670,586 |
| **Loss from operations** | **(11,696,850)** | **(9,658,611)** |
| **Non-operating income/(expense):** | | |
| Losses on foreign currency transactions | (418,216) | (699,237) |
| Interest expense | (835,107) | (1,236,673) |
| Loss on write off property and equipment | (118,933) | - |
| Profit on sale of site | 790,847 | - |
| Gain on sale of marketable securities | 1,437,230 | - |
| Other income | 44,510 | 24,447 |
| Share of net loss of equity method investments | (36,356) | - |
| Total non-operating expense | 863,975 | (1,911,463) |
| **Loss before income taxes** | **(10,832,875)** | **(11,570,074)** |
| Income tax expenses | (548,083) | - |
| **Net Loss** | **(11,380,958)** | **(11,570,074)** |
| Less: Net loss attributable to non-controlling interests | (278,933) | (234,419) |
| | | |
| **Net Loss attributed to Mawson Infrastructure Group, Inc. stockholders** | $ (11,102,025) | $ (11,335,655) |
| | | |
| **Net Loss per share, basic & diluted** | $ (0.80) | $ (0.96) |
| **Weighted average number of shares outstanding** | 13,953,308 | 11,854,946 |

25

*Revenues*

Digital currency mining revenues from production for the three months ended March 31, 2023 and 2022 were $2.76 million and $18.78 million respectively. This represented a decrease of $16.02 million or 85%. The decrease in mining revenue for the period was primarily attributable to a decrease in the total Bitcoin produced. Bitcoin produced totaled 121.11 in 2023 compared with 458.68 in the 2022 period, a decrease of 74% of Bitcoin produced over the respective period. The reason for this decrease is due to less miners being deployed during the current period due to the sale of the Georgia site which occurred during October 2022, in addition to this the difficulty to mine Bitcoin was also higher during the current quarter. Another reason for the decrease in digital currency mining revenue is due to the average price of Bitcoin. During the quarter ended March 31, 2023, the average price of Bitcoin was $22,721 whereas the average price of Bitcoin during the quarter ended March 31, 2022 was $41,256, a 45% decrease in the average price.

Hosting co-location revenue for the three months ended March 31, 2023 and 2022 were $4.32 million and $0.55 million respectively. This increase is due to an increase in the number of miners we hosted during the period ended in March 2023.

Net energy benefits for the three months ended March 31, 2023 and 2022, were $0.44 million and $0 respectively. This increase is due to us not offering this service at in the three months ended March 31, 2022.

Sales of digital mining equipment for the three months ended March 31, 2023 and 2022, were $0.15 million and $0.09 million, respectively.

*Operating Cost and Expenses*

Our operating costs and expenses include cost of revenues; selling, general and administrative expenses; share based payments; and depreciation and amortization.

**Cost of revenues.**

Our cost of revenue consists primarily of direct power costs related to digital currency mining, and cost of mining equipment sold.

Cost of revenues for the three months ended March 31, 2023 and 2022 were $4.68 million and $8.41 million, respectively. The decrease in cost of revenue was primarily attributable to a decrease in power costs related to energy to operate the mining equipment within our owned and hosting facilities. This decrease is attributable to less miners being used in operations during the current quarter due to the sale of the Georgia site.

**Selling, general and administrative.**

Our selling, general and administrative expenses consist primarily of professional and management fees relating to: accounting, payroll, audit, and legal; equipment repairs; marketing; freight; insurance; consultant fees; lease amortization and general office expenses.

Selling, general and administrative expenses for the three months ended March 31, 2023 and 2022 were $4.98 million and $6.48 million respectively. Total selling, general and administrative expenses reduced by $1.51 million in the period. The main reasons for the decrease the expenses were due to equipment repair costs decreasing by $0.83 million; information technology expenses decreased by $0.37 million; freight costs decreased by $0.22 million and marketing costs decreased by $0.22 million. This is offset by an increase in property tax of $0.32 million in relation to the Georgia site which was sold during 2022 and an increase in business and property insurance by $0.14 million.

**Share based payments.**

Share based payments expenses for the three months ended March 31, 2023 and 2022 were $1.07 million and $0.39 million respectively. In the three months ended March 31, 2023, share based payments were largely attributable to costs recognized for warrants issued to Celsius Mining LLC amounting to $0.50 million, shares issued to W Capital Advisors Pty Ltd amounting to $0.31 million and $0.20 million in relation to long-term incentives for the Company's leadership team.

**Depreciation and amortization.**

Depreciation consists primarily of depreciation of digital currency mining hardware and MDC equipment.

Depreciation and amortization for the three months ended March 31, 2023 and 2022 were $7.96 million and $13.80 million, respectively. The decrease is primarily attributable to the Company owning less miners in the quarter ended March 31, 2023, as at March 31 2023 there were 23,332 miners whereas as at March 31 2022 there were 39,225 miners. There was also a revised estimate of the useful life of miners with effect from December 1, 2022 to better reflect the pattern of consumption the change being effected by changing the method of depreciation from reducing balance to the straight line method from that date.

*Change in fair value of derivative asset*

During the three months ended March 31, 2023, there was an adverse change in the fair value of the derivative asset by $0.68 million in relation to our power supply arrangements.

*Non-operating expense*

Non-operating expenses consist primarily of interest expense, losses on foreign currency transactions, loss on write off property, plant and equipment, and share of net loss of associates accounted for using the equity method.

Interest expense for the three months ended March 31, 2023 and 2022 were $0.84 million and $1.24 million, respectively. This was a decrease of $0.39 million which was attributable to the paydown of debt during 2022 and the current quarter resulting in a lower interest charge.

During the three months ended March 31, 2023, the realized and unrealized loss on foreign currency transactions was $0.42 million, and for the three months ended March 31, 2022 there was a loss of $0.70 million due to the movement in foreign exchange rates.

*Non-operating income*

Non-operating income consists primarily of a gain on the sale of investments, profit on sale of site assets and other income.

The gain on sales of marketable securities for the three months ended March 31, 2023 and 2022 were $1.44 million and $0, respectively. The gain during the quarter was in relation to the sale of CleanSpark shares.

The profit on sale of site assets for the three months ended March 31, 2023 and 2022 were $0.79 million and $0, respectively. This gain on sale relates to an accounting adjustment relating to the sale of the Georgia site to CleanSpark. The company determined the impact of recording this adjustment during 2023 was not material to the financial statements or the opening balance of the accumulated deficit.

*Net loss attributable to Mawson Infrastructure Group, Inc. stockholders*

As a result of the foregoing, the Company recognized a net loss of $11.10 million for the three months ended March 31, 2023, compared to a net loss of $11.34 million for the three months ended March 31, 2022.

*Liquidity and Capital Resources*

*General*

Liquidity is the ability of a company to generate funds to support its current and future operations, satisfy its obligations, and otherwise operate on an ongoing basis. Significant factors in the management of liquidity are funds generated by operations, levels of accounts receivable and accounts payable and capital expenditures. For the three month period ended March 31, 2023, we financed our operations primarily through:

1. Net cash provided by operating activities of $1.22 million;

2. On December 9, 2021, MIG No.1 Pty Ltd entered into a Secured Loan Facility Agreement with Marshall Investments MIG Pty Ltd ("Marshall") with a total loan facility of AUD$20 million (USD$12.98 million). Principal repayments began in November 2022, the outstanding balance as at March 31, 2023 is $9.08 million.

3. On February 23, 2022, Luna Squares LLC entered into the Co-Location Agreement with Celsius Mining LLC, in connection with this agreement, Celsius Mining loaned Luna Squares LLC a principal amount of US$20,000,000, for the purpose of funding the infrastructure required to meet part of the obligations of the Co-Location Agreement. The outstanding balance as at March 31, 2023 is $11 million.

4. On July 8, 2022, the Company issued secured convertible promissory notes to investors in the aggregate principal amount of $3,600,000 in exchange for an aggregate of $3,600,000. The outstanding loan balance as at March 31, 2023 is $0.5 million.

5. On July 17, 2022, the Company entered into a Securities Purchase Agreement with an institutional investor providing for the issuance and sale by the Company of 1.33 million shares of the Company's common stock, at a price of $4.80 per share, accompanied by warrants to purchase 1.67 million shares of the Company's common stock in a registered direct offering pursuant to a "shelf" registration statement on Form S-3 (File No. 333-264062). The warrants issued in this offering have an exercise price of $6.06 per share of our common stock, are exercisable 6 months after issuance and will expire five and one-half years following issuance. This offering closed on July 20, 2022. The net amount raised was $5.62 million.

6. On September 2, 2022, Mawson Infrastructure Group Pty Ltd entered into a Secured Loan Facility Agreement with W Capital Advisors Pty Ltd with a total loan facility of AUD$8 million (USD$5.2 million. The outstanding balance as at March 31, 2023 is $2.36 million.

During the three months ending March 31, 2023 we repaid $5.40 million of principal payments against the historical facilities provided by Celsius and W Capital Advisors Pty Ltd.

We believe our working capital requirements will continue to be funded through a combination of the cash we expect to generate from future operations, our existing funds, external debt facilities available to us and further issuances of shares. These are expected to be adequate to fund our operations over the next twelve months. In addition, the Company has access to equity financing through the ATM offering facility entered in May 2022, however, the Company's access to its ATM facility is currently limited by the Instruction I.B.6 to Form S-3, known as the "baby shelf" rules because of the Company's public float being less than $75 million. Because of the "baby shelf" rules limitation and the Company's recent offer and sale of approximately $5 million of shares of common stock and pre-funded warrants (along with a concurrent private offering of warrants to purchase common stock), the Company reduced the amount available to be sold through it ATM facility to $9 million. For our business to grow it is expected we will continue investing in mining equipment, and will require additional working capital in the short-term. We have an aggregate of $22.94 million of debt and 15.33 million of customer deposits that is required to be repaid within eleven months unless we refinance or renegotiate the terms.

28

Please see our Risk Factor entitled "We may need to raise additional capital to continue our operations and execute our business strategy" in our Annual Report on Form 10-K for the year ended December 31, 2022.

*Working Capital and Cash Flows*

As of March 31, 2023, and December 31, 2022, we had cash and cash equivalents balance of $1.39 million and $0.95 million, respectively.

As of March 31, 2023, and December 31, 2022, our trade receivables balance was $7.95 million and $10.46 million, respectively.

As of March 31, 2023, we had $22.94 million of outstanding short-term borrowings, and as of December 31, 2022, we had $23.61 million of short-term borrowings. The short-term borrowings as of March 31, 2023, relate to the to the secured loan facilities with Celsius Mining LLC, W Capital Advisors Pty Ltd, the secured convertible promissory notes issued to investors and Marshall Investments MIG Pty Ltd. As of March 31, 2023, and as of December 31, 2022, we had $0 and $4.51 million, respectively, of outstanding long-term borrowings.

As of March 31, 2023, we had negative working capital of $31.81 million and as at December 31, 2022, we had negative working capital of $15.17 million.

The following table presents the major components of net cash flows (used in) provided by operating, investing and financing activities for the three months ending March 31, 2023 and 2022:

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2023** | | **2022** | |
| Net cash provided by operating activities | $ | 1,316,592 | $ | 5,865,759 |
| Net cash provided by/(used in) investing activities | $ | 4,069,294 | $ | (29,661,210) |
| Net cash (used in)/provided by financing activities | $ | (4,935,714) | $ | 23,484,932 |

For the three months ended March 31, 2023, net cash provided by operating activities was $1,316,592 and for the three months ended March 31, 2022, net cash provided by operating activities was $5,865,759. The decrease in net cash provided by operating activities was primarily attributable to timing differences in trade and other receivables and trade and other payables.

For the three months ended March 31, 2023, net cash provided by investing activities was $4,069,294 and for the three months ended March 31, 2022 net cash used in investing activities was $29,661,210. The net cash provided by investing activities during March 31, 2023 was primarily attributable the proceeds from sale of investment shares in CleanSpark.

For the three months ended March 31, 2023, net cash used in financing activities was $4,935,714 and for the three months ended March 31, 2022 net provided by financing activities was $23,484,932. The cash used in financing activities during March 31, 2023 was primarily attributable to the repayment of borrowings.

*Financial condition*

As at March 31, 2023 and December 31, 2022, we had net current liabilities of $31.81 million and $15.17 million respectively. As at March 31, 2023 and December 31, 2022, we had net assets of $66.73 million and $76.17 million respectively. As at March 31, 2023 we had an accumulated deficit of $133.36 million compared to $122.26 million as at December 31, 2022. Our cash position at March 31, 2023, was $1.39 million in comparison to $0.95 million at December 31, 2022. For the three month period ending March 31 2023 and March 31, 2022 the Company incurred a loss after tax of $11.38 million and a loss after tax of $11.57 million respectively.

Our primary requirements for liquidity and capital are working capital, capital expenditures, public company costs and general corporate needs. We expect these needs to continue as we further develop and grow our business. Our principal sources of liquidity have been and are expected to be our cash and cash equivalents, external debt facilities available to us and further issuances of shares.

In the event that we require additional capital to respond to competitive pressure, market dynamics, new technologies, customer demands, business opportunities, challenges, acquisitions or unforeseen circumstances in either the short-term or long-term, we may determine to engage in equity or debt financings or enter into credit facilities for other reasons. If we are unable to obtain adequate financing on terms satisfactory to us when we require it, our ability to continue to grow or support our business model and to respond to business challenges could be significantly limited. In particular, rising inflation and interest rates, and the conflict between Russia and Ukraine have resulted in, and may continue to result in, significant disruption and volatility in the global financial markets, reducing our ability to access capital. If we are unable to raise additional funds when or on the terms desired, our business, financial condition and results of operations could be adversely affected.

On May 4, 2023, the Company has entered into a definitive agreement with institutional investors for the issuance and sale of 2,083,336 shares of its common stock at a purchase price of $2.40 per share of common stock in a registered direct offering. In addition, in a concurrent private placement, the Company will issue to the institutional investors unregistered warrants to purchase up to 2,604,170 shares of its common stock with an exercise price of $3.23 per share and are exercisable six months following issuance for a period of five and one-half years following issuance. The closing of the registered direct offering and the concurrent private placement is expected to occur on or about May 8, 2023, subject to the satisfaction of customary closing conditions.

***Non-GAAP Financial Measures***

The Company utilizes a number of different financial measures, both GAAP and non-GAAP, in analyzing and assessing its overall business performance, for making operating decisions and for forecasting and planning future periods. The Company considers the use of non-GAAP financial measures helpful in assessing its current financial performance, ongoing operations and prospects for the future. While the Company uses non-GAAP financial measures as a tool to enhance its understanding of certain aspects of its financial performance, the Company does not consider these measures to be a substitute for, or superior to, the information provided by GAAP financial measures. Consistent with this approach, the Company believes that disclosing non-GAAP financial measures to the readers of its financial information provides such readers with useful supplemental data that, while not a substitute for GAAP financial measures, allows for greater transparency in the review of its financial and operational performance. Investors are cautioned that there are inherent limitations associated with the use non-GAAP financial measures as an analytical tool. In particular, non-GAAP financial measures are not based on a comprehensive set of accounting rules or principles and many of the adjustments to the GAAP financial measures reflect the exclusion of items that are recurring and will be reflected in the company's financial results for the foreseeable future. In addition, other companies, including other companies in the Company's industry, may calculate non-GAAP financial measures differently than the Company does, limiting their usefulness as a comparative tool.

The Company is providing supplemental financial measures for (i) non-GAAP adjusted earnings before interest, taxes, depreciation and amortization, or ("adjusted EBITDA") that excludes the impact of interest, taxes, depreciation, amortization, share-based compensation expense, LO2A write-back, unrealized gains/losses on share of associates, and certain non-recurring expenses. We believe that adjusted EBITDA is useful to investors in comparing our performance across reporting periods on a consistent basis.

|  | For the three months Ended March 31, | |
|---|---|---|
|  | 2023 | 2022 |
| **Reconciliation of non-GAAP adjusted EBITDA:** | | |
| Net loss: | $ (11,380,958) | $ (11,570,074) |
| Share of net loss of equity method investments | 36,356 | - |
| Depreciation and amortization | 7,962,523 | 13,803,032 |
| Share based payments | 1,068,288 | 390,609 |
| Unrealized and realized losses/(gain) | 418,216 | 699,237 |
| Other non-operating income | (44,510) | (24,447) |
| Other non-operating expenses | 954,040 | 1,236,673 |
| Income tax | 548,083 | - |
| **Adjusted EBITDA (non-GAAP)** | **$ (437,962)** | **$ 4,535,030** |

**Critical accounting estimates**

The preparation of the financial statements in conformity with U.S. GAAP requires management to make estimates, judgments and assumptions that affect the amounts reported in the financial statements and accompanying notes. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements, and the reported amounts of income and expenses during the reporting periods. Actual results could differ from those estimates. There have been no material changes to our critical accounting policies and estimates as set forth in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, included in our Annual Report on Form 10-K for the year ended December 31, 2022.

**Item 3. Quantitative and Qualitative Disclosures about Market Risks**

As a smaller reporting company, the Company has elected not to provide the disclosure required by this item.

**Item 4. Controls and Procedures**

*Evaluation of disclosure controls and procedures*

Our management, with the participation of our Chief Executive Officer (principal executive officer) and Chief Financial Officer (principal financial officer), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a- 15(e)) and 15d- 15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost benefit relationship of possible controls and procedures. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective at the reasonable assurance level as of March 31, 2023, due to the material weaknesses in our internal control over financial reporting described below. Management's assessment of the effectiveness of our disclosure controls and procedures is expressed at a level of reasonable assurance because management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

***Significant Reliance on Key Individuals.*** There is inadequate segregation of duties in place related to our financial reporting and other management review and oversight procedures due to the lack of sufficient accounting personnel. This is not inconsistent with similar small fast-growing organizations. This gives rise to the risk of lack of ability to react in a timely manner to operations issues and meet increased US GAAP/SOX/SEC registrant requirements. In addition, this poses the risk that compliance and other reporting obligations are not dealt with in an adequate manner.

***Controls over the financial statement close and reporting process.*** Controls were not adequately designed or implemented in the financial statement close and reporting process. This includes controls related to complex and judgmental accounting transactions including business acquisitions and divestures, derivatives, manual journal entries, account reconciliations and financial statement policies and disclosures.

***Information and Technology Controls.*** There are control deficiencies related to information technology ("IT") general controls that aggregate into a material weakness. Deficiencies identified include lack of controls over access to programs and data, program changes, program development, program changes and general IT controls.

***Data from third parties.*** The Company did not properly execute its designed controls to ensure that data received from third parties is complete and accurate. Such data is relied on by the Company in determining amounts pertaining to mining and hosting revenue, net energy benefits, and digital currency assets.

***Fixed asset verification.*** The Company did not properly execute its designed controls around physical asset verification at US mining sites. Together with system limitations, restricting tracking of fixed asset movements, there is a risk around the existence of fixed assets. The root cause is the lack of sufficient capable personnel to perform physical asset inspections, combined with system limitations.

Notwithstanding the identified material weaknesses and management's assessment that our internal control over financial reporting was not effective as of March 31,2023, management believes that the consolidated condensed financial statements included in this Quarterly Report on Form 10-Q fairly present, in all material respects, our financial condition, results of operations and cash flows as of and for the periods presented in accordance with generally accepted accounting principles. We rely on the assistance of outside advisors with expertise in these matters in preparing the financial statements.

**Remediation**

Our Board of Directors and management take internal control over financial reporting and the integrity of our financial statements seriously. With the oversight of senior management and our audit committee, we continue to remediate the underlying causes of the identified material weaknesses, such that the controls are designed, implemented and operating effectively.

Our remediation efforts commenced in the prior financial year, where we performed a risk assessment, designed controls, and gradually implemented controls for all business processes. In the current financial year, management updated the initial risk assessment, refined control designs, continued the implementation of controls and performed ongoing remediation efforts to uplift the quality and effectiveness of existing controls. Remediation efforts further included the implementation of new IT systems and applications with robust controls, segregating duties through implementing system workflows and the hiring of qualified personnel in financial reporting and IT. A number of controls remain to be implemented in the upcoming quarters.

The material weaknesses in our internal control over financial reporting will not be considered remediated until controls operated for a sufficient period of time and have been tested for and concluded on for effectiveness. Formal management testing of the effectiveness of controls is planned for the third and fourth quarters of this financial year.

Remediation efforts for upcoming quarters will be focused on implementing the remainder of controls, refining existing controls and validating the effectiveness of implemented controls using criteria set forth by Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control. We cannot provide any assurance that our remediation efforts will be successful or that our internal control over financial reporting will be effective as a result of these efforts. In addition, we continue to evaluate and work to improve our internal control over financial reporting related to the identified material weaknesses, management may determine to take additional measures to address control deficiencies or determine to modify the remediation plan described above.

***Changes in internal control over financial reporting***

Except for the remedial measures described above, there have been no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) or 15d-15(f) of the Exchange Act) that occurred during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Limitations on Effectiveness of Controls and Procedures and Internal Control over Financial Reporting**

In designing and evaluating the disclosure controls and procedures and internal control over financial reporting, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures and internal control over financial reporting must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

## PART II. OTHER INFORMATION

**Item 1. Legal Proceedings**

We are currently not, and have not been in the recent past, a party to any legal proceedings which may have or have had in the recent past significant effects on our financial position or profitability. However, we have been in the past, and may be from time to time in the future, named as a defendant in certain routine litigation incidental to our business.

**Item 1A. Risk Factors**

The Company's risk factors were disclosed in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2022 which was filed on March 23, 2023. The Company does not have any additional risk factors to disclose.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

On January 16, 2023, the Company entered into an arrangement with the holder of a convertible promissory note whereby the holder received pre-payment of interest to become due under the convertible promissory note by means of the Company issuing 18,807 shares of common stock to the holder. The shares issued were valued at $0.06 million on the date of issuance and represented a partial payment of the interest on the debt.

On February 10, 2023, the Company issued to W Capital Advisors Pty Ltd 93,334 shares of the Company's common stock valued at $0.31 million on the date of issuance for consultancy and advisory services provided to the Company.

We believe that the foregoing sales qualified for exemption under Section 4(a)(2) of the Securities Act and/or Regulation D, as promulgated under the Securities Act, since the issuance of the securities by us did not involve a public offering. The offerings were not "public offerings" as defined in Section 4(a)(2) due to the type of investors, the insubstantial number of investors involved in the offering, the size of the offering, the manner of the offering and number of securities offered. In addition, these security holders represented as to the necessary investment intent as required by Section 4(a)(2) and/or Regulation D. We did not employ an underwriter in connection with the issuance of the securities described above.

**Item 3. Defaults Upon Senior Securities**

None

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

None

**Item 6. Exhibits**

| | |
|---|---|
| 2.1† | Bid Implementation Agreement between Wize Pharma, Inc. and Cosmos Capital Limited, dated December 30, 2020 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on January 5, 2021) |
| 2.2† | Deed of Amendment, dated January 18, 2021, of the Bid Implementation Agreement between Wize Pharma, Inc. and Cosmos Capital Limited, dated December 30, 2020 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on January 19, 2021) |
| 3.1 | Certificate of Incorporation (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on April 5, 2012) |
| 3.2 | Certificate of Amendment to Certificate of Incorporation (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on July 18, 2013) |
| 3.3 | Certificate of Amendment to Certificate of Incorporation dated November 15, 2017 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on November 21, 2017) |
| 3.4 | Certificate of Amendment to Certificate of Incorporation dated March 1, 2018 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on March 5, 2018) |
| 3.5 | Certificate of Amendment to Certificate of Incorporation dated March 17, 2021 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on March 23, 2021) |
| 3.6 | Certificate of Amendment to Certificate of Incorporation dated June 9, 2021 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on June 14, 2021) |
| 3.7 | Certificate of Amendment to Certificate of Incorporation dated August 11, 2021 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on August 16, 2021) |
| 3.8* | Certificate of Amendment to Certificate of Incorporation dated February 6, 2022 |
| 3.9 | Certificate of Registration of a Company of Cosmos Capital Limited ACN 636 458 912 (Incorporated by reference to the Company's Registration Statement on Form S-1 (File No. 333-256947) filed with the SEC on June 9, 2021) |
| 3.10 | Constitution of Cosmos Capital Limited (Incorporated by reference to the Company's Registration Statement on Form S-1 (File No. 333-256947) filed with the SEC on June 9, 2021) |
| 3.11 | Bylaws (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on May 10, 2013) |
| 10.1 | Director Appointment Letter between the Company and Rahul Mewawalla dated January 31, 2023 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on January 31, 2023) |
| 31.1* | Certification of Principal Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32** | Certifications of Principal Executive Officer and Principal Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002. |
| 99.1* | Press Release |
| 99.2* | Investor Presentation |
| 101 | The following materials from the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2023, formatted in Inline XBRL (eXtensible Business Reporting Language): (i) Consolidated Balance Sheets as of March 31, 2023 and December 31, 2022, (ii) Consolidated Statements of Operations for the three months ended March 31, 2023 and 2022, (iii) Consolidated Statements of Cash Flows for the three months ended March 31, 2023 and 2022, and (iv) Notes to Consolidated Financial Statements |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

\*    Filed herewith.

\*\*   Furnished herewith.

†    Exhibits and schedules to this exhibit have been omitted pursuant to Item 601(b)(2) of Regulation S-K. We will furnish the omitted exhibits and schedules to the Securities and Exchange Commission upon request by the Securities and Exchange Commission.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  |  |
|---|---|---|
|  |  | **Mawson Infrastructure Group Inc.** |
| Date: May 15, 2023 | By: | /s/ James Manning |
|  |  | **James Manning, Chief Executive Officer** |
|  |  | (Principal Executive Officer) |
| Date: May 15, 2023 | By: | /s/ Ariel Sivikofsky |
|  |  | **Principal Financial Officer** |
|  |  | (Principal Financial and Accounting Officer) |

35

**<u>EXHIBIT B</u>**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

(Mark One)
☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2023**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-40849**

**Mawson Infrastructure Group Inc.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **88-0445167** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **201 Clark Street, Sharon, Pennsylvania** | **16146** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

+1-412 -515-0896
(Registrant's telephone number, including area code)

(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.001 per share | MIGI | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒

As of August 18, 2023, the issuer had a total of 16,518,043 shares of common stock, par value $0.001 per share, outstanding.

**MAWSON INFRASTRUCTURE GROUP INC.**
**FORM 10-Q**
**FOR THE QUARTER ENDED JUNE 30, 2023**

**TABLE OF CONTENTS**

| Item | | Page Number |
|---|---|---|
| | **Part I – Financial Information** | |
| | | |
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risks | 39 |
| Item 4. | Controls and Procedures | 39 |
| | | |
| | **Part II – Other Information** | |
| | | |
| Item 1. | Legal Proceedings | 41 |
| Item 1A. | Risk Factors | 41 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 43 |
| Item 3. | Defaults Upon Senior Securities | 43 |
| Item 4. | Mine Safety Disclosure | 43 |
| Item 5. | Other Information | 43 |
| Item 6. | Exhibits | 44 |
| | Signatures | 45 |

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements**

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES
CONSOLIDATED CONDENSED BALANCE SHEETS**

| | June 30, 2023 | December 31, 2022 |
|---|---:|---:|
| **ASSETS** | (unaudited) | |
| Current assets: | | |
| Cash and cash equivalents | $ 5,607,254 | $ 946,265 |
| Prepaid expenses | 3,584,578 | 3,488,868 |
| Trade and other receivables | 6,403,552 | 10,458,076 |
| Assets held for sale | - | 5,446,059 |
| **Total current assets** | **15,595,384** | **20,339,268** |
| Property and equipment, net | 78,529,474 | 91,016,498 |
| Derivative asset | 5,174,446 | 11,299,971 |
| Investments, equity method | 1,993,837 | 2,085,373 |
| Marketable securities | - | 3,243,957 |
| Security deposits | 424,064 | 2,524,065 |
| Operating lease right-of-use asset | 3,052,978 | 2,819,933 |
| **Total assets** | **$ 104,770,183** | **$ 133,329,065** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Trade and other payables | $ 25,337,339 | $ 10,572,061 |
| Current portion of operating lease liability | 1,649,529 | 1,300,062 |
| Current portion of finance lease liability | 31,859 | 30,702 |
| Current portion of long-term borrowings | 20,873,805 | 23,610,583 |
| **Total current liabilities** | **47,892,532** | **35,513,408** |
| Customer deposits | - | 15,328,445 |
| Operating lease liability, net of current portion | 1,478,707 | 1,727,975 |
| Finance lease liability, net of current portion | 67,000 | 83,223 |
| Long-term borrowings, net of current portion | - | 4,509,894 |
| **Total liabilities** | **49,438,239** | **57,162,945** |
| Commitments and Contingencies (Note 9) | | |
| Stockholders' equity: | | |
| Series A preferred stock; 1,000,000 shares authorized, no shares issued and outstanding as of June 30, 2023 and December 31, 2022 | - | - |
| Common stock, $0.001 par value per share; 90,000,000 shares authorized, 16,454,709 and 13,625,882 shares issued and outstanding as of June 30, 2023, and December 31, 2022, respectively | 16,455 | 13,626 |
| Additional paid-in capital | 202,136,148 | 194,294,559 |
| Accumulated other comprehensive income | 5,321,282 | 5,021,467 |
| Accumulated deficit | (150,703,559) | (122,257,628) |
| **Total Mawson Infrastructure Group, Inc. stockholders' equity** | **56,770,326** | **77,072,024** |
| Non-controlling interest | (1,438,382) | (905,904) |
| **Total stockholder's equity** | **55,331,944** | **76,166,120** |
| **Total liabilities and stockholder's equity** | **$ 104,770,183** | **$ 133,329,065** |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF OPERATIONS**
(Unaudited)

| | For the three months ended June 30, | | For the six months ended June 30, | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| **Revenues:** | | | | |
| Digital currency mining revenue | $ 4,896,521 | $ 16,212,525 | $ 7,652,521 | $ 34,996,368 |
| Hosting co-location revenue | 4,594,752 | 3,567,912 | 8,917,306 | 4,116,860 |
| Net energy benefits | 1,017,678 | - | 1,458,734 | - |
| Sale of equipment | 42,584 | - | 193,581 | 91,545 |
| **Total revenues** | **10,551,535** | **19,780,437** | **18,222,142** | **39,204,773** |
| Less: Cost of revenues (excluding depreciation) | 7,028,458 | 14,359,072 | 11,706,460 | 22,771,433 |
| **Gross profit** | **3,523,077** | **5,421,365** | **6,515,682** | **16,433,340** |
| Selling, general and administrative | 6,265,256 | 9,431,088 | 11,242,674 | 15,908,034 |
| Stock based compensation | 687,276 | 936,235 | 1,691,619 | 1,326,844 |
| Depreciation and amortization | 8,789,755 | 16,023,817 | 16,752,279 | 29,826,849 |
| Change in fair value of derivative asset | 5,444,300 | (17,714,357) | 6,125,525 | (17,714,357) |
| Total operating expenses | **21,186,587** | **8,676,783** | **35,812,097** | **29,347,370** |
| **Loss from operations** | **(17,663,510)** | **(3,255,418)** | **(29,296,415)** | **(12,914,030)** |
| **Non-operating income (expense):** | | | | |
| Losses on foreign currency transactions | (397,165) | 1,657,055 | (815,382) | 957,818 |
| Interest expense | (647,062) | (1,565,040) | (1,546,114) | (2,801,713) |
| Impairment of financial assets | - | (1,107,197) | - | (1,107,197) |
| Profit on sale of site | 2,562,283 | - | 3,353,130 | - |
| Gain on sale of marketable securities | - | - | 1,437,230 | - |
| Other income | 252,363 | 1,864,968 | 177,941 | 1,889,415 |
| Share of net loss of equity method investments | - | - | (36,356) | - |
| Total non-operating income (expense), net | 1,770,419 | 849,786 | 2,570,449 | (1,061,677) |
| **Loss before income taxes** | **(15,893,091)** | **(2,405,632)** | **(26,725,966)** | **(13,975,707)** |
| Income tax expense | (1,756,371) | - | (2,304,454) | - |
| **Net Loss** | **(17,649,462)** | **(2,405,632)** | **(29,030,420)** | **(13,975,707)** |
| Less: Net loss attributable to non-controlling interests | (305,556) | (288,229) | (584,489) | (522,648) |
| **Net Loss attributed to Mawson Infrastructure Group stockholders** | **$ (17,343,906)** | **$ (2,117,403)** | **$ (28,445,931)** | **$ (13,453,059)** |
| | | | | |
| **Net Loss per share, basic and diluted** | **$ (1.12)** | **$ (0.18)** | **$ (1.93)** | **$ (1.12)** |
| **Weighted average number of shares outstanding** | 15,527,824 | 11,933,092 | 14,744,915 | 11,965,129 |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF COMPREHENSIVE LOSS**
(Unaudited)

| | For the three months ended June 30, | | For the six months ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Net Loss | $ (17,649,462) | $ (2,405,632) | $ (29,030,420) | $ (13,975,707) |
| Other comprehensive (income) loss | | | | |
| Foreign currency translation adjustment | 220,093 | (2,579,238) | 351,826 | (1,995,930) |
| Comprehensive loss | (17,429,369) | (4,984,870) | (28,678,594) | (15,971,637) |
| Less: Comprehensive loss attributable to non-controlling interests | (305,556) | (288,229) | (584,489) | (522,648) |
| **Comprehensive loss attributable to common stockholders** | **$ (17,123,813)** | **$ (4,696,641)** | **$ (28,094,105)** | **$ (15,448,989)** |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY**
(Unaudited)

### For the Three Months Ended June 30, 2023

| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity |
|---|---|---|---|---|---|---|---|---|
| Balance as of March 31, 2023 | 14,131,110 | $ 14,131 | $196,110,680 | $ 5,112,159 | $(133,359,653) | $ 67,877,317 | $(1,143,796) | $ 66,733,521 |
| Issuance of warrants | - | - | 500,500 | - | - | 500,500 | - | 500,500 |
| Exercising of RSU's and stock options | 656 | 1 | - | - | - | 1 | - | 1 |
| Issuance of RSU's and stock options | - | - | 186,775 | - | - | 186,775 | - | 186,775 |
| Issuance of common stock, net of issuance costs | 2,322,943 | 2,323 | 5,338,193 | - | - | 5,340,516 | - | 5,340,516 |
| Net loss | - | - | - | - | (17,343,906) | (17,343,906) | (305,556) | (17,649,462) |
| Other comprehensive income | - | - | - | 209,123 | - | 209,123 | 10,970 | 220,093 |
| Balance as of June 30, 2023 | 16,454,709 | $ 16,455 | $202,136,148 | $ 5,321,282 | $(150,703,559) | $ 56,770,326 | $(1,438,382) | $ 55,331,944 |

See accompanying notes to unaudited consolidated condensed financial statements.

4

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY**
(Unaudited)

**For the Three Months Ended June 30, 2022**

| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity |
|---|---|---|---|---|---|---|---|---|
| **Balance as of March 31, 2022** | 11,930,883 | $ 11,931 | $186,712,936 | $ 62,214 | $ (82,458,914) | $ 104,328,167 | $ (399,045) | $103,929,122 |
| Issuance of common stock, stock based compensation | 833 | 1 | 435,733 | - | - | 435,734 | - | 435,734 |
| Issuance of warrants | - | - | 500,500 | - | - | 500,500 | - | 500,500 |
| Issuance of RSU's and stock options | 150,167 | 150 | 746 | - | - | 896 | - | 896 |
| Net loss | - | - | - | - | (2,117,403) | (2,117,403) | (288,229) | (2,405,632) |
| Other comprehensive income | - | - | - | (2,592,266) | - | (2,592,266) | 13,028 | (2,579,238) |
| Non-controlling interest | - | - | (917,684) | - | 1,623,457 | 705,773 | 534,019 | 1,239,792 |
| **Balance as of June 30, 2022** | 12,081,883 | $ 12,082 | $186,732,231 | $ (2,530,052) | $ (82,952,860) | $ 101,261,401 | $ (140,227) | $101,121,174 |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY**
(Unaudited)

**For the Six Months Ended June 30, 2023**

| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity |
|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2022** | **13,625,882** | **$ 13,626** | **$194,294,559** | **$ 5,021,467** | **$(122,257,628)** | **$ 77,072,024** | **$ (905,904)** | **$ 76,166,120** |
| Conversion of notes payable into common stock | 104,319 | 104 | 276,855 | - | - | 276,959 | - | 276,959 |
| Issuance of common stock in lieu of interest on borrowings | 18,807 | 19 | 63,926 | - | - | 63,945 | - | 63,945 |
| Issuance of common stock for services | 93,334 | 93 | 306,976 | - | - | 307,069 | - | 307,069 |
| Issuance of warrants | - | - | 1,001,000 | - | - | 1,001,000 | - | 1,001,000 |
| Exercising of RSU's and stock options | 113,760 | 114 | (114) | - | - | - | - | - |
| Stock based compensation for RSUs | - | - | 383,550 | - | - | 383,550 | - | 383,550 |
| Issuance of common stock, net of issuance costs | 2,498,607 | 2,499 | 5,809,396 | - | - | 5,811,895 | - | 5,811,895 |
| Net loss | - | - | - | - | (28,445,931) | (28,445,931) | (584,489) | (29,030,420) |
| Other comprehensive income | - | - | - | 299,815 | - | 299,815 | 52,011 | 351,826 |
| **Balance as of June 30, 2023** | **16,454,709** | **$ 16,455** | **$202,136,148** | **$ 5,321,282** | **$(150,703,559)** | **$ 56,770,326** | **$(1,438,382)** | **$ 55,331,944** |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY**
(Unaudited)

**For the Six Months Ended June 30, 2022**

| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity |
|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2021** | 11,791,085 | 11,791 | 186,377,777 | (521,094) | (71,123,259) | 114,745,215 | (164,626) | 114,580,589 |
| Issuance of common stock, stock based compensation | 3,131 | 3 | 543,460 | - | - | 543,463 | - | 543,463 |
| Issuance of warrants | - | - | 667,333 | - | - | 667,333 | - | 667,333 |
| Issuance of RSU's and stock options | 287,667 | 288 | 61,345 | - | - | 61,633 | - | 61,633 |
| Net loss | - | - | - | - | (13,453,059) | (13,453,059) | (522,648) | (13,975,707) |
| Other comprehensive income | - | - | - | (2,008,958) | - | (2,008,958) | 13,028 | (1,995,930) |
| Non-controlling interest | - | - | (917,684) | - | 1,623,458 | 705,774 | 534,019 | 1,239,793 |
| **Balance as of June 30, 2022** | 12,081,883 | $ 12,082 | $186,732,231 | (2,530,052) | (82,952,860) | 101,261,401 | (140,227) | 101,121,174 |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF CASH FLOWS**
(Unaudited)

| | For the six months ended June 30, | |
|---|---|---|
| | 2023 | 2022 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (29,030,420) | $ (13,975,707) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 16,752,279 | 29,826,849 |
| Amortization of operating lease right-of-use asset | 678,310 | 809,130 |
| Foreign exchange gain | 751,833 | 137,758 |
| Sale of intellectual property | - | (1,465,829) |
| Stock based compensation | 1,691,619 | 1,326,844 |
| Non-cash interest expense | 866,691 | 138,293 |
| Unrealized (gain) loss on derivative asset | 6,125,525 | (17,714,357) |
| Non-controlling interest | - | 1,239,793 |
| Gain on sale of marketable securities | (1,437,230) | - |
| Share of loss from equity method investments | 36,122 | - |
| Loss on sale of property and equipment | 158,023 | - |
| Loss on write off of property and equipment | 73,243 | - |
| Profit on sale of site | (3,353,130) | - |
| Changes in assets and liabilities: | | - |
| Trade and other receivables | 1,808,709 | 1,394,878 |
| Operating lease liabilities | (807,136) | - |
| Other current assets | 2,004,290 | (7,869,996) |
| Trade and other payables | (511,208) | 39,299,304 |
| **Net cash (used in) provided by operating activities** | (4,192,480) | 33,146,960 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Payment for the purchase of property and equipment | (4,851,771) | (21,100,867) |
| Proceeds from sale of site | 8,107,508 | - |
| Proceeds from sales of property and equipment | 584,301 | - |
| Proceeds from sale of marketable securities | 6,927,003 | - |
| Payment of property and equipment deposits | - | (32,054,326) |
| **Net cash provided by (used in) investing activities** | 10,767,041 | (53,155,193) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from common share issuances | 6,192,845 | 51,524 |
| Payments of stock issuance costs | (380,950) | - |
| Proceeds from borrowings | 1,986,870 | 26,581,467 |
| Repayment of finance lease liabilities | (19,088) | (937,008) |
| Repayment of borrowings | (9,672,854) | (6,182,245) |
| **Net cash (used in) provided by financing activities** | (1,893,177) | 19,513,738 |
| Effect of exchange rate changes on cash and cash equivalents | (20,395) | (2,478,952) |
| Net increase in cash and cash equivalents | 4,660,989 | (2,973,447) |
| Cash and cash equivalents at beginning of period | 946,265 | 5,467,273 |
| Cash and cash equivalents at end of period | $ 5,607,254 | $ 2,493,826 |
| **Supplemental disclosure of cash flow information** | | |
| **Non-cash transactions** | | |
| Recognition of right of use operating asset and lease liability | $ 911,356 | $ - |
| Accrued interest on convertible notes settled in common stock | $ 276,959 | $ - |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**
(Unaudited)

**NOTE 1 – GENERAL**

**General**

Mawson Infrastructure Group, Inc. (the "Company" or "Mawson" or "we"), was incorporated in the State of Delaware on February 10, 2012.

Mawson, through its subsidiaries, is a 'Digital Asset Infrastructure' business, which owns and operates data centers in the United States. As at June 30, 2023, Mawson owned 23,458 Application-Specific Integrated Circuit ("ASIC") computers known as "Miners," specifically focused on the SHA-256 algorithm.

The accompanying consolidated financial statements, including the results of the Company's subsidiaries: Mawson Infrastructure Group Pty Ltd ("Mawson AU"), Cosmos Trading Pty Ltd, Cosmos Infrastructure LLC, Cosmos Manager LLC, MIG No.1 Pty Ltd, MIG No.1 LLC, Mawson AU Pty Ltd, Luna Squares LLC, Mawson Bellefonte LLC (formed May 5, 2023), Luna Squares Repairs LLC, Luna Squares Property LLC, Mawson Midland LLC, Mawson Hosting LLC, Mawson Ohio LLC and Mawson Mining LLC (collectively referred to as the "Group"), have been prepared by the Company, pursuant to the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and in accordance with generally accepted accounting principles in the United States ("U.S. GAAP").

These consolidated, condensed unaudited interim financial statements should be read in conjunction with the audited consolidated financial statements of the Group as of December 31, 2022, and the notes thereto, included in the Company's Annual Report on Form 10-K filed with SEC on March 23, 2023. Accordingly, they do not include all the information and footnotes required by U.S GAAP for complete financial statements. The results of the interim period are not necessarily indicative of the results to be expected for the full year ending December 31, 2023. These consolidated, condensed interim financial statements reflect all adjustments which, in the opinion of management, are necessary to present fairly the financial position, the results of operations and cash flows of the Company for the periods presented.

**Going Concern**

The accompanying unaudited consolidated condensed financial statements have been prepared assuming the Company will continue as a going concern basis and in accordance with generally accepted accounting principles in the United States of America. The going concern basis of presentation assumes that the company will continue in operation one year after the date these financial statements are issued and will be able to realize its assets and discharge its liabilities and commitments in the normal course of business.

Pursuant to the requirements of the Financial Accounting Standards Board's Accounting Standards Codification ("ASC") Topic 205-40, Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern, management must evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for one year from the date these financial statements are issued. This evaluation does not take into consideration the potential mitigating effect of management's plans that have not been fully implemented or are not within control of the Company as of the date the financial statements are issued. When substantial doubt exists under this methodology, management evaluates whether the mitigating effect of its plans sufficiently alleviates substantial doubt about the Company's ability to continue as a going concern. The mitigating effect of management's plans, however, is only considered if both (1) it is probable that the plans will be effectively implemented within one year after the date that the financial statements are issued, and (2) it is probable that the plans, when implemented, will mitigate the relevant conditions or events that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that the financial statements are issued.

For the six month period ended June 30, 2023, the Company incurred a loss after tax of $29.03 million, and as at June 30, 2023, had net current liabilities of $32.30 million, had total net assets of $55.33 million and had an accumulated deficit of $150.70 million. The Company's cash position as at June 30, 2023, was $5.61 million.

Bitcoin prices have recovered from their lows of approximately $16,000 in late 2022 to approximately $30,000 recently, however this price is still substantially less than the previous highs of approximately $67,000 in late 2021. In addition, the difficulty of earning Bitcoin is approximately 70% higher than the same time last year, and trending higher, which means the Company typically earns less Bitcoin for the same effort. In addition, the rewards that Bitcoin miners earn are expected to halve (not including transaction fees) in or about April or May 2024. The Company's miners and other mining equipment will require replacement over time to ensure that the Company can continue to competitively and efficiently produce Bitcoin. These trend factors are outside the Company's direct control, and the Company may not be able to practically mitigate their impact. The Company cannot predict with any certainty whether these trends will reverse or persist.

On July 20, 2023 we received a notice from Celsius Mining LLC that Celsius Mining LLC does not intend to renew its Customer Equipment Co-Location Agreement ("Co-Location Agreement"), under which it receives hosting services from Luna Squares LLC (a subsidiary of the Company), and that it will expire in accordance with its terms. Celsius Mining LLC is currently the Company's only hosting customer. The Company hosts approximately 20,000 miners for Celsius Mining LLC. In addition, Celsius Mining LLC has made certain allegations against Luna Squares LLC in respect of its performance under the Co-Location Agreement. Luna Squares LLC has made certain allegations against Celsius Mining LLC in respect of its performance under the Co-Location Agreement. There is a risk of a dispute or litigation arising out of these cross allegations, which also relate to the advanced deposit paid by Celsius Mining LLC to Luna Squares LLC valued at $15.33 million (the "Celsius Deposit") and Luna Squares LLC's and Celsius Mining LLC's performance under the Co-Location Agreement. Luna Squares LLC claims, amongst other things, that the deposit, in full or in part, has been forfeited due to Celsius Mining LLC's breaches and its other actions or inactions under the Co-Location Agreement. If Celsius Mining LLC prevails on the dispute, Luna Squares LLC could be required to return the deposit to Celsius Mining LLC. While this amount is included as a current liability within trade and other payables in the consolidated condensed Balance Sheet, the outcome of the dispute is uncertain. In addition, Celsius Mining LLC has failed to pay approximately $3.40 million worth of pre-petition and post-petition hosting invoices. Celsius Mining LLC and Luna Squares LLC have indicated a willingness to continue discussions for hosting services including related to the Co-Location Agreement, and the timing and outcome of such discussions are uncertain.

Hosting revenue accounts for a substantial part of the Company's revenue. The Company is in active discussions with potential new customers for hosting services to replace Celsius, however there is no certainty that the Company will be able to enter into hosting agreements with new customers in a timely manner, or at all, or that the agreements with the new customers will replace all the revenue that Celsius Mining LLC generates for the Company. The Company may decide to use the hosting infrastructure's capacity to self-mine or for other purposes, however it will need to raise a potentially significant amount of capital to finance and acquire further hardware (specifically miners) for self-mining and the potential timing and outcome of these other potential options are uncertain.

In addition to the Celsius Deposit, in connection with the Co-Location Agreement, Celsius Mining LLC loaned $20 million to Luna Squares LLC, through a Secured Promissory Note (the "Celsius Promissory Note"), which has a maturity date of August 23, 2023, and an outstanding balance as at June 30, 2023, of $11.33 million. On July 18, 2023 Luna Squares LLC paid to Celsius Mining LLC $3.33 million as principal and interest.

Celsius Mining LLC is currently in default on payments on the Co-Location Agreement to Luna Squares LLC, and the Company and Luna Squares LLC have reserved all rights.

Celsius Mining LLC filed for Chapter 11 bankruptcy protection on July 13, 2022. On July 25, 2023, Celsius Mining LLC filed a Debtors' Ex Parte Motion for an Order Under Federal Rules of Bankruptcy for Subpoenas for Examination of, and Production of Documents from Mawson Infrastructure Group Inc., Luna Squares LLC, and Cosmos Infrastructure LLC, and the Bankruptcy Court entered an Order on July 26, 2023. Celsius Mining LLC has indicated it intends to use the process of discovery to evaluate the status of the liens securing the Celsius Promissory Note and other potential claims Celsius Mining LLC may have against Mawson and its related entities, including with respect to the Co-Location Agreement. The discovery process is ongoing.

The Company has a Secured Loan Facility Agreement with Marshall Investments GCP Pty Ltd ATF for the Marshall Investments MIG Trust ("Marshall"). The loan matures in February 2024 and the outstanding balance is $8.07 million as at June 30, 2023. On June 30, 2023, MIG No. 1 Pty Ltd did not make a principal and interest payment of $0.50 million. MIG No. 1 Pty Ltd and Marshall are in ongoing discussions with respect to the payment, and the loan terms generally. Marshall and MIG No. 1 Pty Ltd have each reserved their rights.

A subsidiary of the Company, Mawson Infrastructure Group Pty Ltd ("MIG PL") has a Secured Loan Facility Agreement for working capital with W Capital Advisors Pty Ltd with a total loan facility of AUD$8 million (USD$5.2 million) ("Working Capital Loan"). As at June 30, 2023, AUD$1.46 million (USD$0.97 million) has been drawn down from this facility. The Secured Loan Facility expired in March 2023 and the Company and W Capital Advisors Pty Ltd are in ongoing discussions regarding the terms and extension of the loan. W Capital Advisors Pty Ltd and MIG PL have each reserved their rights.

The Company has a Secured Convertible Promissory Note with W Capital Advisors Pty Ltd with an outstanding balance of $0.50 million as at June 30, 2023. The Convertible Note matured in July 2023 and the Company is in ongoing discussions with the noteholder. W Capital Advisors Pty Ltd and the Company have each reserved their rights.

The Company has not fulfilled specific payment obligations related to the Marshall loan, the Working Capital Loan and Secured Convertible Promissory Note mentioned above. Consequently, the creditors associated with these debt facilities may initiate actions as allowed by relevant grace periods. This includes the possibility of opting to expedite the repayment of the principal debt, pursuing legal action against the Company for payment default, raising interest rates to the default rate, or taking appropriate measures concerning collateral, if applicable.

The Company has evaluated the above conditions and concluded that these conditions raise substantial doubt regarding our ability to continue as a going concern for a period of at least one year from the date of issuance of these unaudited condensed consolidated financial statements.

To alleviate these conditions, the Company has explored various avenues to enhance liquidity, fund the Company's expenditures, and meet debt servicing requirements. These strategies include, among others:

- Engage in discussions with new and existing lenders, including related to refinancing debt, raising additional debt, or modifying terms of existing debt.

- Considering equity issuances such as capital raises

- Assessing and evaluating corporate and strategic transactions including engaging an investment bank.

- Assessing and evaluating monetizing specific assets, including potential sales of mining infrastructure equipment, miners, operational sites, or expansion locations under consideration.

- Conducting assessments to identify and implement operational efficiencies, cost-cutting measures, and other actions aimed at enhancing revenue and optimizing expenses.

Although the Company may have access to debt, equity and other sources of funding, these may require additional time and cost, may impose operational restrictions and other covenants on the Company, may not be available on attractive terms, and may not be available at all. If the Company raises additional capital or debt, this could cause additional dilution to the Company's current stockholders. The terms of any future capital raise or debt issuance and the costs of any financing are uncertain and may be unfavorable to the Company. In addition, pursuant to terms and provisions of previous fundraising, the Company is subject to certain restrictive covenants that put restrictions on the Company. Should the Company be unable to source sufficient funding, the Company may not be able to realize assets at their recognized values and fulfill its liabilities in the normal course of business at the amounts stated in these consolidated financial statements.

The Company has engaged Needham and Company, an investment bank, and is obtaining advice from outside legal counsel. It is important to note that strategic and other initiatives may not lead to any transaction or other outcome.

These condensed consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities and other commitments in the normal course of business. They do not include any adjustments relating to the recoverability and carrying amounts of assets and the amounts of liabilities should the Company be unable to continue as a going concern and meet its obligations and debts as and when they fall due.

11

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Principles of Consolidation and Basis of Preparation**

The accompanying consolidated financial statements of the Company include the accounts of the Company and its wholly or majority owned and controlled subsidiaries. Intercompany investments, balances and transactions have been eliminated in consolidation. Non–controlling interests represent the minority equity investment in the Company's subsidiaries, plus the minority investors' share of the net operating results and other components of equity relating to the non–controlling interest.

Pursuant to a Certificate of Amendment to the Certificate of Incorporation of the Company dated February 6, 2023, Mawson executed a reverse stock split of its outstanding common stock at a ratio of 1:6 and reduced its authorized common stock to 90,000,000 shares, as set forth in the Company's Current Report on Form 8-K filed February 9, 2023. Unless otherwise indicated, all share and per share amounts included in this Annual Report reflect the effects of the reverse stock split.

Any change in the Company's ownership interest in a consolidated subsidiary, through additional equity issuances by the consolidated subsidiary or from the Company acquiring the shares from existing stockholders, in which the Company maintains control is recognized as an equity transaction, with appropriate adjustments to both the Company's additional paid-in capital and the corresponding non-controlling interest.

**Use of Estimates and Assumptions**

The preparation of the financial statements in conformity with U.S. GAAP requires management to make estimates, judgments and assumptions that affect the amounts reported in the financial statements and accompanying notes. The Company evaluates on an ongoing basis its assumptions. The Company's management believes that the estimates, judgments, and assumptions used are reasonable based upon information available at the time they are made.

These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements, and the reported amounts of income and expenses during the reporting periods. Actual results could differ from those estimates. The Company has considered the following to be significant estimates made by management, including but not limited to, going concern assumptions, estimating the useful lives of fixed assets, realization of long-lived assets, unrealized tax positions and the realization of digital currencies, valuing the derivative asset classified under Level 3 fair value hierarchy, business combinations and the contingent obligation with respect to future revenues.

**Reclassifications**

Certain reclassifications of prior period amounts have been made to conform to current period presentation.

12

**Significant Accounting Policies**

*Revenue Recognition – Digital currency mining revenue*

The Company recognizes revenue under Accounting Standards Codification ("ASC") 606, *Revenue from Contracts with Customers*. The core principle of ASC 606 is that a company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. Five steps are required to be followed in evaluating revenue recognition: (i) identify the contract with the customer; (ii) identity the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price; and (v) recognize revenue when or as the entity satisfies a performance obligation.

In order to identify the performance obligations in a contract with a customer, a company must assess the promised goods or services in the contract and identify each promised good or service that is distinct. A performance obligation meets ASC 606's definition of a "distinct" good or service (or bundle of goods or services) if both of the following criteria are met: the customer can benefit from the good or service either on its own or together with other resources that are readily available to the customer (i.e., the good or service is capable of being distinct), and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract (i.e., the promise to transfer the good or service is distinct within the context of the contract).

There is currently no specific definitive guidance in U.S. GAAP or alternative accounting frameworks for the accounting of digital currencies and management has exercised judgment in determining appropriate accounting treatment for the recognition of revenue for such operations.

The Company has entered into a contract with mining pools and has undertaken the performance obligation of providing computing power in exchange for non-cash consideration in the form of digital currency. The provision of computing power is the only performance obligation in the Company's contract with its pool operators. Where the consideration received is variable (for example, due to payment only being made upon successful mining), it is recognized when it is highly probable that the variability is resolved, which is generally when the digital currency is received.

The Company measures the non-cash consideration received at the fair market value of the digital currency received. Management estimates fair value on a daily basis, as the quantity of digital currency received multiplied by the price quoted on the crypto exchange that the Company uses to dispose of digital currency.

*Hosting Co-location revenue*

The Company provides power for our co-location hosting customers on a variable basis. Revenue is currently received monthly from the customer based on the power usage at the rate outlined in each customer contract.

The Company recognizes variable power revenue each month as the uncertainty related to the consideration is resolved, power is provided to customers, and customers utilize the power (the customer simultaneously receives and consumes the benefits of the Company's performance).

The customer contracts contain variable consideration to be allocated to and recognized in the period to which the consideration relates. Usually this is when it is invoiced, rather than obtaining an estimation of variable consideration at the beginning of the customer contracts.

Customers also are invoiced a fixed monthly fee for maintenance services which include cleaning, cabling and other services to maintain the customers' equipment.

*Revenue recognition – equipment sales*

The Company earned revenues from the sale of earlier generation digital currency mining units and modular data centers that have been assembled or refurbished for resale (collectively "Hardware"). Revenue from the sale of Hardware is recognized upon transfer of control of the Hardware to the customer. At the date of sale, the net book value is expensed in cost of revenues.

*Revenue recognition – net energy benefits*

In exchange for powering down the Company's systems and curtailing power, in response to instances of high electricity demand, the Company receives net energy benefits from the grid. The Company also has a power pricing arrangement pursuant to which it can trade energy to achieve net energy benefits.

Revenue for curtailing power is recognized over the period of time that the services are being provided. The Company estimates the amount of curtailable power and the expected payment for that power and recognizes revenue based on the proportion of the service that has been provided. In this arrangement the Company is considered the principal and revenue is recognized on a gross basis.

Revenue through the Company's power pricing arrangement is recognized over the period of time that the services are being provided. The Company estimates the amount of energy available for sale and the expected payment for that energy, and recognizes revenue based on the proportion of the service that has been provided. In this arrangement the Company is considered the principal and revenue is recognized on a gross basis.

*Property and equipment*

Property and equipment are stated at cost, net of accumulated depreciation. All other repair and maintenance costs are charged to operating expenses as incurred. The present value of the expected cost for the decommissioning of an asset after its use is included in the cost of the respective asset if the recognition criteria for a provision are met. Property and equipment transferred from customers is initially measured at the fair value at the date on which control is obtained.

Property and equipment are depreciated on a straight-line or declining balance basis based on the asset classification, over their useful lives to the economic entity commencing from the time the assets arrive at their destination where they are ready for use. Low-cost assets are capitalized and immediately depreciated. Depreciation is calculated over the following estimated useful lives:

| Asset class | Useful life | Depreciation method |
|---|---|---|
| Fixtures | 5 years | Straight-Line |
| Plant and equipment | 10 years | Straight-Line |
| Modular data center | 5 years | Declining |
| Motor vehicles | 5 years | Straight-Line |
| Computer equipment | 3 years | Straight-Line |
| Processing machinery (Miners) | 2 years | Straight-Line |
| Transformers | 15 years | Straight-Line |
| Leasehold improvements | Shorter of useful life or lease term | Straight-Line |

Property and equipment are derecognized upon disposal or when no future economic benefits are expected from its use or disposal. Any gain or loss arising on derecognition of the asset is included in the income statement.

14

The residual values, useful lives and methods of depreciation of property and equipment are reviewed at each financial year end and adjusted prospectively, if appropriate.

The Company's long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such an asset is considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds its fair value. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell.

*Fair value of financial instruments:*

The Company accounts for financial instruments under ASC 820, *Fair Value Measurements*. This statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. To increase consistency and comparability in fair value measurements, ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities;

Level 2 — observable inputs other than Level 1, quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, and model-derived prices whose inputs are observable or whose significant value drivers are observable; and

Level 3 — assets and liabilities whose significant value drivers are unobservable. Observable inputs are based on market data obtained from independent sources, while unobservable inputs are based on the Company's market assumptions. Unobservable inputs require significant management judgment or estimation. In some cases, the inputs used to measure an asset or liability may fall into different levels of the fair value hierarchy. In those instances, the fair value measurement is required to be classified using the lowest level of input that is significant to the fair value measurement. Such determination requires significant management judgment.

| | Fair value measured at June 30, 2023 | | | |
| --- | --- | --- | --- | --- |
| | Total fair value as at June 30, 2023 | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| Derivative asset | $    5,174,446 | - | - | $    5,174,446 |

| | Fair value measured at December 31, 2022 | | | |
| --- | --- | --- | --- | --- |
| | Total fair value as at December 31, 2022 | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| Derivative asset | $    11,299,971 | - | - | $    11,299,971 |
| Marketable securities | $    3,243,957 | $    3,243,957 | $    - | $    - |

15

*Level 3 Assets:*

Power Supply Agreement

In June 2022, the Company entered into a Power Supply Agreement with Energy Harbor LLC, the energy supplier to the Company's Pennsylvania facility, to provide the delivery of a fixed portion of the total amount of electricity for a fixed price through to December 2026. If the Pennsylvania facility uses more electricity than contracted, the cost of the excess is incurred at a new price quoted by Energy Harbor LLC.

While the Company manages operating costs at the Pennsylvania facility in part by periodically selling unused or uneconomical power back to the market, the Company does not consider such actions as trading activities. That is, the Company does not engage in speculation in the power market as part of its ordinary activities. Because the sale of any electricity under a curtailment program allows for net settlement, the Company has determined the Power Supply Agreement meets the definition of a derivative under ASC 815, *Derivatives and Hedging*. However, because the Company has the ability to sell the power back to the grid rather than take physical delivery, physical delivery is not probable through the entirety of the contract and therefore, the Company does not believe the normal purchases and normal sales scope exception applies to the Power Supply Agreement. Accordingly, the Power Supply Agreement (the non-hedging derivative contract) is recorded at estimated fair value each reporting period with the change in the fair value recorded in "change in fair value of derivative asset" in the consolidated statements of operations.

The Power Supply Agreement was classified as a derivative asset beginning in the quarter ended June 30, 2022 and measured at fair value on the date of Power Supply Agreement, with changes in fair value recognized in the accompanying unaudited condensed consolidated statements of operations. The estimated fair value of the Company's derivate asset is classified in Level 3 of the fair value hierarchy due to the significant unobservable inputs utilized in the valuation. Specifically, the Company's discounted cash flow estimation models contain quoted commodity exchange spot and forward prices and are adjusted for basis spreads for load zone-to-hub differentials through the term of the Power Supply Agreement, which expires in December 2026. In addition, the Company adopted a discount rate of approximately 20% above the terminal value of the observable market inputs, but also includes unobservable inputs based on qualitative judgment related to company-specific risk factors. The terms of the Power Supply Agreement require pre-payment of collateral, calculated as forward cost based on the market cost rate of electricity versus the fixed price stated in the contract.

*Stock based compensation*

The Company follows ASC 718-10 *Compensation-Stock Compensation*. The Company expenses stock-based compensation to employees and non-employees over the requisite service period based on the estimated grant-date fair value of the awards. The Company determines the grant date fair value of the restricted stock units ("RSUs") and options using the Black-Scholes option-pricing model. The assumptions used in calculating the fair value of stock-based awards represent management's best estimates and involve inherent uncertainties and the application of management's judgment. These assumptions are the expected stock volatility, the risk–free interest rate, the expected life of the option, the dividend yield on the underlying stock and the expected forfeiture rate. Expected volatility computes stock price volatility over expected terms based on its historical common stock trading prices. Risk–free interest rates are calculated based on the implied yield available on a U. S. 10-year Treasury bond.

*Digital currencies*

Digital currencies are included in current assets in the consolidated condensed balance sheets. Digital currencies are classified as indefinite-lived intangible assets in accordance with ASC 350 *Intangibles – Goodwill and Other,* and are accounted for in connection with the Company's revenue recognition policy detailed above.

16

The following table presents the Company's digital currency (Bitcoin) activities for the three months and six months ended June 30, 2023:

| | Three months to June 30, 2023 | Six months to June 30, 2023 |
|---|---|---|
| **Opening number of Bitcoin held as at March 31, 2023 and December 31, 2022** | **1.02** | **0** |
| Number of Bitcoin received | 181.62 | 302.73 |
| Number of Bitcoin sold | (182.64) | (302.73) |
| **Closing number of Bitcoin held as at June 30, 2023** | **0** | **0** |

Digital currencies are not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not likely that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

The Company's policy is to dispose of Bitcoin received from mining operations at the earliest opportunity, therefore the holding period is minimal, usually no more than a few days. Due to the short period for which Bitcoin are held prior to sale and the consequent small numbers held, the risk of impairment is not material. No impairment charges have been recorded during the six month periods ended June 30, 2023 and 2022.

*Equity method investments*

Equity investments are accounted for under the equity method if we are able to exercise significant influence, but not control, over an investee. Our share of the earnings or losses as reported by the investees is classified as income from equity investees on our consolidated condensed statements of operations. The investments are evaluated for impairment annually and when facts and circumstances indicate that the carrying value may not be recoverable. If a decline in fair value is determined to be other-than-temporary, an impairment charge is recorded in our consolidated condensed statements of operations.

*Recent Accounting Pronouncements*

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB") or other standard setting bodies and adopted by the Company as of the specified effective date. For information with respect to recent accounting pronouncements, see Note 2 to the consolidated financial statements for the Company as of December 31, 2022, included in the Company's Annual Report on Form 10-K filed with SEC on March 23, 2023. Recent accounting pronouncements since that date include:

In March 2023, the FASB issued ASU update 2023-01—Leases (Topic 842): Common Control Arrangements. The Company early adopted ASU 2023-01, as allowed under the ASU. Adoption of this ASU did not have a material impact on the Company's consolidated financial statements or disclosures.

In March 2023, the FASB issued ASU update 2023-02—Investments-Equity Method and Joint Ventures (Topic 323): Accounting for Investments in Tax Credit Structures Using the Proportional Amortization Method (a consensus of the Emerging Issues Task Force). The Company does not expect ASU 2023-02 to have a material impact on the Company's consolidated financial statements or disclosures.

**NOTE 3 – BASIC AND DILUTED NET LOSS PER SHARE**

Net loss per common share is calculated in accordance with ASC 260, *Earnings Per Share*. Basic loss per share is computed by dividing net loss by the weighted average number of shares of common stock outstanding during the period. The computation of diluted net loss per share does not include dilutive common stock equivalents in the weighted average shares outstanding, as they would be anti-dilutive.

Securities that could potentially dilute loss per share in the future that were not included in the computation of diluted loss per share as at June 30, 2023 and 2022 are as follows:

|  | As at June 30, | |
|---|---|---|
|  | **2023** | **2022** |
| Warrants to purchase common stock | 5,546,122 | 1,065,278 |
| Options to purchase common stock | 1,750,417 | 4,910 |
| Restricted Stock-Units ("RSUs") issued under a management equity plan | 4,443,516 | 408,288 |
|  | **11,740,055** | **1,478,476** |

**NOTE 4 – LEASES**

During the quarter ended June 30, 2023, the Company entered into two new lease agreements, outlined below.

Effective May 1, 2023 Mawson Ohio LLC took an assignment of a lease agreement for approximately 64,600 square foot for a undeveloped site in Corning, Ohio. The term of the lease is for four years, with an option to extend for five years.

Effective May 24, 2023 Mawson Bellefonte LLC entered into a lease agreement for a 9,918 square foot developed mining facility in Bellefonte, PA. The term of the lease is for two years and seven months, with an option to extend for five years.

The Company's lease costs recognized in the Consolidated Condensed Statements of Operations consist of the following:

|  | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
|  | **2023** | | **2022** | | **2023** | | **2022** | |
| Operating lease charges [1] | $ | 404,778 | $ | 434,977 | $ | 811,991 | $ | 802,112 |
| Finance lease charges: | | | | | | | | |
| Amortization of right-of-use assets | $ | 8,143 | $ | 8,094 | $ | 16,287 | $ | 12,396 |
| Interest on lease obligations | $ | 1,310 | $ | 2,468 | $ | 4,021 | $ | 3,946 |

(1)  Included in selling, general and administrative expenses.

18

The following is a schedule of the Company's lease liabilities by contractual maturity as of June 30, 2023:

| | Operating leases | Finance leases |
|---|---:|---:|
| 2023 | $ 858,374 | $ 19,088 |
| 2024 | 1,548,388 | 38,176 |
| 2025 | 592,926 | 38,176 |
| 2026 | 434,033 | 15,016 |
| 2027 | 70,191 | - |
| Total undiscounted lease obligations | 3,503,912 | 110,456 |
| Less imputed interest | (375,676) | (11,597) |
| Total present value of lease liabilities | 3,128,236 | 98,859 |
| Less current portion of lease liabilities | 1,649,529 | 31,859 |
| Non-current lease liabilities | $ 1,478,707 | $ 67,000 |

Other lease information as of June 30, 2023:

| | Operating leases | Finance leases |
|---|---:|---:|
| Operating cash out flows from leases | $ 728,837 | $ 19,088 |
| Weighted-average remaining lease term (years) | 2.33 | 2.89 |
| Weighted-average discount rate (%) | 8.9% | 7.5% |

## NOTE 5 – PROPERTY AND EQUIPMENT

Property and equipment, net, consisted of the following:

| | June 30, 2023 | December 31, 2022 |
|---|---:|---:|
| Plant and equipment | $ 4,672,674 | $ 4,263,662 |
| Computer equipment | 162,060 | 163,060 |
| Furniture and fixtures | 28,703 | 29,492 |
| Processing machines (Miners) | 102,164,610 | 103,337,719 |
| Modular data center | 24,935,634 | 19,713,534 |
| Motor vehicles | 357,704 | 326,704 |
| Transformers | 9,893,024 | 4,596,892 |
| Low-cost assets | 1,134,858 | 995,292 |
| Assets under construction | 5,183,049 | 11,592,582 |
| Leasehold improvements | 487,527 | 487,527 |
| **Total** | 149,019,843 | 145,506,464 |
| Less: Accumulated depreciation | (70,490,369) | (54,489,966) |
| **Property and equipment, net** | **$ 78,529,474** | **$ 91,016,498** |

The Company incurred depreciation and amortization expenses in the amounts of $8.79 million and $16.02 million for the three month period ended June 30, 2023 and 2022, respectively. The Company incurred depreciation and amortization expenses in the amounts of $16.75 million and $29.83 million for the six month periods ended June 30, 2023 and 2022, respectively. There were no impairment charges recognized for property and equipment for either the six month periods ended June 30, 2023 and 2022.

On April 18, 2023, the Company sold 100% of its membership interest in Luna Squares Texas LLC along with 59 transformers. The total sales price was $8.5 million in cash and stablecoins, the profit on sale of this site has been included in the consolidated condensed statement of operations.

19

**NOTE 6 – INCOME TAXES**

The Company's effective tax rate is calculated by dividing the total income tax expense by the sum of income before the income tax expense and the net income attributable to noncontrolling interests. The Company has maintained a full valuation allowance for federal and the majority of its state jurisdictions.

| | For the three months ended June 30, | |
| --- | --- | --- |
| | **2023** | **2022** |
| Effective income tax rate | 0.00% | 0.00% |

| | For the six months ended June 30, | |
| --- | --- | --- |
| | **2023** | **2022** |
| Effective income tax rate | 0.00% | 0.00% |

The Company's effective tax rate is calculated by dividing the total income tax expense by the sum of income before the income tax expense and the net income attributable to noncontrolling interests. The Company has maintained a full valuation allowance for federal and the majority of its state jurisdictions.

**NOTE 7 – BORROWINGS**

*Marshall loan*

In December 2021 MIG No. 1 Pty Ltd entered into a Secured Loan Facility Agreement with Marshall Investments MIG Pty Ltd. The loan matures in February 2024 and bears interest at a rate of 12% per annum, payable monthly with interest payments that commenced in December 2021. This loan facility is secured by direct assets of MIG No.1 Pty Ltd and a general security agreement given by the Company. Principal repayments began during November 2022. The outstanding balance is $8.07 million as at June 30, 2023 all of which is classified as a current liability.

The loan matures in February 2024 and the outstanding balance is $8.07 million as at June 30, 2023. On June 30, 2023 MIG No. 1 Pty Ltd did not make a principal and interest payment of $0.50 million. MIG No. 1 Pty Ltd and Marshall are in ongoing discussions with respect to the payment, and the loan terms generally. Marshall has reserved its rights.

20

*Celsius loan*

On February 23, 2022, Luna Squares LLC entered into the Co-location Agreement with Celsius Mining LLC. In connection with this agreement, Celsius Mining LLC loaned Luna Squares LLC a principal amount of $20 million, for the purpose of funding the infrastructure required to meet the obligations of the Co-Location Agreement, for which Luna Squares LLC issued a Secured Promissory Note for repayment of such amount. The Secured Promissory Note accrues interest daily at a rate of 12% per annum, and Luna Squares LLC is required to amortize the loan at a rate of 15% per quarter. Repayments to the principal amount began at the end of September 2022. The Secured Promissory Note has a maturity date of August 23, 2023 and the outstanding balance as at June 30, 2023 is $11.33 million, which is classified as a current liability. On July 18, 2023 Luna Squares LLC paid to Celsius Mining LLC $3.33 million as principal and interest. Celsius Mining LLC filed for Chapter 11 bankruptcy protection on July 13, 2022.

*W Capital loan*

On September 2, 2022, MIG PL entered into a Secured Loan Facility Agreement with W Capital Advisors Pty Ltd with a total loan facility of AUD$3.00 million (USD$1.9 million). This was amended on September 29, 2022 and the loan facility was increased to AUD$8.00 million (USD$5.2 million). During the six month period ending June 30, 2023, the Company received AUD$3.00 million (USD$1.99 million) from this loan facility. As at June 30, 2023, AUD$1.46 million (USD$0.97 million) has been drawn down from this facility, all of which is classified as a current liability. The Secured Loan Facility accrues interest daily at a rate of 12% per annum and is paid monthly. Principal repayments are paid ad hoc in line with the loan facility agreement. The Secured Loan Facility expired in March 2023 and MIG PL and W Capital Advisors Pty Ltd are in ongoing discussions regarding the extension of the loan. W Capital Advisors Pty Ltd and MIG Pty Ltd have each reserved their rights.

*Convertible notes*

On July 8, 2022, the Company issued secured convertible promissory notes to investors in the aggregate principal amount of $3.60 million (the "Secured Convertible Promissory Notes") in exchange for an aggregate of $3.6 million in cash. On September 29, 2022, the Company entered into a letter variation relating to some of the Secured Convertible Promissory Notes, with an aggregate principal amount of $3.1 million, which gave those holders the option to elect for pre-payment (including accrued interest to maturity) subject to certain conditions. All of the investors included in this letter variation elected for the pre-payment option and therefore there were $3.1 million principal repayments made during November 2022. The final convertible noteholder (W Capital Advisors Pty Ltd) who was not a party to this variation opted to enter into an arrangement whereby it received pre-payment of interest but agreed that the principal amount of $0.50 million was not immediately required to be repaid. That principal amount has been classified as a current liability. The convertible note matured in July 2023 and the Company is in ongoing discussions with the noteholder regarding a resolution. W Capital Advisors Pty Ltd and MIG PL have each reserved their rights.

21

**NOTE 8 – STOCKHOLDERS' EQUITY**

**Stock-Based Compensation:**

*Equity plans*

Under the 2018 Equity Plan, the number of shares issuable under the Plan on the first day of each fiscal year increase by an amount equal to the lower of (i) 100,000 shares (after a later 10 for 1 stock split) or (ii) 5% of the outstanding shares on the last day of the immediately preceding fiscal year. As of June 30, 2023, there were no shares issuable under the 2018 Equity Plan until it automatically replenishes on January 1, 2024.

At the Company's annual meeting on May 17, 2023, the stockholders approved an amendment to the 2021 Equity Plan that, amongst other things, increased the number of the shares available under the 2021 Equity Plan to 10,000,000 shares. As of June 30, 2023, the number of shares reserved under the 2021 Equity Plan was 4,133,322.

The Company recognized stock-based compensation expense during the three and six months ended June 30, 2023 and 2022 as follows:

|  | For the three months ended June 30, | | For the six months ended June 30, | |
|---|---|---|---|---|
|  | **2023** | **2022** | **2023** | **2022** |
| Performance-based restricted stock awards | $ 166,779 | $ 187,648 | $ 333,558 | $ 353,924 |
| Service-based restricted stock awards | 19,997 | 248,086 | 49,992 | 305,586 |
| Stock issued to consultants | - | - | 307,069 | - |
| Common stock warrant expense | 500,500 | 500,500 | 1,001,000 | 667,333 |
| **Total stock-based compensation** | **$ 687,276** | **$ 936,234** | **$ 1,691,619** | **$ 1,326,843** |

*Performance-based awards*

Performance-based awards generally vest over a three-year performance period upon the successful completion of specified market and performance conditions.

The following table presents a summary of the Company's performance-based awards restricted stock awards activity:

|  | Number of shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding as of December 31, 2022 | 342,310 | - | 8.33 | $ 472,388 |
| Issued | - | - |  |  |
| Exercised | (100,000) | - |  | 318,000 |
| Expired | - | - |  |  |
| Outstanding as of June 30, 2023 | 242,310 | - | 9.04 | $ 457,966 |
| Exercisable as of June 30, 2023 | 144,327 | - | 4.97 | $ 272,778 |

22

As of June 30, 2023, there was approximately $0.70 million of unrecognized compensation cost related to the performance-based awards, which is expected to be recognized over a remaining weighted-average vesting period of approximately one year.

*Service-based restricted stock awards*

Service-based awards generally vest over a one year service period.

The following table presents a summary of the Company's service-based awards activity:

| | Number of shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding as of December 31, 2022 | 74,246 | - | 8.42 | 102,459 |
| Issued | 4,140,720 | - | | |
| Exercised | (13,760) | - | | 43,744 |
| Expired | - | - | | |
| Outstanding as of June 30, 2023 | 4,201,206 | - | 2.84 | 7,940,279 |
| Exercisable as of June 30, 2023 | 60,486 | - | 0.13 | 114,319 |

As of June 30, 2023, there was approximately $7.83 million of unrecognized compensation cost related to the service-based restricted stock awards, which is expected to be recognized over a remaining weighted-average vesting period of approximately one year. James Manning who stepped down as Chief Executive Officer of the Company, effective May 22, 2023, had agreed with the Company that he would be issued 1.35 million RSUs and his other RSU agreements would be cancelled, as set forth in the Company's Current Report on Form 8-K filed May 22, 2023. However, these RSUs have not been issued and have not been included in the above table. Similarly, the existing RSUs have not been cancelled and therefore are included in the above table.

*Stock options awards*

Stock options awards vest upon the successful completion of specified market conditions.

The following table presents a summary of the Company's Stock options awards activity:

| | Number of shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|
| Outstanding as of December 31, 2022 | 417 | $ 35.90 | 1.26 |
| Issued | 1,750,000 | 1.89 | |
| Exercised | - | - | |
| Expired | - | - | |
| Outstanding as of June 30, 2023 | 1,750,417 | $ 1.90 | 10.0 |
| Exercisable as of June 30, 2023 | 417 | $ 35.90 | 1.26 |

23

*Common Stock Warrants*

A summary of the status of the Company's outstanding stock warrants and changes during the six months ended June 30, 2023, is as follows:

| | Number of Warrants | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|
| Outstanding as of December 31, 2022 | 2,825,278 | | |
| Issued | 2,967,512 | 14.31 | 3.69 |
| Exercised | (246,668) | - | - |
| Expired | - | - | - |
| Outstanding as of June 30, 2023 | 5,546,122 | $ 14.31 | 3.39 |
| Warrants exercisable as of June 30, 2023 | 5,546,122 | $ 14.31 | 3.69 |

As of June 30, 2023, there was approximately $0.80 million of unrecognized compensation cost related to the warrants issued is expected to be recognized over a remaining weighted-average vesting period of approximately six months.

On May 3, 2023, the Company has entered into a definitive agreement with institutional investors for the issuance and sale of 2,083,336 shares of its common stock at a purchase price of $2.40 per share of common stock and 246,668 pre-funded warrants at an offering price of $2.399 and an exercise price of $0.001 per share in a registered direct offering. In relation to this agreement, the Company issued the institutional investors unregistered warrants to purchase up to 2,604,170 shares of its common stock with an exercise price of $3.23 per share. The underwriter was also issued warrants to purchase up to an aggregate of 116,667 shares of common stock at an exercise price of $3.00 per share. The Company determined that the warrants did not meet the criteria for a derivative and therefore, these warrants were recorded in stockholders' equity as a stock issuance cost with no net effect on stockholders' equity.

As a condition to the sale of 2,083,336 shares of common stock described above, the Company amended the warrants previously issued to one of the investors in that offering to purchase an aggregate of 1,666,667 shares of common stock for an exercise price of $6.06 per share, which were issued in July of 2022 (the "Existing Warrants"), effective upon the closing of the offering, such that the amended Existing Warrants have a reduced exercise price of $3.23 per share, are exercisable six months following the closing of the offering, and will expire five and one-half years following the closing of this offering. This modification has been accounted for in accordance with ASC 815 Derivatives and Hedging. The Company determined that the incremental fair value of the warrants subsequent to the warrant modification were not material and therefore, the Company did not record additional equity issuance costs and additional-paid-in capital as a result of the modification.

**Common Stock**

On May 3, 2023, the Company has entered into a definitive agreement with institutional investors for the issuance and sale of 2,083,336 shares of its common stock (or prefunded warrants in lieu thereof) at a purchase price of $2.40 per share of common stock in a registered direct offering for proceeds of $4.6 million, net of issuance costs.

The Company has the ability through its ATM Agreement to sell shares of its common stock. Effective May 4, 2023, the Company filed a prospectus supplement to amend, supplement and supersede certain information contained in the earlier prospectus and prospectus supplement, which reduced the number of shares of common stock the Company may offer and sell under the ATM Agreement to an aggregate offering price of up to $9,000,000 from time to time. During the quarter ended June 30, 2023, 239,607 shares were issued as part of the ATM Agreement for cash proceeds of $721,460, net of issuance costs. The Company is contractually restricted from issuing any stock under its ATM Agreement until on or about November 7, 2023.

During the quarter ended June 30, 2023, there were exercises of restricted stock units and common stock options into 656 shares of common stock of the Company for proceeds totaling $186,776.

24

**NOTE 9 – COMMITMENTS AND CONTINGENCIES**

The Company is currently in the process of applying for sales tax registrations and exemptions in different states in the U.S. At this stage, the Company is unable to determine the financial impact of sales tax.

The determination of tax liabilities involves significant judgement as well as the application of complex tax laws and regulations. As of the reporting date, certain income tax matters are uncertain and cannot be reliable estimated primarily for the subsidiaries under the U.S. tax jurisdictions for the current and prior periods. The Company has not recorded any tax liabilities or benefits pertaining to these subsidiaries for the period.

**NOTE 10 – RELATED PARTY TRANSACTIONS**

On March 16, 2022, Luna Squares LLC entered into a lease with respect to a property in the City of Sharon, Mercer County, Pennsylvania with Vertua Property, Inc, a subsidiary entity in which Vertua Ltd has a 100% ownership interest. James Manning, a director and a significant stockholder of the Company, is also a director of Vertua Ltd and has a material interest in the Sharon lease as a large stockholder of Vertua Ltd. The lease is for a term of five years, and Luna Squares LLC has two options to extend for five years each. Rent is subject to annual increases equal to the amount of the Consumer Price Index for the Northeast Region, or 4%, whichever is higher. The base rental amount in the first year is $0.24 million. Depending on power energization and usage, variable additional rent may be payable, with charges ranging from $500 to $10,000 per month, depending on power energized and whether it is available.

During the six month periods ended June, 2023 and 2022, Mawson Infrastructure Group Pty Ltd paid Vertua Limited $154,224 and $102,750 respectively, for reimbursement for office costs charged with a mark-up. James Manning, a director and a significant stockholder of the Company, is also a director of Vertua Ltd. Manning family members also own interests in Vertua Ltd.

During the six month periods ended June, 2023 and 2022, Mawson Infrastructure Group Pty Ltd paid First Equity Tax Pty Ltd $42,741 and $10,124 respectively, for tax advisory services. James Manning, a director and a significant stockholder of the Company, has interests in and is also a partner of First Equity Tax Pty Ltd.

During the six month periods ended June, 2023 and 2022, Mawson Infrastructure Group Pty Ltd paid First Equity Advisory Pty Ltd $48,223 and $25,167 respectively, for accounting labor services. James Manning, a director and a significant stockholder of the Company, has interests in First Equity Advisory Pty Ltd.

During the six month periods ended June, 2023 and 2022, Mawson Infrastructure Group Pty Ltd paid Defender Investment Management Pty Ltd $363,611 and $262,802 respectively, in lieu of paying Mr. Manning directly for his employment. These payments were disclosed in the Executive Summary Compensation table in the Company's 2022 and 2023 Proxy Statements. Mr. James Manning, is a director and a significant stockholder of the Company, and is a director of Defender Investment Management Pty Ltd. Manning family members have equity interests in and control Defender Investment Management Pty Ltd.

During the six month periods ended June, 2023 and 2022, Mawson Infrastructure Group Pty Ltd paid Manning Motorsports Pty Ltd $35,495 and $41,525 respectively, for vehicle services. James Manning, a director and a significant stockholder of the Company, has direct interests in and is a director of Manning Motorsports Pty Ltd.

During the six month periods ended June, 2023 and 2022, Mawson Infrastructure Group Pty Ltd paid International Cargo Solutions, a division of Flynt ICS Pty Ltd, $841,042 and $4,464,097 respectively, for freight services. Manning Capital Holdings Pty Ltd, a company associated with Mr. Manning may have had debt interests in Flynt ICS Pty Ltd. Vertua Ltd entered into an agreement to acquire International Cargo Solutions, a division of Flynt ICS Pty Ltd in October 2022. The transaction closed on June 30, 2023. James Manning, a director and a significant stockholder of the Company, is also a director of Vertua Ltd. Manning family members own interests in Vertua Ltd.

There may be additional related party transactions. Mr. James Manning has not signed a declaration of related party transactions to the Company's satisfaction at the time of this filing.

**NOTE 11 – SUBSEQUENT EVENTS**

On July 18, 2023 Luna Squares LLC paid to Celsius Mining LLC $3.33 million as principal and interest related to the Celsius Promissory Note.

On July 20, 2023 we received a notice from Celsius Mining LLC that Celsius Mining LLC does not intend to renew its Co-Location Agreement, under which it receives hosting services from Luna Squares LLC (a subsidiary of the Company), and that it will expire in accordance with its terms. Celsius Mining LLC is the Company's only hosting customer. The Company hosts approximately 20,000 miners for Celsius Mining LLC. Celsius Mining LLC has made certain allegations against Luna Squares LLC in respect of its performance under the Co-Location Agreement. Luna Squares LLC has made certain allegations again Celsius Mining LLC in respect of its performance under the Co-Location Agreement. There is a risk of dispute or litigation arising out of these allegations.

On July 25, 2023, a Debtors' Ex Parte Motion for an Order Under Federal Rules of Bankruptcy Procedure 2004 and 9016 for Subpoenas for Examination of, and Production of Documents From, Mawson Infrastructure Group Inc., Luna Squares, and Cosmos Infrastructure LLC was filed, and the Bankruptcy Court entered an order on July 26, 2023, authorizing the Debtors to take discovery of the Mawson Entities . The Debtors intend to take discovery of the Mawson Entities to evaluate the status of the liens securing the Celsius Promissory Note and other potential claims the Debtors may have against the Mawson Entities, including with respect to the Co-Location Agreement. The discovery process is ongoing.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*Management's Discussion and Analysis of Financial Condition and Results of Operations analyzes the major elements of our balance sheets, statements of operations and cash flows. The following discussion and analysis of our financial condition and results of operations should be read together with the interim condensed consolidated financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q, as well as our audited consolidated financial statements and related notes as disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022. All amounts are in U.S. dollars.*

*Throughout this report, unless otherwise designated, the terms "we," "us," "our," the "Company," "Mawson," "our company" and the "combined company" refer to Mawson Infrastructure Group Inc., a Delaware corporation, and its direct and indirect subsidiaries, including Mawson Infrastructure Group Pty Ltd, an Australian company ("Mawson AU"), Cosmos Trading Pty Ltd, Cosmos Infrastructure LLC, Cosmos Manager LLC, Cosmos MIG No.1 Pty Ltd, MIG No.1 LLC, Mawson AU Limited, Mawson Bellefonte LLC, Luna Squares Texas, Luna Squares Repairs LLC, Luna Squares Property LLC, Mawson Midland LLC, Mawson Ohio LLC, Mawson Hosting LLC and Mawson Mining LLC.*

**Forward-Looking Statement Notice**

This Quarterly Report on Form 10-Q contains forward-looking statements about our expectations, beliefs or intentions regarding, among other things, our product development efforts, business, financial condition, results of operations, strategies or prospects. In addition, from time to time, our representatives have made or may make forward-looking statements, orally or in writing. Forward-looking statements can be identified by the use of forward-looking words such as "believe," "expect," "intend," "plan," "may," "should" or "anticipate" or their negatives or other variations of these words or other comparable words or by the fact that these statements do not relate strictly to historical or current matters. These forward-looking statements may be included in, but are not limited to, various filings made by us with the SEC, press releases or oral statements made by or with the approval of one of our authorized executive officers. Forward-looking statements relate to anticipated or expected events, activities, trends or results as of the date they are made. Because forward-looking statements relate to matters that have not yet occurred, these statements are inherently subject to risks and uncertainties that could cause our actual results to differ materially from any future results expressed or implied by the forward-looking statements. Many factors could cause our actual activities or results to differ materially from the activities and results anticipated in forward-looking statements, including, but not limited to, the risk factors summarized below.

This report identifies important factors which could cause our actual results to differ materially from those indicated by the forward-looking statements, particularly those set forth under Item 1A. "Risk Factors" below .

Such risk factors are not necessarily all of the important factors that could cause actual results to differ materially from those expressed in any of our forward-looking statements. Given these uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements.

The following important factors, among others, could affect future results and events, causing those results and events to differ materially from those expressed or implied in our forward-looking statements:

- our need to, and difficulty in, raising additional capital;

- downturns in the Cryptocurrency industry;

- inflation;

- increased interest rates;

- the inability to procure needed hardware;

- the failure or breakdown of mining equipment, or internet connection failure;

- access to reliable and reasonably priced electricity sources;

- Cyber-security threats;

- our ability to obtain proper insurance;

- construction risks;

- banks and other financial institutions ceasing to provide services to our industry.

- changes to the Bitcoin network's protocols and software;

- the decrease in the incentive to mine Bitcoin;

- the increase of transaction fees related to digital assets;

- the fraud or security failures of large digital asset exchanges;

- future digital asset, technological and digital currency development; and

- the regulation and taxation of digital assets like Bitcoin;

- our ability to timely and effectively implement controls and procedures required by Section 404 of the Sarbanes-Oxley Act of 2002;

- material litigation, investigations or enforcement actions by regulators and governmental authorities, as disclosed in the legal proceedings section and elsewhere.

Factors that could cause our actual results to differ materially from those expressed or implied in such forward-looking statements include, but are not limited to, the risk factors set out in Item 1A. Risk Factors**.**

All forward-looking statements attributable to us or persons acting on our behalf speak only as of the date of this report and are expressly qualified in their entirety by the cautionary statements included in this report. Except as required by applicable law, we undertake no obligations to update or revise forward-looking statements to reflect events or circumstances that arise after the date made or to reflect the occurrence of unanticipated events. In evaluating forward-looking statements, you should consider these risks and uncertainties.

*Overview*

Mawson is a 'Digital Asset Infrastructure' business, which owns and operates (through its subsidiaries) data centers in the United States.

Our business includes the ownership and operation of the digital infrastructure associated with the operation of blockchain applications. Application-Specific Integrated Circuit ("ASIC") computers known as Miners enable the 'mining' of digital assets such as Bitcoin. We currently operate on two sites located in Pennsylvania. The Miners we operate are predominantly focused on the process of digital mining, specifically Bitcoin.

We offer hosting or co-location facilities to other businesses in the digital asset infrastructure industry to have their Miners located within our data centers. These businesses pay us for the use of our infrastructure and related services.

In exchange for curtailing the power we utilize from the grid in response to instances of high electricity demand, we receive net energy benefits. We also have a contract with our energy provider where we can trade our energy to achieve net energy benefits. We have recognized a derivative asset on our balance sheet for the contract we have with our energy provider, which has been measured at fair value with any changes in fair value recognized in our statement of operations.

We also sell new and used digital currency mining, data center infrastructure and equipment on a periodic basis, subject to prevailing market conditions.

We continue to conduct research and development in relation to our data centers, design, operations and technology.

*Recent Developments*

Effective July 14, 2023, the Company appointed Mr. William "Sandy" Harrison as its new Chief Financial Officer pursuant to the terms of an offer letter which is filed as Exhibit 10.4 hereto. Mr. Harrison has more than 27 years of experience as a senior finance executive primarily in semiconductor and communications-related technology companies. His roles have included senior research analyst, director of research, and a partner at two investment banking firms where he served as a principal and participated in several operating committee roles. He has also served as vice-president of investor relations as well as headed the financial planning and analysis and marketing communications teams at a multi-billion-dollar market-cap technology company. Mr. Harrison earned a B.A. degree from Washington and Lee University and a MBA in Finance from Loyola University Maryland. He is a previous holder of the Series 7, 24, 63, 86 and 87 licenses. There are no reportable family relationships or related person transactions involving the Company and Mr. Harrison. Mr. Harrison is not a party to any transaction that would require disclosure under Item 404(a) of Regulation S-K promulgated under the Securities Act of 1933, as amended.

From August 9, 2022, Mr. Ariel Sivikofsky provided Chief Financial Officer services to the Company. Pursuant to the appointment of Mr. Harrison as Chief Financial Officer, Mr. Sivikofsky ceased providing those services. Mr. Sivikofsky has made certain claims for compensation against the Company which the Company disputes. In addition, the Company announced the departure of Mr. Liam Wilson as the Company's Chief Operating Officer effective July 14, 2023. The Company does not at this time expect to seek a replacement for the Chief Operating Officer position as such responsibilities will be absorbed by the Chief Executive Officer and President and other members of the leadership team.

On July 19, 2023, the Company entered into an Addendum to the Employment Agreement between the Company and Rahul Mewawalla, dated May 22, 2023 (the "Addendum"). The Addendum is intended to provide management continuity related to a potential or actual change-in-control event of the Company and to align with shareholder interests in support of corporate transactions. The Addendum provides for double (200%) severance related payments and benefits if Mr. Mewawalla's employment is terminated (actually or constructively, or by Mr. Mewawalla for Good Reason) upon or after a change-in-control of the Company. The increase in payments and benefits provided to Mr. Mewawalla following a qualifying termination is the same for all change-in-control events. The description set forth above is qualified in its entirety by reference to the full text of the Addendum, which is filed as Exhibit 10.5 hereto.

On July 20, 2023 we received a notice from Celsius Mining LLC that Celsius Mining LLC does not intend to renew its Co-Location Agreement, under which it receives hosting services from Luna Squares LLC (a subsidiary of the Company), and that it will expire in accordance with its terms. Celsius Mining LLC is the Company's only hosting customer. The Company hosts approximately 20,000 miners for Celsius Mining LLC. Celsius Mining LLC has made certain allegations against Luna Squares LLC in respect of its performance under the Co-Location Agreement. Luna Squares LLC has made certain allegations against Celsius Mining LLC in respect of its performance under the Co-Location Agreement. There is a risk of dispute or litigation arising out of these allegations.

The Company is in active discussions with potential new customers for hosting services to replace Celsius, however there is no guarantee that the Company will be able to enter into hosting agreements with new customers in a timely manner, or at all, or that the agreements with the new customers will replace the revenue that Celsius Mining LLC generates for the Company. Celsius Mining LLC and Luna Squares LLC tare in discussions related to Co-Location Agreement, however the outcome of these discussions is uncertain. The Company may decide to use the hosting infrastructure's capacity to self-mine or for other purposes, however it will need to raise a potentially significant amount of capital to finance and acquire further hardware (specifically miners) for self-mining and the potential timing and outcome of these other potential options are uncertain.

On July 25, 2023, a Debtors' Ex Parte Motion for an Order Under Federal Rules of Bankruptcy Procedure 2004 and 9016 for Subpoenas for Examination of, and Production of Documents From, Mawson Infrastructure Group Inc., Luna Squares, and Cosmos Infrastructure LLC was filed, and the Bankruptcy Court entered an order on July 26, 2023 . Celsius has indicated it intends to use the process of discovery to evaluate the status of the liens securing the Celsius Promissory Note and other potential claims Celsius may have against Mawson and its related entities, including with respect to the Co-Location Agreement. The discovery process is ongoing.

### *Environment, Sustainability, Governance*

The Company has a strategy to source renewable or sustainable sources of energy, including carbon-neutral or low carbon emissions sources for the majority of its operations. These are key criteria when analyzing a new site for acquisition, lease or selling an existing site. The Company believes it can make a positive contribution towards lowering carbon emissions by supporting carbon neutral or low-emissions power sources.

The Company can provide, and has provided, electricity grid stability by curtailing its power usage during times of high-power demand through its Energy Markets Program, for example through its membership in the PJM Market, and various demand response programs as and where they are available.

*Results of Operations – Three months Ended June 30, 2023 compared to the three months ended June 30, 2022*

| | For the three months ended June 30, | |
|---|---|---|
| | **2023** | **2022** |
| **Revenues:** | | |
| Digital currency mining revenue | $ 4,896,521 | $ 16,212,525 |
| Hosting co-location revenue | 4,594,752 | 3,567,912 |
| Net energy benefits | 1,017,678 | - |
| Sale of equipment | 42,584 | - |
| **Total revenues** | **10,551,535** | **19,780,437** |
| Less: Cost of revenues (excluding depreciation) | 7,028,458 | 14,359,072 |
| **Gross profit** | **3,523,077** | **5,421,365** |
| Selling, general and administrative | 6,265,256 | 9,431,088 |
| Stock based compensation | 687,276 | 936,235 |
| Depreciation and amortization | 8,789,755 | 16,023,817 |
| Change in fair value of derivative asset | 5,444,300 | (17,714,357) |
| Total operating expenses | 21,186,587 | 8,676,783 |
| **Loss from operations** | **(17,663,510)** | **(3,255,418)** |
| **Non-operating income (expense):** | | |
| Losses on foreign currency transactions | (397,165) | 1,657,055 |
| Interest expense | (647,062) | (1,565,040) |
| Impairment of financial assets | - | (1,107,197) |
| Profit on sale of site | 2,562,283 | - |
| Gain on sale of marketable securities | - | - |
| Other income | 252,363 | 1,864,968 |
| Share of net loss of equity method investments | - | - |
| Total non-operating income (expense), net | 1,770,419 | 849,786 |
| **Loss before income taxes** | **(15,893,091)** | **(2,405,632)** |
| Income tax expense | (1,756,371) | - |
| **Net Loss** | **(17,649,462)** | **(2,405,632)** |
| Less: Net loss attributable to non-controlling interests | (305,556) | (288,229) |
| **Net Loss attributed to Mawson Infrastructure Group stockholders** | **$ (17,343,906)** | **$ (2,117,403)** |
| | | |
| **Net Loss per share, basic and diluted** | **$ (1.12)** | **$ (0.18)** |
| **Weighted average number of shares outstanding** | 15,527,824 | 11,933,092 |

*Revenues*

Digital currency mining revenues from production of Bitcoin for the three months ended June 30, 2023 and 2022 were $4.90 million and $16.21 million respectively. This represented a decrease of $11.31 million or 70%. The decrease in mining revenue for the period was primarily attributable to a decrease in the total Bitcoin produced. Bitcoin produced totaled 181.62 in 2023 compared with 489.60 in the 2022 period, a decrease of 63% of Bitcoin produced over the respective period. The decrease is due to less miners being deployed during the current period as a result of the transition of mining to the Pennsylvania sites following the sale of the Georgia site, which occurred during October 2022. Additionally, the difficulty to mine Bitcoin during the current quarter increased significantly over the prior period, and there was a decrease in the average price of Bitcoin. During the quarter ended June 30, 2022, the average price of Bitcoin was $32,790, whereas the average price of Bitcoin during the quarter ended June 30, 2023 was $27,986, a 15% decrease in the average price.

Hosting co-location revenue for the three months ended June 30, 2023 and 2022 were $4.59 million and $3.57 million respectively. This increase is due to an increase in the number of miners we hosted during the period ended in June 2023.

Net energy benefits for the three months ended June 30, 2023 and 2022, were $1.02 million and $0 respectively. This increase is due to the fact we did not participate in this program during the three months ended June 30, 2022.

Sales of digital mining equipment for the three months ended June 30, 2023 and 2022, were $0.04 million and $0 respectively.

*Operating Cost and Expenses*

Our operating costs and expenses include cost of revenues; selling, general and administrative expenses; stock-based compensation; and depreciation and amortization.

**Cost of revenue**

Our cost of revenue consists primarily of direct power costs related to digital currency mining, cost of energy sold and cost of mining equipment sold.

Cost of revenue for the three months ended June 30, 2023 and 2022 were $7.03 million and $14.36 million, respectively. The decrease in cost of revenue was primarily attributable to a decrease in power costs related to energy to operate the mining equipment within our owned and hosting facilities. This decrease is attributable to less miners being used in operations during the current quarter due to the sale of the Georgia site.

**Selling, general and administrative**

Our selling, general and administrative expenses consist primarily of professional and management fees relating to: accounting, employee compensation payroll, audit, and legal; equipment repairs; marketing; freight; insurance; consultant fees; lease amortization and general office expenses.

Selling, general and administrative expenses for the three months ended June 30, 2023 and 2022 were $6.27 million and $9.43 million respectively, which is a reduction of $3.16 million in the period. The decrease in these expenses is primarily attributable to personal property tax decreasing by $1.29 million in relation to the Georgia site (which was sold during 2022); marketing costs decreasing by $0.38 million; contact labor costs decreasing by $0.47 million; legal costs decreasing by $0.43 million and equipment repairs decreasing by $0.59 million. This is offset by an increase in freight of $0.75 million.

31

**Stock based compensation**

Stock based compensation expenses for the three months ended June 30, 2023 and 2022 were $0.69 million and $0.94 million respectively. In the three months ended June 30, 2023, stock based compensation was largely attributable to costs recognized for warrants issued to Celsius Mining LLC amounting to $0.50 million, and $0.19 million in relation to long-term incentives for the Company's management.

**Depreciation and amortization**

Depreciation consists primarily of depreciation of digital currency mining hardware and MDC equipment.

Depreciation and amortization for the three months ended June 30, 2023 and 2022 were $8.79 million and $16.02 million, respectively. The decrease is primarily attributable to the Company owning less miners in the quarter ended June 30, 2023. At June 30 2023 we owned 23,458 miners whereas as at June 30, 2022 we owned 35,329 miners. We also revised our estimate of the useful life of miners with effect from December 1, 2022 to better reflect the pattern of consumption. The change was effected by updating the method of depreciation from reducing balance to the straight-line method from that date.

*Change in fair value of derivative asset*

During the three months ended June 30, 2023 and 2022, there was an adverse change in the fair value of the derivative asset by $5.44 million and a gain of $17.71 million, respectively in relation to our power supply arrangements. The reason for the adverse change in the derivative asset is due to the fall in the price of energy costs combined with less time left on the power supply agreement.

*Non-operating expenses*

Non-operating expenses consist primarily of interest expenses and losses on foreign currency transactions.

Interest expenses for the three months ended June 30, 2023 and 2022 were $0.65 million and $1.57 million, respectively. This decrease of $0.92 million was attributable to the paydown of debt during 2022 and the current quarter, resulting in lower interest charges.

During the three months ended June 30, 2023, the realized and unrealized loss on foreign currency transactions was $0.40 million, in contrast to the three months ended June 30, 2022, where there was a gain of $1.66 million due to the movement in foreign exchange rates.

*Non-operating income*

Non-operating income consists primarily of sale of site assets and other income.

The profit on sale of site assets for the three months ended June 30, 2023 and 2022 were $2.56 million and $0, respectively. This profit is in relation to the sale of the Luna Squares Texas LLC, including 59 transformers.

*Net loss attributable to Mawson Infrastructure Group, Inc. stockholders*

As a result of the foregoing, the Company recognized a net loss of $17.65 million for the three months ended June 30, 2023, compared to a net loss of $2.41 million for the three months ended June 30, 2022.

*Results of Operations – Six months Ended June 30, 2023 compared to the six months ended June 30, 2022*

| | For the six months ended June 30, | |
|---|---|---|
| | **2023** | **2022** |
| **Revenues:** | | |
| Digital currency mining revenue | $ 7,652,521 | $ 34,996,368 |
| Hosting co-location revenue | 8,917,306 | 4,116,860 |
| Net energy benefits | 1,458,734 | - |
| Sale of equipment | 193,581 | 91,545 |
| **Total revenues** | **18,222,142** | **39,204,773** |
| Less: Cost of revenues (excluding depreciation) | 11,706,460 | 22,771,433 |
| **Gross profit** | **6,515,682** | **16,433,340** |
| Selling, general and administrative | 11,242,674 | 15,908,034 |
| Stock based compensation | 1,691,619 | 1,326,844 |
| Depreciation and amortization | 16,752,279 | 29,826,849 |
| Change in fair value of derivative asset | 6,125,525 | (17,714,357) |
| Total operating expenses | **35,812,097** | **29,347,370** |
| **Loss from operations** | **(29,296,415)** | **(12,914,030)** |
| **Non-operating income (expense):** | | |
| Losses on foreign currency transactions | (815,382) | 957,818 |
| Interest expense | (1,546,114) | (2,801,713) |
| Impairment of financial assets | - | (1,107,197) |
| Profit on sale of site | 3,353,130 | - |
| Gain on sale of marketable securities | 1,437,230 | - |
| Other income | 177,941 | 1,889,415 |
| Share of net loss of equity method investments | (36,356) | - |
| Total non-operating income (expense), net | 2,570,449 | (1,061,677) |
| **Loss before income taxes** | **(26,725,966)** | **(13,975,707)** |
| Income tax expense | (2,304,454) | - |
| **Net Loss** | **(29,030,420)** | **(13,975,707)** |
| Less: Net loss attributable to non-controlling interests | (584,489) | (522,648) |
| **Net Loss attributed to Mawson Infrastructure Group stockholders** | **$ (28,445,931)** | **(13,453,059)** |
| | | |
| **Net Loss per share, basic and diluted** | **$ (1.93)** | **$ (1.12)** |
| **Weighted average number of shares outstanding** | 14,744,915 | 11,965,129 |

33

*Revenues*

Digital currency mining revenues from production for the six months ended June 30, 2023 and 2022 were $7.65 million and $35.0 million respectively. This represented a decrease of $27.35 million or 78%. The decrease in mining revenue for the period was primarily attributable to a decrease in the total Bitcoin produced. Bitcoin produced totaled 302.73 in 2023 compared with 948.27 in the 2022 period, a decrease of 68% of Bitcoin produced over the respective period. The reason for this decrease is due to less miners being deployed during the current period due to the sale of the Georgia site which occurred during October 2022, in addition to this the difficulty to mine Bitcoin was also higher during the current six month period. Another reason for the decrease in digital currency mining revenue is due to the average price of Bitcoin. During the six month period ended June 30, 2023, the average price of Bitcoin was $25,368 whereas the average price of Bitcoin during the six month period ended June 30, 2022 was $37,011, a 31% decrease in the average price.

Hosting co-location revenue for the six months ended June 30, 2023 and 2022 were $8.92 million and $4.12 million respectively. This increase is due to an increase in the number of miners we hosted during the period ended in March 2023.

Net energy benefits for the six months ended June 30, 2023 and 2022, were $1.46 million and $0 respectively. This increase is due to the fact we did not participate in this program during the six months ended June 30, 2022.

Sales of digital mining equipment for the six months ended June 30, 2023 and 2022, were $0.19 million and $0.09 million, respectively.

*Operating Cost and Expenses*

Our operating costs and expenses include cost of revenues; selling, general and administrative expenses; stock based compensation; and depreciation and amortization.

**Cost of revenues.**

Our operating costs and expenses include cost of revenues; selling, general and administrative expenses; stock based compensation; and depreciation and amortization.

Cost of revenues for the six months ended June 30, 2023 and 2022 were $11.71 million and $22.77 million, respectively. The decrease in cost of revenue was primarily attributable to a decrease in power costs related to energy to operate our mining equipment and hosting facilities. This decrease is attributable to less miners being used in operations during the current six month period due to the sale of the Georgia site.

**Selling, general and administrative.**

Our selling, general and administrative expenses consist primarily of professional and management fees relating to: accounting, employee compensation , audit, and legal; equipment repairs; marketing; freight; insurance; consultant fees; lease amortization and general office expenses.

Selling, general and administrative expenses for the six months ended June 30, 2023 and 2022 were $11.24 million and $15.91 million respectively. Total selling, general and administrative expenses reduced by $4.67 million in the period. Some of the main factors impacting the decrease the expenses were due to personal property tax decreasing by $1.34 million in relation to the Georgia site which was sold during 2022; marketing costs decreased by $0.60 million; contact labor costs decreased by $0.88 million; legal costs decreased by $0.57 million; recruitment costs decreased by $0.35 million and equipment repairs decreased by $1.0 million. This is offset by an increase in freight of $0.53 million and an increase in payroll costs of $0.44 million.

34

**Stock based compensation**

Stock based compensation expenses for the six months ended June 30, 2023 and 2022 were $1.69 million and $1.33 million respectively. In the six months ended June 30, 2023, stock based compensation was largely attributable to costs recognized for warrants issued to Celsius Mining LLC amounting to $1.0 million, shares issued to W Capital Advisors Pty Ltd amounting to $0.31 million for consultancy and advisory work and $0.38 million in relation to long-term incentives for the Company's leadership team.

**Depreciation and amortization**

Depreciation consists primarily of depreciation of digital currency mining hardware and MDC equipment.

Depreciation and amortization for the six months ended June 30, 2023 and 2022 were $16.75 million and $29.83 million, respectively. The decrease is primarily attributable to the Company owning less miners in the six month period ended June 30, 2023, as at June 30 2023 there were 23,458 miners whereas as at June 30, 2022 there were 35,329 miners. There was also a revised estimate of the useful life of miners with effect from December 1, 2022 to better reflect the pattern of consumption the change being effected by changing the method of depreciation from reducing balance to the straight line method from that date.

*Change in fair value of derivative asset*

During the six months ended June 30, 2023, there was an adverse change in the fair value of the derivative asset by $6.13 million and a gain of $17.71 million, respectively in relation to our power supply arrangements. The reason for the adverse change in the derivative asset is due to the fall in the price of energy costs combined with less time left on the power supply agreement.

*Non-operating expense*

Non-operating expenses consist primarily of interest expense, losses on foreign currency transactions, loss on write off property, plant and equipment, and share of net loss of associates accounted for using the equity method.

Interest expense for the six months ended June 30, 2023 and 2022 were $1.55 million and $2.80 million, respectively. This was a decrease of $1.32 million which was attributable to the paydown of debt during 2022 and the current six month period resulting in a lower interest charge.

During the six months ended June 30, 2023, the realized and unrealized loss on foreign currency transactions was $0.82 million, and for the six months ended June 30, 2022 there was a gain of $0.96 million due to the movement in foreign exchange rates.

*Non-operating income*

Non-operating income consists primarily of, profit on sale of site assets, gain on sales of marketable securities and other income.

The gain on sales of marketable securities for the six months ended June 30, 2023 and 2022 were $1.44 million and $0, respectively. The gain during the six month period was in relation to the sale of CleanSpark, Inc shares.

The profit on sale of site assets for the six months ended June 30, 2023 and 2022 were $3.35 million and $0, respectively. This is mainly in relation to the sale of the Luna Squares Texas LLC and the 59 transformers. However, $0.79 million of this gain on sale relates to an accounting adjustment relating to the sale of the Georgia site to CleanSpark, Inc during 2022. The Company determined the impact of recording this adjustment during 2023 was not material to the financial statements or the opening balance of the accumulated deficit.

*Net loss attributable to Mawson Infrastructure Group, Inc. stockholders*

As a result of the foregoing, the Company recognized a net loss of $29.03 million for the six months ended June 30, 2023, compared to a net loss of $13.98 million for the six months ended June 30, 2022.

*Liquidity and Capital Resources*

*General*

Liquidity is the ability of a company to generate funds to support its current and future operations, satisfy its obligations, and otherwise operate on an ongoing basis. Significant factors in the management of liquidity are funds generated by operations, levels of accounts receivable and accounts payable and capital expenditures. For the six month period ended June 30, 2023, we financed our operations primarily through:

1.  Net cash used by operating activities of $4.19 million;

2.  On September 2, 2022, Mawson Infrastructure Group Pty Ltd entered into a Secured Loan Facility Agreement with W Capital Advisors Pty Ltd with a total loan facility of AUD$8 million (USD$5.2 million). During the six month period ending June 30, 2023, the Company received AUD$3 million (USD$1.99 million) from this loan facility. As at June 30, 2023, AUD$1.46 million (USD$0.97 million) has been drawn down from this facility. The Secured Loan Facility expired in March 2023 and the Company and W Capital Advisors Pty Ltd are in ongoing discussions regarding the terms and extension of the loan. W Capital Advisors Pty Ltd and MIG PL have each reserved their rights.

3.  The Company has the ability through its ATM Agreement to sell shares of its common stock. Effective May 4, 2023, the Company filed a prospectus supplement to amend, supplement and supersede certain information contained in the earlier prospectus and prospectus supplement, which reduced the amount of shares of common stock the Company may offer and sell under the ATM Agreement to an aggregate offering price of up to $9,000,000 from time to time. During the six months ended June 30, 2023, 415,271 shares were issued as part of the ATM Agreement for cash proceeds of $1.19 million, net of issuance costs. However, the Company is currently contractually restricted from issuing any stock under its ATM Agreement until on or about November 7, 2023.

4.  On May 3, 2023, the Company has entered into a definitive agreement with institutional investors for the issuance and sale of 2,083,336 shares of its common stock (or pre-funded warrants in lieu thereof) at a purchase price of $2.40 per share of common stock in a registered direct offering. In addition, in a concurrent private placement, the Company will issue to the institutional investors unregistered warrants to purchase up to 2,604,170 shares of its common stock with an exercise price of $3.23 per share and are exercisable six months following issuance for a period of five and one-half years following issuance. The shares of common stock and pre-funded warrants described above are being offered and sold by the Company pursuant to a "shelf" registration statement on Form S-3 (File No. 333-264062). The warrants to purchase common stock described above were offered and sold by the Company pursuant to Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder. This offering closed on May 8, 2022. The net amount raised was $4.60 million. As a condition of the offering the Company was precluded from issuing new shares until the date that is 60 days from the date the offering closed, or new shares under the ATM until the date that is 180 days from the date the offering closed.

During the six months ending June 30, 2023 we repaid $9.67 million of principal payments against the historical facilities provided by Celsius, Marshall and W Capital Advisors Pty Ltd.

We believe our working capital requirements will continue to be funded through a combination of the cash we expect to generate from future operations, our existing funds, external debt facilities that may be available to us, further issuances of shares, and other potential sources of capital, monetization or funds. These are expected to be adequate to fund our operations over the next twelve months. In addition, the Company shall have access to equity financing through the ATM offering facility post the contractually restricted period. For our business to grow it is expected, we may continue investing in mining equipment and infrastructure and will require additional working capital in the short-term and long-term. As at June 30, 2023 we had an aggregate of $20.87 million of debt that is required to be repaid within eight months unless we refinance or renegotiate the terms, $3.33 million of this debt was paid during July 2023, a further $11.06 million is required to be repaid on or before August 31, 2023, unless we refinance or renegotiate the terms. In addition, the Celsius deposit of $15.33 million is the subject of a dispute.

Please see our Risk Factor entitled "We may need to raise additional capital to continue our operations and execute our business strategy" in our Annual Report on Form 10-K for the year ended December 31, 2022.

*Working Capital and Cash Flows*

As of June 30, 2023, and December 31, 2022, we had cash and cash equivalents balance of $5.61 million and $0.95 million, respectively.

As of June 30, 2023, and December 31, 2022, our trade receivables balance was $6.40 million and $10.46 million, respectively.

As of June 30, 2023, we had $20.87 million of outstanding short-term borrowings, and as of December 31, 2022, we had $23.61 million of short-term borrowings. The short-term borrowings as of June 30, 2023, relate to the to the secured loan facilities with Celsius Mining LLC, W Capital Advisors Pty Ltd, the secured convertible promissory notes issued to investors and Marshall Investments MIG Pty Ltd. As of June 30, 2023, and as of December 31, 2022, we had $0 and $4.51 million, respectively, of outstanding long-term borrowings.

As of June 30, 2023, we had negative working capital of $32.30 million and as at December 31, 2022, we had negative working capital of $15.17 million.

The following table presents the major components of net cash flows (used in) provided by operating, investing and financing activities for the three months ending June 30, 2023 and 2022:

|  | Six Months Ended June 30, | | | |
|  | 2023 | | 2022 | |
|---|---|---|---|---|
| Net cash (used in)/provided by operating activities | $ | (4,192,480) | $ | 33,146,960 |
| Net cash provided by/(used in) investing activities | $ | 10,767,041 | $ | (53,155,193) |
| Net cash (used in)/provided by financing activities | $ | (1,893,177) | $ | 19,513,738 |

For the six months ended June 30, 2023, net cash used by operating activities was $4,192,480 and for the six months ended June 30, 2022, net cash provided by operating activities was $33,146,960. The decrease in net cash provided by operating activities was primarily attributable to timing differences in trade and other receivables and trade and other payables.

For the six months ended June 30, 2023, net cash provided by investing activities was $10,767,041 and for the six months ended June 30, 2022, net cash used in investing activities was $53,155,193. The net cash provided by investing activities during June 30, 2023 was primarily attributable the proceeds from sale of investment shares in CleanSpark, Inc.

For the six months ended June 30, 2023, net cash used in financing activities was 1,893,177 and for the six months ended June 30, 2022, net provided by financing activities was $19,513,738. The cash used in financing activities during June 30, 2023 was primarily attributable to the repayment of borrowings.

*Material Cash Requirements*

The following discussion summarizes our material cash requirements from contractual and other obligations.

In December 2021 MIG No. 1 Pty Ltd entered into a Secured Loan Facility Agreement with Marshall. The loan matures in February 2024 and bears interest at a rate of 12% per annum, payable monthly with interest payments commencing that commenced in December 2021. This loan facility is secured by direct assets of MIG No.1 Pty Ltd and a general security agreement given by the Company. Principal repayments began during November 2022. The outstanding balance is $8.07 million as at June 30, 2023, all of which is classified as a current liability. On June 30, 2023 MIG No. 1 Pty Ltd did not make a principal and interest payment of $0.50 million. MIG No. 1 Pty Ltd and Marshall are in ongoing discussions with respect to the payment, and the loan terms generally. Marshall and MIG No. 1 Pty Ltd have each reserved their rights.

On February 23, 2022, Luna Squares LLC entered into a Co-Location Agreement with Celsius Mining LLC. In connection with this agreement, Celsius Mining LLC loaned Luna Squares LLC a principal amount of $20 million, for the purpose of funding the infrastructure required to meet the obligations of the Co-Location Agreement, for which Luna Squares LLC issued a Secured Promissory Note for repayment of such amount. The Secured Promissory Note accrues interest daily at a rate of 12% per annum. Luna Squares LLC is required to amortize the loan at a rate of 15% per quarter, principal repayments began at the end of September 2022. The Secured Promissory Note has a maturity date of August 23, 2023, the outstanding balance is $11.33 million as of June 30, 2023, all of which is classified as a current liability. Celsius Mining LLC filed for Chapter 11 bankruptcy protection on July 13, 2022. Under the Co-location Agreement, Celsius Mining LLC advanced deposits of $15.33 million to Luna Squares LLC. The deposits are the subject of a commercial dispute between the parties.

On September 2, 2022, Mawson Infrastructure Group Pty Ltd entered into a Secured Loan Facility Agreement with W Capital Advisors Pty Ltd with a total loan facility of AUD$3.00 million (USD$1.9 million). This was amended on September 29, 2022 and the loan facility was increased to AUD$8.00 million (USD$5.2 million). As at June 30, 2023, AUD$1.46 million (USD$0.97 million) has been drawn down from this facility, all of which is classified as a current liability. The Secured Loan Facility accrues interest daily at a rate of 12% per annum and is paid monthly. Principal repayments are paid ad hoc in line with the loan facility agreement. The Secured Loan Facility expired in March 2023 and Mawson Infrastructure Group Pty Ltd and W Capital Advisors Pty Ltd are in ongoing discussions. W Capital Advisors Pty Ltd and MIG PL have each reserved their rights.

On July 8, 2022, the Company issued secured convertible promissory notes to investors in the aggregate principal amount of $3.60 million (the "Secured Convertible Promissory Notes") in exchange for an aggregate of $3.60 million in cash. On September 29, 2022, the Company entered into a letter variation relating to some of the Secured Convertible Promissory Notes, with an aggregate principal amount of $3.1 million, which gave those holders the option to elect for pre-payment (including accrued interest to maturity) subject to certain conditions. All of the investors included in this letter variation elected for the pre-payment option and therefore there were $3.1 million principal repayments made during November 2022. The final convertible noteholder who was not a party to this variation opted to enter into an arrangement whereby it received pre-payment of interest but agreed that repayment of the principal was not required therefore the remaining $0.50 million has been classified as a current liability. The final convertible note matured in July 2023 and the Company is in ongoing discussions with the noteholder.

*Financial condition*

As at June 30, 2023 and December 31, 2022, we had net current liabilities of $32.30 million and $15.17 million respectively. As at June 30, 2023 and December 31, 2022, we had net assets of $55.33 million and $76.17 million respectively. As at June 30, 2023 we had an accumulated deficit of $150.70 million compared to $122.26 million as at December 31, 2022. Our cash position at June 30, 2023, was $5.61 million in comparison to $0.95 million at December 31, 2022. For the six month period ending June 30, 2023 and June 30, 2022 the Company incurred a loss after tax of $29.03 million and a loss after tax of $13.98 million respectively. Included in trade and other receivables is a $2 million payment being the final payment due from CleanSpark, Inc for the sale of the Georgia facility. CleanSpark, Inc has disputed this payment and there is uncertainty as to whether the Company can recover this amount in part or full.

Our primary requirements for liquidity and capital are working capital, capital expenditures, public company costs and general corporate needs. In particular, we have large power usage costs, and other significant costs include our lease, operational and employee costs. We expect these capital and liquidity needs to continue as we further develop and grow our business. Our principal sources of liquidity have been and are expected to be our cash and cash equivalents, external debt facilities available to us and further issuances of shares.

We require additional capital to respond to near-term debt repayment obligations, competitive pressure, market dynamics, new technologies, customer demands, business opportunities, challenges, potential acquisitions or unforeseen circumstances, and we will likely need to determine to engage in equity or debt financings in the short term. If we are unable to obtain adequate financing on terms satisfactory to us when we require it, our ability to continue to fund, grow or support our business model and to respond to business challenges could be significantly limited, our business, financial condition and results of operations could be adversely affected, and this may result in bankruptcy or our ceasing operations.

The Company is taking steps to preserve cash by optimizing costs and negotiating with suppliers to improve their terms of trade. The Company has been improving its revenue generation by improving the efficiency of its operations. The Company will continue to seek to optimize its cashflows.

### Non-GAAP Financial Measures

The Company utilizes a number of different financial measures, both GAAP and non-GAAP, in analyzing and assessing its overall business performance, for making operating decisions and for forecasting and planning future periods. The Company considers the use of non-GAAP financial measures helpful in assessing its current financial performance, ongoing operations and prospects for the future. While the Company uses non-GAAP financial measures as a tool to enhance its understanding of certain aspects of its financial performance, the Company does not consider these measures to be a substitute for, or superior to, the information provided by GAAP financial measures. Consistent with this approach, the Company believes that disclosing non-GAAP financial measures to the readers of its financial information provides such readers with useful supplemental data that, while not a substitute for GAAP financial measures, allows for greater transparency in the review of its financial and operational performance. Investors are cautioned that there are inherent limitations associated with the use of non-GAAP financial measures as an analytical tool. In particular, non-GAAP financial measures are not based on a comprehensive set of accounting rules or principles and many of the adjustments to the GAAP financial measures reflect the exclusion of items that are recurring and will be reflected in the company's financial results for the foreseeable future. In addition, other companies, including other companies in the Company's industry, may calculate non-GAAP financial measures differently than the Company does, limiting their usefulness as a comparative tool.

The Company is providing supplemental financial measures for (i) non-GAAP adjusted earnings before interest, taxes, depreciation and amortization, or ("adjusted EBITDA") that excludes the impact of interest, taxes, depreciation, amortization, share-based compensation expense, unrealized gains/losses on share of associates, and certain non-recurring expenses. We believe that adjusted EBITDA is useful to investors in comparing our performance across reporting periods on a consistent basis.

| | For the three months ended June 30, | | For the six months ended June 30, | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| **Reconciliation of non-GAAP adjusted EBITDA:** | | | | |
| Net loss: | $ (17,649,462) | $ (2,405,632) | $ (29,030,420) | $ (13,975,707) |
| Impairment of financial assets | - | 1,107,197 | - | 1,107,197 |
| Share of net loss of equity method investments | - | - | 36,356 | - |
| Depreciation and amortization | 8,789,755 | 16,023,817 | 16,752,279 | 29,826,849 |
| Stock based compensation | 687,276 | 936,235 | 1,691,619 | 1,326,844 |
| Unrealized and realized losses/(gain) | 397,165 | (1,657,055) | 815,382 | (957,818) |
| Other non-operating income | (252,363) | (1,864,968) | (177,941) | (1,889,415) |
| Other non-operating expenses | 647,062 | 1,565,040 | 1,546,114 | 2,801,713 |
| Income tax | 1,756,371 | - | 2,304,454 | - |
| **EBITDA (non-GAAP)** | $ (5,624,196) | $ 13,704,634 | $ (6,062,157) | $ 18,239,663 |

**Critical accounting estimates**

The preparation of the financial statements in conformity with U.S. GAAP requires management to make estimates, judgments and assumptions that affect the amounts reported in the financial statements and accompanying notes. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements, and the reported amounts of income and expenses during the reporting periods. Actual results could differ from those estimates. There have been no material changes to our critical accounting policies and estimates as set forth in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, included in our Annual Report on Form 10-K for the year ended December 31, 2022.

**Item 3. Quantitative and Qualitative Disclosures about Market Risks**

As a smaller reporting company, the Company has elected not to provide the disclosure required by this item.

**Item 4. Controls and Procedures**

*Evaluation of disclosure controls and procedures*

Our Board of Directors and management, with the participation of our Chief Executive Officer (principal executive officer) and Chief Financial Officer (principal financial officer), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a- 15(e)) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report. Our Board of Directors and management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost benefit relationship of possible controls and procedures. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective at the reasonable assurance level as of June 30, 2023, including the material weaknesses in our internal control over financial reporting described below. Management's assessment of the effectiveness of our disclosure controls and procedures is expressed at a level of reasonable assurance because management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

*Significant Reliance on Certain Individuals.* There is inadequate segregation of duties in place related to our financial reporting and other review and oversight procedures due to the lack of sufficient accounting personnel. This is not inconsistent with similar small organizations. This gives rise to the risk of lack of ability to react in a timely manner to operations issues and to meet the requirements of the SEC, U.S. GAAP and the Sarbanes-Oxley Act of 2002. In addition, this poses the risk that compliance and other reporting obligations are not dealt with in an adequate manner.

*Controls over the financial statement close and reporting process.* Controls were not adequately designed or implemented in the financial statement close and reporting process. This includes controls related to complex and judgmental accounting transactions including business acquisitions and divestures, derivatives, manual journal entries, account reconciliations and financial statement policies and disclosures.

*Information and Technology Controls.* There are control deficiencies related to information technology ("IT") general controls that in the aggregate constitute a material weakness. Deficiencies identified include lack of controls over access to programs and data, program changes, program development and general IT controls.

39

***Data from third parties.*** The Company did not properly execute its designed controls to ensure that data received from third parties was complete and accurate. Such data is relied on by the Company in determining amounts pertaining to mining and hosting revenue, net energy benefits, and digital currency assets.

***Fixed asset verification.*** The Company did not properly execute its designed controls around physical asset verification. Together with system limitations, restricting tracking of fixed asset movements, there is a risk around the existence of fixed assets.

Notwithstanding the identified material weaknesses and management's assessment that our disclosure controls and procedures were not effective as of June 30, 2023, management believes that the consolidated condensed financial statements included in this Quarterly Report on Form 10-Q fairly present, in all material respects, our financial condition, results of operations and cash flows as of and for the periods presented in accordance with generally accepted accounting principles. We rely on the assistance of outside advisors with expertise in these matters in preparing the financial statements.

**Remediation**

Our Board of Directors and management take internal control over financial reporting and the integrity of our financial statements seriously. With the oversight of senior management and our audit committee, we continue to remediate the underlying causes of the identified material weaknesses, such that the controls are designed, implemented and operate better.

Our remediation efforts commenced in fiscal year 2022, when we performed a risk assessment, designed controls, and gradually implemented controls for all business processes. In the current financial year, management updated the initial risk assessment, refined control designs, continued the implementation of controls and performed ongoing remediation efforts to uplift the quality and effectiveness of existing controls. Remediation efforts further included the implementation of new IT systems and applications with robust controls, segregating duties through implementing system workflows and the hiring of qualified personnel in financial reporting and IT. A number of controls remain to be implemented in the upcoming quarters.

Whilst controls have been implemented across all business processes, the material weaknesses in our internal control over financial reporting and information technology will not be considered remediated until controls are operated for a sufficient period of time and have been tested for and concluded on for effectiveness. Further testing of the effectiveness of controls is planned in subsequent quarters.

Remediation efforts for upcoming quarters will be focused on implementing the remainder of controls, refining existing controls and validating the effectiveness of implemented controls using criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control. We cannot provide any assurance that our remediation efforts will be successful or that our internal control over financial reporting and other business processes will be effective as a result of these efforts. In addition, as we continue to evaluate and work to improve our internal control over financial reporting related to the identified material weaknesses, management may determine to take additional measures to address control deficiencies or determine to modify the remediation plan described above.

***Changes in internal control over financial reporting***

Except for the remedial measures described above, there have been no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) or 15d-15(f) of the Exchange Act) that occurred during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Limitations on Effectiveness of Controls and Procedures and Internal Control over Financial Reporting**

In designing and evaluating the disclosure controls and procedures and internal control over financial reporting, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures and internal control over financial reporting must reflect the fact that there are resource constraints, and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

## PART II. OTHER INFORMATION

**Item 1. Legal Proceedings**

We are currently not, and have not been in the recent past, a party to any litigation which may have or have had in the recent past significant effects on our financial position or profitability. However, we have been in the past, and may be from time to time in the future, be involved in certain litigation related to our businesses. The Company and some of its subsidiaries are currently in commercial disputes, including with Celsius Mining LLC, whereby Celsius Mining LLC, the Company and/or its subsidiaries and affiliates have made certain allegations and claims against each other. The Company is also in a commercial dispute with CleanSpark, Inc. related to payments due by CleanSpark, Inc. to the Company. If the Company and those subsidiaries are unable to resolve these issues with Celsius Mining LLC and/or CleanSpark, Inc, these disputes may lead to litigation. Mr. Sivikofsky, who previously provided CFO services to the Company, has made certain compensation related claims against the Company which the Company disputes.

**Item 1A. Risk Factors**

The Company's risk factors were disclosed in (i) Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2022 which was filed on March 23, 2023 and (ii) Part II, Item 1A of our Quarterly Report on form 10-Q for the quarter ended March 31, 2023. In addition, the Company includes the additional risk factors and updates to existing risk factors below:

*Listing on The Nasdaq Capital Market ("Nasdaq")*

On May 24, 2023 the Company notified Nasdaq that we had fallen out of compliance with Nasdaq's Listing Rules regarding Majority Independent Board and Audit Committee Composition due to an independent director becoming an executive of the company. The Nasdaq Listing Rules provide a cure period to regain compliance, which is until our next annual stockholders' meeting. The Company plans to add a new independent Board director and to the Audit Committee and looks forward to subsequently regaining compliance with the Nasdaq Listing Rules within the cure period allowed by the Nasdaq.

There is a risk that the Company may be de-listed if it fails to maintain compliance with any of the other Nasdaq Listing Rules.

*We will need to raise substantial additional capital to continue our operations and execute our business strategy, and we may not be able to raise adequate capital on a timely basis, on favorable terms, or at all.*

We have a history of losses from operations, we expect negative cash flows from our operations to continue for the foreseeable future, and we expect that our net losses will continue for the foreseeable future as we seek to increase the efficiency of our operations, find new hosting customers, and grow the size of our self-mining operations. These circumstances raise substantial doubt about our ability to continue as a going concern. Our financial statements as of June 30, 2023, have been prepared on the basis that we will be able to continue as a going concern and do not include any adjustments that might result from the outcome of this uncertainty. At June 30, 2023, our accumulated deficit was $150.70 million, our cash and cash equivalents were $5.61 million, and we had negative working capital of $32.30 million. Advancing our future plans will require substantial additional investment. Based on our current operating plan estimates, we do not have sufficient cash to satisfy our working capital needs and other liquidity requirements over the next 12 months from the date of this report. We will need to raise substantial additional capital in the near term to continue to fund our operations and execute our current business strategy. The amount and timing of our capital needs have and will continue to depend on many factors, as discussed further below as well as under "Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations —Liquidity and Capital Resources."

41

Our capital needs have depended on, and will continue to depend on, many factors that are highly variable and difficult to predict, including:

- working capital,

- capital expenditures,

- public company costs and

- general corporate needs.

We are seeking to raise additional capital through a variety of means, including equity, equity-linked or debt securities offerings, or other types of arrangements or sources of capital, monetization or funds. Our past success in raising capital through equity offerings should not be viewed as an indication we will be successful in raising capital through those or any other means in the future. We expect that our ability to raise additional capital and the amount of capital available to us will depend not only on our operations, assets and progress effecting our business plan, but also on several factors outside of our control, such as macroeconomic and financial market conditions.

Unstable and unfavorable market and economic conditions may harm our ability to raise additional capital. An economic downturn, recession or recessionary concerns, delay or failure of the U.S. government to raise the federal debt ceiling, increased inflation, rising interest rates, adverse developments affecting financial institutions or the financial services industry, or the occurrence or continued occurrence of events similar to those in recent years, such as a fall in the price of Bitcoin, the COVID-19 pandemic or other public health emergencies, geopolitical conflict (such as the war in Ukraine), natural/environmental disasters, supply-chain disruptions, terrorist attacks, strained relations between the U.S. and a number of other countries, social and political discord and unrest in the U.S. and other countries, and government shutdowns, among others, increase market volatility and have long-term adverse effects on the U.S. and global economies and financial markets. Volatility and deterioration in the financial markets and liquidity constraints or other adverse developments affecting financial institutions may make equity or debt financings more difficult, more costly or more dilutive and may increase competition for, or limit the availability of, funding from other third-party sources, such as from strategic collaborations and government and other grants.

Our management may devote significant time and we may incur substantial costs in pursuing, evaluating and negotiating potential strategic options or capital-raising transactions and those efforts may not prove successful on a timely basis, or at all. If we cannot raise adequate additional capital when needed, we may be forced to reorganize or merge with another entity, sell or monetize assets, file for bankruptcy, or cease operations. If we become unable to continue as a going concern, we may have to liquidate our assets, and might realize significantly less than the values at which they are carried on our financial statements, and our stockholders may lose all or part of their investment in our common stock.

*We will need to raise capital to meet our debt service obligations on or before August 23, 2023, and to fund our working capital needs. Our inability to raise sufficient capital would have a material adverse effect on our financial condition and business.*

As of June 30, 2023, we had cash and cash equivalents of approximately $5.61 million. As of June 30, 2023, approximately $20.87 million of loans and other borrowings and payables is due of which $3.33 million of this debt was paid during July 2023. We need to raise capital to meet our debt service obligations and fund our working capital needs. We currently have no arrangements for such capital and no assurances can be given that we will be able to raise such capital when needed, on acceptable terms, or at all. If we are unable to raise or source sufficient capital, we will need to implement additional measures to reduce operating expenses and to preserve capital, any of which may further adversely affect our operations. If we fail to comply with our debt service obligations, our lenders could declare a default, which could lead to all or a number of payment obligations becoming immediately due and payable and have a material adverse effect on our financial condition and business.

On July 20, 2023 we received a notice from Celsius Mining LLC that Celsius Mining LLC does not intend to renew its Co-Location Agreement, under which it receives hosting services from Luna Squares LLC (a subsidiary of the Company), and that it will expire in accordance with its terms. Celsius Mining LLC is the Company's only hosting customer. The Company hosts approximately 20,000 miners for Celsius Mining LLC. In addition, Celsius Mining LLC has made certain allegations against Luna Squares LLC in respect of its performance under the Co-Location Agreement. Luna Squares LLC has made certain allegations against Celsius Mining LLC in respect of its performance under the Co-Location Agreement. There is a risk of litigation arising out of these allegations.

The Company is in discussions with potential new customers for hosting services to replace Celsius, however there is no guarantee that the Company will be able to enter into hosting agreements with new customers in a timely manner, or at all, or that the agreements with the new customers will replace the revenue that Celsius Mining LLC generated for the Company. Celsius Mining LLC has indicated a desire to continue working with Luna Squares LLC to discuss a new Co-Location Agreement, however the outcome of this discussion is uncertain. The Company may decide to use the hosting infrastructure's capacity to self-mine or for other purposes, however it will need to raise a potentially significant amount of capital to finance and acquire further hardware (specifically miners) for self-mining and the potential timing and outcome of these and other potential options are uncertain.

On July 25, 2023, a Debtors' Ex Parte Motion for an Order Under Federal Rules of Bankruptcy Procedure 2004 and 9016 for Subpoenas for Examination of, and Production of Documents From, Mawson Infrastructure Group Inc., Luna Squares, and Cosmos Infrastructure LLC [Docket No. 3088] was filed, and the Bankruptcy Court entered an order on July 26, 2023, authorizing the Debtors to take discovery of the Mawson Entities [Docket No. 3091]. The Debtors intend to take discovery of the Mawson Entities to evaluate the status of the liens securing the Promissory Note and other potential claims the Debtors may have against the Mawson Entities, including with respect to the Co-Location Agreement. The discovery process is ongoing.

The Company requires capital to invest in new hardware. Bitcoin mining hardware becomes obsolete over time, and the difficulty to mine for Bitcoin increases as the total hashrate of the Bitcoin network increases. This means that if competitors continue to increase their hashing power relative to the Company, the Company will tend to earn less Bitcoin if its hashing power does not increase in a similar manner.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

None

**Item 3. Defaults Upon Senior Securities**

None

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

None.

**Item 6. Exhibits**

| | |
|---|---|
| 2.1† | Bid Implementation Agreement between Wize Pharma, Inc. and Cosmos Capital Limited, dated December 30, 2020 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on January 5, 2021) |
| 2.2† | Deed of Amendment, dated January 18, 2021, of the Bid Implementation Agreement between Wize Pharma, Inc. and Cosmos Capital Limited, dated December 30, 2020 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on January 19, 2021) |
| 3.1 | Certificate of Incorporation (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on April 5, 2012) |
| 3.2 | Certificate of Amendment to Certificate of Incorporation (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on July 18, 2013) |
| 3.3 | Certificate of Amendment to Certificate of Incorporation dated November 15, 2017 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on November 21, 2017) |
| 3.4 | Certificate of Amendment to Certificate of Incorporation dated March 1, 2018 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on March 5, 2018) |
| 3.5 | Certificate of Amendment to Certificate of Incorporation dated March 17, 2021 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on March 23, 2021) |
| 3.6 | Certificate of Amendment to Certificate of Incorporation dated June 9, 2021 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on June 14, 2021) |
| 3.7 | Certificate of Amendment to Certificate of Incorporation dated August 11, 2021 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on August 16, 2021) |
| 3.8* | Certificate of Amendment to Certificate of Incorporation dated February 6, 2023 |
| 3.9 | Certificate of Registration of a Company of Cosmos Capital Limited ACN 636 458 912 (Incorporated by reference to the Company's Registration Statement on Form S-1 (File No. 333-256947) filed with the SEC on June 9, 2021) |
| 3.10 | Constitution of Cosmos Capital Limited (Incorporated by reference to the Company's Registration Statement on Form S-1 (File No. 333-256947) filed with the SEC on June 9, 2021) |
| 3.11 | Bylaws (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on May 10, 2013) |
| 4.1 | Form of Common Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 8, 2023) |
| 4.2 | Form of Pre-Funded Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 8, 2023) |
| 4.3 | Form of Placement Agent Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 8, 2023) |
| 4.4 | Form of Warrant Amendment Agreement dated May 3, 2023 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 8, 2023) |
| 10.1 | Form of Securities Purchase Agreement (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 8, 2023) |
| 10.2 | Employment Agreement by and between Mawson Infrastructure Group Inc. and Rahul Mewawalla, dated May 22, 2023 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 25, 2023) |
| 10.3 | Letter Deed of Departure by and between Mawson Infrastructure Group Pty Ltd and James Manning, dated May 22, 2023 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 25, 2023) |
| 10.4 | Chief Financial Officer Offer Letter and Exhibit A (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on July 14, 2023) |
| 10.5 | Addendum dated July 19, 2023 to Employment Agreement between Mawson Infrastructure Group, Inc. and Rahul Mewawalla (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on July 21, 2023) |
| 31.1* | Certification of Principal Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32** | Certifications of Principal Executive Officer and Principal Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101 | The following materials from the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2023, formatted in Inline XBRL (eXtensible Business Reporting Language) includes: (i) Consolidated Balance Sheets as of June 30, 2023 and December 31, 2022, (ii) Consolidated Statements of Operations for the three and six months ended June 30, 2023 and 2022, (iii) Consolidated Statements of Comprehensive Loss for the three and six months ended June 30, 2023, and 2022, (iv) Consolidated Statements of Cash Flows for the six months ended June 30, 2023 and 2022, (v) Consolidated Statements of Stockholders' Equity for the three and six months ended June 30, 2023 and 2022, and (vi) Notes to Consolidated Financial Statements |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

\*    Filed herewith.

\*\*    Furnished herewith.

†    Exhibits and schedules to this exhibit have been omitted pursuant to Item 601(b)(2) of Regulation S-K. We will furnish the omitted exhibits and schedules to the Securities and Exchange Commission upon request by the Securities and Exchange Commission.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Mawson Infrastructure Group Inc.**

Date: August 21, 2023                                        By:    /s/ Rahul Mewawalla

                                                                    **Rahul Mewawalla**
                                                                    **Chief Executive Officer and President**
                                                                    (Principal Executive Officer)

Date: August 21, 2023                                        By:    /s/ William Harrison

                                                                    **William Harrison**
                                                                    **Chief Financial Officer**
                                                                    (Principal Financial and Accounting Officer)

45

**EXHIBIT C**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

(Mark One)
☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2024**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number 001-40849

**Mawson Infrastructure Group Inc.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 88-0445167 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 950 Railroad Avenue, Midland, Pennsylvania | 15059 |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: 1-412-515-0896

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | MIGI | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒

As of November 8, 2024, the issuer had a total of 18,707,614 shares of common stock, par value $0.001 per share, outstanding.

**MAWSON INFRASTRUCTURE GROUP INC.**
**FORM 10-Q**
**FOR THE QUARTER ENDED SEPTEMBER 30, 2024**

**TABLE OF CONTENTS**

| Item | | Page Number |
|---|---|---|
| **Part I – Financial Information** | | |
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risks | 39 |
| Item 4. | Controls and Procedures | 39 |
| | | |
| **Part II – Other Information** | | |
| Item 1. | Legal Proceedings | 41 |
| Item 1A. | Risk Factors | 42 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 42 |
| Item 3. | Defaults Upon Senior Securities | 42 |
| Item 4. | Mine Safety Disclosures | 43 |
| Item 5. | Other Information | 43 |
| Item 6. | Exhibits | 44 |
| | Signatures | 45 |

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements**

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED BALANCE SHEETS**

| | September 30, 2024 (unaudited) | December 31, 2023 |
|---|---:|---:|
| ASSETS | | |
| Current assets: | | |
| Cash and cash equivalents | $ 5,758,346 | $ 4,476,339 |
| Prepaid expenses | 4,504,739 | 3,556,933 |
| Trade and other receivables | 12,836,742 | 12,105,387 |
| **Total current assets** | **23,099,827** | **20,138,659** |
| Property, plant and equipment, net | 29,716,284 | 57,740,291 |
| Derivative asset | 3,179,992 | 4,058,088 |
| Investments, equity method | - | 106,807 |
| Security deposits | 481,903 | 415,000 |
| Operating lease right-of-use asset | 4,288,876 | 2,307,399 |
| **TOTAL ASSETS** | **$ 60,766,882** | **$ 84,766,244** |
| | | |
| LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | | |
| Current liabilities: | | |
| Trade and other payables | $ 36,271,942 | $ 32,513,113 |
| Current portion of operating lease liability | 1,208,262 | 1,416,310 |
| Current portion of finance lease liability | 346,819 | 33,059 |
| Current portion of long-term borrowings | 21,365,242 | 19,352,752 |
| **Total current liabilities** | **59,192,265** | **53,315,234** |
| Operating lease liability, net of current portion | 2,828,862 | 1,016,216 |
| Finance lease liability, net of current portion | 302,095 | 50,164 |
| **TOTAL LIABILITIES** | **62,323,222** | **54,381,614** |
| Stockholders' equity (deficit): | | |
| Series A preferred stock; 1,000,000 shares authorized, no shares issued and outstanding as of September 30, 2024 and December 31, 2023 | - | - |
| Common stock, $0.001 par value per share; 90,000,000 shares authorized, 18,707,614 and 16,644,711 shares issued and outstanding as of September 30, 2024 and December 31, 2023 | 18,707 | 16,645 |
| Additional paid-in capital | 222,552,668 | 211,279,176 |
| Accumulated other comprehensive income | 149,380 | 608,688 |
| Accumulated deficit | (224,277,095) | (182,666,465) |
| **Total Mawson Infrastructure Group, Inc. stockholders' equity (deficit)** | **(1,556,340)** | **29,238,044** |
| Non-controlling interest | - | 1,146,586 |
| **TOTAL STOCKHOLDERS' EQUITY (DEFICIT)** | **(1,556,340)** | **30,384,630** |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | **$ 60,766,882** | **$ 84,766,244** |

See accompanying notes to unaudited consolidated condensed financial statements.

1

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF OPERATIONS**
(Unaudited)

| | For the Three-Months ended September 30, | | For the Nine-Months ended September 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| **Revenues:** | | | | |
| Digital colocation revenue | $ 9,518,696 | $ 2,959,074 | $ 25,884,176 | $ 11,876,379 |
| Energy management revenue | 1,963,805 | 1,475,333 | 6,168,906 | 2,934,066 |
| Digital assets mining revenue | 833,516 | 6,898,223 | 11,596,363 | 14,550,744 |
| Equipment sales | - | - | 550,000 | 193,581 |
| **Total revenues** | **12,316,017** | **11,332,630** | **44,199,445** | **29,554,770** |
| Less: Cost of revenues (excluding depreciation) | 7,996,440 | 7,715,920 | 28,577,249 | 19,422,380 |
| **Gross profit** | **4,319,577** | **3,616,710** | **15,622,196** | **10,132,390** |
| Selling, general and administrative | 6,000,344 | 3,655,444 | 13,100,223 | 14,898,118 |
| Stock based compensation | 5,320,823 | 3,784,316 | 11,275,554 | 5,475,935 |
| Depreciation and amortization | 3,607,848 | 11,875,618 | 16,211,516 | 28,627,896 |
| Change in fair value of derivative asset | 789,146 | 520,838 | 878,096 | 6,646,363 |
| Total operating expenses | 15,718,161 | 19,836,216 | 41,465,389 | 55,648,312 |
| **Loss from operations** | **(11,398,584)** | **(16,219,506)** | **(25,843,193)** | **(45,515,922)** |
| **Non-operating income (expense):** | | | | |
| Losses on foreign currency transactions | (352,375) | (600,619) | (474,210) | (1,416,000) |
| Interest expense | (801,625) | (514,953) | (2,289,150) | (2,061,067) |
| Impairment of financial assets | - | (1,837,063) | -- | (1,837,063) |
| Profit on sale of site | - | - | - | 3,353,130 |
| Gain on sale of marketable securities | - | - | - | 1,437,230 |
| Other expenses | (443,537) | (158,577) | (29,800) | (226,330) |
| Loss on deconsolidation | - | - | (12,444,097) | - |
| Other income | 119,526 | - | 309,209 | 245,694 |
| Share of net loss of equity method investments | - | - | - | (36,356) |
| Total non-operating income (expense), net | (1,478,011) | (3,111,212) | (14,928,048) | (540,762) |
| **Loss before income taxes** | **(12,876,595)** | **(19,330,718)** | **(40,771,241)** | **(46,056,684)** |
| Income tax benefit (expense) | 648,857 | - | (1,044,475) | (2,304,454) |
| **Net Loss** | **(12,227,738)** | **(19,330,718)** | **(41,815,716)** | **(48,361,138)** |
| Less: Net loss attributable to non-controlling interests | - | (283,101) | (205,086) | (867,590) |
| **Net Loss attributed to Mawson Infrastructure Group stockholders** | **$ (12,227,738)** | **$ (19,047,617)** | **$ (41,610,630)** | **$ (47,493,548)** |
| **Net Loss per share, basic and diluted** | **$ (0.66)** | **$ (1.15)** | **$ (2.37)** | **$ (3.10)** |
| **Weighted average number of shares outstanding** | | | | |
| | 18,519,572 | 16,500,833 | 17,529,342 | 15,336,653 |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF COMPREHENSIVE LOSS**
(Unaudited)

| | For the Three-Months ended September 30, | | For the Nine-Months ended September 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Net Loss | $ (12,227,738) | $ (19,330,718) | $ (41,815,716) | $ (48,361,138) |
| Other comprehensive (income) loss | | | | |
| Foreign currency translation adjustment | 15,437 | 267,458 | (511,149) | 619,284 |
| Comprehensive loss | (12,212,301) | (19,063,260) | (42,326,865) | (47,741,854) |
| Less: Comprehensive loss attributable to non-controlling interests | - | (283,101) | (205,086) | (867,590) |
| **Comprehensive loss attributable to common stockholders** | $ (12,212,301) | $ (18,780,159) | $ (42,121,779) | $ (46,874,264) |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
(Unaudited)

| | For the Three-Months Ended September 30, 2024 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity (Deficit) |
| **Balance as of June 30, 2024** | 17,518,483 | $ 17,518 | $216,302,100 | $ 133,943 | $(212,049,357) | $ 4,404,204 | $ - | $ 4,404,204 |
| Exercising of RSU's and stock options | 1,189,131 | 1,189 | 929,745 | - | - | 929,745 | - | 929,745 |
| Stock based compensation expense for RSU's and stock options | - | - | 5,320,823 | - | - | 5,320,823 | - | 5,320,823 |
| Net loss | - | - | - | - | (12,227,738) | (12,227,738) | - | (12,227,738) |
| Other comprehensive income | - | - | - | 15,437 | - | 15,437 | - | 15,437 |
| **Balance as of September 30, 2024** | 18,707,614 | $ 18,707 | $222,552,668 | $ 149,380 | $(224,277,095) | $ (1,556,340) | $ - | $ (1,556,340) |

See accompanying notes to unaudited consolidated condensed financial statements.

4

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
(Unaudited)

| | For the Three-Months Ended September 30, 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity |
| **Balance as of June 30, 2023** | 16,454,709 | $ 16,455 | $202,136,148 | $ 5,321,282 | $(150,703,559) | $ 56,770,326 | $(1,438,382) | $ 55,331,944 |
| Issuance of warrants | - | - | 500,500 | - | - | 500,500 | - | 500,500 |
| Exercising of RSU's and stock options | 63,334 | 63 | 163,339 | - | - | 163,402 | - | 163,402 |
| Stock based compensation expense for RSU's and stock options | - | - | 3,120,413 | - | - | 3,120,413 | - | 3,120,413 |
| Net loss | - | - | - | - | (19,047,617) | (19,047,617) | (283,101) | (19,330,718) |
| Other comprehensive income | - | - | - | 221,839 | | 221,839 | 45,619 | 267,458 |
| **Balance as of September 30, 2023** | 16,518,043 | $ 16,518 | $205,920,400 | $ 5,543,121 | $(169,751,176) | $ 41,728,863 | $(1,675,864) | $ 40,052,999 |

See accompanying notes to unaudited consolidated condensed financial statements.

5

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
(Unaudited)

| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | | | | **For the Nine-Months Ended September 30, 2024** | | | | |
| **Balance as of December 31, 2023** | **16,644,711** | **$ 16,645** | **$ 211,279,176** | **$ 608,688** | **$ (182,666,465)** | **$ 29,238,044** | **$ 1,146,586** | **$ 30,384,630** |
| Exercising of RSU's and stock options | 2,062,903 | 2,062 | (2,062) | - | - | - | - | - |
| Stock based compensation expense for RSU's and stock options | - | - | 11,275,554 | - | - | 11,275,554 | - | 11,275,554 |
| Deconsolidation of MIG No.1 Pty Ltd | - | - | - | - | - | - | (889,659) | (889,659) |
| Net loss | - | - | - | - | (41,610,630) | (41,610,630) | (205,086) | (41,815,716) |
| Other comprehensive loss | - | - | - | (459,308) | - | (459,308) | (51,841) | (511,149) |
| **Balance as of September 30, 2024** | **18,707,614** | **$ 18,707** | **$ 222,552,668** | **$ 149,380** | **$ (224,277,095)** | **$ (1,556,340)** | **$ -** | **$ (1,556,340)** |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
(Unaudited)

| | Common Stock (#) | Common Stock ($) | Additional Paid-in-Capital | Accumulated Other Comprehensive Income/(Loss) | Accumulated Deficit | Total Mawson Stockholders' Equity | Non-controlling interest | Total Equity |
|---|---|---|---|---|---|---|---|---|
| | For the Nine-Months Ended September 30, 2023 | | | | | | | |
| **Balance as of December 31, 2022** | **13,625,882** | **$ 13,626** | **$194,294,559** | **$ 5,021,467** | **$(122,257,628)** | **$ 77,072,024** | **$ (905,904)** | **$ 76,166,120** |
| Conversion of notes payable into common stock | 104,319 | 104 | 276,855 | - | - | 276,959 | - | 276,959 |
| Issuance of common stock in lieu of interest on borrowings | 18,807 | 19 | 63,926 | - | - | 63,945 | - | 63,945 |
| Issuance of common stock for services | 93,334 | 93 | 306,976 | - | - | 307,069 | - | 307,069 |
| Issuance of warrants | - | - | 1,501,500 | - | - | 1,501,500 | - | 1,501,500 |
| Exercising of RSU's and stock options | 177,094 | 177 | 163,339 | - | - | 163,516 | - | 163,516 |
| Stock based compensation for RSU's | - | - | 3,503,849 | - | - | 3,503,849 | - | 3,503,849 |
| Issuance of common stock, net of issuance costs | 2,498,607 | 2,499 | 5,809,396 | - | - | 5,811,895 | - | 5,811,895 |
| Net loss | - | - | - | - | (47,493,548) | (47,493,548) | (867,590) | (48,361,138) |
| Other comprehensive income | - | - | - | 521,654 | - | 521,654 | 97,630 | 619,284 |
| **Balance as of September 30, 2023** | **16,518,043** | **$ 16,518** | **$205,920,400** | **$ 5,543,121** | **$(169,751,176)** | **$ 41,728,863** | **$(1,675,864)** | **$ 40,052,999** |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED CONDENSED STATEMENTS OF CASH FLOWS**
(Unaudited)

| | For the Nine-Months ended September 30, | |
| --- | --- | --- |
| | **2024** | **2023** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (41,815,716) | $ (48,361,138) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 16,211,516 | 28,627,896 |
| Amortization of operating lease right-of-use asset | 2,165,370 | 1,057,500 |
| Foreign exchange loss (gain) | (487,908) | 1,303,569 |
| Stock based compensation | 11,275,554 | 5,475,935 |
| Non-cash interest expense | 2,259,147 | 1,365,291 |
| Unrealized (gain) loss on derivative asset | 878,096 | 6,646,363 |
| Loss on deconsolidation | 12,959,923 | - |
| Gain on sale of marketable securities | - | (1,437,230) |
| Share of loss from equity method investments | - | 36,356 |
| Loss on sale of property and equipment | 18,262 | 231,266 |
| Gain on lease termination | (72,159) | - |
| Profit on sale of site | - | (3,353,130) |
| Impairment of equity method investment | - | 1,837,063 |
| Changes in assets and liabilities: | | |
| Trade and other receivables | (731,355) | (2,398,826) |
| Operating lease liabilities | (1,600,314) | (1,096,790) |
| Other current assets | (1,014,710) | 4,041,803 |
| Trade and other payables | 3,060,628 | 1,205,999 |
| **Net cash (used in) provided by operating activities** | 3,106,434 | (4,818,073) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Payment for the purchase of property and equipment | (1,934,610) | (5,254,665) |
| Proceeds from sale of site | - | 8,107,508 |
| Proceeds from sales of property and equipment | 836,956 | 730,697 |
| Proceeds from sale of marketable securities | - | 6,927,003 |
| **Net cash provided by (used in) investing activities** | (1,097,654) | 10,510,543 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from common share issuances | - | 6,192,845 |
| Payments of stock issuance costs | - | (380,950) |
| Proceeds from borrowings | - | 1,930,425 |
| Repayment of finance lease liabilities | (226,773) | (28,632) |
| Repayment of borrowings | (500,000) | (12,829,158) |
| **Net cash (used in) provided by financing activities** | (726,773) | (5,115,470) |
| Effect of exchange rate changes on cash and cash equivalents | - | (26,427) |
| Net increase/(decrease) in cash and cash equivalents | 1,282,007 | 550,573 |
| Cash and cash equivalents at beginning of period | 4,476,339 | 946,265 |
| Cash and cash equivalents at end of period | $ 5,758,346 | $ 1,496,838 |
| **Supplemental disclosure of cash flow information** | | |
| Cash paid for interest | $ 29,903 | $ - |
| Cash paid for income taxes | $ 777,500 | $ - |
| **Non-cash transactions** | | |
| Recognition of right of use operating asset and lease liability | $ - | $ 929,138 |
| Accrued interest on convertible notes settled in common stock | $ - | $ 276,959 |

See accompanying notes to unaudited consolidated condensed financial statements.

**MAWSON INFRASTRUCTURE GROUP INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS**
(Unaudited)

## NOTE 1 – GENERAL

### Nature of Operations

Mawson Infrastructure Group Inc. ("Mawson," the "Company," "we," "us," and "our") is a technology company focused on digital infrastructure platforms, headquartered in the United States of America.

The Company is a corporation incorporated in Delaware in 2012. On March 9, 2021, the Company acquired the shares of Cosmos Capital Limited in a stock for stock exchange. This transaction has been accounted for as a reverse asset acquisition. The Company was previously known as Wize Pharma Inc and changed its name on March 17, 2021. Shares of the Company's common stock, par value $0.001 per share ("Common Stock") have been listed on The Nasdaq Capital Market since September 29, 2021.

The Company develops and operates digital infrastructure platforms for enterprise customers and for its own purposes. The Company's digital infrastructure platforms can be used to operate computing resources for a number of applications, and are offered across digital assets, artificial intelligence (AI), high-performance computing (HPC) and other computing applications. The Company also has an energy management business, which utilizes software and analysis, to generate revenue when the Company adapts its power usage to the real-time needs of the grid. The Company may also transact in digital computational machines, data center infrastructure, and related equipment periodically, subject to business and commercial opportunities.

The Company has a strategy to prioritize the usage of carbon-free energy sources, including nuclear energy, to power its digital infrastructure platforms and computational machines.

The Company manages and operates digital infrastructure platforms delivering a total current capacity of approximately 129 megawatts (MW) with its current operational sites with an additional 24 MW of future capacity that is under development, all strategically located in locations served by the PJM Energy Market in the United States. The PJM Energy Market is the largest wholesale power market in North America.

Previously, the Company also had interests in the Australian market, however for strategic and commercial reasons, the Company is currently focused on advancing its interests in North America. The Company currently operates facilities in the United States of America and does not have operating sites in Australia. The Company has previously reported through an 8-K filing on March 29, 2024 that the Company may seek to exit certain or all of its entities and holdings in Australia. The accompanying consolidated condensed unaudited interim financial statements, including the results of a number of the Company's Australian subsidiaries: Cosmos Trading Pty Ltd, Cosmos Infrastructure LLC, Cosmos Manager LLC, MIG No.1 Pty Ltd (on March 19, 2024, MIG No.1 Pty Ltd was placed into a Australian court appointed liquidation and wind-up process), MIG No.1 LLC, Mawson AU Pty Ltd (on April 23, 2024, Mawson AU Pty Ltd was placed into a Australian court appointed liquidation and wind-up process, as disclosed in note 3), an Australian entity Mawson Services Pty Ltd (on April 29, 2024, Mawson Services Pty Ltd was placed into a Australian court appointed liquidation and wind-up process, as disclosed in note 3), Luna Squares LLC, Mawson Bellefonte LLC, Luna Squares Repairs LLC, Luna Squares Property LLC, Mawson Midland LLC, Mawson Hosting LLC, Mawson Ohio LLC and Mawson Mining LLC (collectively referred to as the "Group"), have been prepared by the Company, pursuant to the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and in accordance with generally accepted accounting principles in the United States of America ("GAAP").

These consolidated, condensed unaudited interim financial statements should be read in conjunction with the audited consolidated financial statements of the Group as of December 31, 2023, and the notes thereto, included in the Company's Annual Report on Form 10-K filed with the SEC on April 1, 2024. Accordingly, they do not include all the information and footnotes required by GAAP for complete financial statements. The results of the interim period are not necessarily indicative of the results to be expected for the full year ending December 31, 2024. These consolidated, condensed unaudited interim financial statements reflect all adjustments which, in the opinion of management, are necessary to present fairly the financial position, the results of operations and cash flows of the Company for the periods presented.

**Going Concern**

The accompanying consolidated, condensed unaudited interim financial statements have been prepared assuming the Company will continue on a going concern basis and in accordance with GAAP. The going concern basis of presentation assumes that the Company will continue in operation one year after the date these financial statements are issued and will be able to realize its assets and discharge its liabilities and commitments in the normal course of business.

Pursuant to the requirements of the Financial Accounting Standards Board's Accounting Standards Codification ("ASC") Topic 205-40, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern*, management must evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for one year from the date these financial statements are issued. This evaluation does not take into consideration the potential mitigating effect of management's plans that have not been fully implemented or are not within control of the Company as of the date these financial statements are issued. When substantial doubt exists under this methodology, management evaluates whether the mitigating effect of its plans sufficiently alleviates substantial doubt about the Company's ability to continue as a going concern. The mitigating effect of management's plans, however, is only considered if both (1) it is probable that the plans will be effectively implemented within one year after the date that the financial statements are issued, and (2) it is probable that the plans, when implemented, will mitigate the relevant conditions or events that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that the financial statements are issued.

For the nine-months ended September 30, 2024, the Company incurred a loss after tax of $41.61 million, and as of September 30, 2024, had negative working capital of $36.09 million, had stockholders' deficit of $1.56 million and had an accumulated deficit of $224.28 million. The Company's cash position as of September 30, 2024, was $5.76 million.

The Company's revenue is dependent on a number of external factors, including commercial terms, payments from customers, payments from partners, counterparty risks, and market conditions, including those related to digital assets, artificial intelligence, high-performance computing and other markets. These factors are outside the Company's direct control, and the Company may not be able to practically mitigate their impact. The Company cannot predict with any certainty whether these trends will reverse or persist. In addition, the Company's equipment and infrastructure will require replacement over time as they come to the end of their useful lives to ensure that the Company can continue to operate competitively and efficiently

<u>Celsius Colocation Agreement Dispute</u>

On July 18, 2024, Celsius Network, LLC filed for arbitration of its claims against the Company with the American Arbitration Association in the matter entitled, "Celsius Network Ltd., Celsius Mining LLC and Ionic Digital Mining LLC v. Mawson Infrastructure Group, Luna Squares LLC and Cosmos Infrastructure LLC - Case 01-24-0006-4462" (the "Celsius Collocation Agreement Dispute"). The Company opposes the claim in arbitration and on August 12, 2024, filed responsive pleadings denying the claims and asserting affirmative defenses, including set off against the claims, and the Company asserted cross-claims against Celsius for sums due to the Company in excess of $115.00 million. This includes counter claims asserted by the Company against Celsius Network Ltd., Celsius Mining LLC and Ionic Digital Mining LLC in excess of $115.00 million for damages due to the Company, including but not limited to, for breach of the Digital Colocation Agreement by Celsius. The matter is proceeding through the arbitration process. An arbitrator was appointed on September 30, 2024 and the parties submitted their respective positions on October 25, 2024 regarding the scheduling of the arbitration. A preliminary hearing was held on October 30, 2024 before the arbitrator to establish an arbitration schedule. Company plans to pursue its claims again Celsius and to defend against claims alleged by Celsius.

<u>Loan Disputes with Australian Entities (W Capital and Marshall)</u>

The Company is the guarantor of a Secured Loan Facility Agreement by MIG No. 1 Pty Ltd ("MIG No.1") with Marshall Investments GCP Pty Ltd ATF for the Marshall Investments MIG Trust ("Marshall"). The loan matured in February 2024 and the total outstanding balance is $10.53 million as of September 30, 2024. There have been no principal and interest payments made since May 2023. This Secured Loan Facility Agreement was entered into with an Australian entity MIG No.1, which was placed into a court-appointed liquidation and wind-up process and was deconsolidated from the group on March 18, 2024. On May 28, 2024, Marshall submitted a statutory demand for payment under Australian law. On June 17, 2024, the Company responded, objecting to the demand under Australian law. Subsequently, on October 3, 2024, a proceeding before the Federal Court of Australia, New South Wales entitled "In The Matter Of Mawson Infrastructure Group Inc. (ARBN 649 261 861)", File No. NSD1395/2024" was filed by W Capital against the Company, seeking a hearing on November 29, 2024 to determine the Company's solvency under Australian law. Marshall Investments GCP Pty Ltd gave formal notice that it intends to appear before the court (the "Marshall and W Capital Australian Loan Disputes"). The current proceeding is in Australian courts and there are no associated proceedings in the United States. The Company believes that W Capital and Marshall are using this proceeding in Australia as a bad faith attempt to gain leverage in ongoing legal disputes between the parties.

The Company is the guarantor on of a Secured Loan Facility Agreement for working capital by Mawson Infrastructure Group Pty Ltd with W Capital Advisors Pty Ltd. As of September 30, 2024, AUD $1.95 million (USD $1.35 million) has been drawn down from this facility. The Secured Loan Facility expired in March 2023. This Secured Loan Facility Agreement was entered into with an Australian entity Mawson Infrastructure Group Pty Ltd, this company was placed into Australian voluntary administration on October 30, 2023, and on November 3, 2023, W Capital Advisors appointed receivers and managers in Australia under the terms of their security relating to their working capital facility.

The Company, or its subsidiaries, have not fulfilled specific payment obligations related to the Celsius Promissory Note, the Marshall loan and the W Capital Working Capital Loan mentioned above. Consequently, the creditors associated with these debt facilities may initiate actions as allowed by relevant grace periods. This includes the possibility of opting to expedite the repayment of the principal debt, pursuing legal action against the Company or its subsidiaries for payment default, raising interest rates to the default or overdue rate, or taking appropriate measures concerning collateral (including appointing a receiver), if applicable.

The Company has evaluated the above conditions and concluded that these conditions raise substantial doubt regarding our ability to continue as a going concern for a period of at least one year from the date of issuance of these consolidated financial statements.

To mitigate these conditions, the Company has explored various avenues to enhance liquidity, fund the Company's expenditures, and meet debt servicing requirements. These strategies include, among others:

- Expanding its digital infrastructure platform and increasing capacities for either digital colocation services and/or AI and HPC markets;

- Executing new customer digital colocation service agreements in either AI, HPC, and/or digital assets mining to diversify its exposure across customers and/or markets;

- Engaging in discussions with capital providers, including related to equity and/or debt;

- Considering equity issuances such as capital raises and at-the-market (ATM) transactions;

- Assessing and evaluating corporate and strategic transactions;

- Assessing and evaluating commercial opportunities or other business opportunities under consideration;

- Conducting assessments to identify and implement operational improvements and/or efficiencies and other actions aimed at enhancing revenue and/or optimizing expenses; and

- Evaluating, assessing and pursuing business revenue and margin expansion opportunities.

Mawson successfully expanded its Midland Facility by 20 MW in June 2024, increasing its total operating capacity to about 129 MW from about 109 MW. In August 2024, Mawson expanded into Perry County, Ohio securing an initial 24 MW of capacity that could expand Mawson's operating capacity to 153 MW once completed.

11

The Company also announced in June 2024 that it had executed a new digital colocation agreement for about 20 MW, or about 5,880 mining units at its Midland facilities. This agreement helped further diversify our customer base and expand our digital colocation services.

Although the Company may have access to capital, equity, debt, and/or other sources of funding, these may require additional time and cost, may impose operational restrictions and other covenants on the Company, may not be available on attractive terms, and may not be available at all. If the Company raises additional capital or debt, this could cause additional dilution to the Company's current stockholders. The terms of any future capital raise or debt issuance and the costs of any financing are uncertain and may be unfavorable to the Company and the Company's current stockholders. Should the Company be unable to source sufficient funding, the Company may not be able to realize assets at their recognized values and fulfill its liabilities in the normal course of business at the amounts stated in these consolidated financial statements.

As previously reported, the Company obtains advice from outside resources, however, it is important to note that strategic and other initiatives may not lead to any transaction or other outcome.

These consolidated, condensed unaudited interim financial statements have been prepared on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities and other commitments in the normal course of business. They do not include any adjustments relating to the recoverability and carrying amounts of assets and the amounts of liabilities should the Company be unable to continue as a going concern and meet its obligations and debts as and when they fall due.

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Principles of Consolidation and Basis of Preparation

The accompanying unaudited consolidated condensed financial statements of the Company include the accounts of the Company and its wholly or majority owned and controlled subsidiaries. Intercompany investments, balances and transactions have been eliminated in consolidation. Non–controlling interests represent the minority equity investment in the Company's subsidiaries, plus the minority investors' share of the net operating results and other components of equity relating to the non–controlling interest.

Any change in the Company's ownership interest in a consolidated subsidiary, through additional equity issuances by the consolidated subsidiary or from the Company acquiring the shares from existing stockholders, in which the Company maintains control is recognized as an equity transaction, with appropriate adjustments to both the Company's additional paid-in capital and the corresponding non-controlling interest.

### Use of Estimates and Assumptions

The preparation of the financial statements in conformity with GAAP requires management to make estimates, judgments and assumptions that affect the amounts reported in the financial statements and accompanying notes. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements, and the reported amounts of income and expenses during the reporting periods. Actual results could differ from those estimates. The Company has considered the following to be significant estimates made by management, including but not limited to, going concern assumptions, estimating the useful lives of fixed assets, realization of long-lived assets, unrealized tax positions, valuing the derivative asset classified under Level 3 fair value hierarchy, and the contingent obligation with respect to future revenues.

### Revenue recognition

*Digital colocation revenue*

The Company additionally charges colocation fees for the use of the facilities, and other related fees. Digital colocation customers typically pay for energy used in connection with the customer colocation services agreement on a pass-through basis, which may be on a fixed or variable basis calculated on the portion of energy used by the customer on the site. Revenue is typically received monthly from the customer based on the power usage at the rates outlined in each customer contract.

The customer contracts contain variable consideration to be allocated to and recognized in the period to which the consideration relates. Usually this is when it is invoiced, rather than obtaining an estimation of variable consideration at the beginning of the customer contracts.

*Energy management revenue*

The Company also has an energy management business to generate revenue when the Company adapts its power usage to the real-time needs of the grid.

Revenue for curtailing power is recognized over the period that the services are being provided. The Company estimates the amount of curtailable power and the expected payment for that curtailment and recognizes revenue based on the proportion of the service that has been provided. In this arrangement, the Company is considered the principal and revenue is recognized on a gross basis.

Revenue through the Company's power pricing arrangement is recognized over the period that the services are being provided. The Company estimates the amount of energy available for sale and the expected payment for that energy, and recognizes revenue based on the proportion of the service that has been provided. In this arrangement, the Company is considered the principal and revenue is recognized on a gross basis.

*Digital mining revenue*

The Company recognizes revenue under ASC 606, *Revenue from Contracts with Customers*. The core principle of ASC 606 is that a company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. Five steps are required to be followed in evaluating revenue recognition: (i) identify the contract with the customer; (ii) identity the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price; and (v) recognize revenue when or as the entity satisfies a performance obligation.

In order to identify the performance obligations in a contract with a customer, a company must assess the promised goods or services in the contract and identify each promised good or service that is distinct. A performance obligation meets ASC 606's definition of a "distinct" good or service (or bundle of goods or services) if both of the following criteria are met: the customer can benefit from the good or service either on its own or together with other resources that are readily available to the customer (i.e., the good or service is capable of being distinct), and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract (i.e., the promise to transfer the good or service is distinct within the context of the contract).

The Company has a contract with mining pools and has undertaken the performance obligation of providing computing power in exchange for non-cash consideration in the form of digital assets. The provision of computing power is the only performance obligation in the Company's contract with its pool operators. Where the consideration received is variable (for example, due to payment only being made upon successful mining), it is recognized when it is highly probable that the variability is resolved, which is generally when the digital asset is received.

The Company measures the non-cash consideration received at the fair market value of the digital asset received. Management estimates fair value on a daily basis, as the quantity of digital assets received multiplied by the price quoted on the exchange that the Company uses to dispose of digital assets.

*Equipment sales*

The Company had previously earned revenues from the sale of equipment and/or infrastructure (collectively, "Hardware"). Revenue from the sale of Hardware is recognized upon transfer of control of the Hardware to the customer. At the date of sale, the net book value is expensed in cost of revenues.

**Property, Plant, and Equipment**

Property, plant and equipment (PP&E) are stated at cost, net of accumulated depreciation. All other repair and maintenance costs are charged to operating expenses as incurred. The present value of the expected cost for the decommissioning of an asset after its use is included in the cost of the respective asset if the recognition criteria for a provision are met. Property, plant and equipment transferred from customers is initially measured at the fair value at the date on which control is obtained.

PP&E are depreciated on a straight-line or declining balance basis based on the asset classification, over their useful lives to the economic entity commencing from the time the assets arrive at their destination where they are ready for use. Low-cost assets are capitalized and immediately depreciated. Depreciation is calculated over the following estimated useful lives:

| Asset class | Useful life | Depreciation Method |
|---|---|---|
| Fixtures | 5 years | Straight-Line |
| Plant and equipment | 10 years | Straight-Line |
| Modular data center | 5 years | Declining |
| Motor vehicles | 5 years | Straight-Line |
| Computer equipment | 3 years | Straight-Line |
| Computational and Processing machinery (Miners) | 2 years | Straight-Line |
| Transformers | 15 years | Straight-Line |
| Leasehold improvements | Shorter of useful life or lease term | Straight-Line |

PP&E are derecognized upon disposal or when no future economic benefits are expected from its use or disposal. Any gain or loss arising on derecognition of the asset is included in the consolidated statement of operations.

The residual values, useful lives and methods of depreciation of PP&E are reviewed at each financial year end and adjusted prospectively, if appropriate.

The Company's long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such an asset is considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds its fair value. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell.

**Fair value of financial instruments:**

The Company accounts for financial instruments under ASC 820, *Fair Value Measurements*. This statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. To increase consistency and comparability in fair value measurements, ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities;

Level 2 — observable inputs other than Level 1, quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, and model-derived prices whose inputs are observable or whose significant value drivers are observable; and

Level 3 — assets and liabilities whose significant value drivers are unobservable. Observable inputs are based on market data obtained from independent sources, while unobservable inputs are based on the Company's market assumptions. Unobservable inputs require significant management judgment or estimation. In some cases, the inputs used to measure an asset or liability may fall into different levels of the fair value hierarchy. In those instances, the fair value measurement is required to be classified using the lowest level of input that is significant to the fair value measurement. Such determination requires significant management judgment.

| | Fair value measured as of September 30, 2024 | | | |
| | Total | Total Level 1 | Total Level 2 | Total Level 3 |
|---|---|---|---|---|
| Derivative asset | $ 3,179,992 | - | - | $ 3,179,992 |

| | Fair value measured as of December 31, 2023 | | | |
| | Total | Total Level 1 | Total Level 2 | Total Level 3 |
|---|---|---|---|---|
| Derivative asset | $ 4,058,088 | - | - | $ 4,058,088 |

*Level 3 Assets:*

In June 2022, the Company entered into a Power Supply Agreement with Energy Harbor LLC, the energy supplier to the Company's Midland, Pennsylvania facility, to provide the delivery of a fixed portion of the total amount of electricity for a fixed price through to December 2026. There were five amendments to the contract with Energy Harbor LLC entered into in November 2023, December 2023, January 2024, April 2024 and May 2024 all the contracts were to purchase additional electricity at a fixed price for the months of December 2023, January 2024, February 2024, April 2024, May 2024 and June 2024. If the Midland, Pennsylvania facility uses more electricity than contracted, the cost of the excess is incurred at a new price quoted by Energy Harbor LLC.

While the Company participates in energy management programs at its Midland, Pennsylvania facility, the Company does not consider such actions as trading activities. That is, the Company does not engage in speculation in the power market as part of its ordinary activities. Because the sale of any electricity under a curtailment program allows for net settlement, the Company has determined the Power Supply Agreement meets the definition of a derivative under ASC 815, *Derivatives and Hedging*. However, because the Company has the ability to sell the power back to the grid rather than take physical delivery, physical delivery is not probable through the entirety of the contract and therefore, the Company does not believe the normal purchases and normal sales scope exception applies to the Power Supply Agreement. Accordingly, the Power Supply Agreement (the non-hedging derivative contract) is recorded at estimated fair value each reporting period with the change in the fair value recorded in "change in fair value of derivative asset" in the consolidated statements of operations.

The Power Supply Agreement was classified as a derivative asset beginning in the quarter ended September 30, 2022, and measured at fair value on the date of Power Supply Agreement, with changes in fair value recognized in the accompanying consolidated statements of operations. The estimated fair value of the Company's derivative asset is classified in Level 3 of the fair value hierarchy due to the significant unobservable inputs utilized in the valuation. Specifically, the Company's discounted cash flow estimation models contain quoted commodity exchange spot and forward prices and are adjusted for basis spreads for load zone-to-hub differentials through the term of the Power Supply Agreement, which expires in December 2026. In addition, the Company adopted a discount rate of approximately 20% above the terminal value of the observable market inputs, but also includes unobservable inputs based on qualitative judgment related to company-specific risk factors. The terms of the Power Supply Agreement require pre-payment of collateral, calculated as forward cost based on the market cost rate of electricity versus the fixed price stated in the contract.

**Stock based compensation**

The Company follows ASC 718-10, *Compensation-Stock Compensation*. The Company expenses stock-based compensation to directors, employees, and non-employees over any requisite service period based on the grant-date fair value of the awards. The Company determines the grant-date fair value of options using the Trinomial Lattice Method. The assumptions used in calculating the fair value of stock-based awards represent management's best estimates and involve inherent uncertainties and the application of management's judgment. These assumptions are the expected stock volatility, the risk–free interest rate, the expected life of the option, and the expected forfeiture rate. Expected volatility computes stock price volatility over expected terms based on its historical common stock trading prices. Risk–free interest rates are calculated based on the yield of a 3-year or 5-year United States Treasury constant maturity bond, depending on the agreement.

**Digital assets**

Digital assets are included in current assets in the consolidated balance sheets. Digital assets are classified as indefinite-lived intangible assets in accordance with ASC 350, *Intangibles – Goodwill and Other*, and are accounted for in connection with the Company's revenue recognition policy detailed above.

The following table presents the Company's digital assets (such as bitcoin) activities for the three-months and nine-months ended September 30, 2024:

|  | Three-months to September 30, 2024 | Nine-months to September 30, 2024 |
|---|---|---|
| **Opening number of bitcoin held** |  |  |
| Number of bitcoin received | 13.47 | 203.05 |
| Number of bitcoin sold | (13.47) | (203.05) |
| **Closing number of bitcoin held** | **0.00** | **0.00** |

Digital assets are not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not likely that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted.

The Company's policy is to typically dispose of bitcoin received from mining operations at the earliest opportunity, therefore the holding period is generally minimal, usually no more than a few days. Due to the short period for which bitcoin is held prior to sale and the consequent small numbers held, the risk of impairment is not material. No impairment charges have been recorded during the nine-month periods ended September 30, 2024 and 2023.

**Recent Accounting Pronouncements**

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board (FASB) or other standard setting bodies and adopted by the Company as of the specified effective date. Unless otherwise discussed, the impact of recently issued standards that are not yet effective will not have a material impact on the Company's financial position or results of operations upon adoption.

In December 2023, the FASB issued ASU 2023-08, Intangibles—Goodwill and Other—Crypto Assets (Topic 3580-60): Accounting for and Disclosure of Crypto Assets. Under the new guidance, an entity would be required to subsequently measure certain crypto assets at fair value, with changes in fair value included in net income in each reporting period. The proposed set of rules would also require presentation of crypto assets and related fair value changes separately in the balance sheet and income statement and require various disclosures in interim and annual periods. The Company does not expect the adoption of ASU 2023-08 to have a material impact on its consolidated financial statements since the Company's policy is to dispose of bitcoin received from mining operations at the earliest opportunity, therefore the holding period is minimal, usually no more than a few days. ASU 2023-08 is effective for fiscal years beginning after December 15, 2024 and interim periods within those fiscal years. The Company will adopt ASU 2023-08 on January 1, 2025.

**NOTE 3 – AUSTRALIAN SUBSIDIARIES DECONSOLIDATION**

Previously, the Company also had interests in the Australian market, however for strategic and commercial reasons, the Company is currently focused on advancing its interests in North America. The Company has previously reported through an 8-K filing on March 29, 2024 that the Company may seek to exit certain or all of its entities and holdings in Australia. The Company currently operates facilities in the United States of America and does not have operating sites in Australia.

**MIG No.1 (Australian Entity)**

*Liquidation and Deconsolidation of an Australian entity MIG No.1*

On March 19, 2024, the Company's subsidiary and an Australian entity, MIG No.1 was placed into an Australian court appointed liquidation due to it being deemed insolvent in Australia. The liquidation of an insolvent company in Australia allows an independent registered Australian liquidator (the liquidator) to take control of the Australian entity so its affairs can be wound up in an orderly and fair way and to benefit creditors. In the instance of MIG No.1, it is an Australian court liquidation, where a liquidator is appointed by the Australian court to wind up a company following an application (by a creditor of MIG No.1). As a result of this, the Company ceded authority for managing this Australian entity to the Australian liquidator, and the Company does not carry on MIG No.1's activities in the ordinary course of business. For these reasons, it was concluded that the Company had ceded control of MIG No.1, and no longer had significant influence over this Australian entity since the liquidator was in control of this Australian entity. Therefore, MIG No.1 loss of control was effective when it was placed into Australian court appointed liquidation on March 19, 2024, and was deconsolidated at this date, in accordance with ASC 810-10-15. In order to deconsolidate this Australian entity, MIG No.1, the carrying values of the assets, liabilities and equity components previously recognized in accumulated other comprehensive income of MIG No.1 were removed from the Company's consolidated balance sheet as of March 19, 2024, in accordance with ASC 810, *Consolidation*. The net impact of removing the assets and liabilities resulted in a loss on deconsolidation of $12.36 million being recorded in the condensed, consolidated statement of operations.

*Investment in the Australian entity MIG No.1*

The investment in this Australian entity, MIG No.1, held by the Company was accounted for under ASC 321, *Investments — Equity Securities* as it was concluded the Company did not have significant influence over MIG No.1 from March 19, 2024. The fair value of MIG No.1 was estimated to be $0, as at the time of the deconsolidation.

*Treatment of intercompany balances*

The Company had total payables owed to MIG No.1 of $1.24 million. These payables have been treated as external payables from the date of liquidation, March 19, 2024.

*Australian entity MIG No.1 Secured Loan Facility Agreement*

MIG No. 1 has a Secured Loan Facility Agreement with Marshall. The loan matured in February 2024 and the total outstanding balance is $10.53 million as of September 30, 2024. The Company is a guarantor of this loan.

**Mawson AU Pty Ltd (Australian Entity)**

*Liquidation and Deconsolidation of an Australian entity Mawson AU Pty Ltd*

On April 23, 2024, the Company's Australian entity and a subsidiary, Mawson AU Pty Ltd was placed into an Australian court appointed liquidation. The liquidation of an insolvent Australian company in Australia allows an independent registered Australian liquidator (the liquidator) to take control of the Australian entity so its affairs can be wound up in an orderly approach. In the instance of Mawson AU Pty Ltd, it is an Australian court liquidation, where a liquidator is appointed by the Australian court to wind up a company. As a result of this the Company ceded authority for this Australian entity to the Australian liquidator, and the Company does not carry on Mawson AU Pty Ltd's activities in the ordinary course of business. For these reasons, it was concluded that the Company had ceded control of Mawson AU Pty Ltd, and no longer had significant influence over this Australian entity since the liquidator was in control of this Australian entity. Therefore, Mawson AU Pty Ltd loss of control was effective when it was placed into Australian court appointed liquidation on April 23, 2024, and was deconsolidated at this date, in accordance with ASC 810-10-15. In order to deconsolidate this Australian entity, Mawson AU Pty Ltd, the carrying values of the assets, liabilities and equity components previously recognized in accumulated other comprehensive income of Mawson AU Pty Ltd were removed from the Company's consolidated balance sheet as of April 23, 2024, in accordance with ASC 810, *Consolidation*. The net impact of removing the assets and liabilities resulted in a gain on deconsolidation of $3.49 million being recorded in the condensed, consolidated statement of operations.

*Investment in the Australian entity Mawson AU Pty Ltd*

The investment in this Australian entity, Mawson AU Pty Ltd, held by the Company was accounted for under ASC 321, *Investments — Equity Securities* as it was concluded the Company did not have significant influence over Mawson AU Pty Ltd from April 23, 2024. The fair value of Mawson AU was estimated to be $0, as at the time of the deconsolidation.

*Treatment of intercompany balances*

The Company had total receivables owed from Mawson AU Pty Ltd of $3.77 million. In accordance with ASC 310, these receivables have been treated as external receivables from the date of liquidation, April 23, 2024, and written off in the condensed, consolidated financial statements.

**Mawson Services Pty Ltd (Australian Entity)**

*Liquidation and Deconsolidation of an Australian entity Mawson Services Pty Ltd*

On April 29, 2024, the Company's Australian entity and a subsidiary, Mawson Services Pty Ltd was placed into an Australian court appointed liquidation. The liquidation of an insolvent company in Australia allows an independent registered Australian liquidator (the liquidator) to take control of the Australian entity so its affairs can be wound up in an orderly approach As a result of this the Company ceded authority for this Australian entity to the Australian liquidator, and the Company does not carry on Mawson Services Pty Ltd's activities in the ordinary course of business. For these reasons, it was concluded that the Company had ceded control of Mawson Services Pty Ltd, and no longer had significant influence over this Australian entity since the liquidator was in control of this Australian entity. Therefore, Mawson Services Pty Ltd loss of control was effective when it was placed into Australian court appointed liquidation on April 29, 2024, and was deconsolidated at this date, in accordance with ASC 810-10-15. In order to deconsolidate this Australian entity, Mawson Services Pty Ltd, the carrying values of the assets, liabilities and equity components previously recognized in accumulated other comprehensive income of Mawson Services Pty Ltd were removed from the Company's consolidated balance sheet as of April 29, 2024, in accordance with ASC 810, *Consolidation*. The net impact of removing the assets and liabilities resulted in a gain on deconsolidation of $0.19 million being recorded in the condensed, consolidated statement of operations

*Investment in the Australian entity Mawson Services Pty Ltd*

The investment in this Australian entity, Mawson Services Pty Ltd, held by the Company was accounted for under ASC 321, *Investments — Equity Securities* as it was concluded the Company did not have significant influence over Mawson Services Pty Ltd from April 29, 2024. The fair value of Mawson Services Pty Ltd was estimated to be $0, as at the time of the deconsolidation.

*Treatment of intercompany balances*

The Company had no payables or receivables owed to Mawson Services Pty Ltd at the date of liquidation, April 29, 2024.

**NOTE 4 – BASIC AND DILUTED NET LOSS PER SHARE**

Net loss per common share is calculated in accordance with ASC 260, *Earnings Per Share*. Basic loss per share is computed by dividing net loss by the weighted average number of shares of common stock outstanding during the period. The computation of diluted net loss per share does not include dilutive common stock equivalents in the weighted average shares outstanding, as they would be anti-dilutive.

Securities that could potentially dilute loss per share in the future that were not included in the computation of diluted loss per share as of September 30, 2024 and 2023, are as follows:

|  | As of September 30, | |
|---|---|---|
|  | 2024 | 2023 |
| Warrants to purchase common stock | 4,904,016 | 5,546,122 |
| Options to purchase common stock | 3,500,417 | 1,750,417 |
| Restricted Stock-Units ("RSU's") issued under equity incentive plan(s) | 14,335,305 | 5,660,426 |
|  | 22,739,738 | 12,956,965 |

**NOTE 5 – LEASES**

The Company's operating leases are for digital mining and colocation sites and its finance leases are primarily for related plant and equipment.

The Company's lease costs recognized in the consolidated condensed statements of operations consist of the following:

|  | For the three-Months ended September 30, | | | | For the nine-Months ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
|  | 2024 | | 2023 | | 2024 | | 2023 | |
| Operating lease charges [1] | $ | 533,963 | $ | 448,449 | $ | 1,325,171 | $ | 1,260,440 |
| Finance lease charges: | | | | | | | | |
| Amortization of right-of-use assets | $ | 102,797 | $ | 8,143 | $ | 150,635 | $ | 24,430 |
| Interest on lease obligations | $ | 23,536 | $ | 1,799 | $ | 35,234 | $ | 5,820 |

(1) Included in selling, general and administrative expenses.

The following is a schedule of the Company's lease liabilities by contractual maturity as of September 30, 2024:

|  | Operating leases | | Finance leases | |
|---|---|---|---|---|
| Remainder of 2024 | $ | 380,839 | $ | 103,294 |
| 2025 | | 1,710,898 | | 413,176 |
| 2026 | | 1,584,205 | | 216,266 |
| 2027 | | 1,270,570 | | - |
| Total undiscounted lease obligations | | 4,946,512 | | 732,736 |
| Less imputed interest | | (909,388) | | (83,821) |
| Total present value of lease liabilities | | 4,037,124 | | 648,915 |
| Less current portion of lease liabilities | | 1,208,262 | | 346,819 |
| Non-current lease liabilities | $ | 2,828,862 | $ | 302,095 |

19

Other lease information as of September 30, 2024:

|  | Operating leases | Finance leases |
|---|---|---|
| Operating cash out flows from leases | $ 1,516,767 | $ 226,773 |
| Weighted-average remaining lease term (years) | 2.89 | 1.59 |
| Weighted-average discount rate (%) | 8.6% | 13.4% |

**NOTE 6 – PROPERTY, PLANT AND EQUIPMENT**

Property, plant and equipment, net, consisted of the following:

|  | September 30, 2024 | December 31, 2023 |
|---|---|---|
| Plant and equipment | $ 10,404,241 | $ 4,973,191 |
| Computer equipment | 176,151 | 125,695 |
| Processing machines (Miners) | 77,447,520 | 102,984,186 |
| Modular data center | 22,103,986 | 25,449,717 |
| Motor Vehicles | 199,246 | 199,246 |
| Transformers | 9,344,544 | 9,843,359 |
| Low-cost assets | 1,047,876 | 998,815 |
| Assets under construction | - | 4,764,051 |
| Leasehold improvements | 487,527 | 487,527 |
| **Total** | 121,211,091 | 149,825,787 |
| Less: Accumulated depreciation | (91,494,807) | (92,085,496) |
| **Property, plant and equipment, net** | $ 29,716,284 | $ 57,740,291 |

The Company incurred depreciation and amortization expenses in the amounts of $3.61 million and $11.88 million for the three-month period ended September 30, 2024 and 2023, respectively. The Company incurred depreciation and amortization expenses in the amounts of $16.21 million and $28.63 million for the nine-month periods ended September 30, 2024 and 2023, respectively. There were no impairment charges recognized for property, plant and equipment for either the nine-month periods ended September 30, 2024 and 2023.

**NOTE 7 – INCOME TAXES**

The Company records income taxes using the asset and liability method. Deferred income tax assets and liabilities are recognized for the future tax effects attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective income tax bases, and operating loss and tax credit carryforwards. The Company establishes a valuation allowance if management believes it is more likely than not that the deferred tax assets will not be recovered based on an evaluation of objective verifiable evidence. Management has considered the Company's history of book and tax income and losses incurred since inception, and the other positive and negative evidence, and has concluded as of this time that it is more likely than not that the Company will not realize the benefits of the net deferred tax assets as of September 30, 2024.

The Company recorded income tax benefit (expense) of approximately 5.10% and 0.0% of loss before income tax expense for the three-month periods ended September 30, 2024 and 2023, respectively.

|  | For the Three-Months ended September 30, 2024 | |
|---|---|---|
|  | 2024 | 2023 |
| Effective income tax rate | 5.10% | 0.00% |

| | For the Nine-Months ended September 30, 2024 | |
|---|---|---|
| | 2024 | 2023 |
| Effective income tax rate | (2.60)% | 0.00% |

As of September 30, 2024, the Company had no unrecognized tax benefits and does not anticipate any significant change to the unrecognized tax benefit balance.

**NOTE 8 – BORROWINGS**

*W Capital loan*

The Company is the guarantor of a Secured Loan Facility Agreement for working capital by Mawson Infrastructure Group Pty Ltd with W Capital Advisors Pty Ltd. As of September 30, 2024, AUD $1.95 million (USD $1.35 million) has been drawn down from this facility, all of which is classified as a current liability. The Secured Loan Facility accrues interest daily at a rate of 12% per annum (with an overdue rate provision of an additional 800bps) and is paid monthly. Principal repayments are paid ad hoc in line with the loan facility agreement. The Secured Loan Facility expired in March 2023. This Secured Loan Facility Agreement was originally with Mawson Infrastructure Group Pty Ltd and this Australian entity was placed into Australian voluntary administration on October 30, 2023 and on November 3, 2023, W Capital Advisors appointed receivers and managers in Australia under the terms of their security relating to their working capital facility. The Company has corresponded with W Capital Advisory Pty Ltd and/or its representatives, the Company's ongoing significant concerns about W Capital Advisory Pty Ltd and James Manning, a former board director and executive of the Company, being related parties. W Capital Advisory Pty has not responded to the Company's concerns in a manner satisfactory to the Company.

*Marshall loan*

The Company is the guarantor of a Secured Loan Facility Agreement by MIG No. 1 with Marshall. The loan matured in February 2024 and bears interest at a rate of 12% per annum (with an overdue rate provision of an additional 500bps), payable monthly with interest payments that commenced in December 2021. This loan facility is secured by direct assets of MIG No.1 Pty Ltd and a general security agreement given by the Company. Principal repayments began during November 2022. The outstanding balance including interest is $10.53 million as of September 30, 2024, all of which is classified as a current liability. There has been no principal and interest payments made since May 2023. This Secured Loan Facility Agreement was entered into with an Australian entity MIG No.1, this company was placed into a court appointed liquidation and wind-up process and was deconsolidated from the group on March 19, 2024. On March 19, 2024, Marshall appointed receivers and managers in Australia under the terms of their security relating to their secured loan facility. The direct assets that secure this loan include 5,372 miners and 8 modular data centers ("MDCs"), these assets are held by the MIG No.1 and therefore were included in the deconsolidation. The receiver's statutory duty includes the obligation to sell the secured assets at market value or, if market value is not known, at the best price reasonably obtainable to maximize the prospects of there being sufficient proceeds available to satisfy the balance of the outstanding secured debt. It is therefore expected that this loan balance will be offset in the future by the amount received from the sale of these miners and MDCs. On June 25, 2024, Marshall inspected and inventoried the miners and MDCs located at the Company's Midland facilities. The Company is currently not utilizing these miners or MDCs for its operations and has asked Marshall to take these assets out of the Company's storage. Marshall has not responded to the Company's ask for these miners and MDCs to be removed from the Company's storage. The Company is reserving all its rights and remedies against Marshall.

21

*Celsius loan*

On February 23, 2022, Luna entered into a Digital Colocation Agreement with Celsius Mining LLC. In connection with this agreement, Celsius Mining LLC loaned Luna a principal amount of $20.00 million, for the purpose of funding the infrastructure required to meet the obligations of the Digital Colocation Agreement, for which Luna issued a Secured Promissory Note for repayment of such amount. The Secured Promissory Note accrues interest daily at a rate of 12% per annum (with an overdue rate provision of an additional 200bps). Luna is required to amortize the loan at a rate of 15% per quarter, principal repayments began at the end of September 2022. The Secured Promissory Note had a maturity date of August 23, 2023, the outstanding balance including interest is $9.38 million as of September 30, 2024, all of which is classified as a current liability. Celsius Mining LLC transferred the benefit of the promissory note to Celsius Network Ltd. Celsius Mining LLC and Celsius Network Ltd filed for Chapter 11 bankruptcy protection on July 13, 2022. Under the Digital Colocation Agreement, Celsius Mining LLC advanced $15.33 million to Luna that were held as a deposit. Whether that amount has been forfeited or must be returned to Celsius Mining LLC is the subject of a dispute between the parties. Pursuant to a court order dated April 22, 2024, the Celsius civil lawsuit against Luna and Mawson has been dismissed pursuant to the Company's successful motion to compel arbitration.

On July 18, 2024, Celsius Network, LLC filed for arbitration of its claims against the Company with the American Arbitration Association in the matter entitled, "Celsius Network Ltd., Celsius Mining LLC and Ionic Digital Mining LLC v. Mawson Infrastructure Group, Luna Squares LLC and Cosmos Infrastructure LLC - Case 01-24-0006-4462". For more details on this dispute, please see the Celsius Collocation Agreement Dispute found in Part I. Financial Information, Item 1. Financial Statements, contained in this Form 10-Q and made part here of and incorporated herein by reference.

*Convertible notes*

On July 8, 2022, the Company issued secured convertible promissory notes to investors in exchange for cash. The outstanding balance relates to the interest on the convertible note which has been accrued from July 2022 onwards and therefore the outstanding balance is $0.11 million as of September 30, 2024, all of which is classified as a current liability. On March 28, 2024, the Company was made a defendant in a civil suit before the Supreme Court of NSW in Sydney Australia, in the matter entitled "W Capital Advisors Pty Ltd in its capacity as trustee for the W Capital Advisors Fund v. Mawson Infrastructure Group, Inc.", Docket No. 2024/00117331, alleging a claim to seek USD $0.17 million as unpaid interest under a convertible note after the Company paid in full the principal of $0.50 million, and AUD $0.30 million under a loan deed, plus interest and costs for sums due claiming corporate guarantee by the Company for a "Variation Deed to Loan Deed" dated September 29, 2022, executed by its Australian entity, Mawson Infrastructure Group Pty Ltd. The Company sought dismissal of the Australian proceedings arguing jurisdiction of any claims against the Company should be in the United States as set forth in the agreements between the parties. Despite its objections, the Australian court ruled in favor of the Australian claimant and rendered a judgment against the Company under Australian law for US $0.17 million as unpaid interest under a convertible note after the Company paid in full the principal of $0.50 million, and AUD $0.30 million under a loan deed, plus interest and costs for sums due.

On June 12, 2024, W Capital issued a statutory demand under Australian Law to the Company seeking USD $0.17 million as unpaid interest under a convertible note after the Company paid in full the principal of $0.50 million, and AUD $0.30 million under a loan deed. The Company rejected this demand. Subsequently, on October 3, 2024, a proceeding before the Federal Court of Australia, New South Wales was filed by W Capital against the Company, seeking a hearing in Australia on November 29, 2024 regarding its claims related to Company's solvency under Australian law. The current proceeding is in Australian courts and there are no associated proceedings in the United States. The Company believes that W Capital and Marshall are using this proceeding in Australia as a bad faith attempt to gain leverage in ongoing legal disputes between the parties. For further information, please reference the Marshall and W Capital Australian Loan Disputes found in Part I. Financial Information, Item 1. Financial Statements, made part here of and incorporated herein by reference.

## NOTE 9 – STOCKHOLDERS' EQUITY

*Common Stock*

During the nine-month period ended September 30, 2024, vested and outstanding restricted stock units were exercised for 2,062,903 shares of common stock of the Company.

*Common Stock Warrants*

The Company's outstanding stock warrants have not changed during the nine-months ended September 30, 2024. The outstanding stock warrants as of September 30, 2024 are 4,904,016 with a weighted average remaining contractual life (in years) of 2.90 and a weighted average exercise price of $11.07, all of which are exercisable.

*Stock-Based Compensation:*

*Equity plans*

Under the 2018 Equity Plan, the number of shares issuable under the Plan on the first day of each fiscal year increase by an amount equal to the lower of (i) 100,000 shares (after a later 10 for 1 stock split) or (ii) 5% of the outstanding shares on the last day of the immediately preceding fiscal year. At the Company's annual meeting on May 17, 2023, the stockholders approved an amendment to the 2021 Equity Plan that, amongst other things, increased the number of the shares available under the 2021 Equity Plan to 10,000,000 shares, and the shares available under the 2021 Equity Plan increased by 1,000,000 shares on January 1, 2024 to 11,000,000. Upon review of the previously granted shares in previous years and the availability of shares, on April 9, 2024, the Board of Directors approved the 2024 Omnibus Equity Plan (the "2024 Plan") which will provide an initial 10,000,000 shares of common stock available for grant per the terms of the 2024 Plan and provides alignment with long-term stockholder value creation. The 2024 Omnibus Equity Plan was approved by the stockholders at the Company's annual general meeting held on June 12, 2024. The 2024 Plan replaced and succeeded the Company's 2018 Equity Incentive Plan and 2021 Equity Incentive Plan. The 2024 Plan provides that awards issued under the 2024 Plan, the 2018 Plan or the 2021 Plan that expire, lapse or are terminated, surrendered or canceled without having been fully exercised or are forfeited in whole or in part, in any case in a manner that results in any share of Common Stock covered by such award being reacquired by the Company or otherwise not being issued, such share of Common Stock shall again be available for the grant of awards under the 2024 Plan. Further, shares of Common Stock delivered (either by actual delivery or attestation) to the Company by a participant to (1) satisfy the applicable exercise or purchase price of an award, and/or (2) satisfy any applicable tax withholding obligation, in each case, shall be added to the number of shares of Common Stock available for the grant of awards under the 2024 Plan. Therefore, an additional 5,000,000 shares of Common Stock are being registered hereunder for those purposes, for an aggregate of 15,000,000 shares of Common Stock being registered hereunder.

The Company recognized stock-based compensation expense during the three and nine months ended September 30, 2024 and 2023, as follows:

| | For the Three-Months ended September 30, | | For the Nine-Months ended September 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Performance-based restricted stock awards | $ 2,913 | $ (812,901) | $ 79,070 | $ (479,343) |
| Service-based restricted stock awards | 4,125,992 | 4,096,717 | 11,161,386 | 4,146,709 |
| Stock issued to consultants | - | - | - | 307,069 |
| Warrant expense | - | 500,500 | - | 1,501,500 |
| Option expense* | 1,191,918 | - | 35,098 | - |
| **Total stock-based compensation**** | $ 5,320,823 | $ 3,784,316 | $ 11,275,554 | $ 5,475,935 |

\*  The option expense for the nine-month period to September 30, 2024 contains a reversal of stock-based compensation expenses from 2023 for cancelled option awards, offset by option expense incurred during the period.

\*\*  Stock-based compensation expense in the consolidated, condensed unaudited statement of operations includes $11.28 million of stock-based compensation.

*Performance-based awards*

Performance-based awards generally vest over a three-year performance period upon the successful completion of specified market and performance conditions.

The following table presents a summary of the Company's performance-based awards restricted stock awards activity:

| | Number of shares | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|
| Outstanding as of December 31, 2023 | 75,545 | 8.58 |
| Expired/forfeited | (3,444) | - |
| Outstanding as of September 30, 2024 | 72,101 | 7.81 |
| Exercisable as of September 30, 2024 | 61,617 | 6.70 |

*Service-based restricted stock awards*

Service-based awards generally vest over a specified time period pursuant to the grant by the Compensation Committee of the Board of Directors and as specified in the award agreements or employment agreements.

The following table presents a summary of the Company's service-based awards activity:

| | Number of shares | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|
| Outstanding as of December 31, 2023 | 5,242,393 | 2.28 |
| Issued | 12,480,531 | - |
| Exercised | (3,459,720) | - |
| Outstanding as of September 30, 2024 | 14,263,204 | 1.54 |
| Exercisable as of September 30, 2024 | 16,804 | 0.01 |

As of September 30, 2024, there was approximately $20.54 million of unrecognized compensation cost related to the service-based restricted stock awards, which is expected to be recognized over a remaining weighted-average vesting period of approximately four years.

*Stock options awards*

Stock options awards vest upon the successful completion of specified stock price threshold conditions.

The following table presents a summary of the Company's Stock options awards activity:

| | Number of shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding as of December 31, 2023 | 3,500,417 | $ 1.23 | 9.70 | $ 6,923,000 |
| Cancelled | (1,750,000) | 0.94 | - | - |
| Issued | 1,750,000 | 0.94 | - | - |
| Outstanding as of September 30, 2024 | 3,500,417 | $ 1.07 | 9.45 | $ 605,500 |
| Exercisable as of September 30, 2024 | 417 | $ 0.00 | - | $ - |

As of September 30, 2024, there was approximately $0.61 million of unrecognized compensation cost related to the stock options awards, which is expected to be recognized over a remaining weighted-average vesting period of approximately eight months.

**NOTE 10 – SUBSEQUENT EVENTS**

Effective September 6, 2024, the Company terminated the At the Market Offering Agreement with H.C. Wainwright & Co., LLC dated May 27, 2022. The Company filed an 8K on October 25, 2024 announcing this termination. This filing is incorporated herein by reference.

On October 3, 2024, a proceeding before the Federal Court of Australia, New South Wales was filed by W Capital against the Company, seeking a hearing on November 29, 2024 regarding its claims related to Company's solvency under Australian law. The current proceeding is in Australian courts and there are no associated proceedings in the United States. The Company believes that W Capital and Marshall are using this proceeding in Australia as a bad faith attempt to gain leverage in ongoing legal disputes between the parties. For further information, please reference the <u>Marshall and W Capital Australian Loan Disputes</u> found in Part I. Financial Information, Item 1. Financial Statements, made part here of and incorporated herein by reference.

On October 17, 2024, the Company filed a complaint in The Court of Common Pleas of Mercer County, Pennsylvania (file number 2024-2332), against Vertua Property, Inc. as landlord for the Company's Sharon, PA property for breach of the lease agreement and wrongful termination of the lease, as well as for tortious interference with a business relationship, seeking reinstatement of the lease, compensatory damages, disgorgement of revenue, and exemplary and punitive damages, as well as reimbursement for Plaintiffs' costs and expenses including attorneys' fees and costs of suit. Vertua Property, Inc. is a company affiliated to Darron Wolter of W Capital and to James Manning, a former board director and executive of the Company.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

Management's Discussion and Analysis of Financial Condition and Results of Operations analyzes the major elements of our balance sheets, statements of operations and cash flows. The following discussion and analysis of our financial condition and results of operations should be read together with the interim condensed consolidated financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q, as well as our audited consolidated financial statements and related notes as disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023. All amounts are in U.S. dollars.

Throughout this report, unless otherwise designated, the terms "we," "us," "our," the "Company," "Mawson," "our company" and the "combined company" refer to Mawson Infrastructure Group Inc., a Delaware corporation, Cosmos Trading Pty Ltd, Cosmos Infrastructure LLC, Cosmos Manager LLC, MIG No.1 Pty Ltd (on March 19, 2024, MIG No.1 Pty Ltd was placed into a court appointed liquidation and wind-up process), MIG No.1 LLC, Mawson AU Pty Limited (on April 23, 2024, Mawson AU Pty Ltd was placed into a court appointed liquidation and wind-up process), Mawson Services Pty Ltd (on April 29, 2024, Mawson Services Pty Ltd was placed into a court appointed liquidation and wind-up process), Mawson Bellefonte LLC, Luna Squares LLC, Luna Squares Repairs LLC, Luna Squares Property LLC, Mawson Midland LLC, Mawson Ohio LLC, Mawson Hosting LLC and Mawson Mining LLC.

*Cautionary Note Regarding Forward-Looking Statements*

This Quarterly Report on Form 10-Q contains forward-looking statements, about our expectations, beliefs or intentions regarding, among other things, our product development efforts, business, financial condition, results of operations, strategies or prospects. Forward-looking statements can be identified by the use of forward-looking words such as "believe", "expect", "intend", "plan", "may", "should", "could" or "anticipate" or their negatives or other variations of these words or other comparable words or by the fact that these statements do not relate strictly to historical or current matters. These forward-looking statements may be included in, but are not limited to, various filings made by us with the United States Securities and Exchange Commission (the "SEC"), press releases or oral statements made by or with the approval of one of our authorized executive officers. Forward-looking statements relate to anticipated or expected events, activities, trends or results as of the date they are made. Because forward-looking statements relate to matters that have not yet occurred, these statements are inherently subject to risks and uncertainties that could cause our actual results to differ materially from any future results expressed or implied by the forward-looking statements. Many factors could cause our actual activities or results to differ materially from the activities and results anticipated in forward-looking statements, including, but not limited to, the factors summarized below.

This report and our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, identify important factors which could cause our actual results to differ materially from those indicated by the forward-looking statements, particularly those set forth herein under Item 1A. "Risk Factors" below, and in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023.

The risk factors included in this Quarterly Report on Form 10-Q and our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, are not necessarily all of the important factors that could cause actual results to differ materially from those expressed in any of our forward-looking statements. Given these uncertainties, you are cautioned not to place undue reliance on such forward-looking statements. The following important factors, among others, could affect future results and events, causing those results and events to differ materially from those expressed or implied in our forward-looking statements:

- continued evolution and uncertainty related to growth in blockchain and bitcoin and other digital assets' usage;

- access to reliable and reasonably priced electricity sources;

- operational, maintenance, repair, safety, and construction risks;

- the failure or breakdown of mining equipment, or internet connection failure;

- our reliance on key management personnel and employees;

- our ability to attract or retain the talent needed to sustain or grow the business;

- our ability to develop and execute on our business strategy and plans;

- counterparty risks related to our customers, agreements and/or contracts;

- adverse actions by creditors, debt providers, or other parties;

- high volatility in bitcoin and other digital assets' prices and in value attributable to our business;

- our need to, and difficulty in, raising additional debt or equity capital and the availability of financing opportunities;

- failure to maintain required compliance to remain eligible for the most cost-effective forms of raising additional equity capital;

- the evolution of AI and HPC market and changing technologies;

- the slower than expected growth in demand for AI, HPC and other accelerated computing technologies than expected;

- the ability to timely implement and execute on AI and HPC digital infrastructure contracts or deployment;

- the ability to timely complete the digital infrastructure build-out in order to achieve its revenue expectations for the periods mentioned;

- downturns in the digital assets industry;

- inflation, economic or political environment;

- cyber-security threats;

- our ability to obtain proper insurance;

- banks and other financial institutions ceasing to provide services to our industry;

- changes to the Bitcoin and/or other networks' protocols and software;

- the decrease in the incentive or increased network difficulty to mine Bitcoin;

- the increase of transaction fees related to digital assets:

- the fraud or security failures of large digital asset exchanges;

- the regulation and taxation of digital assets like Bitcoin;

- our ability to timely and effectively implement controls and procedures required by Section 404 of the Sarbanes-Oxley Act of 2002; and

- material litigation, investigations, or enforcement actions, including by regulators and governmental authorities.

Factors that could cause our actual results to differ materially from those expressed or implied in such forward-looking statements include, but are not limited to, the risk factors set out herein in Item 1A. Risk Factors and in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023.

All forward-looking statements attributable to us or persons acting on our behalf speak only as of the date of this report and are expressly qualified in their entirety by the cautionary statements included in this report. We undertake no obligation to update or revise forward-looking statements to reflect events or circumstances that arise after the date made or to reflect the occurrence of unanticipated events. In evaluating forward-looking statements, you should consider these risks and uncertainties.

*Company Overview*

Mawson Infrastructure Group Inc. ("Mawson," the "Company," "we," "us," and "our") is a technology company focused on digital infrastructure platforms, headquartered in the United States of America.

The Company is a corporation incorporated in Delaware in 2012. On March 9, 2021, the Company acquired the shares of Cosmos Capital Limited in a stock for stock exchange. This transaction has been accounted for as a reverse asset acquisition. The Company was previously known as Wize Pharma Inc and changed its name on March 17, 2021. Shares of the Company's common stock, par value $0.001 per share ("Common Stock") have been listed on The Nasdaq Capital Market since September 29, 2021.

The Company develops and operates digital infrastructure platforms for enterprise customers and for its own purposes. The Company's digital infrastructure platforms can be used to operate computing resources for a number of applications, and are offered across digital assets, artificial intelligence (AI), high-performance computing (HPC) and other computing applications. The Company also has an energy management business, which utilizes software and analysis, to generate revenue when the Company adapts its power usage to the real-time needs of the grid. The Company may also transact in digital computational machines, data center infrastructure, and related equipment periodically, subject to business and commercial opportunities.

The Company has a strategy to prioritize the usage of carbon-free energy sources, including nuclear energy, to power its digital infrastructure platforms and computational machines.

The Company manages and operates digital infrastructure platforms delivering a total current capacity of approximately 129 megawatts (MW) with its current operational sites with an additional 24 MW of future capacity that is under development, all strategically located in locations served by the PJM Energy Market in the United States. The PJM Energy Market is the largest wholesale power market in North America.

Previously, the Company also had an interest in the Australian energy market, however for strategic and commercial reasons, the Company is currently focused on advancing its interests in North America. The Company currently operates facilities in the United States of America and does not have operating sites in Australia. The Company has previously reported through an 8-K filing on March 29, 2024 that the Company may seek to exit certain or all of its entities and holdings in Australia. The accompanying consolidated condensed unaudited interim financial statements, including the results of a number of the Company's Australian subsidiaries: Cosmos Trading Pty Ltd, Cosmos Infrastructure LLC, Cosmos Manager LLC, MIG No.1 Pty Ltd (on March 19, 2024, MIG No.1 Pty Ltd was placed into a Australian court appointed liquidation and wind-up process), MIG No.1 LLC, Mawson AU Pty Ltd (on April 23, 2024, Mawson AU Pty Ltd was placed into a Australian court appointed liquidation and wind-up process, as disclosed in note 3), an Australian entity Mawson Services Pty Ltd (on April 29, 2024, Mawson Services Pty Ltd was placed into a Australian court appointed liquidation and wind-up process, as disclosed in note 3), Luna Squares LLC, Mawson Bellefonte LLC, Luna Squares Repairs LLC, Luna Squares Property LLC, Mawson Midland LLC, Mawson Hosting LLC, Mawson Ohio LLC and Mawson Mining LLC (collectively referred to as the "Group"), have been prepared by the Company, pursuant to the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and in accordance with generally accepted accounting principles in the United States of America ("GAAP").

<u>*Recent*</u> <u>*Developments*</u>

On August 6, 2024, the Company announced the future departure of Mr. Craig Hibbard as the Company's Chief Development Officer given personal reasons. Mr. Hibbard will remain with the Company in a full-time capacity until February 6, 2025 to ensure a structured transition. The Company does not plan to continue with a Chief Development Officer position henceforth and the responsibilities will be divided amongst other management team members.

On August 9, 2024, a wholly owned subsidiary of the Company, Mawson Hosting, LLC, and BE Global Development Limited, executed a Service Provider Agreement for the provision of AI/HPC digital colocation services for 20MW of power for AI/HPC digital colocation services at the Company's facilities at pre-determined pricing for the first two years of the agreement, with the pricing subject to updates every two years, and with an initial six-year contract term. The contract is expected to generate $92 million in the first 2 years, with cumulative revenue potential of $285 million through the 6-year initial contract term. In addition, the Company and the Customer also entered into an additional non-binding Letter of Intent (the "LOI") to supplement the binding 20 MW agreement, to plan for further expansion of their business relationship to a total of 144 MW over time. The Company filed an 8K on August 12, 2024 attaching the agreement as Exhibit 99.1. This filing is incorporated herein by reference.

On August 21, 2024, the Company secured a lease amendment to expand its Ohio facility and extending the lease term for 9 years, through April 2033. Securing an initial 24 MW of capacity through agreements. The Company filed an 8K on August 27, 2024 announcing the event pursuant to a press release which was attached here to the 8-K as Exhibit 99.1 and is incorporated herein by reference.

On September 6, 2024, Luna Squares Property, LLC, a wholly-owned subsidiary of the Company, filed a praecipe of lis pendens for the property leased in Sharon, Pennsylvania. It did so to also provide third parties such as Bitfarms Ltd. notice that the property is encumbered by a lease between Luna Squares Property LLC and Vertua Property, Inc. This property is the subject of a current civil lawsuit between the Company and Luna Squares against Vertua. On October 17, 2024, the Company filed several claims against Vertua Property, Inc including claims for breach of the lease agreement and wrongful termination of the lease, as well as for tortious interference with a business relationship, seeking reinstatement of the lease, compensatory damages, disgorgement of revenue, and exemplary and punitive damages, as well as reimbursement for Plaintiffs' costs and expenses including attorneys' fees and costs of suit.

On September 9, 2024, the Company entered into the Third Amendment to Lease Agreement (the "Amendment") which amended the existing Lease Agreement, dated as of September 20, 2021, by and between the Company and Jewel Acquisition, LLC, pursuant to which the Company leases approximately 8 acres of land and improvements located at 950 10th Street (950 Railroad Avenue), Midland (Beaver County), Pennsylvania (the "Lease"). The Amendment extends the Lease from September 14, 2024 to September 14, 2027 and sets new rental rates that are effective as of September 15, 2024. Future minimum lease payments for the Lease, as amended, are approximately $1,380,509, with annual increases of 3.1%. All other terms of the Lease remain in full force and effect. The Company filed an 8K on September 11, 2024 attaching the amendment as Exhibit 99.1. This filing is incorporated herein by reference.

On September 11, 2024, the Company entered into a Marketing Services Agreement with Outside The Box Capital Inc. ("OTB") pursuant to which OTB will provide certain marketing and distribution services to the Company for a six month term in consideration for the payment of a fee of $100,000 worth of restricted shares of the Company's common stock, as approved by the Company's board. The Company filed an 8K on September 11, 2024 attaching the agreement as Exhibit 99.1. This filing is incorporated herein by reference.

29

*Results of Operations – Three-months Ended September 30, 2024 compared to the three-months ended September 30, 2023*

| | For the Three-Months ended September 30, | |
|---|---|---|
| | **2024** | **2023** |
| **Revenues:** | | |
| Digital colocation revenue | $ 9,518,696 | $ 2,959,074 |
| Energy management revenue | 1,963,805 | 1,475,333 |
| Digital assets mining revenue | 833,516 | 6,898,223 |
| Equipment sales | - | - |
| **Total revenues** | **12,316,017** | **11,332,630** |
| Less: Cost of revenues (excluding depreciation) | 7,996,440 | 7,715,920 |
| **Gross profit** | **4,319,577** | **3,616,710** |
| Selling, general and administrative | 6,000,344 | 3,655,444 |
| Stock based compensation | 5,320,823 | 3,784,316 |
| Depreciation and amortization | 3,607,848 | 11,875,618 |
| Change in fair value of derivative asset | 789,146 | 520,838 |
| Total operating expenses | 15,718,161 | 19,836,216 |
| **Loss from operations** | **(11,398,584)** | **(16,219,506)** |
| **Non-operating income (expense):** | | |
| Losses on foreign currency transactions | (352,375) | (600,619) |
| Interest expense | (801,625) | (514,953) |
| Impairment of financial assets | - | (1,837,063) |
| Profit on sale of site | - | - |
| Gain on sale of marketable securities | - | - |
| Other expenses | (443,537) | (158,577) |
| Loss on deconsolidation | - | - |
| Other income | 119,526 | - |
| Share of net loss of equity method investments | - | - |
| Total non-operating income (expense), net | (1,478,011) | (3,111,212) |
| **Loss before income taxes** | **(12,876,595)** | **(19,330,718)** |
| Income tax benefit (expense) | 648,857 | - |
| **Net Loss** | **(12,227,738)** | **(19,330,718)** |
| Less: Net loss attributable to non-controlling interests | - | (283,101) |
| **Net Loss attributed to Mawson Infrastructure Group stockholders** | **$ (12,227,738)** | **$ (19,047,617)** |
| **Net Loss per share, basic and diluted** | **$ (0.66)** | **$ (1.15)** |
| **Weighted average number of shares outstanding** | **18,519,572** | **16,500,833** |

*Revenues*

Digital colocation business revenues for the three-months ended September 30, 2024 and 2023, were $9.52 million and $3.00 million, respectively. This represented an increase of $6.56 million or 222% increase.

The increase in revenue was due to the Company providing digital colocation services to multiple digital colocation customers. For the same period of 2023, the Company only provided digital colocation services to a single customer whereas the Company now provides digital colocation services to multiple customers. The Company expects to continue to diversify its digital colocation services customer across customers and to expand its business.

Energy management business revenues for the three-months ended September 30, 2024 and 2023, were $1.96 million and $1.48 million, respectively. This represented an increase of $0.49 million or 33% increase.

This increase is due to the Company enhanced energy management program participation in the three-months ended September 30, 2024 than in the 2023 period. The revenue opportunity from energy management is expected to be impacted by seasonal patterns and other weather-related events as well as the dynamic nature of global power prices.

Digital assets mining revenues from the production of bitcoin for the three-months ended September 30, 2024, and 2023, were $0.83 million and $6.90 million, respectively. The decrease for the three-months ended September 30, 2024, was due to a number of factors, including the impact of the April 2024 halving event, and a higher global network difficulty rate in the three-months ended September 30, 2024 compared to the same period in 2023, which led to lower bitcoin production from self-mining. In the three-months ended September 30, 24 period, the Company also significantly expanded and grew its digital colocation services business across multiple customers reallocating some of its digital asset mining capacities. The Company believes its digital mining revenue may continue to fluctuate with bitcoin pricing and market conditions as the bitcoin industry works through the expected volatility inherently associated with bitcoin including the impact post the April 2024 halving event.

*Operating Cost and Expenses*

Our operating costs and expenses include cost of revenues; selling, general and administrative expenses; stock-based compensation; change in fair value of derivative asset; and depreciation and amortization.

**Cost of revenue**

Our cost of revenue consists primarily of direct power costs related to digital asset mining and digital colocation services and cost of equipment and infrastructure sold.

Cost of revenue for the three-months ended September 30, 2024 and 2023, were $8.00 million and $7.72 million, respectively. The increase in cost of revenue was primarily attributable to an increase in power costs related to the increase in energy used to operate the colocated equipment for our enterprise digital colocation customers within our facilities.

**Selling, general and administrative**

Our selling, general and administrative expenses consist primarily of professional and management fees relating to: audit; legal; professional services, director and employee compensation, equipment repairs; marketing; freight; insurance; consultant fees; lease amortization, general and other expenses.

Selling, general and administrative expenses for the three-months ended September 30, 2024 and 2023 were $6.00 million and $3.66 million, respectively.

**Stock based compensation**

Stock based compensation expenses for the three-months ended September 30, 2024 and 2023 were $5.32 million and $3.78 million, respectively. In the three-months ended September 30, 2024, stock-based compensation expense was attributable to the costs recognized in relation to long-term incentives for the Company's directors, management, and employees and to continue to align incentives with long-term stockholder value creation.

**Depreciation and amortization**

Depreciation consists primarily of depreciation of digital asset mining hardware, MDC equipment and other data center infrastructure.

Depreciation and amortization for the three-months ended September 30, 2024 and 2023, were $3.61 million and $11.88 million, respectively. The lower depreciation and amortization expense is the result of an increased number of the Company's digital asset mining hardware being fully depreciated and lower number of digital asset miners for the three-months ended September 30, 2024 following the deconsolidation of MIG No. 1 Pty Ltd.

*Change in fair value of derivative asset*

During the three-months ended September 30, 2024 and 2023, there was a loss on the fair value of the derivative asset by $0.79 million and a loss of $0.52 million, respectively, in relation to our power supply arrangements. The loss on the derivative asset was due to an expected decrease in the price of energy costs in 2024 and decrease in the amount of time remaining for the derivative asset.

31

*Non-operating expenses*

Non-operating expenses consist primarily of interest expenses and other expenses.

Interest expenses for the three-months ended September 30, 2024 and 2023, were $0.80 million and $0.51 million, respectively driven by default interest on loans outstanding.

*Non-operating income*

Non-operating income consists primarily of gain on foreign currency transactions and other income.

During the three-months ended September 30, 2024 and 2023, the realized and unrealized gain on foreign currency transactions was a loss of $0.35 million and a loss of $0.60 million, respectively. This difference was due mostly to the movement in foreign exchange rates.

*Net loss attributable to Mawson Infrastructure Group, Inc. stockholders*

As a result of the foregoing, the Company recognized a net loss of $12.23 million for the three-months ended September 30, 2024, compared to a net loss of $19.05 million for the three-months ended September 30, 2023.

*Results of Operations – Nine-months Ended September 30, 2024 compared to the nine-months ended September 30, 2023*

| | For the Nine-Months ended September 30, | |
| --- | --- | --- |
| | 2024 | 2023 |
| **Revenues:** | | |
| Digital colocation revenue | $ 25,884,176 | $ 11,876,379 |
| Energy management revenue | 6,168,906 | 2,934,066 |
| Digital assets mining revenue | 11,596,363 | 14,550,744 |
| Equipment sales | 550,000 | 193,581 |
| **Total revenues** | **44,199,445** | **29,554,770** |
| Less: Cost of revenues (excluding depreciation) | 28,577,249 | 19,422,380 |
| **Gross profit** | **15,622,196** | **10,132,390** |
| Selling, general and administrative | 13,100,223 | 14,898,118 |
| Stock based compensation | 11,275,554 | 5,475,935 |
| Depreciation and amortization | 16,211,516 | 28,627,896 |
| Change in fair value of derivative asset | 878,096 | 6,646,363 |
| Total operating expenses | 41,465,389 | 55,648,312 |
| **Loss from operations** | **(25,843,193)** | **(45,515,922)** |
| **Non-operating income (expense):** | | |
| Losses on foreign currency transactions | (474,210) | (1,416,000) |
| Interest expense | (2,289,150) | (2,061,067) |
| Impairment of financial assets | - | (1,837,063) |
| Profit on sale of site | - | 3,353,130 |
| Gain on sale of marketable securities | - | 1,437,230 |
| Other expenses | (29,800) | (226,330) |
| Loss on deconsolidation | (12,444,097) | - |
| Other income | 309,209 | 245,694 |
| Share of net loss of equity method investments | - | (36,356) |
| Total non-operating income (expense), net | (14,928,048) | (540,762) |
| **Loss before income taxes** | **(40,771,241)** | **(46,056,684)** |
| Income tax expense | (1,044,475) | (2,304,454) |
| **Net Loss** | **(41,815,716)** | **(48,361,138)** |
| Less: Net loss attributable to non-controlling interests | (205,086) | (867,590) |
| **Net Loss attributed to Mawson Infrastructure Group stockholders** | **$ (41,610,630)** | **$ (47,493,548)** |
| **Net Loss per share, basic and diluted** | **$ (2.37)** | **$ (3.10)** |
| **Weighted average number of shares outstanding** | 17,529,342 | 15,336,653 |

*Revenues*

Digital colocation services revenues for nine-months ended September 30, 2024 and 2023, were $25.88 million and $11.88 million, respectively, representing an increase of $14.01 million or 118% increase.

The increase in revenue was due to growth of the digital colocation business during the nine-months ended September 30, 2024, where the Company provided digital colocation services to multiple digital colocation customers, whereas for the nine-months ended September 30, 2023 the Company provided digital colocation services to a single customer.

Energy management revenues for the nine-months ended September 30, 2024 and 2023, were $6.17 million and $2.93 million, respectively, representing an increase of $3.23 million or 110% increase.

This increase is due to the Company's enhanced participation in energy management programs.

Digital assets revenues from production of bitcoin for the nine-months ended September 30, 2024, and 2023, were $11.60 million and $14.55 million, respectively. In the nine-months ended September 30, 24 period, the Company also significantly expanded its digital colocation services business reallocating some of its digital asset mining capacities. The Company believes its digital mining revenue may continue to fluctuate with bitcoin pricing and market conditions as the bitcoin industry works through the expected volatility inherently associated with bitcoin including the impact post the April 2024 halving event.

Sales of digital mining and other equipment for the nine-months ended September 30, 2024 and 2023, were $0.55 million and $0.19 million, respectively.

*Operating Cost and Expenses*

Our operating costs and expenses include cost of revenues; selling, general and administrative expenses; stock-based compensation; change in fair value of derivative asset; and depreciation and amortization.

**Cost of revenue**

Our cost of revenue consists primarily of direct power costs related to digital assets mining and digital colocation services and cost of mining equipment sold.

Cost of revenue for the nine-months ended September 30, 2024 and 2023, were $28.58 million and $19.42 million, respectively. The increase in cost of revenue was primarily attributable to an increase in power costs related to the energy used to operate the Company's mining equipment and customer colocated mining equipment within our facilities.

33

**Selling, general and administrative**

Our selling, general and administrative expenses consist primarily of professional and management fees relating to: audit; legal; equipment repairs; marketing; freight; insurance; consultant fees; lease amortization, director and employee compensation, general and other expenses.

Selling, general and administrative expenses for the nine-months ended September 30, 2024 and 2023 were $13.10 million and $14.90 million, respectively, which is a reduction of $1.80 million or 12% from period to period. The decrease is primarily attributable to lower employee compensation expenses including payroll costs, lower doubtful debt expense, reduced freight costs, lower marketing and travel expenses also driven by the cost reduction, efficiency, and optimization actions that the Company had previously undertaken.

**Stock-based compensation**

Stock-based compensation expenses for the nine-months ended September 30, 2024 and 2023 were $11.28 million and $5.48 million, respectively. In the nine-months ended September 30, 2024, stock-based compensation was attributable to costs recognized in relation to long-term incentives for the Company's directors and employees and to continue to align incentives with long-term stockholder value creation.

**Depreciation and amortization**

Depreciation consists primarily of depreciation of digital asset mining hardware and MDC equipment.

Depreciation and amortization for the nine-months ended September 30, 2024 and 2023, were $16.21 million and $28.63 million, respectively.

***Change in fair value of derivative asset***

During the nine-months ended September 30, 2024 and 2023, there was a loss on the fair value of the derivative asset by $0.88 million and a loss of $6.65 million, respectively, in relation to our power supply arrangements. The loss on the derivative asset was due to the passage of time offset by an increase in the price of energy costs in 2024.

***Non-operating expenses***

Non-operating expenses consist primarily of interest expenses, loss on deconsolidation and other expenses.

Interest expenses for the nine-months ended September 30, 2024 and 2023, were $2.29 million and $2.06 million, respectively.

During the nine-months ended September 30, 2024, the Company recognized a deconsolidation loss of $12.44 million. This loss was as a result of three Australian entities and subsidiaries, MIG No.1 Pty Ltd, Mawson AU Pty Ltd and Mawson Services Pty Ltd going into Australian court appointed liquidation and accordingly these subsidiaries were deconsolidated. The deconsolidation loss recorded was due to the removal of the net assets and certain liabilities of this subsidiary from the condensed consolidated financial statements. See Note 3 - Subsidiary Deconsolidation to the Consolidated Condensed Financial Statements (Unaudited) in Item 1. Financial Statements, for further discussion.

***Non-operating income***

Non-operating income consists primarily of gain on foreign currency transactions and other income.

During the nine-months ended September 30, 2024 and 2023, the realized and unrealized loss on foreign currency transactions was a loss of $0.47 million and a loss of $1.42 million, respectively. This difference was due mostly to the movement in foreign exchange rates.

34

*Net loss attributable to Mawson Infrastructure Group, Inc. stockholders*

As a result of the foregoing, the Company recognized a net loss of $41.61 million for the nine-months ended September 30, 2024, compared to a net loss of $47.49 million for the nine-months ended September 30, 2023.

*Liquidity and Capital Resources*

*General*

Liquidity is the ability of a company to generate funds to support its current and future operations, satisfy its obligations, and otherwise operate on an ongoing basis. Significant factors in the management of liquidity are funds generated by operations, levels of accounts receivable and accounts payable and capital expenditure. For the nine-month period ended September 30, 2024, we financed our operations primarily through net positive cash flow provided by operating activities and other cash reserves. During the nine-months ending September 30, 2024, the Company repaid $0.50 million of principal payments against previous facilities provided by W Capital Advisors Pty Ltd.

On May 27, 2022, the Company entered an At the Market Offering Agreement (the "ATM Agreement") with H.C. Wainwright & Co., LLC ("Wainwright"), and filed a prospectus supplement, to sell shares of its Common Stock through an "at the market offering" program as defined in Rule 415 promulgated under the Securities Act of 1933, as amended. Effective May 4, 2023, the Company filed a prospectus supplement to amend, supplement and supersede certain information contained in the earlier prospectus and prospectus supplement, which reduced the number of shares of Common Stock the Company may offer and sell under the ATM Agreement to an aggregate offering price of up to $9.00 million from time to time. The Company terminated the ATM Agreement effective September 6, 2024. The Company may choose to enter into other "at the market offering" programs with other parties in the future.

We believe our near-term working capital requirements will continue to be funded through a combination of the cash we expect to generate from future operations, our existing funds, external debt facilities that may be available to us, future issuances of shares, and other potential sources of capital, monetization, or funds. We believe a combination of these opportunities are expected to be adequate to fund our longer-term operations needed over the next twelve-months. For our business growth, it is expected we may continue investing in expanding our infrastructure, expanding and/or upgrading our infrastructure and/or other equipment and will require additional working capital in the short-term and long-term. As of September 30, 2024, we had an aggregate of $21.37 million of debt all of which is overdue for repayment unless we refinance, renegotiate the terms or prevail in our disputes and/or related claims. In addition, the Celsius deposit of $15.33 million is the subject of an ongoing legal dispute in arbitration. For more details on this dispute, please see the Celsius Collocation Agreement Dispute found in Part I. Financial Information, Item 1. Financial Statements, contained in this Form 10-Q and made part here of and incorporated herein by reference.

Please see our Risk Factor entitled "We will need to raise substantial additional capital to continue our operations and execute our business strategy, meet our debt service obligations and execute our business strategy, and we may not be able to raise adequate capital on a timely basis, on favorable terms, or at all. Our inability to raise sufficient capital would have a material adverse effect on our financial condition and business." in our Annual Report on Form 10-K for the year ended December 31, 2023.

*Working Capital and Cash Flows*

As of September 30, 2024 and December 31, 2023, we had a cash and cash equivalent balance of $5.76 million and $4.48 million, respectively, representing a positive increase of 29% in our cash and cash equivalent balance. As of September 30, 2024 and December 31, 2023, the trade receivables balance was $12.84 million and $12.11 million, respectively. As of September 30, 2024, we had $21.37 million of outstanding short-term borrowings, and as of December 31, 2023, we had $19.35 million of short-term borrowings. The short-term borrowings as of September 30, 2024, relate to Celsius Mining LLC, W Capital Advisors Pty Ltd, the secured convertible promissory notes issued to investors and Marshall Investments MIG Pty Ltd (these loans are currently in default, refer to Material Cash Requirements section below for more information*)*. As of September 30, 2024 and December 31, 2023, we had negative working capital of $36.09 million and $33.18 million, respectively.

The following table presents the major components of net cash flows (used in) provided by operating, investing and financing activities for the years ending September 30, 2024 and 2023:

| | Nine-Months Ended September 30, | |
| | 2024 | 2023 |
| --- | --- | --- |
| Net cash provided by (used in) operating activities | $ 3,106,434 | $ (4,818,073) |
| Net cash provided by (used in) investing activities | $ (1,097,654) | $ 10,510,543 |
| Net cash used in financing activities | $ (726,773) | $ (5,115,470) |

For the nine-month period ended September 30, 2024, net cash provided by operating activities was $3.11 million and for the nine-months period ended September 30, 2023, net cash used operating activities was $4.82 million. The increase in net cash provided by operating activities was attributable to operations and timing differences in trade and other receivables and trade and other payables amongst other factors.

For the nine-month period ended September 30, 2024, net cash used in investing activities was $1.10 million and for the nine-month period ended September 30, 2023, net cash provided by investing activities was $10.51 million. The net cash used in investing activities during the nine-months ended September 30, 2024, was primarily attributable to the proceeds from sale of certain non-utilized equipment. The net cash provided by investing activities during the nine-month period to September 30, 2023 was primarily attributable to the proceeds from sale of investment shares in CleanSpark, Inc.

For the nine-month period ended September 30, 2024, net cash used in financing activities was $0.73 million and for the nine-month period ended September 30, 2023, net cash used in financing activities was $5.12 million. The cash used in financing activities during the nine-month period ended September 30, 2024, was primarily attributable to the repayment of borrowings.

*Material Cash Requirements*

The following discussion summarizes our material cash requirements from contractual and other obligations.

The Company is the guarantor of a Secured Loan Facility Agreement by MIG No. 1 with Marshall. The loan matured in February 2024 and bears interest at a rate of 12% per annum (with an overdue rate provision of an additional 500bps), payable monthly with interest payments commencing that commenced in December 2021. This loan facility is secured by direct assets of MIG No.1 Pty Ltd and a general security agreement given by the Company. Principal repayments began during November 2022. The outstanding balance including interest is $10.53 million as of September 30, 2024, all of which is classified as a current liability. There has been no principal and interest payments made since May 2023. This Secured Loan Facility Agreement was entered into with an Australian entity MIG No.1, this company was placed into a court appointed liquidation and wind-up process and was deconsolidated from the group on March 19, 2024. On March 19, 2024, Marshall appointed receivers and managers in Australia under the terms of their security relating to their secured loan facility. The direct assets that secure this loan include 5,372 miners and 8 modular data centers ("MDCs"), these assets are held by the MIG No.1 and therefore were included in the deconsolidation. The receiver's statutory duty includes the obligation to sell the secured assets at market value or, if market value is not known, at the best price reasonably obtainable to maximize the prospects of there being sufficient proceeds available to satisfy the balance of the outstanding secured debt. It is therefore expected that this loan balance will be offset in the future by the amount received from the sale of these miners and MDCs. The Company also reserves and retains all rights against Marshall.

On February 23, 2022, Luna entered into a Digital Colocation Agreement with Celsius Mining LLC. In connection with this agreement, Celsius Mining LLC loaned Luna a principal amount of $20.00 million, for the purpose of funding the infrastructure required to meet the obligations of the Digital Colocation Agreement, for which Luna issued a Secured Promissory Note for repayment of such amount. The Secured Promissory Note accrues interest daily at a rate of 12% per annum (with an overdue rate provision of an additional 200bps). Luna is required to amortize the loan at a rate of 15% per quarter, principal repayments began at the end of September 2022. The Secured Promissory Note had a maturity date of August 23, 2023, the outstanding balance including interest is $9.38 million as of September 30, 2024, all of which is classified as a current liability. Celsius Mining LLC transferred the benefit of the promissory note to Celsius Network Ltd. Celsius Mining LLC and Celsius Network Ltd filed for Chapter 11 bankruptcy protection on July 13, 2022. Under the Digital Colocation Agreement, Celsius Mining LLC advanced $15.33 million to Luna that were held as a deposit. Whether that amount has been forfeited or must be returned to Celsius Mining LLC is the subject of a dispute between the parties. On July 18, 2024, Celsius Network, LLC filed for arbitration of its claims against the Company. The Company has filed cross-claims against Celsius. For more details on this dispute, please see the Celsius Collocation Agreement Dispute found in Part I. Financial Information, Item 1. Financial Statements, contained in this Form 10-Q and made part here of and incorporated herein by reference.

The Company is the guarantor of a Secured Loan Facility Agreement for working capital by an Australian entity Mawson Infrastructure Group Pty Ltd with W Capital Advisors Pty Ltd. As of September 30, 2024, AUD $1.95 million (USD $1.35 million) has been drawn down from this facility, all of which is classified as a current liability. The Secured Loan Facility accrues interest daily at a rate of 12% per annum (with an overdue rate provision of an additional 800bps) and is paid monthly. Principal repayments are paid ad hoc in line with the loan facility agreement. The Secured Loan Facility expired in March 2023. This Secured Loan Facility Agreement was originally with Mawson Infrastructure Group Pty Ltd and this Australian entity was placed into Australian voluntary administration on October 30, 2023 and on November 3, 2023, W Capital Advisors appointed receivers and managers in Australia under the terms of their security relating to their working capital facility. The receiverships of these two Australian companies are proceeding, and the Company is dependent on the appointed receivers and managers to send information on their respective status.

On May 31, 2024, W Capital obtained a judgment from the Australian court awarding it a money judgment for USD $0.17 million as unpaid interest under the convertible note after the Company paid in full the principal of $0.50 million, and AUD $0.30 million under a loan deed. On June 12, 2024, W Capital issued a statutory demand under Australian Law to the Company seeking USD $0.17 million as unpaid interest under a convertible note after the Company paid in full the principal of $0.50 million, and AUD $0.30 million under a loan deed. The Company rejected this demand. Subsequently, on October 3, 2024, a proceeding before the Federal Court of Australia, New South Wales was filed by W Capital against the Company, seeking a hearing on November 29, 2024 regarding its claims related to Company's solvency under Australian law. The current proceeding is in Australian courts and there are no associated proceedings in the United States. The Company believes that W Capital and Marshall are using this proceeding in Australia as a bad faith attempt to gain leverage in ongoing legal disputes between the parties. For further information, please reference the Marshall and W Capital Australian Loan Disputes found in Part I. Financial Information, Item 1. Financial Statements, made part here of and incorporated herein by reference.

*Financial condition*

As of September 30, 2024, and December 31, 2023, we had negative working capital of $36.09 million and $33.18 million, respectively. As of September 30, 2024, and December 31, 2023, we had negative net assets of $1.56 million and $30.38 million, respectively. As of September 30, 2024, we had an accumulated deficit of $224.28 million compared to $182.67 million as of December 31, 2023. Our cash position of September 30, 2024, was $5.76 million in comparison to $4.48 million as of December 31, 2023. For the nine-month period ended September 30, 2024 and 2023 the Company incurred a loss after tax of $41.61 million and $48.36 million, respectively. Included in trade and other receivables is a $2.00 million payment due and pending from CleanSpark, Inc. for the sale of the Georgia facility. CleanSpark, Inc has disputed the obligation to make this payment. On July 16, 2024, the Company filed a civil lawsuit for its claims against CleanSpark, Inc and CSRE with the United States District Court for the Southern District of New York in the matter entitled, "Mawson Infrastructure Group, Inc. and Luna Squares, LLC v. CleanSpark, Inc. and CSRE Properties Sandersville, LLC" under Civil Action Number 1:24-cv-5379 for claims and payments due to the Company in excess of $2.00 million. The matter is proceeding through the court system. For more details, please see the CleanSpark Litigation found in Item 1. Legal Proceedings, Part II Other Information contained in this Form 10-Q.

Our primary requirements for liquidity and capital are working capital, capital expenditures, public company costs and general corporate needs. In particular, we have large power usage costs, and other significant costs include our lease, operational, general costs and employee costs. We expect these capital and liquidity needs to continue as we further develop and grow our business. Our principal sources of liquidity have been and are expected to be our cash and cash equivalents, external debt facilities available to us and further issuances of shares.

We require additional capital to respond to near-term debt repayment obligations, competitive pressure, market dynamics, new technologies, customer demands, business opportunities, challenges, potential acquisitions or unforeseen circumstances, and we will likely need to determine to engage in equity, debt or other financings in the short term. If we are unable to obtain adequate financing on terms satisfactory to us when we require it, our ability to continue to fund, grow or support our business model and to respond to business challenges could be significantly limited, our business, financial condition and results of operations could be adversely affected, and this may result in bankruptcy or our ceasing operations.

The Company continues to take steps to preserve cash by optimizing operations, costs and pursuing efficiencies. The Company has been improving its revenue generation by enhancing its operations, driving growth in business lines, and adding multiple, enterprise digital colocation services customers and diversifying its businesses. The Company will continue to seek to optimize its cashflows through these and other initiatives.

### *Non-GAAP Financial Measures*

The Company utilizes a number of different financial measures, both GAAP and non-GAAP, in analyzing and assessing its overall business performance, for making operating decisions and for forecasting and planning future periods. The Company considers the use of non-GAAP financial measures helpful in assessing its current financial performance, ongoing operations, and prospects for the future. While the Company uses non-GAAP financial measures as a tool to enhance its understanding of certain aspects of its financial performance, the Company does not consider these measures to be a substitute for, or superior to, the information provided by GAAP financial measures. Consistent with this approach, the Company believes that disclosing non-GAAP financial measures to the readers of its financial information provides such readers with useful supplemental data that, while not a substitute for GAAP financial measures, allows for greater transparency in the review of its financial and operational performance. Investors are cautioned that there are inherent limitations associated with the use of non-GAAP financial measures as an analytical tool. In particular, non-GAAP financial measures are not based on a comprehensive set of accounting rules or principles and many of the adjustments to the GAAP financial measures reflect the exclusion of items that are recurring and will be reflected in the company's financial results for the foreseeable future. In addition, other companies, including other companies in the Company's industry, may calculate non-GAAP financial measures differently than the Company does, limiting their usefulness as a comparative tool.

The Company is providing supplemental financial measures for (i) non-GAAP adjusted earnings before interest, taxes, depreciation and amortization, or ("adjusted EBITDA") that excludes the impact of interest, income tax, depreciation, amortization, stock-based compensation expense, change in fair value of derivative asset, impairment of financial assets, unrealized gains/losses, share of net loss of equity method investments, loss on deconsolidation and certain non-recurring expenses. We believe that adjusted EBITDA is useful to investors in comparing our performance across reporting periods on a consistent basis where one-time, or non-recurring gains or losses or expenses unrelated to operating activities would otherwise mask the Company's operating performance.

|  | For the Three-Months ended September 30, | | For the Nine-Months ended September 30, | |
|---|---|---|---|---|
| **Reconciliation of non-GAAP adjusted EBITDA:** | **2024** | **2023** | **2024** | **2023** |
| Net loss: | $ (12,227,738) | $ (19,330,718) | $ (41,815,716) | $ (48,361,138) |
| Impairment of financial assets | - | 1,837,063 | - | 1,837,063 |
| Share of net loss of equity method investments | - | - | - | 36,356 |
| Depreciation and amortization | 3,607,848 | 11,875,618 | 16,211,516 | 28,627,896 |
| Stock based compensation | 5,320,823 | 3,784,316 | 11,275,554 | 5,475,935 |
| Unrealized and realized losses/(gain) | 352,375 | 600,619 | 474,210 | 1,416,000 |
| Other non-operating income | (119,526) | - | (309,209) | (245,694) |
| Other non-operating expenses | 1,245,162 | 673,530 | 2,318,950 | 2,287,397 |
| Loss on deconsolidation | - | - | 12,444,097 | - |
| Change in fair value of derivative asset | 789,146 | 520,838 | 878,096 | 6,646,363 |
| Income tax | (648,857) | - | 1,044,475 | 2,304,454 |
| **EBITDA (non-GAAP)** | **$ (1,680,767)** | **$ (38,734)** | **$ 2,521,973** | **$ (24,632)** |

**Critical accounting estimates**

The preparation of the financial statements in conformity with GAAP requires management to make estimates, judgments and assumptions that affect the amounts reported in the financial statements and accompanying notes. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements, and the reported amounts of income and expenses during the reporting periods. Actual results could differ from those estimates. There have been no material changes to our critical accounting policies and estimates as set forth in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, included in our Annual Report on Form 10-K for the year ended December 31, 2023.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

As a smaller reporting company, the Company has elected not to provide the disclosure required by this item.

**Item 4. Controls and Procedures**

***Evaluation of disclosure controls and procedures***

Our Board of Directors, the Board Committee(s), and management team, including our Chief Executive Officer and President (principal executive officer) and Chief Financial Officer (principal financial officer), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a- 15(e)) and 15d- 15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report. Our Board of Directors and management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost benefit relationship of possible controls and procedures. Based on this evaluation, our Chief Executive Officer and President and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2024, including the material weaknesses in our internal control over financial reporting described below. Management's assessment of the effectiveness of our disclosure controls and procedures is expressed at a level of reasonable assurance because management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

Whilst remediation actions are ongoing and controls have been implemented across multiple business processes, the material weaknesses in our internal control over financial reporting and information technology will not be considered remediated, until controls have operated for a sufficient period of time and have been tested for and concluded to be operating effectively. As operating effectiveness testing has not been concluded as of the date of this report, we continue to disclose the following material weaknesses.

***Significant Reliance on Certain Individuals.*** There is inadequate segregation of duties in place related to our financial reporting and other review and oversight procedures due to the lack of sufficient accounting and other personnel. This is not inconsistent with similar sized organizations. This gives rise to the risk of lack of ability to react in a timely manner to operations issues and to fully meet the requirements of the SEC, GAAP, and the Sarbanes-Oxley Act of 2002. In addition, this poses the risk that compliance and other reporting obligations are not dealt with in an adequate manner.

*Controls over the financial statement close and reporting process.* Controls were not adequately designed or implemented in the financial statement close and reporting process. This includes controls related to complex and judgmental accounting transactions including business acquisitions and divestures, derivatives, manual journal entries, account reconciliations and financial statement policies and disclosures.

*Information and Technology Controls.* There are control deficiencies related to information technology ("IT") general controls that in the aggregate constitute a material weakness. Deficiencies identified include lack of controls over access to programs and data, program changes, program development and general IT controls.

*Data from third parties.* The Company does not have the resources and personnel to fully execute its designed controls to ensure that data received from third parties was validated, complete and accurate. Such data is relied on by the Company in determining amounts pertaining to mining and digital colocation revenue, net energy benefits, and digital asset assets.

*Fixed asset verification.* The Company does not have the resources and personnel to fully execute its designed controls around physical asset verification. Together with system limitations, restricting tracking of fixed asset movements, there is a risk around the existence of fixed assets.

Notwithstanding the identified material weaknesses and management's assessment that our disclosure controls and procedures were not effective as of September 30, 2024, management believes that the consolidated condensed financial statements included in this Quarterly Report on Form 10-Q fairly present, in all material respects, our financial condition, results of operations and cash flows as of and for the periods presented in accordance with generally accepted accounting principles. We rely on the assistance of outside advisors with expertise in these matters in preparing the financial statements.

**Remediation**

Our Board of Directors and management take internal control over financial reporting and the integrity of our financial statements seriously. Our management continues to work to find ways to improve its controls related to our material weaknesses. With the oversight of the Board of Directors, the Board Committee(s), and management, the Company plans to continue to progress the remediation of the underlying causes of the identified material weaknesses, primarily through the performance of a risk assessment process; the development and implementation of formal, documented policies and procedures, improved processes and control activities (including an assessment of the segregation of duties); as well as the hiring of additional finance and other personnel for specific roles including financial reporting.

Whilst controls have been implemented across all business processes and are operating, the material weaknesses in our internal control over financial reporting and information technology will not be considered remediated until controls have operated for a sufficient period of time and have been tested for and concluded on for effectiveness. As operating effectiveness testing has not been concluded as of the date of this report, we continue to disclose the material weaknesses.

Remediation efforts for upcoming quarters will be focused on progressing the implementation of the remainder of controls, refining existing controls and validating the effectiveness of implemented controls using criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control. We cannot provide any assurance that our remediation efforts will be successful or that our internal control over financial reporting and other business processes will be effective as a result of these efforts. In addition, as we continue to evaluate and work to improve our internal control over financial reporting related to the identified material weaknesses, management may determine to take additional measures to address control deficiencies or determine to modify or update the remediation plan described above.

*Changes in internal control over financial reporting*

Except for the remedial measures described above, there have been no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) or 15d-15(f) of the Exchange Act) that occurred during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Limitations on Effectiveness of Controls and Procedures and Internal Control over Financial Reporting**

In designing and evaluating the disclosure controls and procedures and internal control over financial reporting, the Board of Directors, Board Committee(s), and management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures and internal control over financial reporting must reflect the fact that there are resource constraints, and that the Board of Directors, Board Committee(s), and management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

# PART II. OTHER INFORMATION

**Item 1. Legal Proceedings**

The Company, and some of its subsidiaries or entities including Australian entities, are currently in disputes, as outlined below. These disputes may be in or may lead to litigation.

On January 8, 2024, a commercial demand was made by an Australian entity Flynt ICS Pty Ltd to the Company's subsidiary and an Australian entity, MIG No. 1 Pty Ltd, for $0.13 million, for alleged claimed sums due under a service agreement. As determined by the Audit Committee's investigation into Mr. James Manning, Flynt ICS Pty Ltd is a party related to Mr. James Manning, a former board director and executive of the Company. The Audit Committee's investigation concluded that Mr. Manning had not disclosed such related party transactions to the Company, and Mr. Manning has not cooperated with the Company on its investigation. On March 19, 2024, MIG No.1 Pty Ltd was placed into an Australian court appointed liquidation and wind-up process. The Company has ongoing concerns about Flynt ICS Pty Ltd and James Manning being related parties and lack of disclosure by Flynt ICS Pty Ltd and James Manning amongst other concerns. Flynt ICS Pty Ltd and Mr. Manning have not responded to the Company's concerns in a manner satisfactory to the Company.

On April 19, 2024, a civil suit entitled "Blockware Solutions, LLC v. Mawson Bellefonte LLC and Mawson Infrastructure Group, Inc." was filed in the US District Court, Southern District of New York under Civil Action No. 1:24-cv-02976. The parties have elected to enter the court's Mediation Program. The matter is ongoing and the mediation hearing date is currently pending finalization.

On July 16, 2024, the Company filed a civil lawsuit for its claims against CleanSpark, Inc and CSRE with the United States District Court for the Southern District of New York in the matter entitled, "Mawson Infrastructure Group, Inc. and Luna Squares, LLC v. CleanSpark, Inc. and CSRE Properties Sandersville, LLC" under Civil Action Number 1:24-cv-5379 for claims and payments due to the Company in excess of $2.00 million (the "CleanSpark Litigation"). The matter is proceeding through the court system. On September 13, 2024, CleanSpark filed a motion to dismiss. On October 18, 2024, the Company filed a brief in opposition. CleanSpark is due to file a reply motion by November 8, 2024.

On July 18, 2024, Celsius Network, LLC filed for arbitration of its claims against the Company with the American Arbitration Association in the matter entitled, "Celsius Network Ltd., Celsius Mining LLC and Ionic Digital Mining LLC v. Mawson Infrastructure Group, Luna Squares LLC and Cosmos Infrastructure LLC - Case 01-24-0006-4462". For more details on this dispute, please see the Celsius Collocation Agreement Dispute found in Part I. Financial Information, Item 1. Financial Statements, contained in this Form 10-Q and made part here of and incorporated herein by reference.

On October 3, 2024, a proceeding before the Federal Court of Australia, New South Wales entitled "In The Matter Of Mawson Infrastructure Group Inc. (ARBN 649 261 861)", File No. NSD1395/2024" was filed by W Capital against the Company, seeking a hearing on November 29, 2024 regarding its claims related to the Company's solvency under Australian law. Marshall Investments GCP Pty Ltd gave formal notice that it intends to appear before the court. The current proceeding is in Australian courts and there are no associated proceedings in the United States. The Company believes that W Capital and Marshall are using this proceeding in Australia as a bad faith attempt to gain leverage in ongoing legal disputes between the companies. For further information, please reference the Marshall and W Capital Australian Loan Disputes found in Part I. Financial Information, Item 1. Financial Statements, made part here of and incorporated herein by reference.

On October 17, the Company filed a complaint (No. 2024-2332) in The Court of Common Pleas of Mercer County, PA, against Vertua Property, Inc. as landlord for the Company's Sharon, PA property for breach of the lease agreement and wrongful termination, as well as for tortious interference with a business relationship, seeking reinstatement of the lease, compensatory damages, disgorgement of revenue, and exemplary and punitive damages, as well as reimbursement for Plaintiffs' costs and expenses including attorneys' fees and costs of suit.

The Company and its subsidiaries have been in the past, and from time to time in the future may be involved in certain litigation related to our businesses. For example, the Company and its subsidiaries receive letters of demand for payments or other correspondence from time to time which could lead to legal proceedings.

41

**Item 1A. Risk Factors**

The Company's risk factors were disclosed in (i) Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2023, which was filed on April 1, 2024 and (ii) as disclosed in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2024, which was filed on May 15, 2024, and (iii) as disclosed in our 8-K filing on March 29, 2024. In addition, the Company is subject to risks related to:

The Company's expansion into the Artificial Intelligence ("AI") and High-Performance Computing ("HPC") markets. While the Company does not run AI and HPC workloads for its own purposes, it offers infrastructure for potential customers. As such, the Company may be indirectly exposed to risks in the AI and HPC space, including:

- Regulatory Uncertainty. Many countries have not yet established comprehensive AI regulations, creating uncertainty that can impact future development, deployment, and compliance costs.

- Compliance with Privacy Laws. AI companies must address compliance with data protection regulations, such as the EU's General Data Protection Regulation (GDPR) and the California Consumer Privacy Act (CCPA), as these laws significantly impact AI applications that process personal data.

- Technology and Data Dependencies. There is a risk of dependency on vast datasets for training AI models and obtaining quality data could become more difficult due to legal restrictions or competitive factors.

- Cybersecurity. AI systems, like all other IT systems, are vulnerable to cyber-attacks, data breaches, intellectual property theft, and malicious manipulation of AI models.

- Litigation and Intellectual Property. Intellectual property disputes over algorithms, AI models, and proprietary datasets are common concerns. Legal challenges or patent disputes could negatively impact AI companies' operations.

- Reputational Risks. Public trust in AI is in flux and could be undermined by high-profile failures, ethical concerns, or regulatory sanctions. This could affect consumer adoption and AI companies' images and reputations.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

None

**Item 3. Defaults Upon Senior Securities**

Celsius Mining LLC loaned $20.00 million to Luna Squares LLC, through a Secured Promissory Note (the "Celsius Promissory Note"), which had a maturity date of August 23, 2023, and a total outstanding balance as of September 30, 2024, of $9.38 million. Luna Squares LLC has not repaid the loan as required on the maturity date and is claimed by Celsius to be in default. Celsius Mining LLC transferred to benefit of the Celsius Promissory Note to Celsius Network Ltd. Celsius Network Ltd has notified Luna Squares the default interest is payable. On November 23, 2023, Celsius filed an adversary proceeding against Mawson, its subsidiaries Luna Squares LLC and Cosmos Infrastructure LLC, asserting various claims related to the alleged breach of a Digital Colocation Agreement. The Company is pursuing counter claims against Celsius. For more details on this dispute, please see the Celsius Collocation Agreement Dispute found in Part I.Financial Information, Item 1. Financial Statements, contained in this Form 10-Q and made part here of and incorporated herein by reference.

The Company has a Secured Loan Facility Agreement with Marshall Investments GCP Pty Ltd ATF for the Marshall Investments MIG Trust ("Marshall"). The loan matured in February 2024 and the total outstanding balance is $10.53 million as of September 30, 2024. MIG No. 1 Pty Ltd, an Australian entity, has not made a principal and interest payment since May 2023, despite such payments falling due, and is therefore in default. MIG No. 1 Pty Ltd is also in default of a number of other covenants under the terms of the loan. On March 19, 2024, Mig No.1 Pty Ltd was placed into an Australian court appointed liquidation and wind-up process and was deconsolidated for the group from this date.

On March 19, 2024, Marshall appointed receivers and managers in Australia under the terms of their security relating to their secured loan facility. The direct assets that secure this loan include 5,372 miners and 8 modular data centers ("MDCs"), these assets are held by the MIG No.1 and therefore were included in the deconsolidation. The receiver's statutory duty includes the obligation to sell the secured assets at market value or, if market value is not known, at the best price reasonably obtainable to maximize the prospects of there being sufficient proceeds available to satisfy the balance of the outstanding secured debt. It is therefore expected that this loan balance will be offset in the future by the amount received from the sale of these miners and MDCs. On June 25, Marshall inspected and inventoried the miners and MDCs located at the Company's Midland facilities. The company is currently not utilizing these miners or MDCs for its operations and has asked Marshall to take these assets out of the Company's storage. Marshall has not responded to the Company's ask for these miners and MDCs to be removed from the Company's storage. The Company also reserves and retains all rights against Marshall.

The Company is the guarantor of a Secured Loan Facility Agreement for working capital by Mawson Infrastructure Group Pty Ltd with W Capital Advisors Pty Ltd. As of September 30, 2024, AUD $1.95 million (USD $1.35 million) has been drawn down from this facility. The Secured Loan Facility expired in March 2023 and the Company did not extend the maturity date, and has not repaid the loan amount, and is therefore in default. This Secured Loan Facility Agreement was originally with Mawson Infrastructure Group Pty Ltd, an Australian entity which was placed into voluntary administration under Australian law on October 30, 2023 and on November 3, 2023, W Capital Advisors appointed receivers and managers in Australia under the terms of their security relating to their working capital facility.

The Company has a Secured Convertible Promissory Note with W Capital Advisors Pty Ltd with an outstanding balance of $0.11 million as of September 30, 2024. The Convertible Note matured in July 2023. W Capital Advisors did not convert the note, and the Company has repaid the principal balance of the note Convertible Note, however there is outstanding interest claimed which is claimed by W Capital Advisors Pty Ltd to be in default. On January 3, 2024, W Capital put Mawson on notice of its intent to collect what it asserts are past due amounts for the following claims as of December 31, 2023: (a) principal and interest payable on the Loan Amount advanced to Mawson under a variation deed, amounting to $1.30 million (AUD $1.90 million); (b) the principal amount advanced under convertible note, amounting to $0.50 million; and (c) interest payable on the principal amount advanced under a convertible note, amounting to $0.07 million. W Capital is also claiming issuance of an alleged 1,500,000 shares of the Company. The Company paid W Capital $0.50 million on March 6, 2024.

On May 31, 2024, W Capital obtained a judgment from the Australian court awarding it a money judgment for USD $0.17 million as unpaid interest under the convertible note after the Company paid in full the principal of $0.50 million, and AUD $0.30 million under a loan deed. On June 12, 2024, W Capital issued a statutory demand under Australian Law to the Company seeking USD $0.17 million as unpaid interest under a convertible note after the Company paid in full the principal of $0.50 million, and AUD $0.30 million under a loan deed. The Company rejected this demand. Subsequently, on October 3, 2024, a proceeding before the Federal Court of Australia, New South Wales was filed by W Capital against the Company, seeking a hearing on November 29, 2024 regarding its claims related to the Company's solvency under Australian law. The current proceeding is in Australian courts and there are no associated proceedings in the United States. The Company believes that W Capital and Marshall are using this proceeding in Australia as a bad faith attempt to gain leverage in ongoing legal disputes between the parties. For further information, please reference the Marshall and W Capital Australian Loan Disputes found in Part I.Financial Information, Item 1. Financial Statements, made part here of and incorporated herein by reference.

The Company, or its subsidiaries, have not fulfilled specific payment obligations related to the Celsius Promissory Note, Marshall loan, the W Capital Working Capital Loan and Secured Convertible Promissory Note mentioned above. Consequently, the creditors associated with these debt facilities may initiate actions as allowed by relevant grace periods. This includes the possibility of opting to expedite the repayment of the principal debt, pursuing legal action against the Company for payment default, raising interest rates to the default or overdue rate, or taking appropriate measures concerning collateral (including appointing a receiver), if applicable. The company reserves and retains all its rights under all applicable laws.

## Item 4. Mine Safety Disclosures

Not applicable.

## Item 5. Other Information

During the fiscal quarter ended September 30, 2024, no director or officer (as defined in Rule 16a-1(f) promulgated under the Exchange Act) of the Company adopted or terminated any (i) "Rule 10b5-1 trading arrangement" as defined in Regulation S-K § 229.408(a)(1)(i), or (ii) "non-Rule 10b5-1 trading arrangement" as defined in Regulation S-K § 229.408(c).

**Item 6. Exhibits**

| 3.1 | Certificate of Incorporation (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on April 5, 2012) |
|---|---|
| 3.2 | Certificate of Amendment to Certificate of Incorporation (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on July 18, 2013) |
| 3.3 | Certificate of Amendment to Certificate of Incorporation dated November 15, 2017 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on November 21, 2017) |
| 3.4 | Certificate of Amendment to Certificate of Incorporation dated March 1, 2018 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on March 5, 2018) |
| 3.5 | Certificate of Amendment to Certificate of Incorporation dated March 17, 2021 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on March 23, 2021) |
| 3.6 | Certificate of Amendment to Certificate of Incorporation dated June 9, 2021 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on June 14, 2021) |
| 3.7 | Certificate of Amendment to Certificate of Incorporation dated August 11, 2021 (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on August 16, 2021) |
| 3.8 | Certificate of Amendment to Certificate of Incorporation dated February 6, 2023 |
| 3.9 | Certificate of Registration of a Company of Cosmos Capital Limited ACN 636 458 912 (Incorporated by reference to the Company's Registration Statement on Form S-1 (File No. 333-256947) filed with the SEC on June 9, 2021) |
| 3.10 | Constitution of Cosmos Capital Limited (Incorporated by reference to the Company's Registration Statement on Form S-1 (File No. 333-256947) filed with the SEC on June 9, 2021) |
| 3.11 | Bylaws (Incorporated by reference to Company's Current Report on Form 8-K filed with the SEC on May 10, 2013) |
| 4.1 | Form of Common Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 8, 2023) |
| 4.2 | Form of Pre-Funded Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 8, 2023) |
| 4.3 | Form of Placement Agent Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 8, 2023) |
| 4.4 | Form of Warrant Amendment Agreement dated May 3, 2023 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 8, 2023) |
| 4.5# | Form Of Stock Option Grant Notice And Option Agreement Under Company's 2024 Omnibus Equity Incentive Plan |
| 10.1 | Customer Service Provider Agreement, dated August 9, 2024, between the Company and BE Global Development Limited (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on August 12, 2024). |
| 10.2 | Lease Amendment between the Company and Jewel Acquisition, LLC dated September 9, 2024, (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on September 11, 2024). |
| 10.3 | Marketing Service Agreement Letter by and between the Company and Outside the Box Capital, Inc., dated September 11, 2024, (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on September 11, 2024). |
| 31.1* | Certification of Principal Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32** | Certifications of Principal Executive Officer and Principal Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101 | The following materials from the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2024, formatted in Inline XBRL (eXtensible Business Reporting Language) includes: (i) Consolidated Balance Sheets as of September 30, 2024 and December 31, 2023, (ii) Consolidated Statements of Operations for the three and nine-months ended September 30, 2024 and 2023, (iii) Consolidated Statements of Comprehensive Loss for the three and nine-months ended September 30, 2024, and 2023, (iv) Consolidated Statements of Cash Flows for the nine-months ended September 30, 2024 and 2023, (v) Consolidated Statements of Stockholders' Equity for the three and nine-months ended September 30, 2024 and 2023, and (vi) Notes to Consolidated Financial Statements |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

* Filed herewith.

** Furnished herewith.

# Indicates management contract or compensatory plan

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<table>
<tr><td></td><td></td><td colspan="2">**Mawson Infrastructure Group Inc.**</td></tr>
<tr><td>Date: November 14, 2024</td><td></td><td>By:</td><td>/s/ Rahul Mewawalla</td></tr>
<tr><td></td><td></td><td></td><td>**Rahul Mewawalla**<br>**Chief Executive Officer and President**<br>(Principal Executive Officer)</td></tr>
<tr><td>Date: November 14, 2024</td><td></td><td>By:</td><td>/s/ William Harrison</td></tr>
<tr><td></td><td></td><td></td><td>**William Harrison**<br>**Chief Financial Officer**<br>(Principal Financial and Accounting Officer)</td></tr>
</table>

45

**EXHIBIT D**

Michael Sweet, Esq.
Michael R. Herz, Esq.
Isaac M. Hoenig, Esq.
**FOX ROTHSCHILD LLP**
101 Park Avenue, 17th Floor
New York, NY 10178
Telephone: (212) 878-7900
Facsimile: (212) 692-0940

Martin R. Martos, II (admitted *pro hac vice*)
**FOX ROTHSCHILD LLP**
321 N. Clark St., Suite 1600
Chicago, IL 60654
Telephone: (312) 517-9200
Facsimile: (312) 517-9201

*Attorneys for the Mawson Entities*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>                     Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |
| CELSIUS MINING LLC<br><br>                     Plaintiff,<br>v.<br><br>MAWSON INFRASTRUCTURE GROUP INC.,<br>LUNA SQUARES LLC, and COSMOS<br>INFRASTRUCTURE LLC;[2]<br><br>                     Defendants. | Adv. No. 23-01202 (MG) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL**
**ARBITRATION AND DISMISS OR STAY ADVERSARY PROCEEDING**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] The Defendants Mawson Infrastructure Group Inc., Luna Squares LLC, and Cosmos Infrastructure LLC shall be referred to hereinafter as the "Mawson Entities."

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   BACKGROUND ..................................................................................................... 2

    A.    Celsius and Luna Enter the Co-Location Agreement and Promissory Note. ......... 2

    B.    Celsius Fails to Make Payments Under the Co-Location Agreement. ................... 3

    C.    Celsius "Pauses" Its Deployed Miners and the Deployment of New Miners. ................................................................................................................ 5

    D.    Celsius Prematurely Exits Georgia to Avoid Taxes. ............................................... 5

    E.    Celsius Refuses to Deliver Nearly 10,000 Miners. ................................................. 6

    F.    The Arbitration Clause. ............................................................................................ 7

    G.    The Complaint in this Adversary Proceeding. ......................................................... 8

III.  ARGUMENT .......................................................................................................... 8

    A.    The Federal Arbitration Act Requires Arbitration Here. ........................................ 9

    B.    Nothing in the Bankruptcy Code Requires a Different Result. ............................. 10

         (i)    Celsius Agreed to Arbitrate ..................................................................... 10

         (ii)   The Dispute Falls Within the Arbitration Clause and the Parties Delegated Questions of Arbitrability to the Arbitrator ............................ 11

               (1)    Disputes over Arbitrability Are Delegated to the Arbitrator. ....... 11

               (2)    Even if Disputes over Arbitrability Are Not Delegated, Celsius's Claims Fall Under the Arbitration Provision. ............... 12

         (iii)  Celsius's Claims are Non-Core and Must be Arbitrated. ......................... 15

               (1)    Declaratory Judgment Claim (Count One) ................................... 15

               (2)    "Turnover" Claims (Count Two and Count Three) ..................... 16

               (3)    State Law Claims (Count Four Through Count Ten) .................. 18

         (iv)  The Court Should Dismiss or Stay this Case Pending Arbitration. .......... 19

IV.  DEFENDANTS MAY NOT ANSWER OR FILE RULE 12 MOTIONS PENDING THIS MOTION ................................................................................................... 23

V.    CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acolyte Elec. Corp. v. City of New York*,
    69 B.R. 155 (Bankr. E.D.N.Y. 1986) ................................................................17

*In re Asousa Partnership*,
    264 B.R. 376 (Bankr. E.D. Pa. 2001) .................................................................17

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ...........................................................................................9

*In re Barney's, Inc.*
    206 B.R. 336 (S.D.N.Y. 1997) ..........................................................................23

*Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*,
    390 B.R. 784 (Bankr. S.D.N.Y. 2008) ..............................................................10

*In re Cardali*,
    2010 WL 4791801 (Bankr. S.D.N.Y. Nov. 18, 2010) .......................................16

*In re Charter Co.*,
    913 F.2d 1575 (11th Cir. 1990) ........................................................................16

*CompuCredit Corp. v. Greenwood*,
    565 U.S. 95 (2012) .............................................................................................9

*Contec Corp. v. Remote Solution, Co., Ltd.*,
    398 F.3d 205 (2d Cir. 2005) ..............................................................................13

*In re Crysen/Montenay Energy Co.*,
    1999 WL 681487 (S.D.N.Y. Aug. 31, 1999) ....................................................10

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*
    6 F.4th 308 (2d Cir. 2021) ...........................................................................12, 13

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) ..........................................................................................10

*In re Durr Mechanical Construction, Inc.*,
    2021 WL 2460976 (Bankr. S.D.N.Y. Jun. 16, 2021) ...........................18, 20, 22

*Eagle Force Holdings, LLC v. Campbell*,
    187 A.3d 1209 (Del. 2018) ...............................................................................11

*eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. CV 7471-VCP,
    2013 WL 5621678 (Del. Ch. Sept. 30, 2013) ............................................................................4

*In re Enron Corp.*,
    2002 WL 32155353 (Bankr. S.D.N.Y. Mar. 19, 2002) ........................................................19

*Galanova v. Morgan Stanley Servs. Grp. Inc.*,
    2023 WL 6198823 (S.D.N.Y. Sept. 22, 2023)...............................................................12, 23

*Genesco, Inc. v. T Kakiuchi & Co., Ltd*,
    815 F.2d 840 (2d Cir. 1987)..................................................................................................20

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991)................................................................................................................19

*Gordon v. New York Times Emps. Fed. Credit Union*,
    2001 WL 1142174 (S.D.N.Y. Sept. 26, 2001).......................................................................8

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010)........................................................................................................10, 13

*In re Hagerstown Fiber Ltd. P'ship*,
    277 B.R. 181 (Bankr. S.D.N.Y. 2002)......................................................................... *passim*

*Hechinger Inv. Co. of Del., Inc. v. Allfirst Bank (In re Hechinger Inv. Co., of Del.,*
    *Inc.)*,
    282 B.R. 149 (Bankr. D. Del. 2002) ....................................................................................17

*Heller Ehrman LLP v. Gregory Canyon LTD (In re Heller Ehrman LLP)*,
    461 B.R. 606 (Bankr. N.D. Cal. 2011) ................................................................................16

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S. Ct. 524 (2019)......................................................................................................11, 12

*In re Johnson*,
    215 B.R. 381 (Bankr. N.D. Ill. 1997) ..................................................................................17

*JS Barkats, PLLC v. BE, Inc.*,
    2013 WL 444919 (S.D.N.Y Feb. 6, 2013)...........................................................................23

*Katsoris v. WME IMG, LLC*,
    237 F. Supp. 3d 92 (S.D.N.Y. 2017)..............................................................................20, 22

*Lamkin v. Morinda Properties Weight Parcel*,
    440 F. App'x 604 (10th Cir. 2011) .......................................................................................23

*Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*,
   67 F.4th 107 (2d Cir. 2023) ............................................................................12, 13, 14

*Maritima de Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*,
   2011 WL 1465744 (S.D.N.Y. Apr. 15, 2011)..............................................20, 21, 22

*MBNA Am. Bank, N.A. v. Hill*,
   436 F.3d 104 (2d Cir. 2006)......................................................................................15, 17

*Messer v. TX Onshore, LLC* (*In re Madison Williams and Co., LLC*),
   509 B.R. 791 (Bankr. S.D.N.Y. 2014) .......................................................................16

*MF Glob. Holdings Ltd,* 571 B.R. 80, 89 (Bankr. S.D.N.Y. 2017) .........................................10, 19

*In re Mobilactive Media, LLC*,
   2013 WL 297950 (Del. Ch. Jan. 25, 2013) ...............................................................21

*Morgan v. Sundance, Inc.*,
   596 U.S. 411 (2022)..................................................................................................23

*In re N. Parent, Inc.*,
   221 B.R. 609 (Bankr. D. Mass. 1998) .....................................................................17

*NASDAQ OMX Group, Inc. v. UBS Securities LLC*,
   770 F.3d 1010 (2d Cir. 2014).....................................................................................13

*In re Olympus Healthcare Group, Inc.*,
   352 B.R. 603 (Bankr. D. Del. 2006)..........................................................................17

*In re Purdue Pharma, L.P.*,
   2021 WL 5178698 (S.D.N.Y. Nov. 8, 2021) .............................................................15

*Reid v. Tandym Group, LLC*,
   --- F. Supp. 3d ---, 2023 WL 6389131 (S.D.N.Y. Sep. 29, 2023) ...........................13

*In re S.W. Bach & Co.*,
   425 B.R. 78 (Bankr. S.D.N.Y. 2010) ........................................................................14

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
   322 F.3d 115 (2d Cir. 2003)......................................................................................10

*Shubert v. Stranahan (In re Pa. Gear Corp.)*,
   2008 WL 2370169 (Bankr. E.D. Pa. April 22, 2008) ...............................................17

*In re Singer Co. N.V.*,
   2001 WL 984678 (S.D.N.Y. Aug. 27, 2001).............................................................16

*In re Try the World, Inc.*,
   2021 WL 3502607 (Bankr. S.D.N.Y. 2021) ........................................................14, 15, 18

*In re Try the World, Inc.*,
   2021 WL 35057 ...........................................................................................................14

*In re U.S. Lines, Inc.*,
   197 F.3d 631 (2d Cir. 1999)..........................................................................................15

*United States v. Inslaw*,
   932 F.2d 1467 (D.C. Cir. 1991) ....................................................................................17

*Weiner's Inc. v. T.G. & Y. Stores Co.*
   (S.D.N.Y. 1996)............................................................................................................16

*In re Weinstock*,
   1999 WL 342764 (E.D. Pa. 1999) .................................................................................17

*Wells Fargo Advisors, LLC v. Sappington*,
   884 F.3d 392 (2d Cir. 2018)..........................................................................................13

*In re Winimo Realty Corp.*,
   270 B.R. 108 (S.D.N.Y. 2001).......................................................................................16

*In re Winstar Communications, Inc.*,
   335 B.R. 556 (Bankr. D. Del. 2005) ............................................................................17

## Statutes

9 U.S.C. § 2 ...........................................................................................................................9

9 U.S.C. § 3 ...............................................................................................................4, 19, 20

9 U.S.C. § 4 ......................................................................................................................8, 9

28 U.S.C. § 157 ...................................................................................................................19

11 U.S.C. § 542 ......................................................................................................... *passim*

## Other Authorities

Fed. R. Civ. P. 7....................................................................................................... 11, 12

Fed. R. Civ. P. 12..........................................................................................................23

23 Williston on Contracts § 63:16 (4th ed.)....................................................................3

## I.      **INTRODUCTION**

Celsius Mining LLC stopped paying bills and began breaching contracts with commercial partners—including the Co-Location Agreement that forms the basis of this adversary action—long before it filed for bankruptcy. Celsius continued the behavior post-petition. But Celsius did not reject the Co-Location Agreement. Celsius instead incurred new, post-petition breaches by refusing to pay invoices and failing to deliver additional Bitcoin miners to the Mawson Entities. All told, Celsius continued to benefit from operating its miners post-petition at the Mawson Entities' facilities, while failing to pay the Mawson Entities millions of dollars.

Desperate to avoid the natural financial consequences of its own breaches, Celsius now seeks to recast history by blaming the Mawson Entities. Celsius's claims lack merit and would not survive judicial scrutiny. But this action cannot proceed for a more fundamental reason: Celsius "irrevocably and unconditionally" agreed that "any dispute of any nature" "relating in any way" to the Co-Location Agreement "shall be finally settled by arbitration." Those contractual provisions resolve this Motion.

That Celsius disregarded unambiguous arbitration provisions to file this adversary action is unsurprising given the breach of its payment and other contractual obligations. Nonetheless, the arbitration provisions in the Co-Location Agreement are binding, valid, and enforceable. There is no credible dispute that Celsius's claims—and the Mawson Entities' corresponding defenses and counterclaims—fall within the broad scope of those arbitration provisions. And any dispute over the scope of those provisions is subject to arbitration all the same.

Nothing in the Bankruptcy Code requires a different result. All claims in this adversary proceeding are retained causes of action derived from contract disputes—overwhelmingly non-core matters, unrelated to the Bankruptcy Code's main concerns. Despite the window dressing, Celsius's so-called Section 542 claims are just disputed contract claims for which Luna has valid

1

counterclaims and defenses based on breaches committed by Celsius—among other defenses. Such claims must be arbitrated because disputed contracts do not constitute core turnover claims. There is no conflict between the FAA and the Bankruptcy Code. Arbitration is required.

Bluntly, Celsius has no tenable basis for disavowing the arbitration provisions in the Co-Location Agreement. The Court should compel Celsius to arbitrate its claims and should dismiss this adversary proceeding or, in the alternative, stay this proceeding pending arbitration.

## II.    BACKGROUND

### A.  Celsius and Luna Enter the Co-Location Agreement and Promissory Note.

The Mawson Entities provide services to customers like Celsius who require hosting capacity for Bitcoin mining devices.[3] Declaration of Timothy Broadfoot ¶ 2. On February 23, 2022, Celsius and Luna entered into a Co-Location Agreement. Broadfoot Decl. ¶ 3; Compl. ¶ 12, Ex. A. Pursuant to the Co-Location Agreement, Celsius agreed that a total of 30,000 miners would be deployed over roughly a one-year time span. Broadfoot Decl. ¶ 4; Compl. ¶ 13. The Co-Location Agreement also required Celsius to make an up-front deposit for those 30,000 miners and monthly payments at a rate tied to Luna's monthly power costs plus an operating margin. Broadfoot Decl. ¶ 5; Compl. Exs. A (Addendum A), B (revised Addendum A). As set forth in the Broadfoot Decl. and Exhibits annexed thereto, monthly power costs to operate the miners are significant. Plus, the deposit was never intended by either party to be held in "escrow" or to be drawn down against invoices in the normal course, *see generally* Compl. Ex. A.—and the deposit was spent on ramp up and energy costs as the parties expected. Broadfoot Decl. at ¶ 5.

The same day Luna and Celsius signed the Co-Location Agreement (February 23, 2022), Luna signed a Promissory Note under which Celsius loaned Luna $20,000,000. Compl. ¶ 17;

---

[3] Bitcoin mining devices are referred to throughout this Motion as "miners" or "mining rigs."

Broadfoot Decl. ¶ 6. The purpose of the loan was for Luna "to purchase and install modular data centers and transformers to assist Luna with satisfying its obligations under [the Co-Location Agreement]. Compl. ¶ 17; *see* Broadfoot Decl. ¶ 7. In turn, revenues and the deposit Luna received under the Co-Location Agreement would allow Luna to ramp up its facilities and repay the Promissory Note. The Co-Location Agreement and the Promissory Note were thus part of a single package agreed to and negotiated in tandem. Compl. ¶ 17; Broadfoot Decl. ¶ 7. Together, these interrelated agreements provided (a) the terms under which Luna would provide host services to Celsius, (b) the funding needed to build out those services, and (c) the cash-flow needed to repay the Promissory Note. This integrated set of agreements worked as intended—until Celsius breached the Co-Location Agreement.

### B. Celsius Fails to Make Payments Under the Co-Location Agreement.

Just a few months into the relationship, Celsius breached the Co-Location Agreement by failing to make required payments. Section 3.6 of the Co-Location Agreement required Celsius to pay invoices within fifteen days. Compl. Ex. A § 3.6. Under Section 3.7, "all invoices are due upon receipt and become past due fifteen (15) days after the date of the invoice." *Id.* § 3.7. This term was a material term of the Co-Location Agreement. *See* 23 Williston on Contracts § 63:16 (4th ed.) ("It is a material breach [to] fail to pay any substantial amount of the consideration owing under the contract"); Broadfoot Decl. ¶ 8. Thus, Celsius's failure to make millions of dollars in payments for services received constituted a material breach.

In June and July 2022, Celsius failed to pay Luna's invoices. Broadfoot Decl. ¶¶ 9-10. Celsius then asked for a temporary pause on its active miners to avoid incurring additional service costs, as well as a pause on deploying any new miners. *Infra* II.C. But Celsius never cleared its balances from June and July 2022. In other words, Celsius complains that it was unable to add rigs to Luna's facilities during the exact time Celsius was breaching the Co-Location Agreement by

not paying for the rigs it had already delivered—and after it asked for a pause on adding miners.
Nonsense. Due to Celsius's breaches of the Co-Location Agreement, Luna could not run Celsius
rigs or add new rigs to generate revenue regardless of capacity.

Celsius's failure to make required payments continued after the Petition Date. Broadfoot
Decl. ¶¶ 11-14. Celsius failed to pay for services provided during December 2022 and again during
June 2023 through August 2023—when the Co-Location Agreement expired. *Id.* In total, Celsius
failed to pay $6,957,226.91 plus interest on pre-petition and post-petition invoices for services
Luna provided under the Co-Location Agreement. *Id.* ¶ 15. Put simply: Celsius's claim that it
"satisfied all relevant obligations under the Co-Location Agreement," *see, e.g.*, Compl. ¶ 87, is a
farce.

Yet Celsius complains that it was unable to deliver new rigs to Mawson. *Id.* ¶¶ 24-28.
Celsius was not paying for and—as its bankruptcy would prove—could not pay for the miners
Luna had already deployed. *See* Compl. Ex. A § 3. In fact, when asked to deliver the final 10,000
miners required by the Co-Location Agreement in May 2023, Celsius delivered nothing. *Infra* II.E.
By this time, Celsius's breaches of the Co-Location Agreement had caused the intended operation
of the Co-Location Agreement and the Promissory Note to disintegrate.

Because the Mawson Entities continued to house and run Celsius rigs that had been
delivered, they incurred associated electricity costs and lost revenues. Celsius's breaches thus
caused damages that excuse any payments due under the terms of the Promissory Note. Broadfoot
Decl. ¶¶ 8, 18, 23, 25. Put differently, outstanding amounts due under the Promissory Note (if any)
constitute damages caused by Celsius's own breaches of the Co-Location Agreement—which
Luna is entitled to keep as damages or to use as a defense to liability. *Cf. eCommerce Indus., Inc.*

*v. MWA Intel., Inc.*, No. CV 7471-VCP, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013)
(discussing direct and consequential damages from breach).

### C.  Celsius "Pauses" Its Deployed Miners and the Deployment of New Miners.

In 2022, Luna deployed Celsius's rigs at two locations: one site in Sandersville, Georgia,
and another site in Midland Pennsylvania. Broadfoot Decl. ¶ 16. In September 2022, Celsius asked
that the parties enter a "pause agreement" *Id.* ¶ 17. The goal of the Celsius "pause" was to shut
down Celsius's rigs to reduce its power costs and stop the deployment of additional miners. *Id.*
Celsius could not pay its bills and had already breached the Co-Location Agreement through non-
payment. But now, Celsius needed a break from incurring service fees for its deployed miners and
a stop on deploying new rigs—hardly the ready-to-go narrative Celsius fabricates in its adversary
complaint.  With Celsius rigs offline and new deployments paused, the Celsius pause alone cost
Luna and the Mawson Entities millions in post-petition revenue. *Id.* ¶ 18.

### D.  Celsius Prematurely Exits Georgia to Avoid Taxes.

In October 2022, the Mawson Entities sold the Sandersville, Georgia site to a third party.
*Id.* ¶ 19. The Mawson Entities likely would not have sold the Georgia facility absent Celsius's
breaches of the Co-Location Agreement—retaining the fully built-up infrastructure to
accommodate future hosting/mining revenue. *Id.* ¶ 20. Although the Mawson Entities were leaving
Georgia, they arranged for Celsius to keep its miners operating there. *Id.* ¶ 21. Instead of keeping
its miners at the Georgia site, Celsius chose to move its miners to Pennsylvania to avoid state taxes
in Georgia. *Id.* ¶ 22. In an email dated November 23, 2022, Mawson CEO James Manning
informed Celsius Chief Operating Officer Patrick Holert and other Celsius executives that Celsius
miners would be subject to Georgia property taxes if they remained at the Georgia site past
December 31, 2022. *Id.* ¶ 22, Ex. 7. Holert responded on December 1, 2022, to confirm: Celsius
wanted "to move [its] 8,820 rigs at the Sandersville, GA site to the Midland, PA site before the

end of 2022." *Id.* Ex. 7. The move saved Celsius on its state taxes. *Id.* ¶ 22. But by choosing to

prematurely exit the Georgia facility, Celsius reduced its total miner deployment by at least 8,820

rigs—and Luna's related revenues with them. *Id.* ¶ 23. In effect, Celsius chose to take nearly 9,000

of its miners offline to save on taxes—and now wants to blame Mawson for those rigs not running.

Celsius's decision to prematurely leave Georgia, combined with the implementation of the

pause agreement had a significant post-petition monetary impact for the Mawson Entities. *Id.* It

also reset the Mawson Entities' ability to deploy all Celsius rigs scheduled under the Co-Location

Agreement. Because Celsius chose not to take advantage of the Georgia capacity that Luna had

arranged, Celsius further contributed to Luna's losses. Luna's obligations under the Promissory

Note were now further decoupled from the revenues and deployment deposit the parties' Co-

Location Agreement was intended to provide as mechanisms for ramp up and repayment. *See Id.*

¶¶ 22-23.

### E.  Celsius Refuses to Deliver Nearly 10,000 Miners.

Following the Celsius "pause" and Celsius's premature exit from Georgia, Luna still

deployed about 20,000 Celsius rigs. *Id.* ¶ 24. Pursuant to the Co-Location Agreement, Celsius was

required to deliver 30,000 miners to Luna's facilities. *See* Compl. Ex. B (revised Addendum A).

In May 2023, Luna asked Celsius to deliver the remaining approximately 10,000 miners to

Mawson's Midland, Pennsylvania facility. Broadfoot Decl. ¶ 24; *see also* Compl. ¶ 28. Celsius

refused. Broadfoot Decl. ¶ 24. Celsius thus failed to provide the 30,000 rigs it promised. This

additional, post-petition breach by Celsius had a significant adverse monetary impact for Luna and

the Mawson Entities. *Id.* ¶ 25. The Mawson Entities spent millions building the capacity to host

Celsius rigs. *Id.* And they lost millions more compared to what they should have earned if Celsius

had delivered all 30,000 of the required rigs. These losses again constitute damages that reduce

Luna's obligation to make Promissory Note payments or excuse those payments altogether.

### F. The Arbitration Clause.

In the Co-Location Agreement, Celsius agreed to arbitrate "any dispute between the parties in connection with [the Co-Location Agreement], including any question regarding its existence validity or termination." Compl. Ex. A § 12.8. The Co-Location Agreement further provided that the parties agreed to "submit *any dispute of any nature* between the parties *relating in any way to this agreement*" to arbitration. *Id.* (emphasis added) Section 12.8 of the Co-Location Agreement provides in full as follows:

---

**12.8. Governing Law and Venue**

This Agreement and performance of the parties to this Agreement shall be construed and governed according to the internal substantive and procedural laws of the State of Delaware applicable to contracts made and to be fully performed in such state (except any laws of that state that would render such choice of law ineffective). If there is any dispute between the parties in connection with this Agreement, including any question regarding its existence, validity or termination, unless amicably resolved by the parties, such dispute shall be finally settled by arbitration in accordance with the terms set forth hereunder. The parties agree that any such dispute shall be submitted exclusively to arbitration in accordance with the American Arbitration Association (AAA) Rules (the "**Rules**") in effect at the time of submission for arbitration which

Private & Confidential
Luna Squares LLC

Luna Squares LLC
Page 13 of 18

LUNA0001226

Rules are deemed to be incorporated by reference into this clause. The arbitration proceedings shall be conducted in the English language, the number of arbitrators shall be one (1), and the seat, or legal place, of arbitration shall be New York, New York with exclusive jurisdiction over any such dispute. The arbitral award is final and binding on both Parties. Unless the arbitral award is otherwise determined, the arbitration fee shall be borne by the losing party. The losing party shall also compensate the winning party's reasonable legal fees and other expenses. Judgment upon any award rendered may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be..

---

> EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT TO ARBITRATION AS PROVIDED FOR ABOVE AND (B) WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY COURT AND ANY RIGHT OF JURISDICTION ON ACCOUNT OF ITS PLACE OF RESIDENCE OR DOMICILE.

Compl. Ex. A § 12.8. These terms are broad, unambiguous, and irrevocable: Celsius must arbitrate.

### G.  The Complaint in this Adversary Proceeding.

The Co-Location Agreement expired on its own terms in August 2023, without Celsius or any other Debtor rejecting or accepting it as an executory contract.[4] Luna opted out of the Plan releases. Broadfoot Decl. ¶ 26. This adversary action arises solely from retained causes of action—at its core, a contract dispute subject to an unambiguous arbitration clause.[5] Yet contrary to the parties' binding agreement to submit any disputes related in any way to the Co-Location Agreement to binding arbitration, Celsius initiated this adversary action on November 21, 2023. (Adv. Dkt. 1). Celsius served the Mawson Entities on December 1, 2023.

### III.      ARGUMENT

Celsius agreed to arbitrate "any dispute" of "any nature" "relating in any way" to the Co-Location Agreement. The arbitration clause is valid, enforceable, and covers the claims asserted in this adversary proceeding—as well as the Mawson Entities' corresponding defenses and counterclaims. The Bankruptcy Code presents no conflict with the FAA's clear mandate that courts "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

---

[4] The fact that the Co-Location Agreement expired in August 2023, does not affect the enforceability of the arbitration clause. *Gordon v. New York Times Emps. Fed. Credit Union*, 2001 WL 1142174, at *2 (S.D.N.Y. Sept. 26, 2001).

[5] *See Second Plan Supplement* [Dkt. 3273] listing the Mawson Entities as "Excluded Parties" and Celsius's asserted claims against them as among the "Retained Causes of Action."

All the claims in this adversary proceeding, including Celsius's so-called claims for turnover under Section 542 of the Bankruptcy Code, are rooted in a contractual dispute about the Co-Location Agreement (*i.e.*, breaches and effects of alleged breaches thereof as well as the damages and related defenses) and are therefore both non-core and subject to arbitration. Arbitration is mandatory in such circumstances.

Yet even if some of the claims raised in this action were not arbitrable—a decision the parties delegated to an arbitrator—the Mawson Entities' defenses and counterclaims to each cause of action involve the same set of factual and legal questions arising from Celsius's breaches of the Co-Location Agreement. Proceeding on common, interrelated factual and legal issues both here and in arbitration risks inconsistent adjudication and almost guarantees a waste of judicial and party resources. Indeed, the resolution of legal and factual claims related to breaches of the Co-Location Agreement in arbitration will leave nothing for this Court to decide later. Accordingly, the Court should compel Celsius to arbitrate and dismiss this action or, in the alternative, the Court should stay this matter pending the outcome of any arbitration proceeding.

### A. The Federal Arbitration Act Requires Arbitration Here.

The Federal Arbitration Act ("FAA") governs the enforcement of arbitration agreements. Section 2 provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA requires that courts generally "shall" compel arbitration "in accordance with the terms of the agreement" to arbitrate. *Id.* § 4; *see CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012). Together with the rest of the FAA, these provisions codify the "liberal federal policy favoring arbitration," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation omitted). *See also In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181, 204 (Bankr. S.D.N.Y. 2002) (observing the "strong federal policy favoring arbitration."). Under that liberal policy, "any doubts

concerning the scope of arbitral issues should be resolved in favor of arbitration," *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010) (citation omitted).

In short, the FAA "leaves no place for the exercise of discretion." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 221 (1985). It instead requires courts to "rigorously enforce" the terms of written arbitration agreements. *Id.* The written terms of the agreement here are plain: "EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY . . . SUBMITS ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT TO ARBITRATION . . . ." Celsius must arbitrate its claims. Full Stop.

### B. Nothing in the Bankruptcy Code Requires a Different Result.

Courts routinely enforce arbitration clauses in bankruptcy proceedings. *See e.g. In re Crysen/Montenay Energy Co.*, 1999 WL 681487 at *5 (S.D.N.Y. Aug. 31, 1999) (collecting cases and noting that "[b]ankruptcy judges regularly compel arbitration"). Courts, including bankruptcy courts, evaluating a motion to compel arbitration use a four-part test: (i) did the parties agree to arbitrate; (ii) does the dispute fall within the parties' arbitration clause; (iii) if federal statutory claims are raised, did Congress intend those claims to be non-arbitrable; and (iv) if only some claims are arbitrable, should the court stay the non-arbitrable claims pending arbitration. *See MF Glob. Holdings Ltd.*, 571 B.R. 80, 89 (Bankr. S.D.N.Y. 2017) (*citing Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.*), 390 B.R. 784, 789 (Bankr. S.D.N.Y. 2008)). The Mawson Entities address each factor in turn below.

### (i)   *Celsius Agreed to Arbitrate*

Deciding whether there is a valid arbitration agreement is a question of state contract law. *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003). The Co-Location Agreement selects Delaware Law. Compl. Ex. A, § 12.8. A valid contract exists under Delaware law when "(1) the parties intended that the instrument would bind them, demonstrated at least in

10

part by its inclusion of all material terms; (2) these terms are sufficiently definite; and (3) the putative agreement is supported by legal consideration." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018). None of these items is in dispute. Celsius executives signed the Co-Location Agreement. Compl. Ex. A. Celsius does not dispute the validity and legal consideration of the Co-Location Agreement. Compl. ¶ 12. And the parties agreed to arbitrate "any dispute between the parties in connection with [the Co-Location Agreement], including any question regarding its existence validity or termination." Compl. Ex. A § 12.8. Celsius made the election "IRREVOCABLY AND UNCONDITIONALLY." *Id.* Celsius must arbitrate.

> **(ii)**     ***The Dispute Falls Within the Arbitration Clause and the Parties Delegated Questions of Arbitrability to the Arbitrator***

As detailed above and below, this adversary action falls within the broad scope of the arbitration provisions at issue. To the extent Celsius disputes that its claims fall within the scope of the arbitration agreement, the Court must send that dispute to arbitration. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019). ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract.")

> **(1)**     **Disputes over Arbitrability Are Delegated to the Arbitrator.**

When "the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Id*. The AAA Rules expressly empower arbitrators to decide issues of arbitrability. AAA COMMERCIAL ARBITRATION RULE 7(a). Rule 7(a) states that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement *or the arbitrability of any claim or counterclaim, without any need to refer such matters first to court.*" American Arbitration

Association, *Commercial Rules and Mediation Procedures* (Oct. 1, 2013), https://www.adr.org/sites/default/files/CommercialRules_Web-Final.pdf (emphasis added).[6]

While Courts "should not assume that the parties agreed to arbitrate unless there is clear and unmistakable evidence they did so," incorporation of the AAA Rules as part of an arbitration agreement "constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator" *DDK Hotels, LLC v. Williams-Sonoma, Inc.* 6 F.4th 308, 318 (2d Cir. 2021) (internal citations omitted) (collecting cases). Celsius and the Mawson Entities did exactly that: "the American Arbitration Association (AAA) Rules …are deemed to be incorporated by reference to this clause." Compl. Ex. A § 12.8. Thus, even if Celsius disputes whether the arbitration provision covers its claims, questions of arbitrability belong to the arbitrator. *Henry Schein, Inc.* 139 S. Ct. at 528-529.

> **(2)    Even if Disputes over Arbitrability Are Not Delegated, Celsius's Claims Fall Under the Arbitration Provision.**

Disregarding the parties' clear and unmistakable intent to delegate disputes over questions of arbitrability to AAA arbitrators changes nothing. Celsius's claims fall within the broad scope of the arbitration provisions in this case. Courts looking to whether an arbitration agreement covers a particular dispute rely on ordinary principles of contract interpretation. *Galanova v. Morgan Stanley Servs. Grp. Inc.*, 2023 WL 6198823, at *4 (S.D.N.Y. Sept. 22, 2023) (*citing Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 114 (2d Cir. 2023)). Plus, even if "the agreement is 'ambiguous about whether it covers the dispute at

---

[6] The AAA Commercial Arbitration Rules were amended in September 2022, after the Co-Location Agreement was signed. Those revised rules did not alter Rule 7(a). *See The 2022 AAA Commercial Rules and Mediation Procedures Significant Amendments*, American Arbitration Association (Sep. 1, 2022), https://www.adr.org/sites/default/files/document_repository/AAA409_CommRules_Significant_Amendments_Sept2022.pdf

hand', the court may apply a rebuttable 'presumption of arbitrability.'" *Loc. Union 97*, 67 F.4th at 113 (*citing Granite Rock*, 561 U.S. at 301).

There is nothing ambiguous about the arbitration provisions here. Compl. Ex. A § 12.8. Even so, the arbitration provisions are broad—covering "any dispute of any nature" "relating in any way to" the Co-Location Agreement. Compl. Ex. A § 12.8. This clause is unlike the limited clauses in cases where courts have found that incorporation of AAA rules did not designate issues of arbitrability to the arbitrator. *See, e.g.*, *DDK Hotels*, 6 F.4th at 320-21 (arbitration clause applied only to "Disputed Matters" defined as a specific category of disputes for which Board or Member Approval was required); *NASDAQ OMX Group, Inc. v. UBS Securities LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) (arbitration clause applied to disputes "except as may be provided in NASDAQ OMX Requirements"). Instead, the broad language of the arbitration clause in this case coupled with incorporation of the AAA rules expressly delegates questions of arbitrability to the arbitrator. *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 (2d Cir. 2018) (contract incorporating AAA rules and designating "any controversy or dispute arising from employment relationship" for arbitration delegated question of arbitrability to the arbitrator); *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (contract incorporating AAA rules and designating "any controversy arising with respect to this agreement" for arbitration delegated question of arbitrability to the arbitrator"); *Reid v. Tandym Group, LLC*, --- F.Supp.3d ---, 2023 WL 6389131, at *9-10 (S.D.N.Y. Sep. 29, 2023) (same).

As detailed above, Celsius's claims are subject to arbitration because they arise from and are related directly to the Co-Location Agreement. *See, e.g., supra* at IIA-E. Whether as direct claims or as counterclaims and defenses from Celsius's breaches of the Co-Location Agreement— all the claims in this adversary action require the resolution of the same underlying fact and legal

determinations. The alpha and omega of this adversary proceeding is the parties' respective conduct under the Co-Location Agreement and the consequences of that conduct. For instance, Celsius's breach of the Co-Location Agreement caused damages to Luna that prevented or excused Luna from complying with the Promissory Note. Breaches of the Co-Location Agreement are therefore predicates for the breach *vel non* of the Promissory Note—including whether any amounts are due thereunder. As such, Celsius's breaches of the Co-Location Agreement stand as a legal defense (or at least a set off) against any claim for payment under the Promissory Note.

Finally, if the Court were to conclude that that the arbitration provisions here are ambiguous as to any of the claims asserted by Celsius, it must apply a presumption of arbitrability and compel arbitration as to all claims. *See Loc. Union 97*, 67 F.4th at 113; *In re Try the World, Inc.*, 2021 WL 3502607, at *8 (Bankr. S.D.N.Y. 2021) (*citing In re S.W. Bach & Co.*, 425 B.R. 78, 88 (Bankr. S.D.N.Y. 2010)). This presumption applies in the case of any ambiguity here because the parties' arbitration agreement, covering "*any* dispute between the parties *in connection with* [the Co-Location Agreement]" or any dispute *of any nature* between the parties relating *in any way* to the [Co-Location Agreement]" is a classically "broad clause." *See e.g. In re Try the World, Inc.* 2021 WL 35057, at *8 (collecting cases and noting that "in general, courts find that provisions calling for the arbitration of 'any dispute or controversy' that arises out of' or is 'related to' the underlying agreements are broad arbitration clauses").

All claims in this adversary proceeding fit under the broad arbitration provisions in the Co-Location Agreement, through which Celsius agreed to submit to arbitration "any dispute of any nature between the parties relating in any way to [the Co-Location Agreement]." Compl. Ex. A § 12.8. This Court is thus bound by the FAA to give effect to the parties' agreement by dismissing (or staying) this proceeding to compel arbitration.

             **(iii)**    *Celsius's Claims are Non-Core and Must be Arbitrated.*

Nothing in the Bankruptcy Code expressly refers to or displaces the FAA. Even assuming clear "conflict between arbitration and [bankruptcy's] underlying purposes" would displace the FAA, *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006), however, there is no such conflict between bankruptcy and arbitration here. Celsius's claims are classic, non-core claims arising from underlying contract disputes.

When deciding whether to refuse to compel arbitration, bankruptcy courts look to whether a claim is core or non-core. If a matter is non-core, courts must compel arbitration. *Try the World*, 2021 WL 3502607, at *9; *In re Hagerstown Fiber*, 277 B.R. at 203 ("If the dispute is non-core, that will generally end the inquiry. The bankruptcy court will lack the discretion to refuse to compel arbitration"). But "even as to core proceedings, the bankruptcy court will not have discretion to override an arbitration agreement unless it finds that the proceedings are based on provisions of the Bankruptcy Code that 'inherently conflict' with the Arbitration Act or that arbitration of the claim would 'necessarily jeopardize' the objectives of the Bankruptcy Code." *MBNA Am. Bank, N.A.*, 436 F.3d at 108 (*citing In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999)). There is no conflict here.

             **(1)**    **Declaratory Judgment Claim (Count One)**

Celsius seeks a declaration that the Mawson Entities owe approximately $8 million plus interest on the Promissory Note. Compl. ¶¶ 58-66. As detailed above, any amounts purportedly owed under the Promissory Note are subject to the Mawson Entities' counterclaims and defenses related to Celsius's breach of the Co-Location Agreement. Regardless, such declaratory judgment claims related to contract disputes are non-core and must be submitted to arbitration. *In re Purdue Pharma, L.P.*, 2021 WL 5178698, at *4 (S.D.N.Y. Nov. 8, 2021) (adversary proceeding seeking a declaratory judgment as to the parties' rights under a contract was non-core). Similarly, claims

seeking declaratory judgment as to a party's rights under a contract do not present an inherent conflict between Code policy and the FAA and thus must be referred to arbitration. *In re Winimo Realty Corp.*, 270 B.R. 108, 124 (S.D.N.Y. 2001); *In re Singer Co. N.V.*, 2001 WL 984678, at *6 (S.D.N.Y. Aug. 27, 2001).

### (2) "Turnover" Claims (Count Two and Count Three)

In Counts Two and Three, Celsius seeks turnover of amounts purportedly owed under the terms of the Co-Location Agreement and Promissory Note pursuant to 11 U.S.C. § 542. These claims are not turnover claims. Celsius has merely dressed its contract claims as faux "turnover" claims to masquerade as core claims. The Complaint makes clear that Count Two and Count Three arise from alleged contract breaches, *i.e.*, from claims asserted to liquidate disputed debts. Compl. ¶¶67-84. Bankruptcy Courts routinely find turnover claims asserted to liquidate disputed debts owed under a contract are improper. *See In re Cardali*, 2010 WL 4791801 at *8 (Bankr. S.D.N.Y. Nov. 18, 2010) (collecting cases and determining that turnover claim seeking recovery of disputed money did not raise a unique bankruptcy issue posing an impediment to arbitration); *see also Messer v. TX Onshore, LLC (In re Madison Williams and Co., LLC)*, 509 B.R. 791, 799 (Bankr. S.D.N.Y. 2014) (dismissing a turnover claim where defendant disputed plaintiff's right to recover damages under the contract).

Courts often observe that "turnover" implies "ministerial" action, and claims "wholly disputed and unliquidated cannot properly be styled an action to 'turn over' estate property." *Weiner's Inc. v. T.G. & Y. Stores Co.*, (S.D.N.Y. 1996); *see also In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990) ("Turnover proceedings are not to be used to liquidate disputed contract claims."); *Heller Ehrman LLP v. Gregory Canyon LTD (In re Heller Ehrman LLP)*, 461 B.R. 606, 607-08 (Bankr. N.D. Cal. 2011) (holding that an "action to recover an account receivable, for breach of contract, and quantum meruit" is "not an action for turnover of estate property" because"

16

[t]urnover actions involve the return of undisputed funds" rather than a "claim for damages itself, which is not subject to turnover."); *Shubert v. Stranahan (In re Pa. Gear Corp.)*, 2008 WL 2370169, at *4 (Bankr. E.D. Pa. April 22, 2008) ("it is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.") (*quoting United States v. Inslaw*, 932 F.2d 1467, 1472 (D.C. Cir. 1991)). *Hechinger Inv. Co. of Del., Inc. v. Allfirst Bank (In re Hechinger Inv. Co., of Del., Inc.)*, 282 B.R. 149, 162 (Bankr. D. Del. 2002) (observing that turnover under section 542 "is not a remedy available to recover claimed debts which remain unliquidated and/or in dispute."); *In re Asousa Partnership*, 264 B.R. 376, 384 (Bankr. E.D. Pa. 2001) (Turnover "cannot be sued to determine the rights of parties in legitimate contract disputes."); *In re Weinstock*, 1999 WL 342764, at *9 n.14 (E.D. Pa. 1999) ("Turnover under § 542 of the Code 'is not intended as a remedy to determine disputed rights of parties to property.") (*citing In re Johnson*, 215 B.R. 381, 386 (Bankr. N.D. Ill. 1997)); *In re N. Parent, Inc.*, 221 B.R. 609, 626 (Bankr. D. Mass. 1998) (It is "well settled that turnover proceeding pursuant to § 542 are limited to those where liability on the underlying debt is not disputed.").

Notably, "bankruptcy courts do not possess discretion with respect to enforcement of an arbitration clause in a non-core adversary proceeding." *MBNA America Bank, N.A.*, 436 F.3d at 108; *In re Winstar Communications, Inc.*, 335 B.R. 556, 564 (Bankr. D. Del. 2005); *see also In re Olympus Healthcare Group, Inc.*, 352 B.R. 603, 611 (Bankr. D. Del. 2006) (enforcing arbitration clause where turnover claim was a disputed claim "arising from the contract and the alleged breach thereof, and are not properly addressed in the form of a 'turnover' action."). Where amounts owed to debtors are contested, actions cannot be considered turnover actions. *See In re N. Parent, Inc.*, 221 B.R. at 626 (dismissing disputed turnover claim as non-core); *Acolyte Elec. Corp. v. City of New York*, 69 B.R. 155, 172 (Bankr. E.D.N.Y. 1986) (where resolution of an action "involves state

17

law determination of the defendant's liability under the contract it is a step away from a true § 542 turnover proceeding, and, therefore, does not constitute a core proceeding…").

Resolution of Celsius's "turnover" claims requires a decision-maker to determine each parties' disputed rights under the relevant contracts. Before a decision-maker can adjudicate Celsius's turnover claims, therefore, they must evaluate not only Luna's purported breaches of the Co-Location Agreement but also the Mawson Entities' defenses and counterclaims, which arise from Celsius's material breaches of the Co-Location Agreement and which excuse, in whole or in part, Luna's obligations under the Promissory Note. In short, because Celsius's turnover claim is in dispute and merely seeks to liquidate its breach of contract claim, these claims (Count Two and Count Three) are non-core, arbitration poses no "inherent conflict" with the Bankruptcy Code, and arbitration must be compelled. *See, e.g.*, *supra* at 16-17 (listing cases).

Nor is turnover of disputed amounts needed for Debtors to investigate their affairs, provide information about the estate to parties in interest, or otherwise administer the estate. Debtors have confirmed their Chapter 11 Plan, which contemplates that this action will be prosecuted by either by the Debtors, the Litigation Administrator, or the Plan Administrator post-confirmation. (Bankr. Dkt. 3273). Administration of Debtors' Bankruptcy Case thus in no part hinges on resolution of this dispute. *See In re Durr Mechanical Construction, Inc.*, 2021 WL 2460976, at *11 (Bankr. S.D.N.Y. Jun. 16, 2021) (compelling arbitration of contract dispute where Debtors were in process of confirming plan contemplating that action would be pursued post-confirmation).

### (3)     State Law Claims (Count Four Through Count Ten)

Counts Four through Ten allege state law claims (*e.g.*, breach of contract, breach of covenant of good faith and fair dealing, state-law fraudulent transfer, and fraud claims, etc.) that do not derive from the Bankruptcy Code. Compl. ¶¶ 85-141. These are non-core claims, and thus the Court has no discretion to refuse to compel arbitration. *See Try the World, Inc.*, 2021 WL

3502607, at *12 (breach of contract action by a debtor against a party to a pre- petition contract is non-core); *In re Enron Corp.*, 2002 WL 32155353, at *2 (Bankr. S.D.N.Y. Mar. 19, 2002) ("an action based on breach of contract that is brought by a debtor against a party to a pre-petition contract is non-core when its only effect on the administration of the estate is to augment the assets of the estate").

Celsius nonetheless includes a rote assertion that its claims are core because they involve matters "concerning the administration of the estate." Compl. ¶ 10 (citing 28 U.S.C. §§ 157(b)(2)(A)). Celsius is wrong. And no boilerplate recitation can render its catch-all subparts claims core. Rather, "courts in this Circuit routinely recognize that bankruptcy disputes solely invoking the 'catch-all subparts (A) and (O) of section 157(b)(2) are typically non-core." *MF Global*, 571 B.R. at 95. Such is the case with Celsius's claims now.

Yet assuming *arguendo* that some claims are core—they are not—compelling arbitration presents no "inherent conflict" with the Bankruptcy Code. *See In re Hagerstown Fiber*, 277 B.R. at 205 (claims arising from the parties' pre-petition contract were core "solely for procedural reasons" and court was "required to compel arbitration"). Indeed, Debtors' confirmed Plan submits a broad category of plainly core claims to Alternative Dispute Resolution, with an option to select binding arbitration. (Bankr. Dkt. 3869). Considering the Plan's ADR procedures, there is no credible argument that this adversary proceeding, which is based entirely on pre-petition contracts that the Debtors did not reject, and which involve an unambiguous arbitration clause, would "necessarily jeopardize" the objectives of the Bankruptcy Code.

### (iv)    *The Court Should Dismiss or Stay this Case Pending Arbitration.*

Whether the Court compels arbitration of some or all of Celsius's claims, this adversary proceeding should be dismissed pending the resolution of any arbitration. 9 U.S.C. § 3; *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991). At minimum, a stay of this

adversary proceeding is appropriate. The plain language of the FAA requires a stay of proceedings whenever "any issue" is "referable to arbitration." 9 U.S.C. § 3. The discretionary standard used by courts in the Second Circuit likewise requires dismissal or a stay. *See e.g., Genesco, Inc. v. T Kakiuchi & Co., Ltd*, 815 F.2d 840, 856 (2d Cir. 1987).

Courts in the Second Circuit regularly stay proceedings pending arbitration in circumstances where, as here, arbitral results will resolve factual issues with a significant bearing on non-arbitrable claims. For instance, in *Maritima de Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*, the Southern District of New York stayed claims related to a contract between the parties that did not contain an arbitration clause pending arbitration required by a separate agreement. 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011); *see also Durr*, 2021 WL 2460976, at 12 (staying non-arbitrable claims involving common issues of fact regarding parties' conduct under HVAC contract); *Katsoris v. WME IMG, LLC*, 237 F.Supp.3d 92, 111 (S.D.N.Y. 2017) (staying non-arbitrable claims considering significant factual overlap with arbitrable claims); *In re Hagerstown Fiber*, 277 B.R. at 208 (staying non-arbitrable claims involving common issues of fact). In short, if arbitrable claims predominate—or a stay would promote judicial economy, avoid confusion and possible inconsistent results without posing undue hardship or prejudice against the plaintiff—the stay of non-arbitrable proceedings is required. *In re Hagerstown Fiber*, 277 B.R. at 199 (*citing Genesco, Genesco, Inc.* 815 F.2d at 856).

Here, even if some claims are not subject to arbitration—a decision delegated to the arbitrator—Celsius's claims and the Mawson Entities' corresponding defenses, all flow from purported failures under the Co-Location Agreement. For instance, Luna's purported breach of the Promissory Note was caused by Celsius's breach of the Co-Location Agreement. *Supra at* IIA-E. Common questions of law and fact inherent to the Co-Location Agreement predominate as such.

*See In re Hagerstown Fiber*, 277 B.R. at 211. Dismissing or staying non-arbitral claims (if any) will promote judicial economy and avoid the risk of inconsistent results without hardship or prejudice to the parties for the same reasons. Celsius's claims require factual and legal determinations about whether, and to what extent, Celsius and/or Luna breached the Co-Location Agreement, including the size of any related damages and defenses. Arbitration will thus resolve substantially all, if not all, the predicate legal and factual questions raised in this matter—leaving little or nothing for the Court to determine following arbitration.

Indeed, the stay granted in *Maritima* was based on a similar, if less compelling overlap than the overlap amongst claims in this case. In *Maritima,* arbitration of the parties' first contract would resolve an important factual question related to the amount of fees due under the second contract. 2011 WL 1465744, at *5. The same is true here. The court imposed a stay pending arbitration because the arbitral result, even if not controlling, would "have a significant bearing on th[e second] case." *Id*. Resolution of Celsius's claims based on the Co-Location Agreement will resolve crucial factual questions of whether and to what extent Celsius's breach of the Co-Location Agreement excuses or reduces Luna's obligation to make Promissory Note payments.

Put differently, Luna's defense to the Promissory Note is a component of Luna's damages caused by Celsius's prior material breach of the Co-Location Agreement. *See In re Mobilactive Media, LLC,* 2013 WL 297950, at *13 (Del. Ch. Jan. 25, 2013) (discussing prior material breach under Delaware Law). The factual questions surrounding Celsius's and the Mawson Entities' conduct under the Co-Location Agreement, and thus the Mawson Entities' defenses and counterclaims, will be resolved as a matter of course during the arbitration of the Co-Location Agreement claims. Nor will there be any factual issues to be determined after this case is arbitrated. Either Luna will recover damages or sustain a defense against payment of the Promissory Note—

21

or at least a set of that determines the amount of the Promissory Note, if any that needs to be paid,
or it will not. Staying this adversary action pending arbitration will thus save judicial and party
resources and minimize the risk of inconsistent judgments. *Maritima,* 2011 WL 1465744, at *5;
*Durr*, 2021 WL 2460976, at 12; *Katsoris v. WME IMG, LLC*, 237 F.Supp.3d at 111; *In re
Hagerstown Fiber*, 277 B.R. at 208.

*   *   *

Each of the claims asserted by Celsius arise from the Co-Location Agreement and
Promissory Note executed together on February 23, 2022. These agreements were part of a
cohesive mechanism to facilitate the provision of Bitcoin mining hosting services by Defendants
to Celsius. This undisputed connection is evident from the allegations of the Complaint, the
Broadfoot Declaration and from the terms of the Promissory Note itself. *See* Compl. ¶ 17
("concurrently with the execution of the Co-Location Agreement, Celsius loaned Luna $20 million
to purchase and install modular data centers and transformers to assist Luna with satisfying its
obligations under that Agreement"); Broadfoot Decl. ¶ 7; Compl. Ex. C, Promissory Note § (xvi).

Furthermore, Celsius's Promissory Note claims require a determination of Celsius's
conduct under the Co-Location Agreement. Luna's obligation to make promissory note payments
(if any) depends on the determination about the timing and scope of Celsius's breaches of the Co-
Location Agreement. Adjudication of the Co-Location Agreement claims will thus resolve all, if
not substantially all the predicate legal and factual questions raised in this matter. Given the
interrelated nature of the agreements and the related connectedness of the causes of action, granting
a stay as to non-arbitrable claims here will avoid piecemeal litigation of the related factual and
legal issues. *See e.g. Durr Mechanical Construction*, *Inc.*, 2021 WL 2460976, at 12 (staying non-
arbitrable causes of action where all claims "pertain to various difficulties [Debtor] experienced in
attempting to fulfill its obligations under the Contract); *Katsoris v. WME IMG, LLC*, 237 F. Supp.

3d 92, 111 (S.D.N.Y. 2017) (staying non-arbitrable claims in given significant factual overlap with

arbitrable claims). The Court should dismiss or stay this case as a result.

> IV.        **Defendants May Not Answer or File Rule 12 Motions Pending This Motion**

Defendants respectfully submit that they cannot answer the Complaint or file motions listed

in Fed. R. Civ. P. 12(b) without material risk of waiving their right to arbitrate. In *Morgan v.*

*Sundance, Inc.*, the U.S. Supreme Court ruled that prejudice is not required for waiver of a right

to stay litigation or compel arbitration under the FAA. 596 U.S. 411 (2022). *Morgan* thus counsels

that litigants may not undertake acts inconsistent with their rights to stay litigation or compel

arbitration—including by filing merits-based motions or responsive pleadings.

As the Tenth Circuit explained in *Lamkin v. Morinda Properties Weight Parcel*: "requiring

a party to file an answer denying material allegations in the complaint and asserting potential

affirmative defenses—in short, formally and substantively *engaging in the merits of the*

*litigation*—in order to enforce its right *not to litigate* is a non-sequitur." 440 F.App'x 604, 607-608

(10th Cir. 2011) (emphasis in original). Thus, a motion to compel arbitration is a permitted pre-

answer motion within Rule 12(b)'s scope. *Id.* The U.S. District Courts in the Southern District of

New York agree. *JS Barkats, PLLC v. BE, Inc.*, 2013 WL 444919, at *2 (S.D.N.Y Feb. 6, 2013)

("parties are permitted to file motion to stay and compel arbitration in lieu of an answer or other

dispositive motion); *In re Barney's, Inc.* 206 B.R. 336, 341 (S.D.N.Y. 1997) ("a motion to stay

litigation is a pre-answer motion with the scope of Rule 12(b)"). As such, the Court should decide

this Motion and set a reasonable deadline for responsive pleadings if needed thereafter.

*        *        *

Celsius caused the Mawson Entities millions of dollars in losses because of its repeated

(and varied) breaches of the Co-Location Agreement. Instead of tens of millions of dollars flowing

to the Mawson Entities from the Co-Location Agreement—generating the pipeline deposit and

23

revenues Celsius and Luna expected to be used to allow Luna to pay the Promissory Note—Celsius's conduct left tens of millions of dollars in unpaid invoices and lost revenues to pile up on the Mawson Entities. Undeterred, Celsius demands to be paid without regard to the natural financial consequences of its own breaches—its obligations undone, failings forgotten.

But whether Celsius's breaches of the Co-Location Agreement rendered Luna unable to meet its payment obligations on the Promissory Note or the damages resulting from Celsius's breaches offset or excuse the Mawson Entities from performing under the Co-Location Agreement and the Promissory Note altogether are not questions for this Court. Celsius agreed to arbitrate "any dispute" "in connection with" the Co-Location Agreement and further agreed to "IRREVOCABLY AND UNCONDITIONALLY" submit to arbitration "ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES, RELATING IN ANY WAY" to the agreement. Compl. Ex. A § 12.8. All claims in this adversary proceeding relate to the parties' conduct under the Co-Location Agreement and will require analyzing the rights and obligations created by the agreement—as well as the Mawson Entities' defenses and counterclaims related thereto. Having bound itself "irrevocably and unconditionally" to arbitrate claims related in any way to the Co-Location Agreement, Celsius must honor its obligation.

## V.    Conclusion

Celsius has no tenable basis for disavowing the arbitration provisions in the Co-Location Agreement. The Court should compel Celsius to arbitrate its claims and should dismiss this adversary proceeding or, in the alternative, stay this proceeding pending arbitration.

Accordingly, the Mawson Entities respectfully ask the Court to (1) compel Celsius to arbitrate its claims; and (2)(a) dismiss this action pending the outcome of any arbitration or, alternatively, (b) stay this action pending the outcome of any arbitration.

//

Dated: January 2, 2024

Respectfully submitted,

*/s/ Michael R. Herz*
**FOX ROTHSCHILD LLP**
Michael Sweet, Esq.
Michael R. Herz, Esq.
Isaac M. Hoenig, Esq.
101 Park Avenue, 17th Floor
New York, NY 10178
Telephone: (212) 878-7900
Facsimile: (212) 692-0940
Email: msweet@foxrothschild.com
        mherz@foxrothschild.com
        ihoenig@foxrothschild.com

-and-

Martin R. Martos, II (admitted *pro hac vice*)
321 N. Clark St., Suite 1600
Chicago, IL 60654
Telephone: (312) 517-9200
Facsimile: (312) 517-9201
Email: mmartos@foxrothschild.com
*Attorneys for the Mawson Entities*

**<u>EXHIBIT E</u>**

# Commercial

## Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**



AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/commercial**

Rules Amended and Effective September 1, 2022

## R-34. Dispositive Motions

**(a)** The arbitrator may allow the filing of and make rulings upon a dispositive motion only if the arbitrator determines the moving party has shown that the motion is likely to succeed and to dispose of or narrow the issues in the case.

**(b)** Consistent with the goal of achieving an efficient and economical resolution of the dispute, the arbitrator shall consider the time and cost associated with the briefing of a dispositive motion in deciding whether to allow any such motion.

**(c)** Fees, expenses, and compensation associated with a motion or an application to make a motion may be assessed as provided for in Rule R-49(c).

## R-35. Evidence

**(a)** The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

**(b)** The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

**(c)** The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

**(d)** An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

## R-36. Evidence by Written Statements and Post-Hearing Filing of Documents or Other Evidence

**(a)** At a date agreed upon by the parties or ordered by the arbitrator, the parties shall give written notice for any witness or expert witness who has provided a written witness statement to appear in person at the arbitration hearing for examination. If such notice is given, and the witness fails to appear, the arbitrator may disregard the written witness statement and/or expert report of the witness or make such other order as the arbitrator may consider to be just and reasonable.

**(b)** If a witness whose testimony is represented by a party to be essential is unable or unwilling to testify at the hearing, either in person or through electronic or other means, either party may request that the arbitrator order the witness to appear in person for examination before the arbitrator at a time and location where the witness is willing and able to appear voluntarily or can legally be compelled to do so. Any such order may be conditioned upon payment by the requesting party of all reasonable costs associated with such examination.

**EXHIBIT F**

| From: | Richard Mattiaccio <richardmattiaccio@outlook.com> |
|---|---|
| Sent: | Tuesday, December 17, 2024 12:16 PM |
| To: | Hille, David; Wofford, Keith; Moeller-Sally, Stephen; Wofford, Keith; Fay, Dylan; Ulloa, Ryan; Denver Edwards; Julie Capehart; James Hosking; Yasmine Lahlou |
| Cc: | j.patino@chaffetzlindsey.com; ElizabethRobertson@adr.org; ICDR Garima Deepak, Esq, LL.M. |
| Subject: | [EXT] RULINGS re: SCHEDULING following Status Conference: Celsius and Ionic v. Mawson et al: ICDR Case 01-24-0006-4462 - |

All Counsel,

Thank you for your time this morning. It was very helpful to me.

As discussed, the following are my rulings with respect to scheduling in light of the pending involuntary bankruptcy proceeding in Delaware with respect to Mawson (only) and your advice that there will be a significant court appearance in bankruptcy court on January 10, 2025:

Dispositive Motions

The scheduling of dispositive motions is <u>deferred</u> with respect to (a) Celsius' motion against Mawson for failure to satisfy its obligations under the Guaranty, and (b) Ionic's motion to dismiss the Counterclaims that have been asserted jointly by Mawson, Luna Squares and Cosmos.

Claimant Celsius' dispositive motion against Luna Squares for failure to satisfy its obligations under the Note shall go forward on the following schedule:

- <u>December 20, 2024</u> – Celsius to file its moving papers
- <u>January 16, 2025</u> – Opposition papers due
- <u>January 24, 2025</u> – Reply papers due

Report on Bankruptcy Court hearing

Mawson's counsel will submit to all counsel and the Tribunal, no later than <u>January 13, 2025</u>, a report on the bankruptcy proceedings that are scheduled for January 10, 2025.

Update of Draft PO1 including Procedural Schedule

Counsel for all Parties will meet and confer to modify the Schedule set forth in PO1 to accommodate the limited, reasonable delays arising from Mawson's change of counsel and the news of the Mawson involuntary bankruptcy filing.  The goals of the

update to the Schedule are to preserve the evidentiary hearing dates set forth in the Schedule and to render the intermediate deadlines feasible whether or not Mawson is a participant in these proceedings going forward.

I do not recall that we set a deadline for submission of the proposed updates to PO1, but I believe it would be reasonable to expect a report with proposed updates to PO1 by <u>December 30, 2024</u>.

<u>Disclosures</u>

Any disclosures or supplemental disclosures to be filed by any counsel or any Party on account of the appearance of new counsel for Mawson should be filed with the Case Manager (not directly with the arbitrator) in accordance with AAA procedures, by <u>December 20, 2024</u>.

<u>Updates to AAA eFile</u>

Counsel have agreed to cooperate and to work with the Case Manager on an ongoing basis to ensure that the AAA eFile for this case contains all filings and exchanges that are appropriate for such filings.  Please note that the proposer coding of such filings is important to ensure that the Arbitrator does not see filings that are not appropriate for him to receive directly under AAA Rules and administrative procedures.

All deadlines set forth herein are presumed to be at 6:00 p.m. New York time on the date of the deadline unless counsel agree otherwise and timely inform the Arbitrator of any such agreement.

Kindly let me know as soon as possible if I have misstated or left anything of significance out of this e-mail.

Thank you in advance for your continued cooperation.

Regards,

Richard Mattiaccio, Sole Arbitrator

**Richard L. Mattiaccio, C Arb. FCIArb, FCollArb**
Chartered Arbitrator • Independent Arbitrator and Mediator
Fellow, College of Commercial Arbitrators
Member, National Academy of Distinguished Neutrals
Adjunct Professor, Fordham Law School
Mobile: +1.646.413.2832
richardmattiaccio@outlook.com • www.mattiaccio.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited. If you are not the intended recipient please contact the sender and delete all copies. Thank you

**EXHIBIT G**



321 N. Clark Street
Suite 1600
Chicago, IL 60654
312.517.9200  312.517.9201
WWW.FOXROTHSCHILD.COM

MARTIN R. MARTOS, II
Direct No: 312.517.9291
Email: mmartos@foxrothschild.com

**Via Email**

**Mr. Richard L. Mattiaccio**
**richardmattiaccio@outlook.com**

January 10, 2025

Re:    ***Celsius Network LTD et al. v. Mawson Infrastructure Group Inc. et al.*, Case No. 01-
24-0006-4462**

Dear Arbitrator Richard L. Mattiaccio:

Mawson Infrastructure Group, Inc., Luna Squares LLC ("Luna"), and Cosmos Infrastructure LLC ("Cosmos) (collectively, the "Mawson Entities" or "Mawson") have retained Fox Rothschild to represent them in the above-captioned matter (this "Matter"). Fox Rothschild also represents Mawson related to an involuntary petition filed in the United States Bankruptcy Court for the District of Delaware (Case No. 24-12726). Accordingly, we write foremost to introduce ourselves and to raise two pressing issues related thereto. Please see below for details. We look forward to working with you.

*            *            *

**First**, we understand that Mr. Hosking and his colleagues at Chaffetz Lindsey LLP no longer represent the Mawson Entities in this Matter and thus ask that all future communications be directed to Mawson's counsel at Fox Rothschild LLP (mmartos@foxrothschild.com and ihoenig@foxrothschild.com).

By way of additional background, Fox Rothschild LLP briefly appeared at the outset of this Matter but withdrew on August 12, 2024—prior to the selection and appointment of an arbitrator. Fox Rothschild LLP was not involved in this Matter again until now being retained to represent the Mawson entities in place of Chaffetz Lindsey LLP. As such, we are presently uncertain whether the operative conflict searches and arbitrator disclosures included Fox Rothschild LLP and the specific Fox Rothschild LLP attorneys expected to work on this Matter.

A Pennsylvania Limited Liability Partnership

California    Colorado    Delaware    District of Columbia    Florida    Georgia    Illinois    Massachusetts    Minnesota    Missouri
Nevada    New Jersey    New York    North Carolina    Oklahoma    Pennsylvania    South Carolina    Texas    Washington



January 10, 2025
Page 2

The Fox Rothschild LLP attorneys representing Mawson (including Mawson's bankruptcy counsel) are: Martin R. Martos II; Isaac Hoenig; Michael R. Herz; Michael A. Sweet; Seth A. Niederman; Stephanie Slater-Ward; and Akshay Krishnamani. We kindly request that you perform the necessary conflict checks and update any disclosures as needed—Fox Rothschild LLP will conduct a similar search now that it has been retained as counsel in this Matter.

**Second**, we understand you have been alerted to the filing of an involuntary bankruptcy petition related to Mawson but that you have not had the opportunity to receive and review a written position from Mawson regarding the stay of this Matter pending resolution of proceedings in the United States Bankruptcy Court for the District of Delaware.[1] As such, we want to provide you with a full and fair opportunity to do so.

Mawson's assets include its wholly owned subsidiaries—with and through which it conducts its day-to-day activities—and thus the automatic stay designed to protect Mawson during the resolution of the involuntary petition should preclude the advancement of this Matter entirely. Regardless, the caselaw demonstrates that claims like those the Claimants seek to advance in this Matter against Mawson's subsidiaries fall under the types of claims that must be stayed.

An extension of an automatic stay is appropriate when the claim against a debtor is essentially a claim against a non-debtor, as is the case here, because "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against a third-party defendant will in effect be a judgment or finding against the debtor." *In re Am. Film Techs., Inc.*, 175 B.R. 847, 851 (Bankr. D. Del. 1994) (quoting *A.H. Robins v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)).[2] Additionally, Courts have emphasized that protection under Section 362(a) of the bankruptcy code is applicable to non-debtors when the non-debtor and the debtor "share an identity of interest such that a suit against the non-debtor is essentially a suit against the debtor." *In re W.R. Grace & Co.*, 386 B.R. 17, 30 (Bankr. D, Del 2008); *See also In re Philadelphia Newspapers*, LLC, 407 B.R. 606, 616 (Bankr. E.D.Pa. 2009).

Here, the Mawson Entities are three related entities—Mawson and its wholly owned subsidiaries—that entered into a single transaction with interrelated agreements designed to work together. No matter. Claimants seek to hold Mawson jointly and severally liable for any judgment entered against its subsidiaries and contend that Mawson's subsidiaries are alter egos of Mawson.

---

[1] The topic of the involuntary petition and the scope of the automatic stay was raised at a status hearing by prior counsel, without the opportunity for or benefit of prior written submissions or supporting caselaw.

[2] We cite to caselaw from the 3rd Circuit, as that is the caselaw the bankruptcy court will apply if Mawson is required to take additional action in court to prevent the advancement of this Matter.



January 10, 2025
Page 3


Claimants further contend that property held by Mawson should be recovered as having been improperly transferred to Mawson because of alleged wrongdoing by Mawson's subsidiaries. The claims at issue in this Matter also involve parent guarantees. And Mawson is paying for the joint defense of this Matter (*i.e.*, it directly requires the use of Mawson's estate, which is unquestionably protected by the automatic stay). The Mawson Entities thus "share an identity of interest such that a suit against the non-debtor is essentially a suit against the debtor" and the continuation of this proceeding against Luna and Cosmos is incompatible with the authority of the bankruptcy court and the automatic stay. *In re W.R. Grace & Co.*, 386 B.R. at 30. Therefore, Mawson kindly requests that you issue a stay and suspend all deadlines in this Matter pending resolution of Mawson's involuntary bankruptcy proceedings.[3]

The requested stay is not for purposes of delay, but to preserve the status quo (as well as Mawson's assets) to allow for the orderly resolution of proceedings in the bankruptcy court. We expect those proceedings to take approximately 2-4 months. For context, Claimants were notified by judicial decision in April 2024 that this Matter would need to be arbitrated. They then delayed filing the arbitration for several months to suit the needs of their own bankruptcy proceedings. Nevertheless, in the interest of practicality and judicial efficiency, Mawson should not be required to seek relief from the bankruptcy court when you are empowered as the arbitrator in this Matter to order a temporary stay while the work of the bankruptcy court proceeds. Mawson is happy to provide interim reports on that work if helpful.

Bankruptcy counsel for Mawson (i) notified the Claimants that their continued pursuit of this arbitration—even if limited to Mawson's wholly owned subsidiaries—is incompatible with the automatic stay in the involuntary proceeding; and (ii) asked Claimants to honor the bankruptcy court's authority by agreeing to stay this Matter voluntarily. They declined.

We respectfully request your response by Tuesday, January 14th at 10:00 a.m. ET due to tight timelines in the bankruptcy court and upcoming deadlines in this Matter. Please accept our sincere apologies for the urgency of this request.

---

[3] Whether Mawson contests the involuntary petition is irrelevant. If Mawson prevails, this Matter can be resumed with all parties having a full and fair opportunity to be heard. If Mawson is unsuccessful, however, this Matter will be stayed and may have improperly created liabilities that extend directly to Mawson's estate while requiring Mawson to deplete its assets to defend the Matter along the way—to the detriment of all of its creditors.



January 10, 2025
Page 4


      Thank you for your kind attention. We look forward to working with you to achieve a fair, efficient and economical resolution of this Matter. If you have any questions or comments, please do not hesitate to contact us.

Sincerely,



Martin R. Martos II & Isaac Hoenig

CC:
David Hille
Stephen Moeller-Sally
Keith H. Wofford
Ryan A. Ulloa
W. Dylan Fay
*Counsel to Celsius Network Ltd.*

Denver G. Edward
*Counsel to Ionic Digital Mining LLC*

Garima Deepak
*AAA ICDR*

**EXHIBIT H**

WHITE & CASE

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**T** +1 212 819 8200

whitecase.com

January 13, 2025

VIA EMAIL

Arbitrator Richard Mattiaccio
61A Cheyenne Lane
Stratford, CT 06614

Dear Arbitrator Mattiaccio:

We write in response to the letter submitted by counsel to Respondents Mawson, Luna, and Cosmos on January 10, 2025 (the "January 10 Letter").

Claimants Celsius Network Limited and Celsius Mining LLC oppose any stay of proceedings against non-debtors Luna and Cosmos. There is no reason, legal or equitable, for the Tribunal to defer ruling on demands for awards against non-debtors Luna and Cosmos.

*First*, it would be inequitable to stay the arbitration in view of Mawson's opposition to the involuntary bankruptcy case. On the same day that Mawson delivered the January 10 Letter to the Tribunal, it filed an answer to the involuntary petition in the United States Bankruptcy Court for the District of Delaware, Case No. 24-12726 (MFW) [Docket #16], a copy of which is attached hereto as Exhibit A (the "Answer"). In the Answer, Mawson contends that the involuntary case "must be dismissed both procedurally and substantively as a bad faith filing." Answer, ¶ 8. To support its case for dismissal, Mawson has simultaneously commenced discovery, which is likely to create significant delays before the involuntary petition can be finally adjudicated. By opposing the involuntary petition, Mawson is also opposing the imposition of the automatic stay, which would be extinguished immediately upon dismissal of the involuntary case. Mawson's vigorous opposition to the involuntary petition is therefore incompatible with any effort to extend the automatic stay to its non-debtor subsidiaries.

*Second*, Respondents' representation of the scope of the automatic stay is legally incorrect. Luna and Cosmos – which are separate corporate entities – are not "assets" of Mawson intended to be protected by the automatic stay in the involuntary case. Respondents do not dispute that Luna and Cosmos are non-debtors, and it is black-letter law that the automatic stay does not apply to non-debtors.[1] Binding authority holds that this fundamental principle applies to a debtor's non-debtor subsidiaries. As the Third Circuit Court of Appeals explained in *Maritime Elec. Co. v. United Jersey Bank,* 959 F.2d 1194 (3d Cir. 1991), "formal distinctions between debtor-affiliated entities are maintained when applying the stay. A proceeding against a non-bankrupt corporation is not

---

[1]    *See, e.g., In re Forever 21, Inc.*, 623 B.R. 53, 63 (Bankr. D. Del. 2020) ("The automatic stay only protects debtors, not non-debtor parties") (citing *Brown v. Jevic*, 575 F.3d 322, 328 (3d Cir. 2009); *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997)).

Arbitrator Richard Mattiaccio
January 13, 2025

automatically stayed by the bankruptcy of its principal, and section 362 does not bar an action against the principal of a debtor-corporation." *Id.* at 1205 (citations omitted).[2] The Third Circuit's logic flatly precludes the argument that Luna and Cosmos are assets of Mawson for purposes of the automatic stay.

*Third*, no extension of the stay as to Luna and Cosmos is currently in effect: while bankruptcy courts sometimes extend the automatic stay to non-debtors, no such extension has been sought here, much less obtained.

*Fourth*, Respondents' letter incorrectly states the legal standards for obtaining an extension of the automatic stay and ignores the proper procedure for doing so.  If the Tribunal is to enter equivalent relief at Respondents' request, it should do so only based the correct legal standards and with an understanding of the procedure required by the Bankruptcy Court.

There are no types of claims against non-debtors that *must* be stayed.  As the Third Circuit observed in *Maritime*, "the automatic stay is not available to non-bankrupt co-defendants of a debtor, even if they are in the same legal or factual nexus with the debtor."  *Maritime,* 959 F.2d at 1205.  Rather, bankruptcy courts have extended the stay only in "unusual circumstances."  *Forever 21*, 623 B.R. at 63.  Mere allegations of an identity of interest between a debtor and a non-debtor are insufficient to merit extension of the automatic stay.

Judge Walrath, the presiding judge in Mawson's involuntary bankruptcy case, has observed that the "extension" of the automatic stay is actually a form of equitable relief requiring the issuance of a separate injunction pursuant to section 105(a) of the Bankruptcy Code. *Id.* at 64.  Accordingly, the only procedurally proper way to seek an extension of the automatic stay is by filing an adversary proceeding in the Bankruptcy Court.  *Id.* (rejecting as procedurally improper a debtor's requests for the extension of the automatic stay to non-debtors in briefing on a motion to dismiss). As Judge Walrath further notes, "courts generally apply the traditional preliminary injunction test when deciding whether to issue an injunction pursuant to section 105(a)."  *Id.* In other words, a debtor seeking to obtain an injunction "extending" the automatic stay must show a "'substantial likelihood of success on the merits, irreparable harm to the movant, harm to the movant outweighs harm to the nonmovant, and injunctive relief would not violate the public interest.'" *Id.*

Thus, Respondents' request for the Tribunal to extend the automatic stay is procedurally improper and also fails on the merits.  Respondents have not – and cannot – satisfy the requirements for a preliminary injunction.  First, the Tribunal has already considered the question of the likelihood of success on the merits, when Celsius's request to file a dispositive motion on Luna's obligations under the Note was approved.  Second, Respondents cannot argue irreparable harm — as noted, Mawson is seeking to dismiss the involuntary case against it, which would extinguish the automatic stay and allow Claimants to pursue Mawson itself, as well as Luna and Cosmos.  Rather, the harm to Celsius from further delay in its efforts to collect on the Note far outweighs any

---

[2]    *See also, Kreisler v. Goldberg*, 478 F.3d 209, 215 (4th Cir. 2007) (holding that the automatic stay did not prevent a landlord from pursuing an ejectment action against the debtor's wholly-owned non-debtor subsidiary); and *In re Winer*, 158 B.R. 736, 743 (Bankr. N.D. Ill. 1993) (noting that "the debtor cannot invoke the automatic stay just because the action against the non-debtor subsidiary will impact on the value of the debtor's stock").

Arbitrator Richard Mattiaccio
January 13, 2025

negligible harm to Respondents.  Respondents need to address the Claimants' claims whether or not the involuntary petition is granted over Mawson's objection.  Meanwhile, litigation over the involuntary petition – especially given Mawson's discovery demands – is likely to take several months or more.  Finally, in this case, injunctive relief would violate the public interest because, among other reasons, it would reward Respondents for taking inconsistent positions in the Bankruptcy Court and this arbitration, which undermines the integrity of both proceedings.

*Fifth,* the Tribunal should direct Luna and Cosmos to file any opposition to the pending application for dispositive relief on January 16 as scheduled.  For the second time in little more than a month, Respondents seek to disrupt the progress of this arbitration – an arbitration they themselves insisted upon – by shuffling legal counsel.  Neither this change of counsel, nor the involuntary petition filed against Respondent Mawson, justifies this latest attempt at delay.

Contrary to counsel's statements in the January 10 Letter that they had not yet had the opportunity to present their position on the automatic stay, they in fact strategically declined three separate opportunities: first, during the correspondence regarding Respondents' initial request for a suspension of the arbitration on December 4; second, on December 16, at a meet and confer to which counsel was expressly invited but declined to attend; and, third, at the Conference on December 17, 2024, when the Tribunal considered the impact of the involuntary petition on this arbitration (the "Scheduling Conference").  The Tribunal issued rulings on the schedule and set deadlines for Claimant Celsius's dispositive motion for an award against Luna on the Note.  Now Respondents wish to reargue the same matters discussed and resolved at the Scheduling Conference; and seek expanded relief in the form of a complete stay of the arbitration with respect to all Respondents, including non-debtors.

Given counsel's prior involvement in (and familiarity with) the dispute between Claimants and Respondents, and given that counsel passed on the opportunity to address the issue of a stay for more than a month, Claimants believe that no alteration of the current briefing schedule is necessary or appropriate.

* * *

In short, proceeding with the arbitration does not impinge on the authority of the Bankruptcy Court.  The Bankruptcy Court is not currently exercising jurisdiction over Luna, Cosmos or any of their respective assets.  And a delay here effectively grants Mawson the equivalent of an injunction which Mawson has not sought, and likely does not want to seek, in court.  It is both at odds with the law and inequitable that Mawson's subsidiaries should benefit from further delay in this arbitration, given the inconsistency of the Respondents' current legal positions, the repeated tactical changes in counsel, and their efforts to compel Claimants to the forum of this arbitration.

Based on the foregoing, Claimants Celsius Network Limited and Celsius Mining, LLC respectfully request that the Tribunal deny Respondents' request for a stay of the arbitration against Luna and Cosmos and that Luna and Cosmos be directed to file any opposition to the pending application for dispositive relief on January 16 as scheduled.

If you have any questions or need any further information, please don't hesitate to contact me.

WHITE & CASE

Arbitrator Richard Mattiaccio
January 13, 2025

Respectfully submitted,

*/s/ David Hille*
**David Hille**
Partner

**E** dhille@whitecase.com

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAWSON INFRASTRUCTURE GROUP, INC. | Case No. 24-12726 (MFW) |
| Alleged Debtor. | |

## ALLEGED DEBTOR'S ANSWER TO INVOLUNTARY PETITION

Pursuant to Federal Rule of Bankruptcy Procedure 1011(b), which incorporates Federal Rule of Civil Procedure 12(b), the above-captioned alleged debtor, Mawson Infrastructure Group, Inc. ("Mawson" or the "Alleged Debtor" or the "Company"),[1] answers the involuntary petition (the "Involuntary Petition") filed by petitioning creditors W Capital Advisors Pty Ltd ("W Capital"), Marshall Investments MIG Pty Ltd ("Marshall Investments"), and Rayra Pty Ltd ("Rayra" and collectively with W Capital and Marshall Investments, the "Petitioning Creditors" and each a "Petitioning Creditor"), as follows and requests dismissal of the Involuntary Petition for the following reasons:

## Introduction[2]

1. Mawson generally denies the allegations set forth in the Involuntary Petition and insists that the petition was filed in bad faith with the improper purpose to harass and intimidate Mawson. The Involuntary Petition is an extension of ongoing disputes with Mawson's former Board Director and Chief Executive Officer, James Manning ("Manning"). As detailed below, Manning has waged a vendetta against Mawson, beginning in his home-turf in Australia, and this

---

[1]    Mawson is a Delaware corporation listed on the NASDAQ under MIGI.

[2]    Capitalized terms used in this Introduction, but not defined shall have the meaning ascribed to them as defined herein in this answer.

1

Involuntary Petition, with the assistance of the Petitioning Creditors – all Australian entities with disputed claims – is Manning's most recent attempt to harass and intimidate Mawson in an effort to avoid accounting for various misconduct while he was Board Director and/or Chief Executive Officer of Mawson.

2.      Notwithstanding the inappropriate motives, the Involuntary Petition is improper under the strict requirements of section 303 of the Bankruptcy Code. Specifically, (i) Mawson is generally paying its debts that are not subject to bona fide disputes as to liability or amount as they become due; (ii) the Petitioning Creditors' debts are the subject of bona fide disputes as to liability and amount; and (iii) the circumstances strongly suggest that one of the Petitioning Creditors' debts (Rayra) appears to have been acquired from another Petitioning Creditor (Marshall Investments) for the purpose of meeting the involuntary petition numerosity requirement.

3.      First, an order for relief can only be entered against a debtor if the petitioning creditor proves that "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. §303(h)(1). The burden of establishing that the alleged debtor is not paying its debts as they generally become due is squarely on the petitioning creditors. *In re Luxeyard, Inc.*, 556 B.R. 627, 643 (Bankr. D. Del. 2016) (citing *In re A & J Quality Diamonds, Inc.,* 377 B.R. 460, 463 (Bankr. S.D.N.Y. 2007) ("the petitioning creditors have the burden of proving all statutory requirements of Bankruptcy Code § 303, including that the debtor is *generally* not paying its bills on time." (emphasis in original)). Mawson denies the allegation in the Involuntary Petition that it is not paying its undisputed and non-contingent debts as they come due. Accordingly, it is the Petitioning Creditors' burden to prove otherwise.

2

4.      Second, Mawson disputes the validity and amounts of the debts that the Petitioning

Creditors assert they are owed. As detailed below, the debts are the product of Manning's self-

dealing and are subject to dispute, the nature of which disputes were communicated to each of the

first two Petitioning Creditors (W Capital and Marshall Investments[3]) several months before the

filing of the Involuntary Petition. The burden of proof is on the petitioning creditor to establish a

*prima facie* case that there is no bona fide dispute as to both liability and amount. *In re AMC*

*Investors, LLC,* 406 B.R. 478, 484 (Bankr. D. Del. 2009); *In re Elverson*, 492 B.R. 831, 835 (Bankr.

E.D. Pa. 2013). If there is a dispute as to the amount of the debt owed, then the debt no longer

qualifies for 11 U.S.C. § 303 purposes. *In re Bimini Island Air, Inc.*, 370 B.R. 408, 413 (Bankr.

S.D. Fla. 2007). There are several issues of genuine material fact and law that bear on the alleged

liability of Mawson to the Petitioning Creditors.

5.      Third, the circumstances surrounding Rayra's acquisition of its claim by

assignment from Marshall Investments are highly suspect, including (i) the timing of the

assignment, shortly before the filing of the Involuntary Petition and in proximity to when Mawson

sued an entity in which Manning (and/or parties related to Manning) holds an interest and Manning

and W Capital's (one of the petitioners in this matter) Director and Secretary, Darron Siegfried

Wolter, are directors, and (ii) the de minimis amount of the purported assignment. The assignment

to Rayra was for just A$50,000 of Marshall Investment's purported A$12,073,339 claim.[4] Rayra's

pre-filing assignment amounts to just under $31,000 (U.S. Dollars) as of January 9, 2025, *i.e.*,

0.41% of the A$12,073,339 disputed debt.

---

[3]      The claim of the third Petitioning Creditor, Rayra, was acquired from Marshall Investments, one of the other
three petitioning creditors.

[4]      A$ refers to Australian dollars.

6.      More curious, the Assignment Agreement between Rayra and Marshall Investments, although referenced as Exhibit A to the Involuntary Petition and required to be filed with the petition pursuant to Bankruptcy Rule 1003(a), was not filed until sixteen (16) days after the Involuntary Petition was filed, nor was it provided to Mawson's counsel despite multiple requests to the Petitioning Creditors' counsel beginning eight (8) days before it was filed.

7.      As set forth further herein and as will be revealed through discovery, there is ample reason to dismiss the Involuntary Petition. In addition to disputes regarding the validity and amounts of the Petitioning Creditors' purported debts, Manning's self-dealing and breaches of fiduciary duties cast doubt on the transactions giving rise to the Petitioning Creditors' purported debts. Indeed, when Mawson began reviewing Manning's conduct, Manning refused to cooperate and he subsequently threatened retaliation, including threatening to put Mawson into involuntary bankruptcy if certain demands were not met.

8.      Accordingly, there are bona fide disputes as to the debts. The Petitioning Creditors lack the requisite standing, credentials, and good faith motives in order to proceed with this Involuntary Petition and it must be dismissed both procedurally and substantively as a bad faith filing. Mawson expressly reserves its rights under section 303(i) of the Bankruptcy Code to pursue costs, attorneys' fees, and actual and punitive damages for this improper and retaliatory filing.

## The Involuntary Bankruptcy

9.      On December 4, 2024, the Petitioning Creditors, all of whom are Australian entities, filed the Involuntary Petition [Docket No. 1] seeking relief against the Alleged Debtor under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

10.     The Involuntary Petition alleges the following debts for the Petitioning Creditors in the following amounts above the value of any lien:

4

      a. **W Capital Advisors Pty Ltd. As trustee for the W Capital Advisors Fund**: A$1,661,552.58 plus interest accruing under the Secured Loan Deed and the interest accruing under the certain convertible promissory note, dated 8 July 2022 and legal and professional services costs.

      b. **Marshall Investments MIG Pty Ltd as trustee for the Marshall Investments MIG Trust**: A$12,073,339 plus interest and default management fees accruing under the Secured Loan Facility Agreement and legal professional services costs.

      c. **Rayra Pty Ltd as trustee for The Mountainview Trust**: A$50,000 plus interest accruing under the Secured Loan Facility Agreement.

11.    On December 20, 2024, the Petitioning Creditors filed their Corporate Ownership Statements [Docket Nos. 7, 8 and 9]. Each of the Corporate Ownership Statements were filed and dated after the Petition Date.[5]

12.    On December 30, 2024, the Court entered the *Order Approving Stipulation Extending Time to Respond to Involuntary Petition* [Docket No. 12], which extended Mawson's deadline to respond to the Involuntary Petition through and including January 10, 2025. The Petitioning Creditors and Mawson agreed that within five (5) business days of the filing of any response contesting the Involuntary Petition, the parties would meet and confer to discuss an appropriate schedule for discovery, briefing, and a hearing.

## Factual Background

### A. Issues with James Manning

13.    Manning served as Chief Executive Officer ("CEO") and director of Mawson Infrastructure Group Pty Ltd ("MIGPL"), an Australian entity, upon its inception in September

---

[5]    Pursuant to Bankruptcy Rule 1010(b), corporate ownership statements must be filed with the involuntary petition.

2019.[6]  In early 2021, MIGPL and its subsidiaries were acquired by Wize Pharma, Inc., a Delaware corporation, and subsequently renamed Mawson Infrastructure Group, Inc. on or about March 15, 2021.  Following the merger, Manning became CEO and an executive director of Mawson until he stepped down as CEO on May 22, 2023. Thereafter, Manning served as a non-executive director from July 5, 2023 until August 22, 2023, when he departed Mawson entirely. The reason for Manning's departure in August 2023 is ostensibly due in large part to Mawson commencing an investigation into Manning's related party transactions and self-dealing during his tenure as CEO and Board Director, in an effort to avoid the Company's inquiries. As an officer and director of MIGPL and Mawson, Manning was obligated to exercise various fiduciary duties and act in the interests of the Company pursuant to Australian and Delaware law, U.S. federal and state securities law, his employment agreement, and the Company's internal policies, including a Code of Ethics and a Policy on Related Party Transactions.

14.     On or about March 11, 2024, Mawson's outside Australian counsel, a global firm known for its expertise on such matters, prepared (and sent to Manning's Australian counsel) a comprehensive report (the "Report") outlining its findings of Manning's related party transactions and Mawson's claims for breach of fiduciary and statutory duties, including under Australian and Delaware law and the terms of his employment agreement. The Report included preliminary discovery requests from Manning regarding the related party transactions; however, Manning has continually refused to provide any information or cooperate with the Company's investigation. Upon information and belief, Petitioning Creditor W Capital and its principal, Darron Siegfried Wolter ("Wolter"), are significant players in the related party transactions orchestrated by Manning.

---

[6]     Manning was also a director of subsidiaries of MIGPL, including Mawson AU Ptd Ltd and MIG No. 1 Pty Ltd.

15.    In particular, Manning pushed Mawson into investing in many businesses and borrowing money to support those efforts, without Mawson having the full picture about those investments or, perhaps more importantly, knowing who was financially benefitting from them. Specifically, those investments in which Manning had an interest. For example, upon information and belief, from 2021 through 2023, Manning caused Mawson to remit payment of over A$11.4 million to Flynt International Cargo Solutions ("Flynt ICS") for shipping services that Mawson did not need. Upon information and belief, Manning did not inform Mawson that he was seeking and eventually had financial interests in Flynt ICS, nor did he update the Company upon his securing self-serving financial interests with Flynt ICS or seek board approval for his financial interests with Flynt ICS despite the substantial payment amounts. It was not until late 2023, shortly before departing the Company as a Director, that Manning admitted to Mawson he was the owner of Flynt ICS by virtue of Vertua Ltd's ("Vertua") acquisition of Flynt ICS. Upon further information and belief, Manning is a significant shareholder of Vertua and is a Director of Vertua. Despite a request from the Mawson board, Manning refused to provide any details in writing regarding Manning's interest in Flynt ICS. Manning's failure to disclose his interests in Flynt ICS was a clear breach of Manning's fiduciary duties under Australian and Delaware law, U.S. federal and state securities law, and his contractual obligations to Mawson.

16.    Manning also pushed Mawson to engage in related party transactions with First Equity Advisory Pty Ltd ("First Equity Advisory") and First Equity Tax Pty Ltd ("First Equity Tax").  At all relevant times of the transactions, Manning was a director of First Equity Advisory and First Equity Tax, and thus the transactions personally benefitted him at the expense of Mawson working with independent third parties to conduct independent financial and tax advisory work. Upon information and belief, First Equity Advisory and First Equity Tax are owned by Vertua.

7

Again, Manning's push to drive Mawson into unnecessary obligations and payments to entities in which he had a personal stake is a breach of Manning's fiduciary duties under Delaware and Australian law, U.S. federal and state securities law, and his contractual obligations to Mawson.

17.    Manning pushed Mawson into other investments to pay hundreds of thousands of dollars to entities believed to be related to Manning for unnecessary or inflated services including to Manning Motorsports Pty Ltd, Defender Asset Management, and other possible entities that are yet to be uncovered given Manning's repeated refusal to provide information or cooperate with the Company. Manning's improper related-party transactions and self-dealing are believed to be substantial and extensive. Discovery is imperative to understand the full scope of those transactions and efforts.

18.    To that end, several requests have been made to Manning to account for his self-dealing and related party transactions. For example, Mawson Board meeting minutes for August 17, 2023 reflect that Manning informed Mawson's Board that "he was unwilling to attest to his own related party transactions" and that "[t]he Chairman Greg Martin asked Mr. Manning to explain to the Board how he thought that he was properly fulfilling his fiduciary duties. Mr. Manning said he would take the question on notice."  Rather than provide the related party transaction information and cooperate as repeatedly requested by Mawson's Board and Audit Committee, Manning tendered his resignation just days later on August 23, 2023. By way of further example, on January 18, 2024, Mawson sent Manning a letter formally requesting that he provide a statutory declaration or other attestation with a complete list of all actual and potential conflicts and related party transactions that involved Manning or any of his affiliates at any time when he was a board director or CEO of Mawson and MIGPL.  Discovery and information requests were also directed to Manning in the aforementioned March 11, 2024 Report. To date, Manning has

repeatedly refused to answer all of the discovery and information requests. Discovery in this proceeding is thus imperative to understand the scope of Manning's improper conduct and its connection to the disputed claims of the Petitioning Creditors.

19.     Since leaving Mawson, Manning has made threats to Mawson, both indirectly and through third parties including, but not limited to, sending threating images of a home on fire to Greg Martin, a member of the Mawson Board of Directors, contemporaneously with the issuance of W Capital's Statutory Demand (defined below); telling a third party that he was going to "burn Mawson to the ground," and threatening to put Mawson into involuntary bankruptcy if certain demands, including for compensation, were not met.

**B.  W Capital's Claim**

20.     W Capital's listed address is Suite 303 Level 3, 44 Miller Street, North Sydney, NSW 2060. As noted, the Director and Secretary of W Capital is Wolter.

21.     As set forth herein, there are multiple connections between W Capital, Wolter, and Manning. Upon information and belief, Wolter has been affiliated with the Manning family for decades, including as an employee or affiliate of several of the Manning family's interests.

22.     Upon information and belief, Wolter holds an interest in or is a board member for the following Manning-related entities: (i) CEO of Vertua Opportunities Fund; (ii) board member of Vertua; and (iii) CEO of Defender Tourism Fund, a division of Defender Asset Management.

23.     Additionally, many of the Manning and Wolter related entities share the same address. For example, W Capital, Vertua, and Defender Asset Management all share a same address at: Suite 303 Level 3, 44 Miller Street, North Sydney, NSW 2060.

24.     Upon information and belief, W Capital's registered office and principal place of business was previously listed as First Equity Tax, Unit 501, 97 Pacific Highway North Sydney.

As noted above, First Equity Tax is a Manning-related entity. Manning was a director of First Equity Tax, and First Equity tax was owned by Vertua, which is also a Manning related entity, and James Manning is the Managing Partner of First Equity.

25.     With the context of the Manning, W Capital and Wolter relationships in mind, Mawson strongly contests W Capital's asserted claim and the validity of the underlying loans made to W Capital, including the terms and provisions, which contain various ambiguities, as well as the need for the W Capital debts because they appear to be the product of Manning's self-dealing. It is also unclear, what, if any, consideration was received from W Capital in exchange for Mawson, at Manning's direction providing a corporate guarantee on September 29, 2022 for a prior loan dated September 2, 2022. W Capital further claims that Manning promised it at least 1,500,000 restricted stock units (RSUs) in Mawson; however, Mawson does not have any authorized documentation that would support W Capital's alleged claim and, despite request, W Capital has not come forward with such documentation. Additionally, the transactions with W Capital were directly negotiated by Manning at his own behest; other Mawson directors and senior executives were never permitted to participate or engage directly with W Capital.

26.     On June 12, 2024, W Capital made a statutory demand ("Statutory Demand") under Australian law to Mawson for A$368,877.55. Upon information and belief, the W Capital Statutory Demand was directed by Manning in an effort to improperly retaliate against Mawson for the claims and allegations that Mawson has asserted against Manning with respect to his breaches of fiduciary duty, related party transactions, and self-dealing.

27.     On June 26, 2024, Mawson submitted a formal reply to W Capital's Statutory Demand asserting, among other things:

- "…a genuine dispute between W Capital and Mawson regarding the amount of the debt to which your demand relates" and advising that the Statutory Demand sought to improperly coerce payment of a disputed amount.

- "There are defects in the statutory demand … and W. Capital's statutory demand has been made in bad faith. W Capital knows that this debt is categorically disputed by Mawson…".

- "W Capital is fully aware that the agreements between Mawson and W Capital have invoked Delaware law in the United States, and that disputes and claims need to be adjudicated pursuant to applicable law in the United States of America."

- "…Mawson has significant damages claims against W Capital to offset any sums…"

- "At all times material hereto, W Capital's principal, Darron Wolter had and has close business and personal ties to James Manning, the former CEO of Mawson at the time this debt was claimed to be created, resulting in the appearance of serious conflicts of interest, collusion, and self-dealings, which negate the legitimacy of any financing agreements with Mawson at issue here and raising issues of civil and criminal liability against W Capital and Mr. Wolter…"

- "W Capital's collection attempts of a seriously disputed claim is an abuse of process, as it is an attempt to coerce a clearly solvent company to pay a disputed debt."

The June 26th formal reply clearly put W Capital on notice of the bona fide dispute as to the amount of the W Capital alleged debt. A copy of the June 26, 2024 reply is annexed hereto as **Exhibit A**.

11

28.     As noted herein, Mawson has pushed for many months to get statutorily required disclosures and information from Manning and W Capital, but Manning has refused to answer very basic questions. In mid-2023 and again on January 18, 2024, the Mawson Board of Directors requested that Manning clarify under oath whether he and/or related entities (including debt providers) have an interest in W Capital and its affiliates.[7] To date, Manning has repeatedly refused to answer these requests.

C.  **Marshall Investments' Claim**

29.     Marshall Investments' address is Suite 1 Level 12, 53 Martin Place, Sydney, NSW 2000.

30.     Upon information and belief, Manning has connections with Marshall Investments, including with its Managing Director, David Marshall and Chairman, John Marshall. Neither Marshall Investments nor Manning have disclosed such related party interests to Mawson.

31.     Mawson disputes Marshall Investments' alleged debt on multiple bases, including: (i) rights to setoff under Australian and U.S. law (ii) the timing of penalty interest applied by Marshall; and (iii) improperly treating a force majeure event under the loan facility as a material default.

32.     With respect to the disputed penalty interest calculations, Marshall Investments issued a statutory demand in Australia on or about May 28, 2024; however, upon information and belief, instead of applying the standard commercial interest rate of 8%, Marshall Investments has

---

[7]     Manning's refusal to respond to these requests has been noted in filings by Mawson with the Securities Exchange Commission. *See, e.g.* Form 8-K dated February 23, 2024, available at *https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/1218683/000117184324000946/f8k_0223 24.htm*

improperly applied penalty interest at 25% beginning several months prior to issuing the statutory demand.

33.    Like W Capital, Marshall Investments is acutely aware of the ongoing disputes that Mawson has with respect to the alleged debt. For example, on June 17, 2024, Mawson submitted a formal reply to Marshall Investments' Statutory Demand asserting that "there is a genuine dispute between Marshall Investments … and Mawson … regarding the amount of the debt to which your demand relates." A copy of the June 17, 2024 reply is annexed hereto as **Exhibit B**.

**D.  Rayra's Claim:**

34.    Upon information and belief, Rayra's address is Unit 58A, 1183-1187 The Horsley Dr, Wetherill Park, NSW 2164.

35.    Attached to the Involuntary Petition is a declaration (the "Itaoui Declaration") of Ray Itaoui, Director and Company Secretary of Rayra. The Itaoui Declaration was submitted to explain the nature of its alleged debts against Mawson, which it acquired shortly before the filing of the Involuntary Petition.

36.    The Itaoui Declaration explains that Rayra holds claims against Mawson in the aggregate principal amount of at least A$50,000 plus accruing interest based upon its holdings under that certain Secured Loan Facility Agreement by and between Marshall Investments and MIG No. 1 Pty Ltd, dated as of December 9, 2021 (the "Loan Agreement"). Marshall Investments and the Debtor entered into a Continuing Guaranty, causing the Debtor to act as a guarantor for the prompt repayment by MIG No. 1 Pty Ltd of the commitments under the Loan Agreement. *See* Itaoui Declaration at ¶ 3.

37.    The Itaoui Declaration further explains that Rayra acquired the holdings under the Loan Agreement from Marshall Investments pursuant to the assignment "Assignment

Agreement") whereby Marshall Investments assigned A$50,000 of its claim to Rayra. The Assignment Agreement was purportedly signed on October 18, 2024. Despite being referenced as Exhibit A to the Itaoui Declaration, the Assignment Agreement was not filed with the Involuntary Petition as required by Rule 1003(a) of the Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules"). The Assignment Agreement was eventually filed sixteen (16) days after the Petition Date.[8] *See* Docket No. 6-1. The Itaoui Declaration claims that Rayra "did not purchase the claims for the purpose of commencing this case under the Bankruptcy Code." Itaoui Declaration at ¶ 4.

38.     Mawson has never had any knowledge of or any prior interaction with Rayra. Mawson disputes both the validity of the Assignment Agreement whereby Rayra assumed A$50,000 of Mawson debt previously held by Marshall Investments and Rayra's statement that it did not purchase its 0.41% interest in the disputed debt for the purpose of commencing this case. Mawson submits that the substance and timing of the Assignment Agreement make the claims in the Itaoui Declaration highly suspect.

39.     First, Rayra purportedly purchased A$50,000 of the allegedly overdue and unpaid debt at 100 cents on the dollar, which is extremely unusual, and even more so given that the Involuntary Petition was filed soon thereafter. Second, Rayra made the purchase on October 18, 2024 – three (3) days after Mawson filed suit on October 15, 2024 against a Manning-related entity, Vertua Property, Inc., for overbilling, wrongful eviction, and tortious interference. *See* Court of

---

[8]     Beginning on December 12, 2024, counsel for Mawson made multiple requests to the Petitioning Creditors' counsel for a copy of the Assignment Agreement. The Assignment Agreement was not provided in response to these requests. The Assignment Agreement was eventually docketed on December 20, 2024 [Docket No. 6].

Common Pleas of Mercer County, Pennsylvania Civil Division, Case No. 2024-2332. Second, Rayra acquired the debt from Marshall *after* Marshall made its Statutory Demand.

40.     The fact that an unrelated party located in Manning's home-turf of Australia, would pay for a small, but tactically crucial, portion of Marshall Investment's claim at a 100% rate, and shortly thereafter join as the necessary third creditor to an Involuntary Petition against Mawson, a company with whom it had no prior relationship and had never done business, suggests more than a mere coincidence. Given the circumstances, discovery is needed to clarify this questionable transaction and the underlying motivations.

### **Answer:**

41.     In response to the Allegations set forth in Part 3, Section 11 of the Involuntary Petition, Mawson responds as follows:

   a.  Mawson **DENIES** that the Petitioning Creditors are eligible to file the Petition under 11 U.S.C. § 303(b). Section 303(b)(1) of the United States Bankruptcy Code requires that when a debtor has 12 or more creditors, an involuntary petition may be filed by three or more entities, each of which hold claims which are "not contingent as to liability or the subject of a bona fide dispute as to liability or amount."  Mawson disputes each of the Petitioning Creditors' debts as to liability and/or amount.

   b.  The Petitioning Creditors checked the box: "The Debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount." – Mawson **DENIES** this allegation – Mawson is paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.

15

    c.   The Petitioning Creditors checked the box: "Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession." – Mawson **DENIES** this allegation – no custodian has been appointed.

## FIRST DEFENSE

42.    The Involuntary Petition fails to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6), made applicable herein by Fed.R.Bankr.P. 7012.

## SECOND DEFENSE

43.    The Petitioning Creditors' claims are subject of bona fide disputes as to liability and amount.

## THIRD DEFENSE

44.    Mawson is generally paying its debts that are not subject of a bona fide dispute as to liability or amount as they become due.

## FOURTH DEFENSE

45.    The Involuntary Petition was filed in bad faith.  In particular, (i) at least a majority of the Petitioning Creditors had actual knowledge that Mawson disputes their claims as to liability and amount; (ii) the Petitioning Creditors failed to conduct sufficient due diligence before filing the Involuntary Petition; and (iii) the Involuntary Petition was filed in order to harass and intimidate Mawson in furtherance of previous threats.

## FIFTH DEFENSE

46.    The Petitioning Creditors lack standing to file an involuntary petition against Mawson and therefore, the Court lacks jurisdiction of this proceeding.

16

## SIXTH DEFENSE

47.     The Involuntary Petition was not commenced by three or more entities holding noncontingent, undisputed claims aggregating at least $10,000 more than the value of any lien.

## SEVENTH DEFENSE

48.     The claims in the Involuntary Petition are barred by the doctrine of unclean hands.

## EIGHTH DEFENSE

49.     Any claims held by the Petitioning Creditors are subject to setoff.

## NINTH DEFENSE

50.     The Involuntary Petition and the relief sought in this proposed chapter 11 case is barred by the doctrines of laches, waiver, and estoppel.

## RESERVATION OF RIGHTS TO SEEK COSTS, ATTORNEYS' FEES, DAMAGES, AND SANCTIONS

51.     Pursuant to 11 U.S.C. § 303, Mawson reserves its rights to seek recovery of costs, attorneys' fees under 11 U.S.C. § 303(i)(1), actual and punitive damages under 11 U.S.C. § 303(i)(2), and sanctions under Bankruptcy Rule 9011(c).

52.     11 U.S.C. § 303(i) provides as follows:

If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1) against the petitioners and in favor of the debtor for—

(A) costs; or

(B) a reasonable attorney's fee; or

(2) against any petitioner that filed the petition in bad faith, for—

(A) any damages proximately caused by such filing; or

(B) punitive damages.

17

53.     Mawson does not waive the right to judgment under 11 U.S.C. § 303(i).

## **RESERVATION OF RIGHTS TO REQUEST A BOND**

54.     Mawson reserves the right to request that the Petitioning Creditors be required to post a bond pursuant to section 303(e) of the Bankruptcy Code.[9]  A bond may be particularly necessary in this case given the circumstances and that the Petitioning Creditors are all foreign. It is unclear what assets the Petitioning Creditors have in the United States that would be available to fund an award under section 303(i)(1) or (2) of the Bankruptcy Code in the event this involuntary case is dismissed, including if there is an award for damages for a bad faith filing under section 303(i)(2).

## **RESERVATION OF RIGHTS AND NEED FOR DISCOVERY**

55.     Mawson hereby gives notice that it intends to rely upon such other and further defenses as may become available or apparent during the discovery process in this action, and hereby reserves the right to amend its answer to assert any such defenses. The assertion of the above defenses by Mawson are not intended and should not be deemed or construed to alter or shift any burden of proof Petitioning Creditors may have in connection with the claims asserted in the Involuntary Petition.

56.     Mawson further reserves the right, at or before trial, to move to dismiss the Involuntary Petition and/or for Summary Judgment, on the ground that the Involuntary Petition fails to state a claim upon which relief can be granted and/or that Mawson is entitled to judgment as a matter of law, based on any and all of the above defenses.

---

[9]     The Congressional record notes that section 303(e) was enacted to "…discourage frivolous petitions as well as the more dangerous spiteful petitions, based on a desire to embarrass the debtor (who may be a competitor of a petitioning creditor) or to put the debtor out of business without good cause…"  *In re Apollo Health Street, Inc.*, 2011 WL 2118230 (Bankr. D.N.J. May 23, 2011) (*quoting* H. Rep. No. 95-595, 95th Cong., 1st Sess. At 323 (1977)).

18

57.    In the event that the Court does not dismiss the Involuntary Petition immediately, Mawson requires the opportunity to take written discovery and depositions related to, *inter alia*: (i) the circumstances surrounding the loans from W Capital and Marshall Investments to Mawson, including with respect to potential self-dealing and related party transactions, conflicts of interest, and breaches of fiduciary duty by Manning; (ii) for the validity, terms, provisions, and amount of the Petitioning Creditors' claims including with respect to corporate guarantees allegedly provided to them; (iii) the extent of Manning's interests and control over W Capital; (iv) collusion between W Capital and Manning given the relationship between Manning and Wolter; (v) the relationship between Marshall Investments and Manning; (vi) the Petitioning Creditors' motivation for filing the Involuntary Petition; and (vii) the circumstances surrounding the Rayra Assignment Agreement.

58.    Mawson expressly reserves its right to supplement its discovery requests and targets as information is uncovered with respect to the Petitioning Creditors and the Involuntary Petition.

**WHEREFORE**, Mawson demands judgment in its favor as follows:

(a)    the Court to enter an order dismissing this petition for the reasons stated above;

(b)    find that the Petitioning Creditors acted in bad faith;

(c)    awarding costs, reasonable attorneys' fees, damages caused by the filing, and/or punitive damages, as allowable pursuant to 11 U.S.C. § 303(i); and

(d)    granting such other and further relief as the Court deems just and proper.

Dated:  January 10, 2025                    **FOX ROTHSCHILD LLP**

_/s/ Seth A. Niederman_
Seth A. Niederman (No. 4588)
Stephanie Slater Ward (No. 6922)
1201 North Market Street, Suite 1200
Wilmington, DE  19801
Telephone: (302) 654-7444
Email: sniederman@foxrothschild.com
Email: sward@foxrothschild.com

-and-

Michael A. Sweet (_pro hac vice_ admission pending)
345 California Street, Suite 2200
San Francisco, California 94104
Telephone: (415) 364-5540
Facsimile: (415) 391-4436
Email: msweet@foxrothschild.com

-and-

Michael R. Herz (_pro hac vice_ admission pending)
49 Market Street
Morristown, NJ 07960
Telephone: (973) 548-3330
Email: mherz@foxrothschild.com

_Counsel to the Alleged Debtor_

**Exhibit A**



**Mawson Infrastructure Group Inc**
950 Railroad Ave., Midland, PA 15059 USA

June 26, 2024

VIA EMAIL ONLY
Ranjani Sundar (ranjani.sundar@hfw.com)
HFW Australia
Level 10, 126 Phillip Street
Sydney NSW 2000
+61 (0)2 9320 4609

Re:   Formal reply of Mawson Infrastructure Group, Inc. to the statutory demand
      of W Capital Advisors Pty Ltd dated 12 June 2024

Dear Ms. Sundar,

In response to the statutory demand dated 12 June, 2024 of W Capital Advisors Pty Ltd ("W Capital"), Mawson Infrastructure Group, Inc. ("Mawson"), replies as follows.

Pursuant to the Australian Commonwealth Consolidated Acts (Corporations Act 2001 - Sect 459H(a)), we assert that there is a genuine dispute between W Capital and Mawson regarding the amount of the debt to which your demand relates and in good faith therefore refuse to pay it. As per your country's long-established jurisprudence, for example, Moutere Pty Ltd v Deputy Commissioner of Taxation [2000] NSWSC 379, "The policy underlying Sect 459H is that the statutory demand procedure should not be used to coerce a person to pay a disputed amount. A statutory demand is not an instrument of debt collection."

There are defects in the statutory demand of your client and W Capital's statutory demand has been made in bad faith. W Capital knows that this debt is categorically disputed by Mawson and further that pursuant to the Australian Commonwealth Consolidated Acts (Corporations Act 2001 - Sect 585), Mawson cannot be considered insolvent.

W Capital is fully aware that the agreements between Mawson and W Capital have invoked Delaware law in the United States, and that disputes and claims need to be adjudicated pursuant to applicable law in the United States of America. W Capital's attempt to avail itself of a favorable jurisdiction does not necessitate that Mawson is subject to such jurisdiction. We believe that all disputes and claims between Mawson and W Capital have to be adjudicated in the United States.

In addition, Mawson has significant damage claims against W Capital to offset any sums which, in the unlikely event, may be determined by a competent court of law having jurisdiction over Mawson.

At all times material hereto, W Capital's principal, Darron Wolter, had and has close business and personal ties to James Manning, the former CEO of Mawson at the time this debt was claimed to be created, resulting in the appearance of serious conflicts of interest, collusion, and self-dealings which negate the legitimacy of any financing agreements with Mawson at issue here and raising issues of civil and criminal liability against W Capital and Mr. Wolter pursuant to the Corporations Act 2001, Sects. 181 and 182, as well as US law.  These actions of W Capital also subject it to sanctions in the US pursuant to SEC regulation, the US Department of Treasury, and its Committee on Foreign Investment regulations, and potential enforcement action by the Department of Justice.

Mawson as a Delaware incorporated company and listed on a U.S. exchange is subject to U.S. law and does not accede to the jurisdiction of Australia by this response or otherwise.  To the contrary however, W Capital by its actions, has acceded to the personal and subject matter jurisdictions of the state and federal courts of the United States and various US regulatory agencies.

Accordingly, under the Corporations Act 2001 – Sect 459J, there are significant defects in W Capital's demand, and substantial injustice will be caused unless the statutory demand is set aside. W Capital's collection attempts of a seriously disputed claim is an abuse of process, as it is an attempt to coerce a clearly solvent company to pay a disputed debt.  Continuing to pursue this demand will expose W Capital to potential damages and sanctions which would offset, if not exceed, any claimed amounts due under the pending statutory demand.

Moreover, several provisions of the agreements between Mawson and W Capital remain in dispute. For example, Mawson maintains that the recitation of "assets" in a September 29, 2022 guarantee must relate back to a July 8, 2022 guarantee, wherein the collateral was limited to certain bitcoin mining equipment located in the United States. W Capital Advisors has attempted to take the position that "all assets" of the Company are subject to the guarantee, which Mawson strongly disagrees with and continues to dispute. Mawson has raised this critical definitional issue, and several other procedural issues, in opposition to W Capital.

We hereby respectfully but firmly demand that W Capital's statutory demand be withdrawn in writing immediately. If W Capital does not set aside its statutory demand, Mawson  will be forced to pursue all claims, damages and remedies against W Capital and its principals as applicable under U.S law.  Mawson reserves all rights under both U.S. and Australian law.

Please give this reply your prompt and serious attention.  It is requested that this reply be forwarded by you to your clients, W Capital Advisors Pty Ltd and its principals and investors as well as to ASIC and the Australian courts should you risk taking this matter further.

Unless otherwise authorized by me, you are to direct all further communications only to me at the above address or using below contact information, and to no other Mawson

entity or any of their employees, directors, officers, agents, representatives, or legal counsel.

Feel free to contact me to discuss this matter further.

Very truly yours,

Kaliste Saloom
General Counsel
Mawson Infrastructure Group, Inc.
Kaliste.Saloom@MawsonInc.com
Mobile: +1 (337) 962-5836

**<u>Exhibit B</u>**



**Mawson Infrastructure Group Inc**
950 Railroad Ave., Midland, PA 15059 USA

June 17, 2024

VIA EMAIL ONLY
Daniel Zabow (dzabow@hwle.com.au)
Courtney McDonald (cmcdonald@hwle.com.au)
HWL Ebsworth Lawyers

REPLY TO STATUTORY DEMAND – PRIVILEGED AND CONFIDENTIAL

Dear Colleagues,

In response to your Statutory Demand dated 28 May, 2024, Mawson Infrastructure Group, Inc., replies as follows:

Pursuant to the Australian Commonwealth Consolidated Acts (Corporations Act 2001 - SECT 459H(a)), we assert that there is a genuine dispute between Marshall Investments GCP Pty Ltd (formerly Marshall Investments MIG Pty Ltd), ACN 655 680 256 as trustee for Marshall Investments MIG Trust ABN 51 605 110 090 and Mawson Infrastructure Group Inc ARBN 649 261 861 ("Mawson") regarding the amount of the debt to which your demand relates. As per Moutere Pty Ltd v Deputy Commissioner of Taxation [2000] NSWSC 379, "The policy underlying Sect 459H is that the statutory demand procedure should not be used to coerce a person to pay a disputed amount. A statutory demand is not an instrument of debt collection." There is thus a defect in the Statutory Demand due to a misstatement of an amount or total. See Section 9 of the Corporations Act.

In particular, we assert that (i) Marshall has miscalculated the amount due by using the penalty interest rate of 25% instead of the standard commercial interest rate of 8%; and (ii) Marshall has been charging the penalty interest rate improperly and untimely, as it has been charging such penalty interest rate prior to its filing of the Statutory Demand.

Further, Marshall is in bad faith in making this demand as it is fully aware that Mawson is in possession of and is making arrangements to turn over significant collateral in the United States valued in excess of the sums demanded statutorily.  By law of offset, the debt is extinguishable by the mere transfer of such assets.  A list of these assets are attached hereto.

Accordingly, there are significant defects in Marshall's demand, and substantial injustice will be caused unless the demand is set aside. We hereby respectfully request, and demand if necessary, that Marshall's Statutory Demand be withdrawn in writing immediately . If Marshall does not set aside its Statutory Demand, Mawson will not only actively and successfully refute any presumptions of insolvency under Australian law in

Marshall Statutory Demand Reply
June 17, 2024

an applicable proceeding but will countersue in an appropriate US court for damages based in fraud and bad faith.

Furthermore, by its actions Marshall has consented to the personal and subject matter of the courts of the United States and further litigation will be instituted there should this matter not be amicably resolved.

Please give this reply your prompt and serious attention, directing all further communications to me.

Feel free to contact me to discuss this matter further.

Very truly yours,

Kaliste Saloom
General Counsel
Mawson Infrastructure Group, Inc.
Kaliste.Saloom@MawsonInc.com
Mobile: (337) 962-5836

Enclosures

**<u>EXHIBIT I</u>**

| | |
|---|---|
| **From:** | Richard Mattiaccio <richardmattiaccio@outlook.com> |
| **Sent:** | Monday, January 13, 2025 6:31 PM |
| **To:** | Fay, Dylan; mmartos@foxrothschild.com; Hoenig, Isaac |
| **Cc:** | Hille, David; Wofford, Keith; Moeller-Sally, Stephen; Ulloa, Ryan; dedwards@bradfordedwards.com; ICDR Garima Deepak, Esq, LL.M. |
| **Subject:** | [EXT] RE: Celsius Network Ltd. et al v. Mawson Infrastructure Group et al - Case 01-24-0006-4462 |

Counsel,

My assumption that there was to be a conference in bankruptcy court tomorrow was based on the information that counsel provided to me.  My intention in sending my e-mail on Saturday was to spare counsel and the parties further briefing on whether to go forward with the application pending before me until you could hear from the bankruptcy court at the conference that seemed to be imminent.

Based on the extensive letter submissions of both sides, the question whether the automatic bankruptcy stay should be extended to the application pending should decided by the court.  It is, of course, the burden of the party seeking relief to present a timely application to the court.

In the absence of a contrary determination by the bankruptcy court, the application pending before me will go forward, except that the briefing schedule is modified as follows:

- <u>January 20, 2025, 6:00 p.m.</u> – Opposition papers due
- <u>January 27, 2025, 6:00 p.m.</u> – Reply papers due.

No further modifications to filing deadlines will be granted unless I receive notice in advance of a deadline that the bankruptcy court has extended the stay to cover the pending application.

Cordially,

Richard Mattiaccio, Sole Arbitrator


**Richard L. Mattiaccio, C Arb. FCIArb, FCollArb**

**<u>EXHIBIT J</u>**



321 N. Clark Street
Suite 1600
Chicago, IL 60654
312.517.9200 ☎   312.517.9201 🖶
WWW.FOXROTHSCHILD.COM

MARTIN R. MARTOS, II
Direct No: 312.517.9291
Email: mmartos@foxrothschild.com

**Via Email**

**Mr. Richard L. Mattiaccio**
**richardmattiaccio@outlook.com**

January 13, 2025

Re:   ___Celsius Network LTD et al. v. Mawson Infrastructure Group Inc. et al.___, Case No. 01-24-0006-4462

Dear Arbitrator Richard L. Mattiaccio:

On behalf of Mawson Infrastructure Group, Inc., Luna Squares LLC, and Cosmos Infrastructure LLC (collectively, the "Mawson Entities" or "Mawson"), we thank you for your attention to our January 10, 2025 correspondence ("1/10/25 Mawson Letter") and your commitment to this arbitration—particularly over the weekend as your January 11, 2025 Response demonstrates ("1/11/25 Mattiaccio Response"). We also note the January 13, 2025 Letter by Celsius ("1/13/25 Celsius Letter"), as well as your January 13, 2025 Response ("1/13/25 Mattiaccio Response"). Because there seems to be some confusion, especially around the procedural posture of the involuntary proceeding and the 1/10/25 Mawson Letter, we write to clarify the situation and to advise the Court of the status of the involuntary proceedings in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").

\*       \*       \*

In the 1/11/25 Mattiaccio Response, you refer to a January 14 conference. We have consulted with our colleagues representing Mawson in the Delaware Bankruptcy Court and confirmed that there is no January 14 conference in the involuntary proceedings—nor did undersigned, or any counsel for Mawson, represent otherwise. Mawson's request for your response to the 1/10/25 Mawson Letter by January 14 at 10:00 a.m. ET arose solely from Mawson's need to determine whether it would be forced to file an emergency motion in the Delaware Bankruptcy Court, given the previous deadline of January 16 for Mawson to respond to



January 13, 2025
Page 2


Claimant's Rule 34 Motion in this Matter (a deadline set prior to undersigned counsel appearing in this Matter on January 10, 2025).

There was, however, an omnibus hearing set for January 14 in Celsius's bankruptcy in the United States Bankruptcy Court for the Southern District of New York. That is not the bankruptcy court before which Mawson is proceeding, and that hearing has been adjourned. But, again, Mawson and its undersigned counsel did not refer to a January 14 conference at all. Mawson requested a response by January 14, with apologies for the urgency, "due to tight timelines in the bankruptcy court and upcoming deadlines in this Matter." 1/10/25 Mawson Letter at 3.

After receiving the 1/11/25 Mattiaccio Response, undersigned prepared a draft letter to you politely noting that there was no January 14 hearing in the involuntary proceeding. The Court has instead ordered Mawson and the Petitioning Creditors to meet and confer by January 17 on an agreed schedule—which will include setting the time for an initial conference during which time Mawson would be able to seek guidance from the Court on the scope of the stay. Dkt. 12. Claimants delivered the 1/13/25 Celsius Letter before counsel for Mawson was able to send its own letter, unfortunately.

Had counsel for Celsius alerted counsel for Mawson that the reference in the 1/11/25 Mattiaccio Response was to a now-adjourned date in the Celsius bankruptcy, or otherwise attempted to meet and confer at all, Mawson would have agreed to a joint letter clarifying the procedural posture of the involuntary proceeding and seeking your guidance (although we expect the parties would have disagreed on what that guidance should be). The 1/13/25 Mattiaccio Response was sent before Mawson could respond to the 1/13/25 Celsius Letter as well. Regardless, the unavoidable conclusion of the 1/11/25 Mattiaccio Response and 1/13/25 Mattiaccio Response is that the Delaware Bankruptcy Court should decide this dispute. Mawson will ask the Delaware Bankruptcy Court to do just that—but cannot control the Court's timetable and according to her procedures.

We encourage you to review the 1/10/25 Mawson Letter again. There is no reference to a January 14 hearing. Mawson sought a response by January 14 so that it could prepare an emergency motion in the Delaware Bankruptcy Court, if needed. Your view at the time was that this Matter should wait for a conference with the bankruptcy court to advise as to the scope of the stay. *See* 1/11/25 Mattiaccio Response. Mawson will file its moving papers in the Delaware Bankruptcy Court by January 17, 2025.

As you state in the 1/13/25 Mattiaccio Response, "the question whether the automatic bankruptcy stay should be extended to the application pending should decided by the court." With



January 13, 2025
Page 3

respect, however, the 1/13/25 Mattiaccio Response does not provide time for that to occur before imposing the deadline for a dispositive motion—and appears to be based on the mistaken conclusion that Mawson relied on a January 14 hearing. Accordingly, for the reasons stated herein as well as the 1/10/25 Mawson Letter, Mawson requests a stay of this Matter pending the Delaware Bankruptcy Court's decision on that question.

*    *    *

Thank you for your kind attention. If you have any questions or comments, please do not hesitate to contact us.

Sincerely,

Martin R. Martos II & Isaac Hoenig

CC:
David Hille
Stephen Moeller-Sally
Keith H. Wofford
Ryan A. Ulloa
W. Dylan Fay
*Counsel to Celsius Network Ltd.*

Denver G. Edward
*Counsel to Ionic Digital Mining LLC*

Garima Deepak
*AAA ICDR*

**<u>EXHIBIT K</u>**

| | |
|---|---|
| **From:** | Richard Mattiaccio <richardmattiaccio@outlook.com> |
| **Sent:** | Tuesday, January 14, 2025 11:03 AM |
| **To:** | Hoenig, Isaac; Fay, Dylan; Martos, Martin R. |
| **Cc:** | Hille, David; Wofford, Keith; Moeller-Sally, Stephen; Ulloa, Ryan; dedwards@bradfordedwards.com; ICDR Garima Deepak, Esq, LL.M. |
| **Subject:** | [EXT] Re: Celsius Network Ltd. et al v. Mawson Infrastructure Group et al - Case 01-24-0006-4462 |

Dear Mr. Hoenig,

Respondents' renewed request for a stay of the application pending before me (for early disposition of the claim against Luna Squares based on the Note,) is denied.

Respondents have been on notice since December 17, 2024, that I would not be deferring the briefing or decision of the pending application against Luna Squares due to the reported filing of an involuntary bankruptcy petition against entities other than Luna Squares.  It was incumbent on Respondents to pursue any appropriate remedies promptly in the bankruptcy court if they felt they were entitled to such relief.

Mawson's opposition papers are due on January 20, 2025.  If I do not receive them by that time, I will proceed to decide the application based on the papers that have been submitted.  That would not be my preference would not be consistent with arbitration's promise to be an efficient process.

Cordially,

Richard Mattiaccio, Sole Arbitrator


**Richard L. Mattiaccio, C Arb. FCIArb, FCollArb**
Chartered Arbitrator • Independent Arbitrator and Mediator
Fellow, College of Commercial Arbitrators
Member, National Academy of Distinguished Neutrals
Adjunct Professor, Fordham Law School
Mobile: +1.646.413.2832
richardmattiaccio@outlook.com • www.mattiaccio.com
*****************************************************************

This e-mail may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited. If you are not the intended recipient please contact the sender and delete all copies. Thank you